# EXHIBIT PACKAGE
# TABLE OF CONTENTS

**EXHIBIT 1:**      **The Hershey Medical Center's Document Requests dated September 1, 2020**

**EXHIBIT 2:**      **Plaintiff's Responses to Document Requests dated October 16, 2020**

**EXHIBIT 3:**      **Deposition Transcript of Plaintiff, December 1, 2021**

**EXHIBIT 4:**      **Letter from the Hershey Medical Center to Plaintiff, dated January 5, 2022**

**EXHIBIT 5:**      **Plaintiff's Response Letter, dated January 6, 2022, and Plaintiff's Privilege Log**

**EXHIBIT 6:**      **Letter from the Hershey Medical Center to Plaintiff, dated January 24, 2022**

**EXHIBIT 7:**      **Plaintiff's Response Letter, dated February 18, 2022**

# EXHIBIT 1

EXHIBIT 1

# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

Pablo A. Salcedo,                                    :
                                                     :
                              Plaintiff,             :
                                                     :
                                                     :
        v.                                           :      CIVIL ACTION NO. 2019-cv-02201-CCC
                                                     :
The Milton S. Hershey Medical Center,                :
                                                     :
                              Defendant.             :
                                                     :
                                                     :

## DEFENDANT'S FIRST REQUEST FOR PRODUCTION
## OF DOCUMENTS TO PLAINTIFF

Defendant, The Milton S. Hershey Medical Center, (hereinafter referred to as "Defendant"), by and through its attorneys, White and Williams LLP, request that Plaintiff, Pablo Salcedo, produce the following items within thirty (30) days at the office of the undersigned counsel for the Defendant in accordance with the Federal Rules of Civil Procedure. This Request to Produce Documents is continuing and any information secured subsequent to the filing of the Responses, which would have been included in the Responses had it been known or available, is to be supplied by Supplemental Responses.

## A.  DEFINITIONS

1.      "Document" or "Documents" means the original and all copies of any writing or recording of any type, including but not limited to any book, pamphlet, periodical, letter, memorandum, telegram, report, record, study, office communication, e-mail, note, working paper, diary, journal, log, schedule, calendar, appointment book, application, tax return, chart, paper, graph, survey, index, photograph, films, videotape, audiotape, disc, data sheet or data processing printout or any other written, typed, printed, recorded, transcribed, electronic or graphic matter, translated if necessary by Plaintiff into reasonably usable form.

2.      "Identify," "set forth," or "state" when used in reference to a natural person means to specify in the answer his or her:

      a.       full name;

      b.       present or last known address (including street name and number, city or town, state and zip code) and telephone number; and,

      c.       present or last known place of employment and job title.

3.      "Identify," "set forth," or "state" when used in reference to a company, corporation or other entity other than a natural person, means to specify in the answer its:

      a.       full name and type of organization or entity;

      b.       address of principal place of business; and,

      c.       state of incorporation or organization.

4.      "Relating to" or "in reference to" shall mean referring to, concerning, discussing, mentioning, comprising, or consisting of, in whole or in part.

5.      "Plaintiff" and "you" shall mean the Plaintiff, Pablo Salcedo.

6.      "Defendant" shall mean Defendant, The Milton S. Hershey Medical Center.

7.      "Person" means a natural person, firm, association, organization, partnership, business, trust, corporation or any other public or private entity.

8.      "Communication" means any contact between two or more persons including, without limitation:

      a.       written contact by any means, including letters, memoranda, electronic mail, facsimiles, text messages, telegrams or telex messages;

      b.       oral contact by any means, including face-to-face meetings and/or telephone; or,

      c.       audio contacts and visual contacts by signal or computer language.

9.      "Correspondence" means a communication between persons or entities sent by any means, including electronic means.

10.  "Complaint" means the Complaint you filed in the United States District Court for the Middle District of Pennsylvania, at Civil Action No. 19-02201.

- 2 -

## B.  INSTRUCTIONS

1.      Each requested document is to be produced in the original manner in which it is maintained, including the file folder in which it is maintained, if applicable, and not separated from any document to which it is clipped, attached or stapled.

2.      A copy of each original document and all nonconforming copies of that document are to be produced.

3.      Unless otherwise specified, the documents to be produced are those generated on or since 2011.

4.      In the event any responsive information is stored on data processing equipment, a hard copy of the information should be produced.

5.      If any document is withheld from production on the ground of privilege, your response must identify the document by date, author, addressee, title, type of document (*i.e.,* letter, memorandum, etc.) and subject matter.  Further, you must list all persons who received the document and/or are in possession of the document and must state the precise nature of the privilege relied upon.

6.      If you do not possess either the original or a copy of the requested document, state the name, address and telephone number of the present custodian of the original or copy, or the name, address and telephone number of the person whom you believe is presently in possession of same.

7.      If you no longer are in possession of or have access to the original or a copy of a requested document, state when the document was most recently in your possession or subject to your access and what disposition was made of the document. If the documents have been destroyed, state when the documents were destroyed, identify the person(s) who directed that the documents be destroyed and the person(s) who destroyed the documents and state the reasons why the documents were destroyed.

24547004v.1

## C.  DOCUMENTS REQUESTED

1.      Copies of all statements made by any party to this litigation or made by any witness or potential witness which relate to the claims or defenses of the parties in this litigation.

2.      Any and all documents referring to or relating in any way to the Complaint.

3.      Any and all documents and/or exhibits which you intend to or may utilize at the trial of this matter.

4.      Copies of resumes of all experts whom you intend to call at the trial of this matter.

5.      Copies of all expert reports, including all documents, articles, correspondence, and other materials relied upon by any expert whom you intend to offer at the trial of this matter, and which documents were relied upon by the expert in rendering an opinion.

6.      Any and all personal records including email communications, calendars, diaries, notes, tapes, journals, correspondence, social media posts, or other type of written or recorded document which relate to the allegations made in the Complaint.

7.      Any and all documents related to any litigation, court filings, civil or criminal matters, which you have been involved in within the past fifteen (15) years.

8.      All documents that relate or refer to any and all complaints, charges, correspondence, statements, or other documents given, shown or submitted by Plaintiff to, or received by Plaintiff from, any state, federal or local authority, entity or agency, including, but not limited to, the Equal Employment Opportunity Commission, the Pennsylvania Human Relations Commission, the Workers' Compensation Board, and Bureau of Unemployment Compensation Benefits and Allowances, which in any way relate to any allegations of the Complaint in this matter.

9.      Any and all documents relating to the medical condition(s) that you claim are a disability or serious health condition as alleged in the Complaint.

10.     Any and all communications between you and Dr. Nicole Swallow relating in any way to the claims or factual allegations made in the Complaint.

11.     Any and all communications between you and Drs. Kogut, Bedi, and Marshall relating in any way to the claims or factual allegations made in the Complaint.

12.     Any and all documents relating to Plaintiff's claim that "Defendant was aware of Plaintiff's disabilities" as alleged in Paragraph 36 of the Complaint.

13.     Any and all documents relating to Plaintiff's claim that "Shorty after starting his internship in July 2017, Plaintiff requested reasonable accommodations from three Chief

Residents: Dr. James Kogut, Dr. Simrajit Bedi, and Dr. Britt Marshall" as alleged in Paragraph 47 of the Complaint.

14.    Any and all documents relating to Plaintiff's claim that Plaintiff requested a reasonable accommodation as alleged in Paragraphs 48 - 49 of the Complaint.

15.    Any and all documents relating to Plaintiff's allegation that Plaintiff contacted Human Resources as alleged in Paragraph 50 of the Complaint.

16.    Any and all documents relating to Plaintiff's claim that he requested accommodations due to his serious health conditions/disabilities as further alleged in Paragraphs 51-55, 59, 74, 75, and 85 of the Complaint.

17.    Any and all documents relating to Plaintiff's claim that his medical providers requested accommodations for Plaintiff as alleged in Paragraphs 52, 54 and 55 of the Complaint.

18.    Any and all documents that Plaintiff submitted to Defendant related to Plaintiff's alleged requests for accommodations.

19.    Any and all documents relating to Plaintiff's claim that "Dr. Swallow continued to schedule Dr. Salcedo 78 to 80 or more hours per week before and after his requests for accommodation" as alleged in Paragraph 60 of the Complaint.

20.    Any and all documents relating to Plaintiff's claim that Dr. Swallow directed and Plaintiff provided fitness for duty assessments as alleged in Paragraphs 66 – 72 of the Complaint.

21.    Any and all documents relating to Plaintiff's claim that Dr. Swallow issued Plaintiff a remediation plan as alleged in Paragraphs 73-81 of the Complaint.

22.    Any and all documents related to communications between Dr. Swallow and Dr. Munoz as alleged in Paragraphs 90-94 of the Complaint.

23.    Any and all documents relating to Plaintiff's claim that "Dr. Salcedo was terminated despite receiving consistent positive reviews from his attending physicians up until April 4, 2018" as alleged in Paragraph 100 of the Complaint.

24.    Any and all documents relating to Plaintiff's claim that he filed an appeal of the decision to terminate him from the program as alleged in Paragraph 101 of the Complaint.

25.    Any and all documents relating to Plaintiff's claim that Dr. Snyder submitted an "outlier evaluation" as alleged in Paragraph 102 of the Complaint.

26.    Any and all documents relating to Plaintiff's claim that "Plaintiff was terminated from the program because his disability, record of disability or perceived disability" as alleged in Paragraph 122 of the Complaint.

27.     All documents that relate to, or refer to, Plaintiff's efforts to mitigate damages, including, but not limited to, resumes, job interview letters, job offer letters, online job applications, and printouts from any and all online job search websites.

28.     All documents that relate or refer to any and all monies received by Plaintiff, including, but not limited to, pay stubs, W-2 forms and state and federal tax returns (with schedules) for the years 2018 to the present.

29.     Any and all documents which you contend are not within the scope of the above Document Requests but which otherwise support your claim for damages.

30.     Authorizations for the release of any and all medical records, and the like, from any and all individuals identified by Plaintiff in response to Defendant's First Set of Interrogatories, served contemporaneously with these document requests.

31.     Any and all documents which relate to, reflect, refer to or were otherwise relied upon in answering Defendant's First Set of Interrogatories to Plaintiff.

**WHITE AND WILLIAMS LLP**


By:     */s/Nancy Conrad*
        Nancy Conrad, Esquire (56157)
        3701 Corporate Parkway, Suite 300
        Center Valley, PA  18034
        Phone: (610) 782-4909
        conradn@whiteandwilliams.com
        Attorneys for Defendant

DATED:  September 1, 2020

24547004v.1

**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

Pablo A. Salcedo,

                Plaintiff,

    v.

The Milton S. Hershey Medical Center,

                Defendant.

        CIVIL ACTION NO. 2019-cv-02201-CCC

## CERTIFICATE OF SERVICE

I, Nancy Conrad, Esquire, do hereby certify that on this 1st day of September, 2020, I caused a true and correct copy of the attached Defendant's First Request for Production of Documents to Plaintiff to be served, via E-Mail upon the following:

Sharon R. Lopez, Esq.
Andrea C. Farney, Esq.
Triquetra Law
34 East Orange Street
Suite 301
Lancaster, PA 17602
*Attorneys for Plaintiff*

**WHITE AND WILLIAMS LLP**

*/s/Nancy Conrad*_____
Nancy Conrad
Attorneys for Defendant

# EXHIBIT 2

EXHIBIT 2

# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| Pablo A. Salcedo, | : | Civil Action No. 19-cv-2201 |
| Plaintiff, | : | |
| v. | : | Before the Honorable |
| | : | Yvette Kane |
| The Milton S. Hershey Medical | : | |
| Center, | : | Jury Trial Demanded |
| Defendant. | : | |

## PLAINTIFF'S RESPONSES TO
## DEFENDANT'S FIRST REQUEST FOR DOCUMENTS

**COME NOW**, Plaintiff, Pablo A. Salcedo, by his counsel, and in accordance with the Rule 34 of the Federal Rules of Civil Procedure, state the following as his objections to Defendant's First Set of Requests for Documents:

**PRELIMINARY STATEMENT AND GENERAL OBJECTIONS:**

a.      Plaintiff objects to these requests to the extent they seek information not in Plaintiff's custody or control, such as documents already in Defendants' counsel's possession, or documents equally available to Plaintiff and Defendants.

b.      Plaintiff objects to Defendants' Requests to the extent that they seek disclosure of information protected by the attorney-client privilege, the work product doctrine or other applicable privilege.

c.      Plaintiff objects to Defendants' Requests to the extent they seek

disclosure of Plaintiff's' (and/or his representative's) mental impressions, conclusions or opinions respecting the value or merit of a claim or defense or respecting strategy or tactics as protected by the Federal Rules of Civil Procedure.

d.      Plaintiff objects to Defendants' Requests to the extent they call for the disclosure of information of a confidential, or personal or private nature to Plaintiff.

e.      Plaintiff objects to Defendants' Requests to the extent they call for information regarding matters not relevant to the claims or defenses of the parties and not reasonably calculated to lead to the discovery of admissible information.

f.      Plaintiff objects to Defendants' Requests to the extent that they are overbroad in scope, unduly and unreasonably burdensome, and/or oppressive.

g.      Plaintiff objects to Defendants' Requests to the extent they call for information not known to Plaintiff, nor reasonably ascertainable by Plaintiff because such information is in the hands of, or under the control of, third parties not within Plaintiff's control.

h.      Plaintiff objects to Defendants' Requests to the extent they are so vague and ambiguous that they are not subject to reasonable interpretation.

i.      Plaintiff objects to Defendants' Requests to the extent they purport to impose additional disclosures beyond those required by the Federal Rules of Civil Procedure.

These general objections apply to each and every separate response to Defendants' Requests. Such objections are incorporated in each answer as if stated verbatim for each individual request.

## DOCUMENT REQUESTS:

1.      Copies of all statements made by any party to this litigation or made by any witness or potential witness which relate to the claims or defenses of the parties in this litigation.

## OBJECTION:

Plaintiff objects to Defendant'' request to the extent the term statement is not defined, it is so vague and ambiguous that they are not subject to reasonable interpretation.

## RESPONSE:

See Bates Documents:
Salcedo.000001-000002
Salcedo.000003-000003
Salcedo.000004-000004
Salcedo.000005-000010

___

2.      Any and all documents referring to or relating in any way to the Complaint.

**OBJECTION**:

Plaintiff objects to this request to the extent it seeks information not in Plaintiff's custody or control, such as documents already in Defendant's counsel's possession, or documents equally available to Plaintiff and Defendant.

Plaintiff objects to Defendant's request to the extent it calls for information not known to Plaintiff, nor reasonably ascertainable by Plaintiff because such information is in the hands of, or under the control of, third parties not within Plaintiff's control.

Plaintiff objects to Defendant's request to the extent it is overbroad in scope, unduly and unreasonably burdensome, and/or oppressive, especially at this phase of discovery and since Defendant has not responded to Plaintiff's discovery requests.

**RESPONSE**:

See Bates Documents:
Salcedo.000011-000011
Salcedo.000012-000012
Salcedo.000013-000014
Salcedo.000015-000015
Salcedo.000016-000016
Salcedo.000017-000017
Salcedo.000018-000018
Salcedo.000019-000019
Salcedo.000020-000020
Salcedo.000021-000021
Salcedo.000022-000022
Salcedo.000023-000023
Salcedo.000024-000024
Salcedo.000025-000025

Salcedo.000026-000026
Salcedo.000028-000031
Salcedo.000032-000067
Salcedo.000068-000070
Salcedo.000071-000353

---

3.      Any and all documents and/or exhibits which you intend to or may utilize

at the trial of this matter.

**OBJECTION:**

Plaintiff objects to this request to the extent it seeks information not in

Plaintiff's custody or control, such as documents already in Defendant's counsel's

possession, or documents equally available to Plaintiff and Defendant.

Plaintiff objects to Defendant's request to the extent it calls for information not

known to Plaintiff, nor reasonably ascertainable by Plaintiff because such information

is in the hands of, or under the control of, third parties not within Plaintiff's control.

Plaintiff objects to Defendant's request to the extent it is overbroad in scope,

unduly and unreasonably burdensome, and/or oppressive, especially at this phase of

discovery and since Defendant has not responded to Plaintiff's discovery requests.

**RESPONSE:**

See Bates Documents:
Salcedo.000354-000360
Salcedo.000361-000363

Salcedo.000364-000365
Salcedo.000366-000368
Salcedo.000369-000377
Salcedo.000378-000382
Salcedo.000383-000435
Salcedo.000436-000438
Salcedo.000439-000441
Salcedo.000012-000012
Salcedo.000013-000014
Salcedo.000442-000444
Salcedo.000445-000445
Salcedo.000446-000446
Salcedo.000447-000453
Salcedo.000454-000454
Salcedo.000455-000456
Salcedo.000457-000457
Salcedo.000458-000458
Salcedo.000020-000020
Salcedo.000459-000459
Salcedo.000460-000846
Salcedo.000847-000847
Salcedo.000848-000848
Salcedo.000849-000850
Salcedo.000851-000851
Salcedo.000852-000860
Salcedo.000861-000861
Salcedo.000862-000862
Salcedo.000863-000863
Salcedo.000864-000865
Salcedo.000866-000866
Salcedo.000867-000882
Salcedo.000883-000884
Salcedo.000885-000885
Salcedo.000886-000888
Salcedo.000889-000901
Salcedo.000902-000906
Salcedo.000907-000908

4.      Copies of resumes of all experts whom you intend to call at the trial of this matter.

**OBJECTION:**

Plaintiff objects to Defendant's request to the extent it is so vague and ambiguous that they are not subject to reasonable interpretation, given that discovery is ongoing and responses to Plaintiff's discovery requests have not been disclosed.

Plaintiff objects to Defendant's request to the extent it purports to impose additional disclosures beyond those required by the Federal Rules of Civil Procedure, given that discovery is ongoing and responses to Plaintiff's discovery requests have not been disclosed.

**RESPONSE:**

See Bates Documents:
Salcedo.000909-000913

_____

5.      Copies of all expert reports, including all documents, articles, correspondence, and other materials relied upon by any expert whom you intend to offer at the trial of this matter, and which documents were relied upon by the expert in rendering an opinion.

**OBJECTION:**

Plaintiff objects to this request to the extent it seeks information not in Plaintiff's custody or control, such as documents already in Defendants' counsel's possession, or documents equally available to Plaintiff and Defendants.

Plaintiff objects to Defendant's request to the extent it is so vague and ambiguous that they are not subject to reasonable interpretation, given that discovery is ongoing and responses to Plaintiff's discovery requests have not been disclosed.

Plaintiff objects to Defendant's request to the extent it purports to impose additional disclosures beyond those required by the Federal Rules of Civil Procedure, given that discovery is ongoing and responses to Plaintiff's discovery requests have not been disclosed.

Plaintiff objects to Defendant's request to the extent it is overbroad in scope, unduly and unreasonably burdensome, and/or oppressive.

## RESPONSE:

See Bates Documents:
Salcedo.000913-000913
Salcedo.000914-000914
Salcedo.000915-000916
Salcedo.000885-000885

6.      Any and all personal records including email communications, calendars, diaries, notes, tapes, journals, correspondence, social media posts, or other type of written or recorded document which relate to the allegations made in the Complaint.

**OBJECTION:**

Plaintiff objects to Defendant's request to the extent it calls for information regarding matters not relevant to the claims or defenses of the parties and not reasonably calculated to lead to the discovery of admissible information.

Plaintiff objects to Defendant's request to the extent it is so vague and ambiguous that they are not subject to reasonable interpretation.

**RESPONSE:**

See Bates Documents:
Salcedo.000917-000917
Salcedo.000918-000918
Salcedo.000919-000919
Salcedo.000920-000920
Salcedo.000921-000921
Salcedo.000922-000922
Salcedo.000923-000923
Salcedo.000924-000924
Salcedo.000455-000456
Salcedo.000925-000925
Salcedo.000926-000926
Salcedo.000927-000927
Salcedo.000928-000928
Salcedo.000929-000929
Salcedo.000930-000933
Salcedo.000934-000934

Salcedo.000935-000935
Salcedo.000936-000936
Salcedo.000937-000937
Salcedo.000938-000938
Salcedo.000939-000939
Salcedo.000940-000940

---

7.    Any and all documents related to any litigation, court filings, civil or criminal matters, which you have been involved in within the past fifteen (15) years.

**OBJECTION:**

Plaintiff objects to this request to the extent it seeks information not in Plaintiff's custody or control, such as documents already in Defendants' counsel's possession.

**RESPONSE:**

There are no documents responsive to this request for documents.

---

8.    All documents that relate or refer to any and all complaints, charges, correspondence, statements, or other documents given, shown or submitted by Plaintiff to, or received by Plaintiff from, any state, federal or local authority, entity or agency, including, but not limited to, the Equal Employment Opportunity Commission, the Pennsylvania Human Relations Commission, the Worker's

Compensation Board, and Bureau of Unemployment Compensation Benefits and Allowances, which in any way relate to any allegations of the Complaint in this matter.

**RESPONSE:**

See Bates Documents:
Salcedo.000071-000353

---

9.     Any and all documents relating to the medical conditions that you claim are a disability or serious health conditions as alleged in the Complaint.

**OBJECTION:**

Plaintiff objects to Defendant's request to the extent it calls for information regarding matters not relevant to the claims or defenses of the parties and not reasonably calculated to lead to the discovery of admissible information.

**RESPONSE:**

See Bates Documents:
Salcedo.000941-000941
Salcedo.000942-000942
Salcedo.000943-000943
Salcedo.000944-000944
Salcedo.000945-000945
Salcedo.000946-001033
Salcedo.001034-001043
Salcedo.001044-001046

10.    Any and all communications between you and Dr. Nicole Swallow relating in any way to the claims or factual allegations made in the Complaint.

## OBJECTION:

Plaintiff objects to Defendant's request to the extent it is overbroad in scope, unduly and unreasonably burdensome, and/or oppressive.

Plaintiff objects to Defendant's request to the extent it calls for information not known to Plaintiff, nor reasonably ascertainable by Plaintiff because such information is in the hands of, or under the control of, third parties not within Plaintiff's control.

Plaintiff objects to Defendant's request to the extent it is so vague and ambiguous that they are not subject to reasonable interpretation.

## RESPONSE:

See Bates Documents:
Salcedo.001047-001047
Salcedo.000018-000018
Salcedo.000019-000019
Salcedo.001048-001048
Salcedo.001049-001049
Salcedo.000024-000024
Salcedo.000025-000025
Salcedo.000026-000026

11.     Any and all communications between you and Drs. Kogut, Bedi, and Marshall relating in any way to the claims or factual allegations made in the Complaint.

**OBJECTION:**

Plaintiff objects to this request to the extent it seeks information not in Plaintiff's custody or control, such as documents already in Defendant's counsel's possession, or documents equally available to Plaintiff and Defendants.

**RESPONSE:**

See Bates Documents:
Salcedo.000015-000015
Salcedo.000017-000017

_____

12.     Any and all documents relating to Plaintiff's claim that "Defendant was aware of Plaintiff's disabilities" as alleged in Paragraph 36 of the Complaint.

**OBJECTION:**

Plaintiff objects to Defendant's request to the extent it is overbroad in scope, unduly and unreasonably burdensome, and/or oppressive.

**RESPONSE:**

See Bates Documents:
Salcedo.000011-000011
Salcedo.000012-000012

Salcedo.000013-000014
Salcedo.000442-000444
Salcedo.000015-000015
Salcedo.000016-000016
Salcedo.000017-000017
Salcedo.000018-000018
Salcedo.000021-000021
Salcedo.000023-000023

---

13.    Any and all documents relating to Plaintiff's claim that "Shortly after starting his internship in July 2017, Plaintiff requested reasonable accommodations from three Chief Residents: Dr. James Kogut, Dr. Simrajit Bedi, and Dr. Britt Marshall" as alleged in Paragraph 47 of the Complaint.

**OBJECTION:**

Plaintiff objects to this request to the extent they seek information not in Plaintiff's custody or control, such as documents already in Defendants' counsel's possession, or documents equally available to Plaintiff and Defendants.

**RESPONSE:**

See Bates Documents:
Salcedo.000011-000011
Salcedo.000012-000012
Salcedo.000013-000014
Salcedo.000015-000015
Salcedo.000016-000016

14.    Any and all documents relating to Plaintiff's claim that Plaintiff requested a reasonable accommodation as alleged in Paragraphs 48-49 of the Complaint.

**OBJECTION:**

Plaintiff objects to Defendants' Requests to the extent that they are overbroad in scope, unduly and unreasonably burdensome, and/or oppressive as discovery is ongoing and Defendant has not yet responded to Plaintiff's discovery request.

**RESPONSE:**

See Bates Documents:
Salcedo.000439-000441
Salcedo.000015-000015
Salcedo.000016-000016
Salcedo.000018-000018
Salcedo.000849-000850
Salcedo.000851-000851
Salcedo.000021-000021

---

15.    Any and all documents relating to Plaintiff's allegation that Plaintiff contacted Human Resources as alleged in Paragraph 50 of the Complaint.

**RESPONSE:**

See Bates Documents:
Salcedo.000012-000012
Salcedo.000013-000014

16.    Any and all documents relating to Plaintiff's claims that he requested accommodations due to his serious health conditions/ disabilities as further alleged in Paragraphs 51-55, 59, 74, 75, and 85 of the Complaint.

**RESPONSE:**

See Bates Documents:
Salcedo.000946-001033
Salcedo.001034-001043
Salcedo.001044-001046
Salcedo.000442-000444
Salcedo.000015-000015
Salcedo.000918-000918
Salcedo.000447-000453
Salcedo.000454-000454
Salcedo.000455-000456
Salcedo.000928-000928
Salcedo.000930-000933

---

17.    Any and all documents relating to Plaintiff's claim that his medical providers requested accommodations for Plaintiff as alleged in Paragraphs 52, 54 and 55 of the Complaint.

**RESPONSE:**

See Bates Documents:
Salcedo.000946-001033
Salcedo.001034-001043
Salcedo.000918-000918
Salcedo.000447-000453

Salcedo.000924-000924
Salcedo.000455-000456
Salcedo.000928-000928

18.    Any and all documents that Plaintiff submitted to Defendant related to Plaintiff's alleged requests for accommodations.

**OBJECTION:**

Plaintiff objects to Defendants' Requests to the extent that they are overbroad in scope, unduly and unreasonably burdensome, and/or oppressive.

**RESPONSE:**

See Bates Documents:
Salcedo.000015-000015
Salcedo.000016-000016
Salcedo.000018-000018
Salcedo.000021-000021

19.    Any and all documents relating to Plaintiff's claim that "Dr. Swallow continued to schedule Dr. Salcedo 78 to 80 or more hours per week before and after his requests for accommodation" as alleged in Paragraph 60 of the Complaint.

**RESPONSE:**

See Bates Documents:
Salcedo.000445-000445
Salcedo.000446-000446

Salcedo.000459-000459
Salcedo.000847-000847
Salcedo.000848-000848

---

20.    Any and all documents relating to Plaintiff's claim that Dr. Swallow

directed, and Plaintiff provided fitness for duty assessments as alleged in Paragraphs

66- 72 of the Complaint.

**RESPONSE:**

See Bates Documents:
Salcedo.000019-000019
Salcedo.000447-000453
Salcedo.000924-000924
Salcedo.000455-000456
Salcedo.000849-000850

---

21.    Any and all documents relating to Plaintiff's claim that Dr. Swallow

issued Plaintiff a remediation plan as alleged in Paragraphs 73-81 of the Complaint.

**RESPONSE:**

See Bates Documents Salcedo.000020-000020

---

22.    Any and all documents relating to communications between Dr. Swallow

and Dr. Munoz as alleged in Paragraphs 90-94 of the Complaint.

**RESPONSE:**

See Bates Documents:
Salcedo.000849-000850
Salcedo.000021-000021

_____

23.     Any and all documents relating to Plaintiff's claim that "Dr. Salcedo was terminated despite receiving consistent positive reviews from his attending physicians up until April 4, 2018" as alleged in Paragraph 102 of the Complaint.

**RESPONSE:**

See Bates Documents
Salcedo.000383-000435

_____

24.     Any and all documents relating to Plaintiff's claim that he filed an appeal of the decision to terminate him from the program as alleged in Paragraph 101 of the Complaint.

**RESPONSE:**

See Bates Documents:
Salcedo.000383-000435
Salcedo.001050-001050
Salcedo.001051-001051
Salcedo.001052-001052
Salcedo.001053-001053
Salcedo.001054-001057
Salcedo.000864-000865
Salcedo.001058-001060

_____

25.    Any and all documents relating to Plaintiff's claim that Dr. Snyder submitted an "outlier evaluation" as alleged in Paragraph 102 of the Complaint.

**RESPONSE:**

See Bates Documents
Salcedo.000864-000865

---

26.    Any and all documents relating to Plaintiff's claim that "Plaintiff was terminated from the program because his disability, record of disability or perceived disability" as alleged in Paragraph 122 of the Complaint.

**OBJECTION:**

Plaintiff objects to this request to the extent it seeks information not in Plaintiff's custody or control, such as documents already in Defendants' counsel's possession, or documents equally available to Plaintiff and Defendants.

**RESPONSE:**

See Bates Documents:
Salcedo.000383-000435
Salcedo.000018-000018
Salcedo.000019-000019
Salcedo.000020-000020
Salcedo.000021-000021
Salcedo.000849-000850
Salcedo.000023-000023
Salcedo.000024-000024
Salcedo.000864-000865
Salcedo.000022-000022

As discovery is ongoing, Plaintiff reserves the right to supplement these responses.

Respectfully submitted on this 16th day of October 2020.

⏃ **T**RIQUETRA **L**AW ®

Sharon R. López, Esquire
PA Attorney ID 70605
The Offices at Marion Court
35 East Orange Street, Suite 301
Lancaster, PA 17601
T: (717) 299-6300 F: (717) 299-6338
Lopez@TriquetraLaw.com

### In The United States District Court
### For the Middle District Of Pennsylvania

| | | |
|---|---|---|
| Pablo A. Salcedo, | : | Civil Action No. 19-cv-2201 |
| Plaintiff, | : | |
| v. | : | Before the Honorable |
| | : | Yvette Kane |
| The Milton S. Hershey Medical | : | |
| Center, | : | Jury Trial Demanded |
| Defendant. | : | |
| | ; | |

### Certificate of Service

I, Sharon R. López, hereby certify that on this date, a true and correct copy of the foregoing has been served via electronic mail to:

Nancy Conrad, Esq.
White and Williams, LLP
3701 Corporate Parkway, Suite 300
Center Valley, PA 18034-8233
(610) 782-4957
ConradN@WhiteandWilliams.com
*Attorney for Defendant*

▽ **Triquetra Law ®**
Respectfully submitted,

Dated: October 16, 2020

Sharon R. López, PA ID 70605
35 East Orange Street, Suite 301
Lancaster, PA 17602
T: (717) 299-6300 F: (717) 299-6338
Lopez@TriquetraLaw.com
*Counsel for Pablo A. Salcedo*

# EXHIBIT 3



Deposition of:

## Pablo A. Salcedo

*December 1, 2021*

In the Matter of:

## Salcedo, Pablo A. Vs. The Milton S. Hershey Medical Center

Veritext Legal Solutions

800.233.2441 | svs@veritext.com |

Page 1

1              IN THE UNITED STATES DISTRICT COURT
          FOR THE MIDDLE DISTRICT OF PENNSYLVANIA
2
      PABLO A. SALCEDO            ) No. 1:19-cv-02201
3                  Plaintiff      )
                                  )
4            vs.                  )
                                  )
5     THE MILTON HERSHEY MEDICAL  )
      CENTER                      )
6                  Defendant      )
7
8          VIDEOTAPED DEPOSITION OF PABLO SALCEDO
9                  Taken via Zoom on Wednesday, December
10    1, 2021, commencing at 9:57 a.m., by Leandra M.
11    Stoudt, RPR, CBC, CCP, CRR, Notary Public and
12    Shelby Stotler, Videographer
13
14    APPEARANCES:
15          TRIQUETRA LAW
            BY:  Sharon Lopez, Esq.
16          35 East Orange Street, Suite 301
            Lancaster, PA 17602
17          717-299-6300
            Lopez@triquetralaw.com
18          -- For the Plaintiff
19
20
21
22
23
24
25

Page 2

```
1    APPEARANCES (continued):
2
3        WHITE AND WILLIAMS LLP
         BY:  Nancy Conrad, Esq.
4        3701 Corporate Parkway, Suite 300
         Center Valley, PA 18034
5        610-782-4909
         conradn@whiteandwilliams.com
6        -- For the Defendant
7
8
9    ALSO PRESENT:
10       Shelby Stotler, Videograper
11       Nicole A. Swallow, M.D.
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 4

```
1           INDEX TO EXHIBITS
2    (Exhibits not in custody of reporter.)
3    EXHIBITS:     DESCRIPTION          PAGE
4    Exhibit 16  Letter of Accommodation     162
               Request 8/28/17
5
6    Exhibit 17  Email170
     Exhibit 18  Text message thread        172
7
     Exhibit 20  10/30/17 reminder          173
8    Exhibit 23  Log hours            180
9
     Exhibit 24  CCC Milestone Review181
10
     Exhibit 25  Exhibit 12/6/17183
11
     Exhibit 26  Document            189
12
     Exhibit 27  Document            197
13
     Exhibit 28  Return to work clearance    201
14
     Exhibit 29  Notes Dr. Batz        205
15
     Exhibit 30  Return to work Sullivan     207
16
     Exhibit 31  Remediation letter      211
17
     Exhibit 32  Document            216
18
     Exhibit 33  Warning letter       229
19
     Exhibit 34  Email235
20
     Exhibit 37  Log hours            245
21
     Exhibit 39  HMC453               249
22
23           INDEX TO REQUESTS
24   Page 118 / Line 22; Page 192 / Line 8;
25   Page 235 / Line 17
```

Page 3

```
1            INDEX TO WITNESS
2
3    WITNESSSPAGE
4    PABLO A. SALCEDO
5    By Ms. Conrad 6
6
7            INDEX TO EXHIBITS
8    (Exhibits not in custody of reporter.)
9    EXHIBIT:    DESCRIPTION          PAGE
10   Exhibit 1    EEOC Charge          17
11   Exhibit 2    Federal Complaint        53
12   Exhibit 3    Plaintiff's responses to     101
             Defendant's first request for
13           responses to interrogatories
14   Exhibit 4    Resident agreement form     129
15   Exhibit 5    Resident Agreement form yr 2-4 134
16   Exhibit 6    Email Dr. Kogut 6/27/17      135
17   Exhibit 7    Form to get cleared to work   145
18   Exhibit 8    Treatment notes Michelle Batz  146
19   Exhibit 9    Treatment plan        151
20   Exhibit 10   Faculty evaluation form      151
21   Exhibit 11   Email exchange with Hundertmark153
22   Exhibit 13   Email158
23   Exhibit 14   Treatment note Britt Marshall  159
24
25
```

Page 5

```
1        (It is stipulated by and between
2    counsel for the respective parties that all
3    objections except as to the form of the question
4    are reserved until the time of trial.)
5        MS. LOPEZ:  Since we have all the
6    exhibits, I won't need those, but I will need a TXT
7    file or an ASCII file just so I can download it.
8    And then maybe original and condensed.
9        THE VIDEOGRAPHER:  We are now on the
10   record.  This begins videotape number 1 and the
11   deposition of Pablo A. Salcedo in the matter of --
12   excuse me -- of Salcedo, Pablo A. versus The Milton
13   S. Hershey Medical Center.  Today is Wednesday,
14   December 1st, and the time is 10:22 a.m.
15       This deposition is being taken
16   remotely via Zoom.  The videographer is Shelby
17   Stotler of Veritext Legal Solutions and the court
18   reporter is Leandra Stoudt of Veritext Legal
19   Solutions.
20       Will counsel and all parties present
21   state their appearances and whom they represent?
22       MS. LOPEZ:  Sharon Lopez for the
23   Plaintiff, Pablo Sal -- Dr. Pablo Salcedo.
24       MS. CONRAD:  Good morning.  Nancy
25   Conrad for The Milton S. Hershey Medical Center.
```

2 (Pages 2 - 5)

Page 6

1    And with me today is Dr. Swallow from the medical
2    center.
3            THE VIDEOGRAPHER:  Will the court
4    reporter please swear in the witness.
5            THE REPORTER:  The attorneys
6    participating in this deposition acknowledge that I
7    am not physically in the present -- in the
8    deposition room and that I will be reporting this
9    deposition remotely.  They further acknowledge
10   that, in lieu of an oath administered in person, I
11   will administer the oath remotely.  The parties and
12   their counsel consent to this arrangement and waive
13   any objections to this manner of reporting.
14           Mr. Salcedo, could you please raise
15   your right hand?
16           PABLO SALCEDO, having been duly
17   sworn, was examined and testified as follow:
18           THE REPORTER:  Thank you.
19                   * * *
20           EXAMINATION
21   BY MS. CONRAD:
22   Q.      Good morning, Dr. Salcedo.  My name is
23   Nancy Conrad, and as you are aware, I represent The
24   Hershey Medical Center in this lawsuit that you
25   filed against it.

Page 7

1            We are here today to take your
2    deposition.  And we're taking that deposition
3    pursuant to a notice that was issued with respect
4    to the deposition.
5            Did you receive a copy of that notice?
6    A.      I -- I believe so.  I can't see the
7    actual notice in front of me.
8    Q.      All right.  Well, I'm not marking it
9    as an exhibit.
10           And did you bring any documents, per
11   the notice, that have not been produced in
12   discovery to date?
13   A.      No, I have not.
14   Q.      Have you ever been deposed before,
15   Dr. Salcedo?
16   A.      No, I have not.
17   Q.      And did you not bring documents
18   because there are no other documents, or because
19   you have not yet had the opportunity to produce
20   such documents?
21   A.      Because there are no other documents,
22   and I was instructed that -- not to bring any
23   documents.
24   Q.      And is it your testimony that all
25   documents pursuant to this case have been produced

Page 8

1    by your attorney in this action?
2    A.      To the best of my knowledge.
3    Q.      During the course of this deposition,
4    I will be asking you a series of questions.  If at
5    any time you do not understand my question, please
6    let me know and I will rephrase it.
7            If you answer the question then, I
8    will presume that -- that you understand what --
9    the information that I am seeking.
10           If at any time during the deposition
11   you want to take a break, we certainly will
12   accommodate that request.  I ask, though, that you
13   complete any question that is pending prior to the
14   break.
15           And even though we are sitting in
16   separate rooms and not in the usual setting that a
17   deposition take place, I want to remind you that
18   the same rules apply, in that you are to answer
19   truthfully, as you are under oath.  And that there
20   is no coaching or consulting permitted with respect
21   to the questions that are presented to you.
22           I want to let you know that we
23   received late last night and this morning some
24   supplemental documents from your counsel.  In light
25   of that late production, I have reserved the right

Page 9

1    to recall you to a second day of a deposition.
2    With that in mind, we will determine how best to
3    proceed; that is, if we get to late afternoon
4    knowing that there will be a second day, we may
5    confer and decide to conclude at a certain point in
6    time based on the second day of deposition.
7            MS. LOPEZ:  Counsel, I'd like to just
8    put on the record clearly that I do object to that
9    and that my client is prepared to spend extra time,
10   if that is what is required, to cover those extra
11   documents that were disclosed yesterday and today.
12   I just want to make sure that that's clearly stated
13   on the record.
14           MS. CONRAD:  I understand your
15   position.  I have not had the opportunity to review
16   those documents and may not be in a position to ---
17   to get to them today.  And it is not my intent to
18   stay late into the evening hours just to complete
19   the deposition when we have additional time for
20   discovery.
21   BY MS. CONRAD:
22   Q.      Dr. Salcedo, do you have any medical
23   condition or are you on any medications that will
24   affect your ability to testify today?
25   A.      No, I don't have any conditions or

3 (Pages 6 - 9)

Page 10

1  take any medications that would impact my ability
2  to be deposed today.
3  Q.      And, Dr. Salcedo, did you prepare at
4  all for today's deposition?
5  A.      Yes, I did.
6  Q.      How did you prepare?
7  A.      I reviewed timelines I created as well
8  as all the documents that I had in my possession,
9  that I received from the medical center, including
10  Dr. Swallow.  And I also reviewed this material
11  with my attorney, Sharon.
12  Q.      The exchange that you had with your
13  counsel is privileged, and I will not be asking you
14  about those exchanges.  But I do want to ask you a
15  few follow up questions about the documents.
16      What timelines are you referring to?
17  A.      Basically, my -- my recollection of
18  the events that --
19      MS. LOPEZ:  Counsel -- counsel, just
20  so you know, the -- just those timelines were
21  attorney/client communications.
22      MS. CONRAD:  They are not now.  If he
23  reviewed them in preparation for this deposition, I
24  have the right to review them.
25      MS. LOPEZ:  I -- I disagree.  I

Page 11

1  disagree.  She -- he -- he provided those to me in
2  preparation for this deposition.  You have some of
3  the timelines already that he did provide to you
4  that were created in -- before he filed this
5  lawsuit.  But there were communications to counsel
6  that were not disclosed to counsel and are
7  protected and were not requested during -- during
8  the deposition process -- during the discovery
9  process.
10  BY MS. CONRAD:
11  Q.      Dr. Salcedo, how many timelines do you
12  possess?
13  A.      It's just one.  It's just my
14  recollection of the events as they unfolded at the
15  medical center, and that's what I've discussed with
16  my attorney.
17  Q.      Just to make clear, you testified that
18  you have a document that you reviewed that is a
19  timeline, correct?
20  A.      That I created, yes.
21  Q.      And has that timeline been produced in
22  this -- in discovery in this matter?
23  A.      At this moment, I don't know.
24      MS. CONRAD:  And, Attorney Lopez, I
25  understand that you may know the answer to that

Page 12

1  question, but because we are on video, I would
2  request that you not nod your head, because that
3  then is a way of communicating with your client.
4  And it is his testimony that I seek today.
5      MS. LOPEZ:  I understand.
6      MS. CONRAD:  Thank you.
7  BY MS. CONRAD:
8  Q.      And that brings another good point,
9  Dr. Salcedo.  Because we have a court reporter
10  present and she will be reporting your every word,
11  it's important that you respond using words and
12  avoid head nods or other hand gestures in order for
13  us to have a complete record.  Do you understand
14  that instruction?
15  A.      Yes.
16  Q.      Dr. Salcedo, are you currently
17  employed?
18  A.      Yes.
19  Q.      With whom?
20  A.      Booz Allen Hamilton.
21  Q.      What is your position?
22  A.      Advanced health scientist.
23  Q.      And what are your primary job duties
24  and responsibilities?
25  A.      Oh, I serve as a research scientist

Page 13

1  and -- and a subject matter expert.  I oversee
2  clinical trials at various hospitals throughout the
3  country.
4  Q.      When did you start that employment?
5  A.      September through October of 2019.
6  Q.      What are -- is your annual salary?
7  A.      $115,000.
8  Q.      Have you been evaluated in that
9  position?
10  A.      Yes.
11  Q.      And what is the overall level of the
12  evaluation?
13  A.      Exceeds expectations.  I'm currently
14  leading a research department on my own.  So I've
15  been highly referred and recognized at my company.
16  I received a few awards already.  So doing well
17  there.
18  Q.      And did you request accommodations in
19  order to do your job duties and responsibilities?
20  A.      Yes, I did.
21  Q.      What accommodations did you request?
22  A.      So when I initially started at Booz
23  Allen Hamilton, as I do whenever I start a new
24  position, I sought out accommodations.  But because
25  of the nature of my position, the combination team

4 (Pages 10 - 13)

Page 14

1 at Booz Allen Hamilton felt that I was okay with my
2 current work structure.
3         I'm currently working 40 hours a week,
4 so I have ample time for self-care, ample time to
5 see my providers, and there were no need -- there
6 was not any need for additional accommodations.
7 Q.      How did you seek those accommodations
8 that you originally requested?
9 A.      I went to my direct manager,
10 supervisor and asked them about the process.  They
11 referred me to H -- HR.  There's actually a
12 specific -- actually -- there's actually a specific
13 team at Booz Allen Hamilton.  It's a rather company
14 that handles accommodations, so they have their own
15 department with accommodations, and I was connected
16 with that department.
17 Q.      Did you submit any documentation with
18 respect to the request for accommodations?
19 A.      No.
20 Q.      How did you then communicate your
21 request for an accommodation?
22 A.      Verbal conversations on the phone and
23 email.
24 Q.      And what information was contained in
25 the email with respect to the accommodations?

Page 15

1 A.      Just that I suffer from chronic major
2 depression and generalized anxiety, and I wanted to
3 see what the company offered for people with
4 disabilities and what the accommodation process
5 was.
6 Q.      Did you request any specific
7 accommodation?
8 A.      No.  I just initiated the process and
9 the conversation.  It ended up being that because
10 of the project I'm on currently, both myself and
11 the accommodation department felt that I was
12 adequately addressed and didn't need
13 accommodations.
14 Q.      And who did you speak with in regards
15 to this exchange?
16 A.      I would have to refer to that -- that
17 information.  I don't know the name off the top of
18 my head.
19 Q.      But you would have that in an email,
20 correct?
21 A.      Yes.
22 Q.      Other than the employment position
23 that you just described, have you held any other
24 positions since leaving Hershey Medical Center?
25 A.      As an employee, no.

Page 16

1 Q.      In any other capacity?
2 A.      I did attend a fellowship, a training
3 fellowship, but that was unpaid.  That was a
4 scholarly activity.
5 Q.      And with whom did you engage in that
6 training fellowship?
7 A.      The name is Flatiron School.  It's a
8 -- based out of Wash -- out of Washington D.C.
9 It's a data science program for advanced degree
10 professionals.
11 Q.      And did you receive an advanced
12 degree?
13 A.      Yes.
14 Q.      What degree?
15 A.      M.D.
16 Q.      And that was after you left Hershey?
17 A.      Yes.
18 Q.      I want to focus just for a moment with
19 respect to Hershey Medical Center.
20         Did you have an agreement with Hershey
21 Medical Center with respect to your residency?
22 A.      I -- I did have a resident agreement
23 that I signed prior to starting.
24 Q.      And prior to starting or at the time
25 of starting, did attend an orientation session with

Page 17

1 respect to your residency program?
2 A.      Yes.
3 Q.      What information, if any, do you
4 recall was covered during that orientation?
5 A.      I believe it was largely
6 administrative in nature, sort of expectations,
7 where things were located.  We were given tours.
8 Sort of met our colleagues.  I believe there were
9 team building workshops and activities of that
10 such.  Yep.
11 Q.      Did you receive any documents during
12 that orientation?
13 A.      I believe I received that resident
14 agreement as well as maybe some IT forms to get
15 badged and photographed and things like that.
16 Q.      Did you receive any information with
17 respect to policies of Hershey Medical Center that
18 applied to residents?
19 A.      Yes.
20 Q.      What policies did you receive or
21 obtain access to?
22 A.      I received a short document that was
23 entitled -- I believe it was for residents, first
24 years and had some brief policies on expectations
25 of basically PGY-1, so it was directed at

5 (Pages 14 - 17)

Page 18

1  first-year residents. I remember getting that
2  during orientation.
3  Q.        Did you receive any -- or did you
4  receive information about any other policies that
5  applied to residents?
6  A.        It's possible. But those policies
7  that I just mentioned are the ones that come to my
8  mind right now.
9  Q.        Did you receive any information from
10  human resources about policies that applied to
11  residents?
12  A.        No, not that I can recall.
13  Q.        Dr. Salcedo, have you received copies
14  of the exhibits for today's deposition?
15  A.        Yes, ma'am.
16  Q.        I'd like to direct your attention to
17  Exhibit 1.
18        (Exhibit 1 was marked.)
19  BY MS. CONRAD:
20  Q.        Are you familiar with this document?
21  A.        Yes.
22  Q.        What is it?
23  A.        That is the charge of discrimination
24  with the Equal Employment Opportunity Commission
25  that I filed.

Page 19

1  Q.        And is that your signature on the
2  signature block at the bottom of the first page?
3  A.        Yes.
4  Q.        And what is the date of -- that you
5  signed this document?
6  A.        September 5th, 2018.
7  Q.        And you declare, under penalty of
8  perjury, that the information is true and correct,
9  don't you?
10  A.        Yes.
11  Q.        And is the information contained in
12  this document, throughout this document true and
13  correct?
14  A.        Yes. I'm just scrolling down because
15  there's multiple pages. I don't want to see every
16  document I'm commenting on.
17  Q.        I want to direct your attention to the
18  second page of the exhibit.
19        Number 3, it says, I informed the
20  hospital of my need for an accommodation.
21        Do you see that statement?
22  A.        Yes.
23  Q.        Who do you mean when you say hospital?
24  A.        Penn State Hershey Medical Center.
25  Q.        What person, in any, are you referring

Page 20

1  to?
2  A.        Dr. Swallow and the three chief
3  residents.
4  Q.        When did you inform Dr. Swallow of
5  your need for an accommodation?
6  A.        So I met with Dr. Swallow late August
7  of 2017, around August 30th.
8  Q.        What information did you provide to
9  Dr. Swallow on August 30th, 2017 about your need
10  for an accommodation?
11  A.        I provided her two documents, two
12  separate documents. The first document I provided
13  her was the accommodation request form provided by
14  HR that I had started to fill out, as well as a --
15  a note from my psychiatrist, Dr. Munoz, requesting
16  accommodations. So two documents.
17  Q.        Dr. Salcedo, are you looking at any
18  documents as you testify today?
19  A.        The exhibits, I have them on an
20  external monitor.
21  Q.        Are you look -- in addition to the
22  exhibit, you appear to be looking down at
23  something. Is there an additional document or
24  monitor or screen that you're looking at?
25  A.        No. I have anxiety, so I have a

Page 21

1  fidget spinner just to help me get through. That's
2  what's down there.
3  Q.        Thank you for that clarification.
4        What information, if any, did you tell
5  the three chiefs about your need for an
6  accommodation?
7  A.        I also disclosed to them that I suffer
8  from chronic major depression and generalized
9  anxiety, and I -- I wanted accommodations and I
10  wanted to see what could be provided from the
11  medical center. So we did have a discussion on
12  things that could be implemented, and they included
13  sit down rounds with physicians, meeting attendings
14  prior to the rotations to set expectations and
15  goals, and quiet spaces to do work.
16  Q.        Dr. Salcedo, could you take your
17  screen for a broader view so we can see what --
18  what is in front of you?
19  A.        You mean turn my computer around.
20  Q.        I mean give us a broader view. So,
21  for example, right now, you -- you can see my
22  yellow legal pad that I'm working on. I would like
23  you to lower the view so I can see what is in front
24  of you. Thank you.
25  A.        Okay.

6 (Pages 18 - 21)

Page 22

1   Q.      When did you meet with the three
2   chiefs?
3   A.      Around August 25th, 2017.  August 24th
4   or 25th.
5   Q.      And who are the three chiefs that you
6   met with?
7   A.      It would be Dr. James Kogut, Dr. Sim
8   Bedi, and Dr. Britt Marshall.
9   Q.      In number 4, you state, I asked for an
10  accommodation as soon as I started my internship.
11  And that my accommodation requests were deemed
12  reasonable by the chief resident.
13          Do you see that allegation?
14  A.      Yes.
15  Q.      Who are you referring to when you say,
16  the requests were deemed reasonable?
17  A.      Mainly Dr. Britt Marshall and Dr.
18  James Kogut.
19  Q.      And what, if anything, did they say to
20  you that led you to the belief that they were
21  deemed reasonable?
22  A.      They provided reassurance, which
23  included nodding and yeses.  And they continued to
24  engage in the conversation by providing alternative
25  methods of accommodation.  So there was a dialogue.

Page 23

1   Q.      And who -- who suggested the quiet
2   space to do notes?
3   A.      Dr. Britt Marshall.
4   Q.      Who suggested meeting with colleagues
5   in advance?
6   A.      I believe I started that suggestion,
7   and then it -- we just kind of snowballed it into
8   the full meeting with the new attendings prior to
9   each rotation to set expectations and goals.  So,
10  again, it was a discussion.  It wasn't like I had a
11  list of accommodations prepared.
12  Q.      You had a list prepared?
13  A.      I said it was not as if I had a list.
14  So no, I did not.
15  Q.      You did not have a list?
16  A.      No.
17  Q.      Who made the suggestion about sit-down
18  rounds?
19  A.      It could either have been Dr. Britt
20  Marshall or Dr. James Kogut.
21  Q.      And who made the suggestion about the
22  ability to see your healthcare provider monthly?
23  A.      Just, I guess, one comment.  Is there
24  any way we can have the video just be on you?
25  Because I've been looking at Dr. Swallow while

Page 24

1   you're asking me the questions.
2   Q.      I -- we'll try, but I don't want   to
3   --
4   A.      Okay.  If you can.  It's just a little
5   distracting.
6           Could you please repeat the question?
7   Q.      Who suggested the accommodation of
8   seeing your healthcare provider monthly?
9   A.      Oh, I'd say that was -- that was my
10  comment and that I -- that the chief residents know
11  it was a priority for me.
12  Q.      Were there any emails or documents
13  existing about this discussion that you had with
14  the chiefs?
15  A.      There were a few.  There's one in
16  which I reached out to the chief residents to
17  schedule this meeting.  I am the one that initiated
18  it and requested it.  There's also a follow-up
19  email by myself thanking the resident -- I mean the
20  chief resident for their time and for listening to
21  my requests for accommodations.
22  Q.      Were there any emails from the chiefs
23  about this meeting?
24  A.      There was a response from Dr. James
25  Kogut, but that was prior to the meeting, just

Page 25

1   confirming the meeting.
2   Q.      And approximately when was this
3   meeting held?
4   A.      August 25th, 2018.
5   Q.      How do you remember that date?
6   A.      It was the first time that I had
7   disclosed my disability to the program.  It was
8   very hard for me.  I was making myself very
9   vulnerable, especially given the stigma that
10  existed in medical education.  But I knew it was
11  what I needed to do for myself.  So there's a lot
12  of emotional tie into that event.
13  Q.      Under paragraph 5 of the EEOC charge,
14  you state that, in the second sentence, you started
15  filling out accommodation paperwork.  Do you see
16  that --
17  A.      Yes.
18  Q.      -- statement?
19  A.      Yes.
20  Q.      What accommodation paperwork are you
21  referring to?
22  A.      I had reached out to human resources
23  prior to meeting with Dr. Swallow to get the
24  accommodation request form.  My therapist and my
25  mental health care provider suggested that I obtain

7 (Pages 22 - 25)

Page 26

1  that form. So I had it emailed to me from Penn
2  State Hershey Medical Center HR.
3  Q.      How did you know to go to HR about an
4  accommodation request?
5  A.      Again, it was suggested to me by my
6  mental health providers. So they're the ones that
7  prompted me to obtain that form.
8  Q.      What medical health providers told you
9  to go to HR?
10  A.      So, again -- you want specific names?
11  I'll give the names. Michelle Batz. She is my
12  therapist while I was at Penn State Hershey Medical
13  Center. And I cannot definitively say she said go
14  to HR, but she did say that there was a form that I
15  should get to request those accommodation.
16  Q.      Well, then how did you know to go to
17  HR to get that form?
18  A.      I'm recalling most likely Google and
19  trying to refer to how do I get this accommodation
20  -- I Goggled what the accommodation form is,
21  because I never had to actually use that form. And
22  it somehow landed me to the Penn State human
23  resource site. And I remember finding a contact
24  there and I emailed them. So I never met them in
25  person.

Page 27

1  Q.      All right. So what did you Google?
2  A.      Accommodation request form.
3  Q.      And after you put in accommodation
4  request form, the response was to go to the human
5  resources department at Penn State health?
6  A.      No, I can't recall with 100 percent
7  the pathway that led me from my Google search to
8  getting in touch with human resources. I just know
9  that's how I initiated the process.
10  Q.      Did somebody tell you to go to HR?
11  A.      No. I would say no one directly said
12  to go to HR, but HR was a department that would
13  have had the accommodation request form.
14  Q.      How did you know that?
15  MS. LOPEZ: Objection. Asked and
16  answered.
17  A.      I don't understand the question.
18  MS. LOPEZ: Objection. Asked and
19  answered. You can ask --
20  BY MS. CONRAD:
21  Q.      How did you know that HR at Hershey
22  Medical Center would have the accommodation request
23  form?
24  A.      So there's two possibilities, one
25  being my therapist and one being I found it online

Page 28

1  via Google search. But the initial request form
2  came up from my therapist during that meeting we
3  had.
4  Q.      Your therapist suggested to you that
5  there was a form that you needed to complete?
6  A.      Yes.
7  Q.      And you then searched on Google where
8  to obtain that format at Hershey Medical Center?
9  A.      Yes.
10  Q.      Did you -- did your Google search lead
11  you to any policies at Hershey Medical Center that
12  discussed the accommodation process?
13  A.      No, not that I can recall. It had --
14  no.
15  Q.      Did you search the Hershey Medical
16  Center site for any policies that related to a
17  request for an accommodation?
18  A.      I don't believe so. I believe once I
19  found the form and the point of contact at human
20  resources, I went with that route.
21  Q.      Again, the question is: How did you
22  find the point of contact?
23  MS. LOPEZ: Objection. Asked and
24  answered.
25  BY MS. CONRAD:

Page 29

1  Q.      Your answer is -- so if I Google right
2  now accommodation request form, that would lead me
3  to Hershey Medical Center human resources?
4  MS. LOPEZ: Objection. Argumentative.
5  MS. CONRAD: It is not argumentative.
6  Q.      You may answer the question.
7  A.      it's -- It's possible. I'm not sure
8  what -- what Google would return. What I'm saying
9  is that I did a Google search after getting advice
10  to obtain accommodation request form from my
11  therapist, and that led me to the path of
12  contacting HR to get that accommodation request
13  form. The details in between, I can't 100 percent
14  tell you those details. That was just a Google
15  search.
16  Q.      So is it your testimony that you do
17  not know the path that you took to get to -- that
18  led you to sending the email to HR to request the
19  form?
20  MS. LOPEZ: Objection. Misstates
21  testimony.
22  A.      I do not.
23  BY MS. CONRAD:
24  Q.      Do you know the path you followed to
25  get to -- prior to sending the email to HR?

8 (Pages 26 - 29)

1    MS. LOPEZ:  Objection.  Asked and
2  answered.
3  Q.     You may answer again.
4  A.     Yes, I'll -- I'll try to be more
5  direct with it because I might ne missing
6  something.  But my therapist said, there's an
7  accommodation request form that you should get
8  filled out.  So I Googled to find that form.  And I
9  found the contact information for HR, and I
10 requested that form from HR.
11      The exact page or browser history or
12 technical pathway that led me to that I cannot
13 comment on.
14 Q.     And that's what I'm having a hard time
15 understanding.
16      I'm trying to understand:  What was
17 the search terms you used on Google that led you to
18 contact information for HR?
19      MS. LOPEZ:  Asked and answered.
20 BY MS. CONRAD:
21 Q.     You may answer again.
22 A.     I -- I -- I can't tell you the exact
23 search terms.  I just know that I found the form, I
24 contacted HR, and I got the appropriate forms.
25 Q.     Well, if you found the form, why did

1  you have to contact HR for the form?
2  A.     I found where the form could be found.
3  I didn't have the form online, so I found where the
4  form would be located.  I misspoke.
5  Q.     And who did you reach out to in HR?
6      MS. LOPEZ:  Objection.  Asked and
7  answered.
8  BY MS. CONRAD:
9  Q.     What is the name of the person you
10 reached out to in HR?
11      MS. LOPEZ:  Objection.  Asked and
12 answered.
13 BY MS. CONRAD:
14 Q.     You may answer again.
15 A.     I believe it was a Miss Henderhook.
16 Q.     Who?
17 A.     A Miss Henderhook or Miss Barbara
18 Henderhook.  I might be mispronouncing the name.
19 That's who I had the email communications with.
20 Q.     How do you remember her name sitting
21 here today?
22 A.     Because she is who I had the email
23 conversation with about the request forms.  There
24 -- there was a hiccup where they sent them to me,
25 but I didn't get them, and she had to resend them.

1  I just remember her name.
2  Q.     Did you have any conversations with
3  her?
4  A.     Out -- outside of email, No.
5  Q.     Did you ask her about the process to
6  submit the claim -- the accommodation request form?
7  A.     I -- I let her know that I was a -- a
8  resident starting out at Penn State with a
9  disability, and I was looking for this form so that
10 I could get accommodations.  I was just trying to
11 get the form.
12 Q.     Did you ask her, once you received the
13 form, to whom you should submit the form?
14 A.     No.
15 Q.     Did you review an HR policy to find
16 out, once you obtained the form, to whom it should
17 be submitted?
18      MS. LOPEZ:  Objection.  Asked and
19 answered.
20 Q.     You may answer again.
21 A.     I read the directions and instructions
22 on the form.
23 Q.     And did that tell you to whom the form
24 should be submitted once it was completed?
25 A.     It did.  However, I was given

1  different instruction on how to complete the form
2  by my direct supervisor, Dr. Swallow.
3  Q.     What information was contained on the
4  form about its submission?
5  A.     It would be helpful -- do you have the
6  form that you can show me?  I don't know it from
7  memory.
8  Q.     Well, I'm asking you what you
9  remember.
10      You said that there was information on
11 the form about to whom it should be submitted.  And
12 I'm asking you:  What information was on the form?
13 a.     Sure.  Okay.  The form included, I
14 believe, four or five sections.  One section was
15 preliminary information about me:my name, my ID
16 number, contact information.  There was a section
17 for your healthcare provider.  I believe there was
18 a section for Dr. Swallow to complete.  And then
19 there was a final section for whoever was receiving
20 this request, to comment on and fax back to HR.
21 Q.     So what information was on the form
22 about -- after it was completed, where it was to be
23 submitted?
24      MS. LOPEZ:  Objection.  Asked and
25 answered.

9 (Pages 30 - 33)

1    Q.        You may answer.
2    A.        I -- I shared what I recalled from the
3    form.
4    Q.        Turning to the next page of the EEOC
5    charge. The second sentence says, on August 28th,
6    2017, my doctor submitted the first in a series of
7    letters/requests for accommodations.
8              Do you see that allegation?
9    A.        Yes.
10   Q.        To whom are you referring to when you
11   say, my doctor?
12   A.        Dr. Frank Munoz.
13   Q.        And when you say, my doctor submitted
14   the first in a series of letters/requests for
15   accommodations, to whom did Mr. Munoz submit those
16   letters?
17   A.        Dr. Nicole Swallow.
18   Q.        How did Dr. Munoz know to submit them
19   to Dr. Swallow?
20             MS. LOPEZ:  Objection. Calls for
21   speculation.
22   Q.        Do you know how Dr. -- did you inform
23   -- provide any information to Dr. Munoz about to
24   whom to submit the form?
25   A.        Did the second form, Dr. Swallow

1    herself reached out to Dr. Frank Munoz via
2    telephone.
3    Q.        I'm talking about the August 28, 2017
4    reference.
5    A.        Okay. So for the August 28th, that
6    was a handwritten letter that I delivered to
7    Dr. Swallow on our August 30th meeting.
8    Q.        So Dr. Munoz didn't submit the August
9    28, 2017 letter to Dr. Swallow, correct?
10   A.        Yes. It wasn't addressed to her, but
11   it was to my direct supervisor and the person in
12   change of my scheduling and accommodations.
13   Q.        I'm asking: Who did Dr. Munoz hand
14   the October 28, 2017 letter to.
15             MS. LOPEZ:  Objection. Asked and
16   answered.
17             MS. CONRAD:  He just answered it.
18   It's -- it was submitted to him.
19   A.        Yeah, to Dr. --
20   Q.        Is that correct, Dr. Salcedo?
21   A.        It was written for Dr. Swallow, and I
22   delivered it to Dr. Swallow on our August 30th
23   meeting.
24   Q.        Listen to my question, please, and
25   please answer my question.

1              To whom did Dr. Munoz submit the
2    August 28th, 2017 letter? Whom did he physically
3    give it to or send it to?
4              MS. LOPEZ:  Objection. Asked and
5    answered.
6              MS. CONRAD:  I'm just trying to
7    clarify.
8    Q.        Was -- did Dr. Munoz give that August
9    28, 2017 letter to you?
10   A.        Yes.
11   Q.        Now, Doctor, the third or fourth
12   sentence, you -- there's an allegation that you
13   were told they were, quote, working on it.
14             Do you see that allegation?
15   A.        Yes.
16   Q.        Who is the "they" you are referring
17   to?
18   A.        Dr. Nicole Swallow.
19   Q.        Anyone else?
20   A.        Dr. Nicole Swallow.
21   Q.        So why didn't you use the word "she"
22   instead of "they"?
23   A.        I believe when I submitted this
24   complaint, I was referring to the hospital as one
25   entity and Dr. Swallow as that person of the

1    entity. So that's just a semantic. Could have
2    been a she.
3    Q.        The last sentence of that paragraph
4    makes reference to your doctor putting you on med
5    -- medication. Do you see that allegation?
6    A.        Yes.
7    Q.        What doctor are you referring to
8    there?
9    A.        Dr. Frank Munoz.
10   Q.        What medication?
11   A.        Restoril.
12   Q.        And what side effect?
13   A.        Retrograde amnesia.
14   Q.        Tell me about what occurred with
15   respect to that side effect.
16   A.        Okay. To the best of my recollection,
17   because given the nature of the side effect being
18   amnesia, I don't remember a lot. But I do recall
19   that I woke up early in the morning and I went to
20   the grocery store for some reason. And I was also
21   supposed to take my step 3 exam that day. And I
22   recall that my roommate drove me to take that exam.
23   I don't remember taking the exam.
24             I do remember having some double
25   vision and some blurriness in my vision. But the

Page 38

1  main side effect was retrograde amnesia. I don't
2  recall a lot of what happened.
3  Q.      Do you recall that you were driving
4  your car and -- and there was -- and a dent in it
5  that -- on it that you couldn't explain?
6  A.      Yeah, I recall that there was a
7  scraping on the bottom of my car, most likely from
8  a curb. And from the parking lot. But, again, I
9  don't remember what happened that day in more
10  detail.
11  Q.      And what was the outcome of the exam
12  that you took?
13  A.      I failed.
14  Q.      And did you have any meetings at the
15  hospital with respect to this incident?
16  A.      Yes. With Dr. Swallow.
17  Q.      And what was the outcome of those
18  meetings?
19  A.      Right after this amnestic episode,
20  Dr. Swallow put me on a medical leave of absence.
21  And I believe on the 14th, I had a follow-up
22  meeting with her to return to service. And it was
23  during that meeting that we discussed my condition
24  and remediation and stuff.
25         So it was a follow-up meeting shortly

Page 39

1  after the event and then a return to service
2  meeting on December 14th, 2017.
3  Q.      During that meeting with Dr. Swallow,
4  in conjunction with the medical leave and return,
5  did you have any discussions about accommodations?
6  A.      Yes.
7  Q.      And what was the nature of those
8  conversations?
9  A.      I told Dr. Swallow that I was still
10  struggling, that my health was deteriorating. I
11  was not getting enough sleep. And that was one of
12  the reasons I had been placed on this medication,
13  to try to help the sleep.
14         We also discussed -- I was requested
15  of by Dr. Swallow to make an emergency mental
16  health plan during that meeting. She wanted me to
17  talk about what my disability was and how I would
18  address my disability independently or on my own,
19  and I had to submit that as a requirement to
20  returning to service.
21  Q.      And who were your physicians that you
22  were seeing in December of 2017 during your medical
23  leave?
24  A.      Aside from Dr. Frank Munoz, who is my
25  psychiatrist, I had a primary care provider, and

Page 40

1  that was Dr. Britt Marshall. And I also saw a PA,
2  or physician assistant, a Timothy Sullivan during
3  that time, as requested by Dr. Swallow. She had
4  specifically asked that I get seen by someone that
5  worked for the hospital rather than my own
6  physician choosing.
7  Q.      Anyone else? Any other medical
8  providers?
9  A.      And my therapist, Michelle Batz.
10  Q.      Did you return to the medical center
11  after your medical leave?
12  A.      Yes.
13  Q.      And did your physicians provide any
14  type of certification about your ability to return?
15  A.      Under -- I believe that the return to
16  work letters, they were very brief and it just
17  said, fit for duty and able to return to work.
18  Q.      Was it your testimony that --
19  A.      And that I would --
20  Q.      -- Dr. Munoz, Marshall, Sullivan, Batz
21  all submitted return to work certifications?
22  A.      No. I -- I -- I thought you asked me
23  what was in the return.
24  Q.      No. Who submitted return to work
25  certifications following your medical leave in

Page 41

1  December of 2017?
2  A.      Michelle Bats, Frank Munoz, and
3  Timothy Sullivan.
4  Q.      And did those return to work
5  certifications reference any of the accommodations
6  you were seeking?
7  A.      No. Those -- those letters were
8  purely just to be able to return to work. They
9  were not to address accommodations.
10  Q.      Did you need accommodations in order
11  to return to work?
12  A.      I needed accommodations, but those
13  were already being discussed with Dr. Swallow.
14  Those weren't the point of those letters.
15  Q.      Okay. Well, returning to work
16  following a medical leave, did you ask your medical
17  providers to address those accommodation requests
18  in that return to work certification?
19  A.      No. I did -- I did not see how that
20  -- if the return to work certification -- no. I
21  was already discussing the accommodation with
22  Dr. Swallow. She already had a notification from
23  my psychiatrist. And since Dr. Swallow was still
24  engaging with me in discussions, I reasonably
25  included she was still working on them.

11 (Pages 38 - 41)

Page 42

1    Q.      Well, you just had a side effect from
2    a medication that caused you amnesia, along with
3    other reactions; you were placed on a medical
4    leave; you're seeking to return to work, yet are
5    you telling me you didn't ask your physicians to
6    address your accommodations in your return to work?
7           MS. LOPEZ: Objection. Asked and
8    answered.
9    Q.      Did you ask your physicians to address
10   your need for accommodations in conjunction with
11   your return to work after your medical leave?
12          MS. LOPEZ: Objection. Asked and
13   answered.
14   Q.      You may answer again.
15   A.      I was given specific instruction by
16   Dr. Swallow to get a letter saying that I was fit
17   to return for duty, so I followed those
18   instructions and I obtained letters that stated
19   exactly that.
20   Q.      That's not my question.
21          Did you ask your physicians to address
22   your need for accommodations in your -- in their
23   certifications related to your return to work?
24          MS. LOPEZ: Objection. Asked and
25   answered.

Page 43

1    Q.      You may answer again.
2    A.      In those letters, no, because both
3    myself and my treating providers were under the
4    assumption -- you can refer to my treatment notes
5    -- that the -- Dr. Swallow was still working on
6    accommodations. So if we believe that
7    accommodations were being worked on at that time,
8    why -- we would not include that in the letter for
9    fitness to return to duty.
10   Q.      In the same paragraph, there is a
11   sentence that you had an acute setback on February
12   24, 2018. Do you see that reference? We're still
13   -- we are on the fourth page, still under -- the
14   page starts, feedback, Dr. Swallow placed me on a
15   remediation program. That paragraph.
16   A.      Okay.
17   Q.      And there's a sentence there, I
18   suffered an acute setback on February 24, 2018.
19          Do you see that sentence?
20   A.      Yes.
21   Q.      Describe the setback that you are
22   referencing in this document.
23   A.      I -- I was experiencing worsening
24   depression and anxiety, secondary to chronic
25   disregulation.

Page 44

1    Q.      You then say, and the on-call resident
2    took over.
3           Do you see that statement?
4    A.      Yes.
5    Q.      And who was that on-call resident?
6    A.      I'm confident it was Dr. Renuca Rudra,
7    but I'm not 100 percent confident.
8    Q.      Can you spell the name, please?
9    A.      R-E-N-U-K-A, R-U-D-R-A.
10   Q.      And, again, I presume you're looking
11   at the screen with the exhibit?
12   A.      Yeah. I just have an external
13   monitor.
14   Q.      Okay. So this setback occurred while
15   you were working in your capacity as a resident;
16   is that correct?
17   A.      Yes.
18   Q.      And describe for me what shift you
19   were on.
20   A.      I was on Hershey Medical Center wards
21   or floors, so that's just the internal medicine
22   teaching team.
23   Q.      And what happened while you were on
24   the wards on February 24th that led to the on-call
25   resident having to take over?

Page 45

1    A.      I requested that I -- I be removed
2    from service, so I had contacted Dr. Kogut to let
3    him know if we could meet, and I -- I let him know
4    I wanted to remove myself from service.
5    Q.      Why did you want to remove yourself
6    from service?
7    A.      Because I was feeling very depressed,
8    very anxious. And throughout my time at the
9    medical center, I was able to compartmentalize my
10   suffering and my chronic disregulation. But it got
11   to a point of being so sleep deprived and
12   disregulated that I -- I no longer felt comfortable
13   working.
14          And I think that was my turning point
15   where I said, well, something has to give. I'm
16   still waiting for accommodations. Nothing is being
17   implemented. And I no longer feel like I can work
18   unaccommodated. So I reached out to Dr. James
19   kogut, so I did a fact -- I'm the one who pulled
20   myself out of service that day.
21   Q.      On February 24th, what time did you
22   start service that day?
23   A.      It would be around 6:30 a.m.
24   Q.      And at what point in time did you
25   suffer the acute setback that led to the on-call

12 (Pages 42 - 45)

1  resident taking over?

2  A.      So when -- for depression and anxiety,

3  it's not so much that's something like a switch

4  that you turn on and off. So, again, this was a

5  buildup of chronically suffering and -- and not

6  having those accommodations. So it was just -- it

7  was worsening, and that was just the turning point

8  where I just said enough was enough.

9  Q.      I'm asking: After you started on --

10 at 6:30 a.m., at what point in time did you have

11 this setback that led the on call resident to take

12 over?

13 A.      I -- my response was that there was

14 not a point in time because it's a continuum. It's

15 symptomatology that continued to fluctuated and

16 worsens, but there was a point in time where I

17 recognized that enough was enough and I wanted to

18 remove myself from service. But I think you're --

19 you're asking for, like, a -- 7 a.m. I said, oh no,

20 this is really bad, but that's not how my

21 disability works.

22 Q.      At some point in time the resident

23 took over -- or the on-call resident took over, as

24 you set forth in this document. My question is:

25 What time did the on-call resident take over?

1  A.      Okay. That -- all right. You asked a

2  different question before.

3  Q.      Well, you had a setback -- you have a

4  setback and the on-call resident takes over. So

5  what time did the setback occur and what time did

6  the on-call resident take over?

7          MS. LOPEZ: Objection. Compound

8  question.

9  Q.      Or give me the two separate times.

10 A.      Sure. So I had the discussion with

11 Dr. James Kogut around noon, give or take. And

12 after I explained to Dr. Kogut that I wanted to

13 remove myself from service because of my worsening

14 symptoms, he said that was fine, that would call

15 the risk resident. So that's the resident that

16 comes to replace another resident should the

17 emergency arise, and he asked me to wait in the

18 resident conference room until my replacement came.

19         So I went -- waited. It -- it wasn't

20 a long wait, maybe 30 minutes. And then once she

21 was there, then I was dismissed.

22 Q.      And about what time was that?

23 A.      Currently after noon, after 1 p.m.

24 Q.      So during the time period of 6 a.m. to

25 12 noon when you called Dr. Kogut, were you seeing

1  patients?

2  A.      Yes.

3  Q.      You make reference in that paragraph

4  about a remediation program. Can you describe for

5  me the remediation program that you're describing

6  -- or that you reference in that paragraph?

7  A.      The remediation program was the

8  program that Dr. Swallow placed me on December

9  14th, 2017. And there were a couple components to

10 that remediation. One included Dr. Swallow

11 reaching out to check in with me frequently.

12         Another one included me having a

13 couple clinical vignette scenarios with attendings,

14 like three or four. I believe three.

15         One included having a meeting with

16 Dr. Ami Dewaters to review my notes, my patient

17 progress notes.

18         And another component, another

19 remediation included surprise visits from someone

20 from the program. They would just come and watch

21 me work.

22         There might be a couple other things

23 that were on that letter, but those are the main

24 parts of the remediation program.

25 Q.      You state that you successfully

1  completed the remediation. Do you see that

2  statement?

3  A.      Yes.

4  Q.      What does that mean?

5  A.      That I fulfilled all my duties and

6  requirements for the remediation, attending those

7  meetings. And I fulfill my -- my -- my duties as

8  part of the remediation. I completed it.

9  Q.      So -- so did you successfully complete

10 that remediation program without any accommodations

11 in place?

12 A.      Yes. But I -- I would note that this

13 remediation program was separate from my clinical

14 duties. They occurred during the day that I was

15 working, but they were not connected in the sense

16 of my clinical responsibilities.

17 Q.      Were you complete -- had you

18 successfully completed your clinical duties up

19 until February 24, 2018?

20 A.      Yes.

21 Q.      And you successfully completed your

22 clinical duties without accommodation?

23 A.      Yes.

24 Q.      You then make reference to another

25 leave of absence; is that correct?

Page 50

1    A.      Yes.
2    Q.      And when was the leave of absence?
3    A.      So I -- it started essentially when I
4    took myself off of service on February 24th, 2018
5    and I -- I believe it was supposed to be for two
6    weeks, but ultimately, it kept getting -- kept
7    getting extended and extended by the program, even
8    though I didn't request it.  So basically, from
9    February 24th up until my termination.
10   Q.      Now, at or about the same time, was
11   there a mid-year review that all residents were
12   completing?
13          MS. LOPEZ:  Objection.  Calls for
14   speculation.
15   Q.      You may answer the question.
16   A.      Not that I was aware of at the time.
17   Q.      Were you aware of any mid-year review
18   that would take place with respect to your
19   first-year residency?
20   A.      I believe -- I believe I had knowledge
21   of a review occurred mid-year, but I didn't have
22   any -- was never communicated with me any details
23   of that review, who -- who did it, what it was
24   composed of.  So I really can't answer about that
25   review.

Page 51

1    Q.      You then make reference to a
2    termination letter that was dated March 6th, 2018.
3    Do you see that?
4    A.      Said '18.  Sorry.  I was reading the
5    wrong part.  Are you talking about the first line
6    on March 19th I met with Dr. Swallow?
7    Q.      Correct.
8    A.      Okay.
9    Q.      Did you receive a termination letter
10   on March 19th when you met with Dr. Swallow and Dr.
11   Ghahramani?
12   A.      Yes.
13   Q.      And you referenced certain items that
14   are included in that termination letter, don't you?
15   A.      Yes.
16   Q.      Was patient safety referenced in the
17   termination letter?
18   A.      I believe so, yes.
19   Q.      You have in quotes, disappearing
20   during shifts.  Was that included in the
21   termination letter?
22   A.      Yes.  That -- that accusation was in
23   the termination letter.
24   Q.      In the next paragraph, you reference
25   that the termination letter stated communications

Page 52

1    problems.  Do you see that?
2    A.      Yes.
3    Q.      And language difficulties?
4    A.      Yes.
5    Q.      Does the termination letter reference
6    or specifically state there was an issue with
7    language difficulties?
8           MS. LOPEZ:  Objection.  Compound
9    question and ambiguous.
10   Q.      Does the termination letter use the
11   words language difficulties?
12   A.      I -- I don't have it listed in quotes
13   without, so seeing the letter in front of me, I
14   don't want to definitively say if those two words
15   were used.  But I -- I would assume the
16   communication is done via language.
17   Q.      I'm not asking about your assumptions.
18   I'm asking about what is in the letter.
19   A.      Okay.  It might be helpful to pull up
20   the letter, but without seeing the letter in front
21   of me, I can't tell you such detail.
22   Q.      And we'll get to that in the
23   deposition.
24          Turning to the next page.  In that
25   paragraph, you make a statement about the second

Page 53

1    sentence, I believe, Dr. Swallow clearly had a bias
2    against me because of my disability.
3           Do you see that statement?
4    A.      Yes.
5    Q.      What led you to form the belief that
6    Dr. Swallow clearly had a bias against you because
7    of your disability?
8    A.      I would say the first event that
9    cemented that was when I returned to her office on
10   December 14th, 2017 to discuss the amnestic event
11   and accommodations, but I was in the same meeting,
12   minutes apart, also put on a remediation that
13   seemed very punitive.  That's -- that was my first
14   flag, red flag.
15   Q.      What led you to connect the
16   remediation with a bias because of disability?
17   A.      The fact that remediation form and the
18   mental health form were given to me at the same
19   time.  They were handed to me at the same time,
20   discussed at the same time in the same meeting.  It
21   was apparent that my disability was being
22   interwoven into my clinical performance by
23   Dr. Swallow.
24   Q.      What mental health form are you
25   referring to?

14 (Pages 50 - 53)

1   A.      I believe it was titled confidential
2   follow-up, and that's the form -- document where
3   I'm asked to make a mental health emergency plan
4   by Dr. Swallow.
5   Q.      Did you object to preparing an
6   emergency plan?
7   A.      No.  I followed the direction of my
8   supervisor.
9   Q.      And the request for the emergency plan
10  followed the event -- the amnesia event, didn't it?
11  A.      Yes.
12  Q.      Let me direct your attention to
13  Exhibit 2, the federal complaint.
14          (Exhibit 2 was marked.)
15  BY MS. CONRAD:
16  Q.      Are you familiar with this document?
17  A.      Yes.
18  Q.      I -- I'm sorry.  I didn't hear your
19  answer.
20  A.      Yes, I am familiar with this document.
21  Q.      What is it?
22  A.      The federal complaint I submitted.
23  Q.      And are the factual allegations
24  contained in this complaint true and correct?
25  A.      To the best of my knowledge, yes.

1   Some things may have changed as more information
2   was brought to light during discovery that may need
3   -- like specific dates, of that nature.  But for
4   the most part, to my knowledge, it's accurate and
5   true.
6   Q.      And did you review this complaint to
7   verify the factual allegations prior to it being
8   filed?
9   A.      Yes.
10  Q.      And sitting here today, can you point
11  out to me any additions or changes since the filing
12  of the complaint?
13          MS. LOPEZ:  Objection.  Ambiguous.
14          MS. CONRAD:  Well, he just testified
15  that there may have been some changes after
16  reviewing discovery.  I'm asking, what changes, if
17  any, he was referencing.
18          MS. LOPEZ:  What changes he would make
19  or what changes he discovered during discovery?
20  It's -- it's very unclear what you're asking.
21          MS. CONRAD:  Okay.  Could you go back
22  and -- and read his testimony, please, about the
23  some things may have changed?
24          THE REPORTER:  Yes.
25          (The record was read back by the court

1   reporter.)
2   BY MS. CONRAD:
3   Q.      Dr. Salcedo, what, if any, changes
4   were you referencing in that prior testimony?
5          MS. LOPEZ:  Objection.  Asked and
6   answered.
7   Q.      You may answer the question.
8   A.      If -- if you scroll your attention
9   down to paragraph 90.  So I believe that date,
10  February 27th, is actually February 26th.
11  Dr. Swallow called my treating psychiatrist after I
12  met with her on the 26th.  So it was the same day.
13  Q.      Any other changes?
14  A.      Not that I see at the moment.  That --
15  that was the main change.
16  Q.      I want to direct your attention to
17  paragraph 15.
18          Paragraph 15, you allege that
19  Dr. Swallow was removed as program director
20  following Dr. Salcedo's termination.
21          What is the basis for your allegation
22  that Dr. Swallow was removed?
23  A.      I believe she changed positions.  And
24  on -- again, on Google, she was no longer the
25  program director after I -- I was terminated,

1   shortly after, the following year.
2   Q.      Dr. Salcedo, you used the word
3   removed.  On what do you base your allegation that
4   she was removed as program director?
5   A.      I guess the wording could be changed
6   to she was no longer the program director.
7   Q.      May I direct your attention to
8   paragraph 45 of the complaint?
9          Paragraph 45, you make reference to
10  obligations that were contained in the resident
11  agreement.  Do you see that reference?
12  A.      Yes.
13  Q.      Did the resident agreement provide any
14  obligations with respect to you that -- if you were
15  obligated to do certain things?
16  A.      Yes.
17  Q.      What obligations were required of you
18  per the resident agreement?
19  A.      I believe they -- they included
20  fulfilling your clinical duties.  There were
21  actually quite a few sections, a lot of them were
22  administrative, so it would help if we had that
23  document.  They included, like, disclosing criminal
24  -- criminal activity, drug use, things like that.
25  So that would be helpful to have that document to

15 (Pages 54 - 57)

Page 58

1 actually comment on it.
2 Q.        We'll get to that later in the day.
3          I want to direct your attention now to
4 paragraph 47.
5          In paragraph 47, you testified that
6 you requested reasonable accommodations from the
7 three chief residents.  Do you see that allegation?
8 A.        Yes.
9 Q.        Is it true that you requested those
10 accommodations, or is it that the residents made
11 suggestion -- the chiefs made suggestions?
12          MS. LOPEZ:  Objection.
13 Mischaracterized testimony.
14 A.        Those -- those are both accurate
15 statements.  I requested accommodations and,
16 subsequently the chief resident suggested
17 accommodations.
18 Q.        What did the chiefs suggest?
19          MS. LOPEZ:  Objection.  Asked and
20 answered.
21 Q.        You may answer.
22 A.        The chiefs suggested sit-down rounds,
23 a quiet space to work, and being able to establish
24 relationship with attending physicians prior to
25 rotations.

Page 59

1 Q.        What did you request?
2 A.        Again, my intent in that meeting was
3 to let the chief residents know that I wanted
4 accommodations and to find out what accommodations
5 could be offered.  So I didn't explicitly request a
6 -- a specific accommodation during that meeting.
7 Q.        Did you use --
8 A.        (inaudible/overlapping) --
9 Q.        -- the word, accommodations, in that
10 meeting with the chiefs?
11 A.        Yes.
12 Q.        Excuse me?
13 A.        Yes.
14 Q.        Are there any documents that reflect
15 that you said to the chiefs, I am requesting
16 accommodations and I need to know what
17 accommodations can be offered?
18 A.        No.  That was a conversation.
19 Q.        Are there documents, including emails,
20 following the meeting that you had with the chiefs?
21 A.        Yes.
22          MS. LOPEZ:  Objection.  Ambiguous.
23 Q.        What documents?
24 A.        There's an email following the meeting
25 in which, I think, Dr. Kobut for his time and --

Page 60

1 and that I was looking forward to implementing what
2 we discussed during the meeting.
3 Q.        Implement what the chiefs had
4 suggested?
5          MS. LOPEZ:  Objection.  Argumentative.
6 Q.        Were you -- were you looking forward
7 to implementing the suggestions from the chiefs?
8 A.        The suggestions that we discussed and
9 agreed upon, I think, was a collaborative
10 discussion.  But I had just said, implement what he
11 had discussed.  I didn't use the word --
12 Q.        I'm asking you what you meant by that.
13          Did you mean that you were looking
14 forward to implementing the chiefs' suggestions?
15 A.        Yes.
16 Q.        Paragraph 48, you state that you
17 requested permission for four items.  Do you see
18 that?
19 A.        Yes.
20 Q.        To whom did you make this request?
21 A.        The chief residents.
22 Q.        I thought these were the items that
23 the chief suggested to you?
24 A.        Yes, I think they were suggestion that
25 were agreed upon.  So it was a discussion.  It was

Page 61

1 not a -- a yes, no one-way conversation in the
2 sense that he said, well, these are things we can
3 do, and I said yes, sit-down rounds would be great,
4 meeting with my colleagues in advance would be
5 great.  So I confirmed, reinforced those
6 suggestions so that they were --
7 Q.        If they had suggested them, why did
8 you request permission from them?
9          MS. LOPEZ:  Objection.  Misstates
10 testimony.
11 Q.        Why did you request permission for the
12 suggestions that the chiefs had provided to you?
13 A.        Well, ultimately, they are the ones in
14 control of the accommodations and my schedule.  So
15 if they were going to be implemented, it would be
16 through the program leadership, not myself.
17 Q.        Did you need the chiefs' permission to
18 have a quiet space in which to take notes?
19 A.        To avoid any potential punitive
20 actions, I believe so.
21 Q.        So is the answer to that question yes,
22 you needed the chiefs' permission for a quiet space
23 in which to take notes?
24 A.        I needed approval.
25 Q.        From who?

16 (Pages 58 - 61)

1   A.      The chief residents.
2   Q.      And so you asked for the chiefs to
3   approve a quiet space for you to take notes?
4         MS. LOPEZ: Objection.  Asked and
5   answered.
6         ms. Conrad:  Well, he's using
7   permission, approval.  I'm trying to figure out
8   what he was seeking and what he -- what information
9   he obtained from the chiefs.
10        MS. LOPEZ:  I think he's provided you
11  with an explanation of his conversation of the
12  chiefs.  If you want him to describe that
13  conversation, you know, in some other way, then you
14  have to ask the question in a different way.  He's
15  answered this question.
16  BY MS. CONRAD:
17  Q.      Just so I understand, you asked
18  Dr. Kogut, Dr. Beti, and Dr. Marshall for
19  permission for a quiet space in which to take
20  notes; is that correct?
21  A.      I discussed with them the potential
22  accommodation, such as having a quiet place to take
23  notes.  But I didn't exact -- I didn't specifically
24  use the words, may I have a quiet space to -- in
25  which to take notes, if that's what you're trying

1   to infer.
2   Q.      Dr. Salcedo, I'm trying to find out
3   whether or not paragraph 48 is a true statement or
4   -- or not.
5   A.      Yeah, it's a true statement.  I
6   requested these things after having the discussion
7   with the chief residents, the permission where it
8   may make it vague, but nonetheless is an accurate
9   statement.
10  Q.      Did you or did you not ask for
11  permission --
12        MS. LOPEZ:  Objection --
13  Q.      -- from -- permission from these four
14  items?
15        MS. LOPEZ:  Objection.  Asked and
16  answered.  He just explained what --
17        MS. LOPEZ:  He hasn't answered the
18  question.
19        MS. LOPEZ:  -- permission means to
20  him.  He just explained what permission means.
21  Multiple times.
22  BY MS. CONRAD:
23  Q.      You asked for approval from them?  Is
24  that your testimony?
25  A.      Yes.

1   Q.      And what was their response?
2         MS. LOPEZ: Objection.  Asked and
3   answered.
4   Q.      You may answer.
5   A.      They were amenable to -- to the
6   request.
7   Q.      What does that mean?
8   A.      They didn't see it -- the request as
9   being problematic and that it would be helpful.  I
10  left that meeting --
11  Q.      Sir, did you go forward with these
12  four suggestions from the chief?
13  A.      I followed up, but ultimately, those
14  -- those needed to be implemented from leadership,
15  not me.  I don't have that power to put
16  accommodations into place.
17  Q.      Did you have the power to find a quiet
18  space in which to take notes?
19        MS. LOPEZ:  Objection.  Ambiguous.
20  And, also, asked and answered.
21        MS. CONRAD:  No, I'm using his exact
22  words to ask a new question.
23  Q.      Did you have the power to find a quiet
24  space in which to take notes?
25        MS. LOPEZ:  Objection.  Asked and

1   answered.  He's already testified, counsel, that
2   he's not in charge of the accommodations, that the
3   chiefs are the ones who are making decisions and
4   that he was concerned that there could be some sort
5   of ramification.  He's testified about this
6   broadly.
7         MS. CONRAD:  I'm asking a different
8   question.
9   BY MS. CONRAD:
10  Q.      Did you have the power to find a quiet
11  space in which to take notes?
12        MS. LOPEZ:  Objection.  Ambiguous.
13  Q.      You may answer the question.
14  A.      As I needed accommodation, no, I did
15  not have the power.
16  Q.      You did not have the power to find a
17  quiet space to have notes?
18  A.      As a designated accommodation.
19  Q.      I'm not asking about an accommodation,
20  because the chiefs will talk about, in their
21  depositions, what took place in this meeting.  I am
22  asking a separate question.
23        Did you have the power to find a quiet
24  space in which to take notes?
25        MS. LOPEZ:  Objection.  Ambiguous.

17 (Pages 62 - 65)

1 What do you mean by power?
2      MS. CONRAD: He -- it's his word. So
3 he can answer the question.
4      THE WITNESS: So I don't have the
5 power to have listed as an accommodation a quiet
6 space in which to take notes so that I don't -- I
7 am not punished in the future. I don't have that
8 power.
9 Q.     Dr. Salcedo, I am not asking you about
10 accommodations. Let me ask you it -- it
11 differently.
12 A.     I'm sorry. You are. You're asking
13 about the quiet space to which to take notes.
14 That's an accommodation.
15 Q.     Dr. Salcedo, did you have the ability
16 to find a quiet space in which to take notes?
17      MS. LOPEZ: Objection. Asked and
18 answered.
19      MS. CONRAD: It's a different
20 question.
21      MS. LOPEZ: This was asked a long time
22 ago. Ten minutes ago.
23 BY MS. CONRAD:
24 Q.     Dr. Salcedo, you may answer the
25 question.

1 A.     I did not have the power to find a
2 quiet space in which to take notes without
3 guarantee, without having penalization or being
4 sure I wouldn't be penalized for it. I think
5 that's important distinction. It sounds like
6 you're trying to infer that I could just grab a
7 random empty room and started taking notes. That
8 would not have been an accommodation.
9 Q.     I'm not asking about accommodations.
10 I'm asking about note-taking.
11      Is it your testimony you were not in a
12 position to find a quiet space in which to take
13 notes?
14      MS. LOPEZ: Asked and answered.
15      MS. CONRAD: I'm not asking about
16 power. I'm not asking about ability.
17      MS. LOPEZ: You asked if he --
18      MS. CONRAD: Let me ask the -- a new
19 question.
20 BY MS. CONRAD:
21 Q.     During your residency, were you able
22 to find a quiet space in which to take notes?
23      MS. LOPEZ: Objection. Ambiguous.
24 What time period are you talking about?
25 Q.     At any point in time during your first

1 year of residency, were you able to find a quiet
2 space in which to take notes?
3      MS. LOPEZ: Calls for speculation.
4      MS. CONRAD: He --
5 Q.     Dr. Salcedo, please answer the
6 question, even if you have to speculate.
7 A.     I don't want to speculate. And I
8 don't really understand the question. I feel like
9 I answered it multiple times and multiple ways.
10 That -- I'm just confused now.
11 Q.     Okay. Here's a simple question.
12      At any time during your residency, did
13 you find a quiet space to take notes?
14 A.     During my residency, it was customary
15 for everyone to work together in a work group. And
16 that's where I would work.
17 Q.     So is the answer to the question you
18 could not find a quiet space to take notes?
19 A.     No. The answer is that because I did
20 not have approval from leadership to do so, I did
21 not just disappear from my team. I stuck with the
22 team in the work group.
23 Q.     I'm not asking about disappearing.
24      Is -- did you need approval to go to a
25 quiet space to take notes?

1      MS. LOPEZ: Asked and answered. You
2 can answer if you can.
3 A.     To ensure no negative consequences,
4 yes, I did need approval for -- for -- to be able
5 to go somewhere in a quiet space away from the
6 team. If I did so without approval, I would risk
7 ramifications.
8 Q.     Did you ever have time to work on
9 charts or notes by yourself or were you always with
10 a team?
11      MS. LOPEZ: Objection. Vague.
12 A.     I was usually with the team in -- in
13 the team room where we took notes. Also, I can't
14 really take notes anywhere. The computer with the
15 MR system, they're a computer in designated areas,
16 so those are the work areas.
17 Q.     During your residency, did you meet
18 with colleagues in advance as described in 48B?
19 A.     To the best of my ability, I -- I
20 tried to meet with some of them beforehand,
21 especially attendings that I had already
22 established a relationship with and that I felt
23 comfortable sharing and disclosing with. And that
24 I didn't think I would be penalized or stigmatized
25 by sharing.

18 (Pages 66 - 69)

1    Q.       And did you request to meet with
2    colleagues in advance?
3    A.       Are we still talking about the August
4    25th meeting or in general?
5    Q.       I'm talking about your allegation in
6    48B.
7    A.       Yes.
8    Q.       Did you request to meet with
9    colleagues in advance?
10   A.       Yes.
11   Q.       And did you meet with them in advance?
12           MS. LOPEZ: Objection. Vague.
13   Q.       Dr. Salcedo, you just said that you
14   requested to meet with colleagues in advance. Do I
15   have that right?
16   A.       Yes.
17   Q.       And the follow-up question is: After
18   you made that request, did you meet with them in
19   advance?
20   A.       When I was able to. But it was not in
21   the form of an accommodation; it was a form of me
22   taking additional risk of disclosing my condition
23   and my need to various colleagues and leaders.
24   Q.       Did you engage in sit -- were you able
25   to sit during rounds?

1    A.       It depended on the attending's
2    preference. But I do recall one particular
3    attending that I did disclose to and we did utilize
4    sit-down rounds.
5    Q.       And did you meet with your healthcare
6    provider monthly?
7    A.       Yes.
8    Q.       You then state in paragraph 50 that on
9    august 19th, you contacted the medical center human
10   resource office and requested the paperwork. Do
11   you see that?
12   A.       Yes.
13   Q.       Did you provide that paperwork to the
14   chief residents whom you had met with about these
15   specific requests -- suggestions?
16   A.       No.
17   Q.       Paragraph 53, you make reference to
18   meeting with Dr. Kogut to discussion your previous
19   requests for accommodation. Do you see that
20   allegation?
21   A.       Yes.
22   Q.       Tell me about what happened in that
23   meeting with Dr. Kogut.
24   A.       And so this number 53 is also an item
25   that we would need to date. It should be -- there

1    was a follow-up email. There actually was not a
2    meeting; there was a follow-up email.
3    Q.       And what information was contained in
4    the follow-up email?
5    A.       It was just me being polite,
6    expressing gratitude for their time and saying that
7    I was looking forward to implementing all of the
8    things we discussed during our meetings, such as
9    what we already talked about here today, the
10   sit-down rounds, quiet space to work, meeting
11   colleagues and attendings beforehand, and setting
12   expectations.
13   Q.       Paragraph 54, you allege you went to
14   your treating psychiatrist and secured a written
15   letter. Do you see that allegation?
16   A.       Yes.
17   Q.       What do you mean by the word you
18   secured a written letter?
19   A.       I obtained.
20   Q.       And two specific requests. Do you see
21   that?
22   A.       Yes.
23   Q.       Did you make those requests to
24   Dr. Munoz?
25   A.       So when I met with Dr. Munoz, we had

1    -- again, it was an interactive discussion. And we
2    discussed what my triggers were and what would be
3    best accommodation-wise to help me with my
4    disability. And we ultimately decided on -- on
5    these two -- two, but these were -- these two
6    items, but these -- the wording of these two items
7    are his words, not mine.
8    Q.       Who decided on these two specific
9    requests?
10           MS. LOPEZ: Objection. Asked and
11   answered.
12   A.       We both did.
13   Q.       You may answer.
14   A.       It's an interactive process of
15   discussion with my treatment provider, and these
16   are the two items that we ultimately agreed upon.
17   But he actually wrote this letter and those are his
18   words.
19   Q.       Understood.
20           What is meant by less stressful
21   rotation When's possible?
22           MS. LOPEZ: Objection. Calls for
23   speculation.
24   Q.       Dr. Salcedo, you just decided that
25   both you and Dr. Munoz decided on these two

Page 74

1   specific requests for accommodations.
2          So my question is: What did you mean
3   by less stressful rotations when possible?
4   A.      So in that statement, the intent was
5   to convey the need for rotations, if possible, that
6   weren't erratic and that were more structured in
7   the sense of hour-wise, duty-wise, predictability,
8   rather than having a random shift on a weekend day
9   and -- and it just being random, or working 80
10  hours a week overnight rather than during the day.
11  So that statement is to address the predictability
12  and the consistency of my schedule.
13  Q.      What rotation, if any, were you being
14  -- were -- were you seeking to be excused from any
15  specific rotations?
16  A.      I wouldn't say I was seeking to be
17  excused from specific rotations I could name, but I
18  did ask to be considered for rotations that, again,
19  had more predictable schedules and that would allow
20  me to have self-care that I needed.
21  Q.      So what rotations were you seeking?
22          MS. LOPEZ: Objection. Asked
23  answered.
24  Q.      What specific rotations were you
25  seeking?

Page 75

1   A.      Again, I -- I don't have a name for
2   the rotation being that I was just starting there.
3   I don't know what the rotations were like or which
4   are the less stressful rotations. Those are
5   something that my program director or leadership
6   would have to engage in a discussion with me to
7   discuss. So that this is to initiate that
8   discussion so we can find out what those rotations
9   are.
10         But the point here is, what are those
11  rotations and if I can be assigned to them.
12  Q.      Were certain rotations required as
13  part of your first-year residency program?
14          MS. LOPEZ: Objection. Calls for
15  speculation and ambiguous.
16          MS. CONRAD: It does not. He receives
17  information about what's required.
18  Q.      Were there certain rotations required
19  during that first-year program?
20  A.      Yes.
21  Q.      What were those rotations that were
22  required?
23  A.      There -- there's a document we have
24  that has what the requirements are. I can only
25  comment on the fact that because I was a

Page 76

1   preliminary intern, my requirements were less
2   stringent and more modifiable than a regular
3   internal medicine resident.
4          So I recall that I had printed out an
5   ACGME form that showed what the minimum
6   requirements for myself, as a PGY-1 preliminary
7   intern was, and shared that with Dr. Swallow to
8   demonstrate that there was flexibility in my
9   schedule, because it showed that I did not need as
10  many of certain types of rotations. So there was
11  more room to accommodate and modify the schedule.
12  Q.      What certain types of rotations did
13  you conclude were not needed?
14          MS. LOPEZ: Objection. That -- that
15  misstates the testimony. That's not what we said.
16  BY MS. CONRAD:
17  Q.      I believe you said, and I tried to
18  write it down, that you did not need certain types
19  of rotations. Is that correct, Dr. Salcedo?
20  A.      No. Let me rephrase to the -- the
21  amount, quantity of the types of rotations was
22  different. So perhaps a regular PGY-1 might need
23  six months of floors, while a PGY-1 -- oh, I don't
24  want you -- these are hypotheticals, so never mind
25  -- I don't want you to quote me.

Page 77

1          They were just less rigorous. The --
2   the requirements were less rigorous and there was
3   more flexibility in the schedule and in
4   Dr. Swallow's ability to accommodate me. So the
5   whole point of me bringing that up to her and
6   giving her documentation was to remind her and let
7   her know. It was, again, another ask for help.
8   Q.      Number 2 says, assignments to
9   rotations which allow for adequate sleep and time
10  off on weekend when possible.
11         Do you see that?
12  A.      Yes.
13  Q.      What rotations were you seeking that
14  allowed for adequate time -- adequate sleep and
15  time off on weekend?
16  A.      It's almost as though you asked --
17  that question you just asked me is essentially what
18  we're asking Dr. Swallow: What are the options?
19  What are the rotations that can allow me to sleep
20  better? You're the program director. Please
21  inform us and let us know what can be done.
22         So this statement is asking for that.
23  But as an intern and as a psychiatrist, we don't
24  know that information. That's why we're seeking
25  Dr. Swallow's help.

20 (Pages 74 - 77)

Page 78

1  Q.      Did you know whether or not such
2  requests were available --
3              MS. LOPEZ:  Objection --
4  Q.      -- in conjunction with the
5  requirements of your program?
6              MS. LOPEZ:  Objection.  Asked and
7  answered.
8  Q.      You can answer.
9  A.      You said if I was aware that such
10  requests were available.  I don't -- I don't
11  understand.
12  Q.      You had certain program requirements,
13  didn't you?
14  A.      Yes.
15  Q.      Do you know whether there was the type
16  of flexibility and less rigor within those program
17  requirements that you were seeking?
18              MS. LOPEZ:  Objection.  Asked and
19  answered.
20  Q.      You can answer again.
21  A.      Yes, I -- that was -- that was the
22  whole intent of showing that, even though I'm
23  assuming -- or, I mean, I would assume that the
24  program director should have knowledge of that.  Me
25  giving her the documentation from ACGME was just to

Page 79

1  reinforce that those options were there.
2  Q.      I'm not asking about what the program
3  director had in her possession.  I'm asking about
4  whether or not you had knowledge and information
5  that certain accommodations could be met while
6  still meeting the program requirements?
7              MS. LOPEZ:  Objection.  Asked and
8  answered.
9              MS. CONRAD:  He can simply answer yes
10  or no.
11  A.      Can you repeat the question?
12  Q.      Do you know whether you would be in a
13  position to complete the program requirements in
14  conjunction with these two specific requests that
15  are listed in paragraph 54?
16              MS. LOPEZ:  Objection.  Calls for
17  speculation.
18              MS. CONRAD:  Counsel, I'm going to
19  note for the record that you are engaging in a
20  series of objections that are not consistent with
21  what is provided in the Rules of Civil Procedure.
22  And I consider such objections to be disruptive,
23  wasting time, and not appropriate for this
24  deposition.
25              If you want to object to the form of

Page 80

1  the question, that is permissible.  Please follow
2  the Rules of Civil Procedure.
3              MS. LOPEZ:  And I am following the
4  Rules of Civil Procedure.  And the objections
5  provided for include asked and answered, ambiguous,
6  calls for speculation, and misstates testimony, as
7  well as compound questions, and you are asking the
8  same question over and over and over again.
9              MS. CONRAD:  Attorney Lopez, this is a
10  deposition.  We are not at trial.  At deposition,
11  there is one objection, to the form of the
12  question, and perhaps an objection with related to
13  privileged material.
14              MS. LOPEZ:  Well --
15              MS. CONRAD:  Now, let's go on with the
16  deposition and save your objections for trial.
17              MS. LOPEZ:  You're -- you know, what
18  you need to know is that it is required and
19  actually appropriate to state what the form of the
20  question objection is so that you have an
21  opportunity to cure the question.  I'm not leading
22  the -- the witness.  I'm not, you know, giving any
23  kind of additional hints.  I am providing an
24  objection so you can rephrase the question or
25  understand why I believe there's a problem with the

Page 81

1  question.  It's completely appropriate.
2              MS. CONRAD:  You can just object to
3  the form of the question.  I don't need the
4  additional information.
5              MS. LOPEZ:  I --
6  BY MS. CONRAD:
7  Q.      Dr. Salcedo, can you --
8              MS. LOPEZ:  I need to put it on the
9  record.
10  Q.      Dr. Salcedo, do you know whether or
11  not these two specific requests for accommodation
12  were possible while still meeting the program
13  requirements?
14  A.      To the best of my knowledge, yes.
15  Q.      In paragraph 55, you allege that you
16  gave Dr. Swallow the accommodation letter from
17  Dr. Munoz.  Do you see that allegation?
18  A.      Yes.
19  Q.      What did Dr. Swallow do with that
20  accommodation letter, if you know?
21  A.      Sure.  So I did give her the
22  accommodation letter along with the accommodation
23  request form.  So I gave her two items at the same
24  time.  She read them over and she said, okay.  And
25  she also stated that it would be much easier and

21 (Pages 78 - 81)

1  quicker to implement the accommodations through
2  her, so there was no need to continue with this
3  form.
4        And then she gave me back both the --
5  the request from my provider and the partially
6  filled out accommodation request form. So she gave
7  them back to me during the meeting. She didn't
8  need them, she said.
9  Q.      Paragraph 59, you allege that you
10 emailed Dr. Swallow to request a meeting to discuss
11 his request -- requested accommodations. Do you
12 see that allegation?
13 A.      Yes.
14 Q.      What do you recall from that email?
15 A.      I -- I recall that I sent that email
16 to Dr. Swallow to let her know that I was still
17 waiting for accommodations. It -- it was a short
18 email, but it was just another check-in to
19 essentially say, hey, I'm still here and, hey, I
20 haven't been accommodated.
21 Q.      Did -- did you use the word
22 accommodations --
23 A.      I --
24 Q.      -- in that email?
25 A.      -- didn't use that exact word,

1  accommodation, no.
2  Q.      I'm sorry. I missed that. Say that
3  again, please?
4  A.      I said, I didn't use the exact word
5  accommodation. I believe I said something along
6  the lines of any of the things we had discussed or
7  implemented, any of the items we -- we discussed.
8  Q.      In paragraph 60, you make reference to
9  being scheduled 78 -- 78 to 80 or more hours per
10 week. Do you see that?
11 A.      Yes.
12 Q.      What was -- do you know what the
13 typical amount of hours to be scheduled for a
14 resident in your program?
15        MS. LOPEZ: Objection. Calls for
16 speculation.
17 Q.      Do you know, is the question. Yes or
18 no?
19 A.      It's a difficult question to answer
20 only because no one resident's schedule is the same
21 at the same time. So you could have residents that
22 are working more hours than others. So I could do
23 -- a point in time, I could be working closer to
24 80, and if you did another point in time, I could
25 be working 70 or 60. So it depended on the

1  rotation and the point of time.
2  Q.      Paragraph 63, you make reference to
3  the December 2017 incident. And you use the words
4  that you experienced side effects that impaired him
5  temporarily. Do you see that?
6  A.      Yes.
7  Q.      Other than what you described, were
8  you impaired in any other way as a result of the
9  sleep aid?
10 A.      No. My -- my symptomologist repeat
11 the -- the symptomatology was the retrograde
12 amnesia, so not recalling the generalized
13 confusion, the double vision, and kind of the
14 visual blurriness. And not really recalling things
15 exactly or knowing something was really there.
16 But that's -- secondary to the amnesia, that was
17 the main symptom profile.
18 Q.      Would those impairments impact your
19 ability to carry out your job duties as a resident?
20 A.      Had they occurred during duty hours,
21 yes. Fortunately, this event occurred during my
22 own time, off hospital time.
23 Q.      In paragraph 67, you alleged that
24 following the December incident, Michelle Batz
25 released you to return to full duty. Do you see

1  that?
2  A.      Yes.
3  Q.      And that Dr. Munoz indicated you were
4  fit for duty and could return to full-duty work.
5  Do you see that?
6  A.      Yes.
7  Q.      And 69, you -- into 70, that Timothy
8  Sullivan found that you were stable and able to
9  return to work without any specific restrictions;
10 is that correct?
11 A.      Yes.
12 Q.      Paragraph 77, you allege that
13 Dr. Salcedo, on December 14, 2017, told you that
14 your performance feedback was positive up until
15 that point. Do you see that allegation?
16 A.      Yes.
17 Q.      Now, up until December 14th, had you
18 been receiving or were you being evaluated in
19 conjunction with the performance of your job duties
20 and responsibilities?
21 A.      Yes.
22 Q.      Did you review those evaluations?
23 A.      Yes.
24 Q.      Were there any areas of concern that
25 were raised in those evaluations?

1  A.        There weren't any areas of concern
2  noted in those evaluations.  There were suggestion
3  for improvement in the free text comment section.
4  So the way that the scoring worked was it was like
5  a one to five numerical score.  So if there was a
6  concern, you would put a little deficiencies score.
7          And, in fact, I actually received
8  higher than average scores for a majority of my
9  rotations or average.  There were suggestions for
10  improvement, but that was standard in the feedbacks
11  comment.
12  Q.        Paragraph 78, you indicate that
13  Dr. Swallow informed you that the remediation plan
14  was not punitive.  Do you see that?
15  A.        Yes.
16  Q.        Did you understand the purpose of the
17  remediation plan?
18  A.        Yes.
19  Q.        What was that -- the purpose of the
20  plan?
21  A.        The intended purpose was to give extra
22  help to a resident.  But if -- remediation plan is
23  a -- is a little odd in that there wasn't really,
24  like, a systematic performance improvement plan to
25  help me, per se.  It was more of a opportunity to

1  watch me and evaluate me.  So not so much grow and
2  learn, but rather be critiqued.  So it was a
3  very odd remediation.
4  Q.        Well, did you have opportunities to
5  learn as part of the remediation plan?
6  A.        For the most part, I would say no,
7  because I felt like I was kind of on the hot seat,
8  being quizzed.  You know, I got these -- where
9  basically they were evaluating me, so they were
10  evaluations.
11          And so part of the remediation plan
12  was actually just focused on my disability.  So it
13  was very -- again, it was a very odd remediation
14  plan, because a component of it was just discussing
15  my disability and how it was impacting me.
16  Q.        I'm sorry.  I missed that.  Did you
17  say the remediation plan was discussing your
18  disability?
19  A.        Yes, part of it.
20  Q.        Where was that addressed in the
21  remediation plan?
22  A.        I had a meeting around February 9th,
23  2018 with Dr. Jed Gonzalo.  And he had said,
24  honestly, I was told about this meeting a few hours
25  ago, which I don't really know what we're supposed

1  to be talking about, but we should just talk about
2  you, your struggles, how it is impacting to
3  residency life.
4          So the entire meeting was almost like
5  a session; it felt like a therapy session, but it
6  essentially was just discussion of my disability,
7  how I was adapting, how I was coping, and that's
8  listed as a remediation meeting.
9  Q.        Was that the only component of the
10  remediation plan, that meeting with Dr. Gonzalo?
11  A.        There was -- there were two other
12  meetings that went over kind of a question patient.
13  So the -- the doctor would provide me a patient
14  with symptoms and then kind of follow through with
15  the work-up.
16          And then there's a -- there was
17  another meeting with Dr. Ami Dewaters in which she
18  reviewed two of my progress notes that I had
19  written for patients, and that seemed to have go --
20  gone well.  She said my notes were -- were good and
21  they were on par with my peers.
22  Q.        Any other components of the
23  remediation plan?
24  A.        There was a component of Dr. Swallow
25  checking in with me.  She was supposed to set up

1  meetings.  I remember I followed up to ask her how
2  it would be set up, but she never initiated those
3  meetings or fulfilled her obligation on that end.
4          There was also a case workbook.  There
5  was, like, a book of clinical vignettes that I
6  completed and I left on Dr. Swallow's mailbox.  No
7  one ever reviewed them with me, no one ever
8  discussed them or asked about it, so I just
9  completed the book and returned it.
10          And there was also a practice OSPE
11  sesh -- sesh -- practice OSCE session, which is
12  like an objective standardized performance
13  evaluation in which the chief residents watched me,
14  again, do a clinical vignette, but on a -- an actor
15  patient.
16  Q.        And did you receive feedback during
17  those meetings?
18  A.        Some of them, yes; some of them, no.
19  But the feedback was more on -- so I'll break down
20  each case.  So the note-taking with Dr. Ami
21  Dewaters.  She said my notes were good.  They were
22  on par with my peers.
23          The OSCE patient component, I never
24  heard any feedback.  No one ever followed up with
25  that.  Dr. Swallow never gave me feedback.  No one

Page 90

1    ever discussed the book with me.
2            And the two meetings -- then there was
3    the meeting with Dr. Jed Gonzalo, which there was
4    not really any feedback, except keep trying hard
5    and good job for being proactive and being strong,
6    because that -- that meeting -- the remediation
7    meeting was just me talking about my disability and
8    my struggles.
9            So the only real feedback I got were
10   from the two 45-minute sections, which basically
11   kind of went over my thinking and my work-up of
12   patients. Aside from that, there really was not
13   any learning or feedback involved in the
14   remediation plan, unfortunately.
15   Q.      Now, following the December incident,
16   there was another incident in February that you
17   referenced in paragraph 84. So let me direct your
18   attention to paragraph 84.
19           You make reference to a February 23rd,
20   2018 incident in which you had to leave the
21   hospital because of a reaction to the depression
22   and anxiety. And that you had to leave before your
23   shift was completed. Do you see that in paragraph
24   84?
25   A.      Yes.

Page 91

1    Q.      Okay. Other than what we've already
2    described about that incident, do you have any
3    further information related to it?
4    A.      Yes, I would -- I would like to
5    clarify that. Again, it was a -- I realized after
6    discovery that the days in the sequence, so that me
7    leaving my shift occurred on the 24th. That's
8    after I removed myself and reached out to
9    Dr. Kogut. So that was not on the 23rd of 2018.
10   Q.      And then on paragraph 85, you allege
11   that you met with Dr. Kogut, correct?
12   A.      Yes.
13   Q.      And did you inform him about the
14   negative impact of working so many hours on your
15   ability to cope with depression and anxiety?
16   A.      Yes.
17   Q.      And did you tell Dr. Kogut that you
18   needed accommodation?
19   A.      During that -- that meeting on the
20   24th of February, I didn't use made any -- use the
21   word accommodation. I -- but I did say --
22   indicated that because I wasn't accommodated, I
23   wasn't sleeping well, I wasn't getting the amount
24   of sleep I needed, and that was impacting my
25   health.

Page 92

1    Q.      But did you or did you not use the
2    word accommodation in your meeting with Dr. Kogut
3    On February 24, 2018?
4    A.      No.
5    Q.      So paragraph 85 of the complaint is
6    not true and accurate?
7    A.      It is accurate, but you're asking for
8    a specific word. And 85 is describing a
9    conversation, a situation that occurred. So
10   although the word accommodation was not said, we
11   did discuss the need for accommodation. You don't
12   have to say the word accommodation to know you're
13   discussing them or discussing ways to help a
14   struggling learner.
15           So, yeah, we didn't use the word
16   accommodation, but we did discuss that I was
17   working a lot of hours and sleep was deregulated.
18   I wasn't getting enough sleep. And basically what
19   I needed was more sleep. And that was the
20   discussion. So --
21   Q.      Was it true or not that you met with
22   Dr. Kogut to discuss your need for accommodation?
23           MS. LOPEZ: Objection. Asked and
24   answered.
25   Q.      You said you didn't use the word

Page 93

1    accommodation. So what word did you use to relate
2    your need for accommodation?
3    A.      I relayed my need for accommodation by
4    describing my worsening health and that I knew it
5    was attributed to poor sleep.
6    Q.      So you wanted Dr. Kogut to conclude
7    from your expression that your health was worsening
8    and you needed sleep that you needed an
9    accommodation?
10   A.      I No, I didn't want him to conclude
11   that, per se, although reasonably, a medical
12   professional would have understood that. The point
13   of me reaching out to him was to let him know. At
14   that point, my focus was removing myself from
15   service.
16           It wasn't, again, for the fourth or
17   fifth time, to request accommodations, but to let
18   him know, I'm struggling and I'm removing myself
19   from service. That was the primary purpose of that
20   discussion on February 24th.
21   Q.      Okay. So then you did not discuss
22   with Dr. Kogut your need for accommodation?
23           MS. LOPEZ: Objection. That
24   mischaracterizes his testimony.
25   Q.      Look at paragraph 85. Let's break it

24 (Pages 90 - 93)

Page 94

1    down one word at a time if we have to.  Let's make
2    it by phrase.
3            On February 24, 2018, Dr. Salcedo met
4    with Dr. Kogut to discuss his need for
5    accommodation.
6            Is that a true and accurate statement?
7    A.     I would say that that statement is
8    accurate, except it leaves out the primary purpose
9    of reaching out to him.  So it is true that I met
10   with him and I discussed the negative impact.  That
11   was all these hours were having on my health.
12           But in addition, it was to remove
13   myself from service.  So that's something that
14   would need to be added to that paragraph.
15   Q.     Okay.  And did you discuss with him
16   your need for accommodation?
17           MS. LOPEZ:  Objection.  Asked and
18   answered.
19           MS. CONRAD:  I still haven't gotten an
20   answer to that.
21   A.     I guess I'm a little confused because
22   I feel like I've answered this question a couple of
23   different ways, and I'm not sure --
24   Q.     Dr. Salcedo, I'm asking for a yes or
25   no answer.

Page 95

1            Did you, on February 24, 2018, meet
2    with Dr. Kogut and discuss your need for
3    accommodation?
4    A.     Yes.
5    Q.     So you used word accommodation with
6    Dr. Kogut?
7            MS. LOPEZ:  Objection.  Objection
8    asked and answered.
9    A.     That's a different question.
10   Q.     If -- if the answer is no, then what
11   word did you use in place of accommodation?
12           MS. LOPEZ:  Objection.  Asked and
13   answered.
14   A.     I'm -- I'm sorry, but you're asking me
15   two different questions.  And you're asking for the
16   same answer to two different questions.
17   Q.     I'm asking you to verify whether or
18   not paragraph 85 is true and accurate.
19           MS. LOPEZ:  And he's answered that
20   question, counsel.
21   Q.     And what is the answer, just so I have
22   it when I meet with Dr. Kogut?  That's all I want
23   to know.
24   A.     So it's accurate that I did discuss
25   the negative impact of working these many hours

Page 96

1    were having on my health.  But the primary reason
2    for this would need to be added to the paragraph,
3    was to remove myself from service.
4    Q.     I understand that.
5            And what about that first line?
6    A.     And I'm saying that this paragraph
7    needs to be updated so it's clearer.
8    Q.     Okay.  So tell me, what would the
9    clearer allegation consist of?
10   A.     On February 24, 2018, Dr. Salcedo
11   texted Dr. Kogut to meet with him as soon as
12   possible.  Dr. Salcedo met with Dr. Kogut, and Dr.
13   Salcedo noted that he did not feel comfortable on
14   service anymore.  He wanted to remove himself.  He
15   was experiencing worsening anxiety, worsening
16   depression.  He was not getting the sleep he
17   needed.  And his health was being negatively
18   impacted due to this.
19   Q.     Thank you.
20           In paragraph 91, you allege that --
21   that Dr. Swallow made a call to Dr. Munoz without
22   your permission or knowledge.  Do you see that
23   allegation?
24   A.     Yes.
25   Q.     Had you included Dr. Munoz and his

Page 97

1    contact information on the emergency plan that you
2    had submitted to Dr. Swallow?
3    A.     If I did, that emergency plan was for
4    my use, not for Dr. Swallow's.  It was what I would
5    do, not what Dr. Swallow would do.  So I did not --
6    under any assumption believe she would contact
7    anyone on that list, including my family and my
8    partner.
9    Q.     And if it was for your use, why would
10   you include a phone number on it?
11   A.     For it to be thorough.  I got --
12   Q.     Paragraph 98.  What meeting notes are
13   you are referring to in paragraph 98?
14   A.     They are a clinical competency
15   committee meeting notes that were propounded or
16   given to us during the discovery process.
17   Q.     And do those notes specifically
18   reference Dr. Salcedo's disability?
19   A.     I believe so.  I also believe that my
20   disability is referred to as a personal issue.  I
21   believe those words were used.
22   Q.     Okay.  We'll review those notes later
23   in the deposition.
24           Paragraph 100, you refer to consistent
25   positive reviews.  Do you see that reference?

25 (Pages 94 - 97)

1    A.    Yes.
2    Q.    Had you received any reviews that were
3  not positive?
4    A.    When you refer to the reviews, are you
5  talking about my objective performance scores or
6  free text --
7    Q.    I'm referring to whatever you're
8  referring to in paragraph 100.
9    A.    My reviews were positive, yes.
10   Q.    All reviews were positive?
11   A.    Objective score performance, values,
12  on a scale of one to five, all were positive.  They
13  were either average or above average.
14   Q.    Any negative concerns, issues on any
15  review as of April 4, 2018?
16   A.    Are you including April 4th?  Not to
17  be technical, but I remember I got a -- a false
18  evaluation that day.  So prior to April 4th, all of
19  my performance measures and scores, the numbers
20  were positive, average, above average.  And my free
21  text comments, which attending residents could
22  leave at the bottom, they included constructive
23  feedback and ways to improve, but they in no way
24  demonstrated critical deficiencies.
25   Q.    Up and until April 4th, had you been

1  informed of any critical deficiencies?
2    A.    By my attendings or my colleagues, no.
3  But I would -- if you're counting the remediation,
4  being placed on that remediation on December 14th,
5  that would be my only answer.
6    Q.    Up and until April 4th, 2018, had you
7  been placed on any warning or received any warning?
8    A.    No.
9    Q.    With respect to the appeal that you
10  referenced in paragraph 101, did you ever proceed
11  with a hearing or meeting with respect to that
12  appeal?
13   A.    I had initiated the -- the process of
14  the appeal, but after realizing that the appeal was
15  going to be biased, tainted, it was going to -- I
16  was given specific instructions that were not to my
17  benefit for the appeal, I did not continue that
18  process.
19   Q.    What do you mean you were given
20  specific instructions?
21   A.    Dr. Swallow notified me that I could
22  not have anyone for support.  I could not have my
23  legal counsel present.  That I had to be by myself,
24  alone, and that she would be leading the entire
25  process.

1    Q.    Had you reviewed the procedures that
2  applied to an appeal prior to that notice for
3  Dr. Swallow?
4    A.    Prior to her communication that I
5  could not have support or help?  No.
6    Q.    But did you review any policies that
7  addressed whether or not you could have support,
8  help, or someone with you at the appeal proceeding?
9    A.    I -- I didn't.  There's a grievance
10  process policy, but it did not men -- mention those
11  specific requirements that Dr. Swallow was giving
12  me.
13   Q.    In paragraph 102, you make reference
14  to an outlier evaluation.  Do you see that
15  allegation?
16   A.    Yes.
17   Q.    What do you mean by that?
18   A.    So up until that evaluation that I
19  received from Dr. Ashley Snyder, all of my
20  objective performance scores were either average,
21  above average, or aspirational.  It wasn't until
22  she submitted an evaluation after my termination
23  that I received the worst scoring possible in just
24  about all categories.
25       And they were scorings and categories

1  that Dr. Snyder had no knowledge of or did not have
2  a basis to comment on.  But nevertheless, there
3  were negative critical deficiencies marked there.
4  So this is the time that I received my first
5  critical deficiency scores, after termination.
6    Q.    What was the date of, if you recall,
7  Dr. Snyder's eval -- outlier evaluation?
8    A.    I believe it -- it was around April
9  4th.  That's the -- the point in my mind.  I -- I
10  -- I know because I had a set of evaluations and
11  scorings that I had before access was taken away.
12  And then afterwards, this date, all my scores
13  dropped because of the submission from Dr. Ashley
14  Snyder.  So it's almost like two versions of my
15  record.
16       MS. CONRAD:  I'm about to start a new
17  exhibit.  And before I do, I want to check with the
18  court reporter as well as counsel and Dr. Salcedo
19  as to whether this is a good time to take a break.
20  And if so, do we want to make it a brief lunch
21  break?
22       MS. LOPEZ:  I would appreciate at
23  least a comfort break and I'm fine with a lunch
24  break, if that's the consensus of the group.
25       MS. CONRAD:  It's -- it's

26 (Pages 98 - 101)

1  approximately 12:30.  I would propose that we
2  reconvene at 1:00, if that works for everyone.
3          MS. LOPEZ:  That's fine with.
4          THE VIDEOGRAPHER:  I just have to go
5  off the record.  I apologize.
6          The time is 12:28 p.m.  We are going
7  off the record.
8          (A break was taken.)
9          THE VIDEOGRAPHER:  All right.  The
10  time is now 1:03 p.m.  We are going back on the
11  record.
12          MS. CONRAD:  Thank you.
13          (Exhibit 3 was marked)
14  BY MS. CONRAD:
15  Q.      So I'd like to direct your attention
16  to Exhibit 3.
17          MS. CONRAD:  Jenny, are you with us?
18  Yes, she is.
19  Q.      Dr. Salcedo, Exhibit 3 consists of a
20  document titled, Plaintiff's responses to
21  defendant's first request for responses to
22  interrogatories.  Are you familiar with this
23  document?
24  A.      Yes.
25  Q.      Excuse me?

1  A.      Yes.
2  Q.      And did you review and verify the
3  truth and accuracy of the factual allegations
4  contained in this document prior to it being
5  finalized?
6  A.      Yes.
7  Q.      Turning your attention to number 2,
8  you list a number of individuals who have knowledge
9  about the facts contained in the Complaint, and I
10  very briefly want to run through these individuals.
11          Who is Dr. Vo?
12  A.      Dr. Cristina Vo, she's a pediatrician
13  based out of Philadelphia, Pennsylvania.
14  Q.      Did you treat with Dr. Vo?
15  A.      She's a colleague.
16          THE REPORTER:  I'm -- I'm sorry.
17  Sorry.  Sorry.  What was your answer?
18          THE WITNESS:  She's a colleague.
19          THE REPORTER:  She's a colleague.
20  Thank you.
21          THE WITNESS:  Colleague.
22          THE REPORTER:  Thank you.
23  BY MS. CONRAD:
24  Q.      And in what capacity is she a
25  colleague?

1  A.      We went to medical school together.
2  Q.      And what facts does she have knowledge
3  about?
4  A.      She has a general understanding of the
5  events that unfolded at Penn State Hershey Medical
6  Center, including my disclosure of my disability,
7  my request for accommodations, the lack of
8  implementation, my termination, and just general
9  understanding of where this case in the timeline
10  is.
11  Q.      How did she obtain that information?
12  A.      I told her.
13  Q.      Who is Dr. Santos?
14  A.      It's a -- a colleague of mine.  She's
15  a podiatrist in New Jersey.
16  Q.      And what information does she have
17  about the facts relevant to this claim?
18  A.      It -- it would be exactly the same as
19  Cristina Vo.
20  Q.      And from whom did she learn that
21  information?
22  A.      Me, myself.
23  Q.      Dr. Garcia?
24  A.      He's also a colleague of mine.  He's a
25  physician in Florida, and he -- he's aware of the

1  same information.
2  Q.      And from whom did he learn that
3  information?
4  A.      Me.
5  Q.      Dr. Nicholas Duca?
6  A.      Dr. Nicholas Duca was an attending of
7  mine during my employment at Penn State Hershey
8  Medical Center.
9  Q.      And how does Dr. Duca know about the
10  document -- documented disability request to
11  Hershey Medical Center?
12  A.      I told him.
13  Q.      Dr. Greene?
14  A.      She's the vice dean, Rutgers Medical
15  School in Newark, New Jersey.
16  Q.      How does Dr. Greene know about the
17  documented disability request to Hershey Medical
18  Center?
19  A.      I told her.
20  Q.      Dr. Hill?
21  A.      He's associate dean of students at
22  Rutgers.
23  Q.      And how does Dr. Hill know about the
24  documented disability request and the alleged
25  suffering?

27 (Pages 102 - 105)

1   A.      Told him.
2   Q.      Dr. Munoz?
3   A.      He's my -- he was my treating
4   psychiatrist in Hershey, Pennsylvania.
5   Q.      And what is the source of the
6   information he possesses?
7   A.      In addition to our -- our treatment
8   sessions, he also spoke directly to Dr. Swallow.
9   Q.      Miss Colston?
10  A.      Miss Sheri colston, she is my
11  therapist and she's in New Jersey.
12  Q.      When you say your therapist, at what
13  point in time?
14  A.      After leaving -- after employment at
15  Penn State Hershey Medical Center in June of 2018,
16  I transitioned care to her.
17  Q.      Are you still treating --
18  A.      Yes.
19  Q.      -- with Miss Colson?
20  A.      Yes.
21  Q.      And what is the source of the
22  information that Miss Colston possesses?
23  A.      She's aware of all of the same
24  information --
25  Q.      I don't --

1   A.      -- and what I told her in our
2   treatment sessions, I -- I disclosed it.
3   Q.      Miss Batz?
4   A.      She was my treating therapist during
5   my employment at Penn State Hershey Medical Center.
6   She's aware of the same information because I
7   disclosed it to her during our treatment sessions.
8   Q.      Dr. Obi?
9   A.      Same.  She's another colleague of
10  mine, and she's aware of all the events because I
11  discussed them with her.  I told her about them.
12  She's a close friend.
13  Q.      Dr. Jafri?
14  A.      Dr. Aliya jafri, she was a co-intern,
15  PGY-1 also into PGY-2 to 4 at PMNR.
16  Q.      And what is the source of information
17  she possesses?
18  A.      I told her.
19  Q.      Dr. Willer?
20  A.      Similar to Dr. Jafri, I told her.
21  Q.      Dr. Rudra?
22  A.      Similar to the above, she's a -- she
23  was a co-intern and I -- I told her myself.
24  Q.      Dr. Chen?
25  A.      I told her as well.

1   Q.      Antonio Marrero?
2   A.      He's my former roommate while I was at
3   Penn State Hershey Medical Center.  And I discussed
4   with him as well.
5   Q.      Directing your attention to
6   Interrogatory number 4.  In number 4, the answer
7   provides that you gave statements to my previous
8   lawyer as well as to the EEOC during the
9   investigation.
10          Do you see that response?
11  A.      Yes.
12  Q.      Have those statements been produced in
13  discovery?
14  A.      I'm not 100 percent sure.
15          MS. CONRAD:  I request at this time,
16  counsel, that all statements be produced as they
17  have been requested, to the extent they haven't
18  already been.
19          (Request.)
20  Q.      Number 5, you indicate that -- in your
21  response, that disabilities have been treated since
22  2008.
23          Do you see that response?
24  A.      Yes.
25  Q.      Did you receive accommodations at any

1   point during your education since these
2   disabilities have been treated in 2008?
3   A.      Yes.
4   Q.      What accommodations did you receive?
5   A.      I received extra test-taking time, a
6   quiet space for examinations.  I'm in just close --
7   close relationships with my -- my managers or
8   directors at the time.  So I had accommodations in
9   undergrad as well as the medical school.
10  Q.      When you sought accommodations in
11  undergrad, who did you request those -- how did you
12  request those accommodations?
13  A.      There's a disabilities service office
14  at my undergrad institution, Montclair State
15  University, where they provide counseling,
16  treatment and safe space.
17  Q.      And in medical school, how did you
18  request accommodations in medical school?
19  A.      I went to Dr. James Hill.  He's the
20  dean of students.
21  Q.      Directing your attention to the
22  response to Interrogatory number 6.  You make a
23  statement that you handed Dr. Swallow the
24  accommodation request form partially filled out.
25          Do you see that response?

1   A.      Yes.
2   Q.      Why was it partially filled out?
3   A.      Because I -- I only filled in the
4   specific lines that I could address myself, which
5   was just identifying information, date of birth,
6   basic identifying information.
7   Q.      And I believe you previously testified
8   that you handed Dr. Swallow the accommodation
9   request form and the letter from Dr. Munoz.  Is
10  that correct?
11  A.      Yes.
12  Q.      You don't reference that in this
13  answer, do you?
14  A.      Yes.  There is something that needs to
15  be updated in that paragraph -- in the sense
16  that, because the days occurred -- occurred close
17  together, I actually gave Dr. Swallow the
18  accommodation request form from Dr. Munoz the same
19  day.  When I was originally accounting this, I
20  thought it was on a separate day.
21  Q.      And -- and -- in the event -- on the
22  next page, the next paragraph -- well -- well, in
23  the same paragraph, you -- you -- you allege that
24  you informed Dr. Swallow you would get a letter
25  from your psychiatrist with suggestions for

1   accommodations as a starting point, right?
2   A.      Yes.
3   Q.      So what is it -- what is the -- the
4   accurate statement, that you handed swallow the
5   accommodation form and the Munoz letter on the --
6   at the same time or you did it separately?
7   A.      At the same time, during the same
8   meeting.
9   Q.      Then why does it say here, around late
10  August 2017, I submitted a letter of accommodation
11  from Munoz?
12  A.      So, again, during this last week of
13  August of 2017, there were numerous meetings that
14  occurred as I sought to secure accommodations.  So
15  the dates -- I mixed up one of the days.  So I
16  recall I met the chiefs on one day, then I met
17  Mr. Britt Marshall in the clinic another on the --
18  or around that same time I met Dr. Munoz to get the
19  release -- or I mean the notice for accommodations,
20  and then I met with Dr. Swallow.  So there were
21  multiple meetings that all occurred within a span
22  of a week.
23  Q.      Okay.  Could you put them in
24  chronological order for me, please?  Which -- which
25  meeting occurred first?

1   A.      The meeting with the chief.
2   Q.      And that's where the chiefs made the
3   suggestion to you, correct?
4   A.      Yes.
5           MS. LOPEZ:  Objection.
6   Mischaracterizes testimony.
7           MS. CONRAD:  He's already answered the
8   question.
9   Q.      After the meeting with the chiefs,
10  what meeting took place next?
11  A.      The meeting with Dr. Frank Munoz.
12  Q.      Then what?
13  A.      The meeting with Dr. Swallow -- oh, I
14  did have a clinic appointment with Dr. Britt
15  Marshall, and then the meeting with Dr. Swallow.
16  Q.      Is there anything else in these
17  Interrogatory answers that are not correct?
18  A.      To my knowledge, that's -- that's the
19  only item that would need updating.
20  Q.      On the -- I believe it's later in that
21  page, there's a reference to December 17, 2017 and
22  the emergency medical -- or the emergency mental
23  health plan.  Do you have that paragraph?
24  A.      Yes.
25  Q.      You say, at this time, I was forced --

1   I'm halfway in that paragraph -- to sign a letter
2   placing myself in remediation.
3           Do you see that?
4   A.      Yes.
5   Q.      What do you mean when you say you were
6   forced?
7   A.      Me signing that remediation -- me
8   being able to return to work was contingent on me
9   accepting that remediation.
10  Q.      Well, you could have said no, I'm not
11  signing it, right?
12  A.      I -- I could have denied signing that
13  form and not continued my training.
14  Q.      And you wanted to continue your
15  training?
16  A.      Yes.
17  Q.      So you signed the form?
18  A.      Yes.
19  Q.      You say, the letter was heavily geared
20  toward my disability.
21          Do you see that statement?
22  A.      Yes.
23  Q.      What does that mean?
24  A.      That the bulk of the discussion I had
25  with Dr. Swallow was on my mental health, on my

Page 114

1  disability, how I would address it, rather than
2  what accommodations could be implemented.  So the
3  bulk of the meeting was just discussing my
4  disability.
5     Q.     Well, did you ask to submit any form
6  of response or addendum to the remediation plan?
7            MS. LOPEZ:  Objection.  Compound
8  question.
9     Q.     Did you ask to submit any response to
10 the remediation plan?
11    A.     No.  There was not an addendum or a
12 response submitted.  It was just --
13    Q.     I'm asking if you asked -- if you were
14 able to submit a response?
15           MS. LOPEZ:  Objection.  Calls for
16 speculation.
17    Q.     Did you ask about submitting a
18 response to the remediation plan?
19    A.     I did not ask to submit a response.  I
20 didn't know that was an option.  I was just told to
21 sign the form.
22    Q.     Did you ask if it was an option?
23    A.     I'm sorry.  I just said I didn't know
24 it was an option.
25    Q.     On the next page, referring to the

Page 115

1  February 26th incident, the second full paragraph
2  refers to the evening of February 26th.  You assert
3  in this response that Dr. Swallow violated HIPAA
4  and called my psychiatrist to discuss my medical
5  history.
6            On what do you form the basis for your
7  allegation that Dr. Swallow violated HIPAA?
8     A.     I -- I never signed a written release
9  or told Dr. Swallow it was okay to discuss my
10 disability, my mental health, my symptomatology or
11 any episodes at the center with anyone else.
12    Q.     Had you told Dr. Munoz not to disclose
13 your medical information to anyone?
14    A.     I did not have to tell Dr. Munoz that.
15 He knew to follow the guidelines.  So it was him
16 who actually requested the release form after
17 Dr. Swallow called him, because he thought it was
18 inappropriate.
19    Q.     Well, he was the one who possessed
20 your medical history, didn't he?
21    A.     Yes.  He's my treating provider.
22    Q.     And he is the one that made
23 disclosures about your medical history, isn't he?
24    A.     No.  The events around February 26th,
25 2018, they were disclosed to Dr. Munoz by

Page 116

1  Dr. Swallow, I believe.
2     Q.     So -- but it was Dr. Munoz who made
3  the disclosures about your medical history,
4  correct?
5            MS. LOPEZ:  Objection.  Asked and
6  answered.
7     Q.     Did Mr. Munoz violate HIPAA when he
8  disclosed information to Dr. Swallow about your
9  medical history?
10           MS. LOPEZ:  Objection.
11 Mischaracterizes testimony.
12           MS. CONRAD:  I'm asking a question.
13 I'm not even characterizing his testimony.  Please
14 stop being disruptive.
15           MS. LOPEZ:  I'm not being disruptive.
16 I'm putting my objection to the form of the
17 question on the record.
18           MS. CONRAD:  There was no reference to
19 his testimony in that question, so there is no
20 proper basis for that objection.
21           Could you repeat the question to
22 Dr. Salcedo, please?
23           THE REPORTER:  Yes.
24           (The question was read back by the
25 reporter.)

Page 117

1            THE WITNESS:  No, Dr. Munoz did not
2  violate HIPAA.  Not only did he have -- he asked
3  for a signed release form before he would talk more
4  with Dr. Swallow.  Or should I say --
5  BY MS. CONRAD:
6     Q.     But he talked to her on February 26th,
7  didn't he?
8     A.     Yes.  But that was without the release
9  form.
10    Q.     And he disclosed medical  information
11 --
12    A.     No.
13    Q.     -- about you on February 26th, didn't
14 he?
15    A.     I did not state that.
16    Q.     You say in your answer here, on the
17 evening of February 26th, 2018, Dr. Swallow
18 violated HIPAA and called my psychiatrist,
19 Dr. Frank Munoz, to discuss my medical history.
20    A.     Yes.
21    Q.     Dr. Munoz provided information in that
22 February 26th call about your medical history.
23    A.     No, not that I am aware of.
24    Q.     Was Dr. Swallow one of your medical
25 providers?

30 (Pages 114 - 117)

1    A.    No.

2    Q.    Then how did Dr. Swallow violate

3    HIPAA?  Strike that.

4          Just let me ask:  How did Dr. Swallow

5    violate HIPAA on February 26th, 2018?

6    A.    Because she has a duty as the program

7    director to keep all information confidential that

8    she had learned on my behalf, including my

9    disability and mental health.

10   Q.    And is it your position that's a

11   violation of HIPAA?

12   A.    I would say that her disclosing my --

13   my disability and my exacerbation of symptoms

14   without my permission, as a medical professional,

15   in my opinion, is a violation of HIPAA, because it

16   was in the sense under her care as her student, a

17   medical student.

18   Q.    What did --

19   A.    Say it again.

20   Q.    What did Dr. Swallow disclose to

21   Dr. Munoz on the evening of February 26th?

22   A.    She -- Dr. Swallow told Dr. Frank

23   Munoz that I was having worsening in my condition,

24   that I had a slip in self-care.  She discuss --

25   discusses a patient incident.

1          She goes on to discuss accommodations

2    she states that she has already implemented.  And

3    possible further accommodations.

4    Q.    And this discussion took place after

5    the incident in February of 2018 in which you

6    removed yourself from service, correct?

7    A.    Yes.  Two days after.

8    Q.    And what is the source of your

9    information that Dr. Swallow disclosed your

10   worsening condition, your slip in self-care, the

11   patient incident, and accommodations with

12   Dr. Munoz?

13   A.    Dr. Frank Munoz wrote down notes of

14   the telephone call and transcribed them for me.

15   Q.    Turning to page 11.  On page 11, in

16   about the third sentence, you note that the three

17   chief residents provided examples of accommodations

18   that would be easy to arrange.  Don't you?

19   A.    Yes.

20   Q.    And you then list the quiet space, the

21   ability to meet with colleagues, the option to

22   conduct sit-down rounds, and schedule time to meet

23   with healthcare providers monthly.

24   A.    Yes.

25   Q.    You then go on to say that you left

1    the meeting under the impression that, my requests

2    for acknowledged in good faith and to be acted upon

3    in a timely manner.

4          Do you see that statement?

5    A.    Yes.

6    Q.    Who did you expect to act upon them in

7    a timely manner?

8    A.    The chief residents themselves, they

9    -- they reached out when I started working at the

10   medical center to let all the residents know that

11   if they had any concerns or requests, that they

12   were the people to reach out to.

13   Q.    But what do you mean that -- that the

14   requests were acknowledged in good faith and to be

15   acted upon in a timely manner?  What does that

16   mean?

17   A.    We -- we had a discussion and I was

18   left under the impression that the items we

19   discussed, those sit-down rounds, the quiet space

20   to work, the meeting the attendings beforehand, and

21   establishing those relationships, that the chief

22   residents would work on getting those put into

23   place.

24   Q.    Did you take any action to put them in

25   place?

1    A.    I -- I did what I could do best on my

2    end, which was remind them.  But that actually

3    needed to come from the people with the power to

4    make the change, which was the leadership that I

5    approached.

6    Q.    So you took no action to -- with

7    respect to any of those items addressed in that

8    paragraph?

9          MS. LOPEZ:  Objection.

10   Mischaracterizes testimony.

11   BY MS. CONRAD:

12   Q.    Did you take any action to find a

13   quiet space in which to take notes?

14   A.    So I did take action myself because

15   accommodations were not implemented.  And by that

16   was when I disclosed my disability to my attendings

17   beforehand to get accommodations such as sit-down

18   rounds.  But those were ad hoc and I had to do them

19   at out-of-rotation basis.  They were not

20   accommodations implemented by the program itself.

21   Q.    Okay.  Listen carefully to my

22   question, please.

23          Did you act in a timely manner to

24   obtain a quiet space in which to take notes?

25          MS. LOPEZ:  Asked and answered.

31 (Pages 118 - 121)

1    A.      I believe I already asked -- answered
2  that question, ma'am.
3    Q.      Did you act in a timely manner to
4  conduct sit-down rounds?
5    A.      Yes.  I started my employment there
6  July 1st, 2017, and before I even started working
7  there, I had already reached out to leadership.  So
8  I was very timely.  And I had reached out for
9  accommodations before I even started rotating.
10   Q.      Dr. Salcedo, I'm not asking if your
11  requested.  I'm asking if you found a quiet space
12  to take notes.
13          MS. LOPEZ:  Counsel, I think you asked
14  him about sit-down rounds, not quiet space.
15          MS. CONRAD:  I know.  I'm -- I'm going
16  back because I want to make sure that we -- we're
17  on the same page here.
18  BY MS. CONRAD:
19   Q.      Did you, Dr. Salcedo, in a timely
20  manner and find a quiet space to take notes?
21          MS. LOPEZ:  Asked and answered.
22   Q.      Just give me a yes or no.  It will
23  take you a second.
24   A.      Unfortunately, I feel like it's a --
25  it's a leading question.  You're -- you're assuming

1  that I could do that without consequence.  So, no.
2    Q.      Did you act in a timely manner to
3  conduct sit-down rounds?
4    A.      I don't understand the question.  Did
5  I act in a timely manner to conduct sit-down
6  rounds?  I don't conduct them.  I'm a part of the
7  sit-down rounds.
8    Q.      During the sit-down rounds, did you
9  sit down?  During rounds, did you sit down?
10   A.      Yes.
11   Q.      Did you schedule time to meet with
12  your health care providers monthly?
13   A.      Yes.
14   Q.      Turning to page 12, Interrogatory
15  number 7.  This question asked about others who
16  were not disabled but required some sort of
17  flexibility as first-year interns that were granted
18  help.
19          And in your response, you list
20  Dr. Erik Soto.  Who is Dr. Soto?
21   A.      He was a colleague of mine, another
22  intern.
23   Q.      And what -- what flexibility or help
24  did he receive?
25   A.      I know he received financial support

1  from the program as well as time off to visit
2  family.
3    Q.      What was the amount of time off that
4  he received?
5    A.      I don't know the exact details of how
6  much time he was granted.
7    Q.      How about Dr. Kuzmin?
8    A.      He had a sports-related in -- injury,
9  and I noted that he was often excused from being
10  late to events and meetings and things without
11  consequence.
12   Q.      And how long did that take place?
13   A.      How long did it take place?
14   Q.      Yes.
15   A.      Throughout the beginning of my
16  employment, I believe he came in with the injury or
17  got it near the beginning of employment, until he
18  healed.
19   Q.      And how long was he excused from being
20  tardy to events and meetings and visually observed?
21  For what period of time?
22   A.      I can't comment on the exact dates or
23  time span.
24   Q.      Directing your attention to page 15,
25  Interrogatory number 10.  This is in reference to

1  the February incident.  And in your response, you
2  make the statement, I did not accept this patient
3  under my care, leaving the responsibility to
4  Dr. Snyder, who received sign-out for this patient.
5          Do you see that statement?
6    A.      Yes.
7    Q.      Had you cared for this patient at any
8  point in time?
9    A.      I can't definitively tell you that
10  because I don't know who the patient is that's
11  being referred to.
12   Q.      In -- on the next page, number 11, in
13  your response, you state that you told Dr. Swallow
14  that there was an error in patient hand-off as I
15  never assumed responsibility for the patient or
16  stated I would accept care of him or her.
17          Do you see that statement?
18   A.      Yes.
19   Q.      Does that refresh your recollection as
20  to the patient at issue?
21   A.      Again, so during this meeting,
22  Dr. Swallow brought to my attention that there was
23  a patient concern, but, again, nothing was brought
24  up to my attention the day prior when it occurred,
25  so I can't comment on event on a patient that was

1    not brought to my attention when it occurred.
2         So literally during that session is
3    when I was getting the details that a -- an alleged
4    patient event occurred that was -- the patient
5    wasn't seen in a timely manner.
6         But that could possibly be any
7    patient. I don't know which patient is being
8    referred to, who the patient was signed off to.
9    It's not like I had all of that in front of me to
10   make that decision or to be informed.
11        Dr. Swallow only said there was an
12   issue with a patient not being seen in a timely
13   manner. And I had stated that that might have been
14   a patient hand-off problem or issue. And Dr.
15   Swallow responded, hmm, sounds like it was a
16   miscommunication.
17        But that's all the detail I'm given of
18   that event.
19   Q.        Well, prior to your -- I believe you
20   -- you testified you called Dr. Kogut and said you
21   couldn't continue on the ward; is that correct?
22   A.        Yes.
23   Q.        Well, prior to you then leaving the
24   ward, what action, if any, did you take with the
25   patients you have seen up until that point in time?

1    A.        I had made sure that all orders were
2    complete and that my colleague was aware of where
3    all the patients stood so that it would be a smooth
4    transition. But because of the time that I left in
5    the early afternoon, morning rounds would have
6    already been completed, so orders and notes would
7    have already been done for the patients.
8    Q.        What about the night before? What
9    about those patients?
10   A.        What about them?
11   Q.        When did you start that shift?
12        MS. LOPEZ: Counsel, are you referring
13   to February 23rd?
14   BY MS. CONRAD:
15   Q.        On the day that you left ward -- the
16   wards at around -- I thought you said it was around
17   noon, 1:00, when had you started that shift?
18   A.        Approximately 6:30, February 24th.
19   Q.        6:30 p.m. or a.m.?
20   A.        A.m., approximately.
21   Q.        February -- what was the date?
22   A.        24th.
23   Q.        Had you worked the previous day?
24   A.        Yes.
25   Q.        What were your hours on February 23rd?

1    A.        Approximately 6:30 a.m. to 6:30 p.m.
2    Q.        And when you referenced speaking to a
3    colleague prior to leaving on the 24th, to whom did
4    you speak?
5    A.        Samantha Willard.
6    Q.        I want to go back to paragraph 11. In
7    the second paragraph, after you allege that
8    Dr. Swallow violated HIPAA, you state that
9    Dr. Swallow described false accommodations to my
10   psychiatrist, such as a 50-hour workweek. Do you
11   see that reference?
12   A.        Yes.
13   Q.        Did you ever have 50-hour workweeks?
14   A.        There may have been some rotations
15   that I worked around 50-hour hours, but those --
16   those were just the nature of the rotation, not the
17   result of an accommodation or schedule change.
18   Q.        Did you ever have lighter rotations
19   despite my schedule never being altered?
20   A.        Yes.
21   Q.        And did you ever have no overnight
22   call?
23   A.        Yeah, there were points in my training
24   in which I was not required to work overnight.
25   Q.        And was that a result of the type of

1    rotation that you were on?
2    A.        Exactly, yes. It was the result of
3    the type of rotation.
4    Q.        So -- strike that.
5         Directing your attention to page 20,
6    response number 14.
7         You make reference here to
8    Dr. Snyder's online performance evaluation and it
9    being one month past the required deadline. Do you
10   see that statement?
11   A.        Yes.
12   Q.        What do you mean by the required
13   deadline?
14   A.        By required, I mean that there's a --
15   a good standard suggestion that a feedback
16   evaluation should be submitted in a timely manner,
17   soon after the rotation ends.
18   Q.        I believe you just testified that
19   there was a standard suggestion. Was that the --
20   was that the word you used?
21   A.        Yes.
22   Q.        So please reconcile standard
23   suggestion with required deadline.
24   A.        If I could update this portion, I
25   would put the recommended time -- within the

1 recommended timeframe.
2 Q.       I want to direct your attention to
3 page 24, Interrogatory number 18.  In your
4 response, you state that you were offered a job
5 along with several available disability
6 accommodations when needed from Booz Allen
7 Hamilton.
8         Do you see that statement?
9 A.       Yes.
10 Q.       I thought you testified that you
11 didn't need disability accommodations in your
12 current position?
13 A.       Correct.  The statement reads when
14 needed.  So if -- if there comes a point that I do
15 need additional accommodations, then they would
16 engage in and help me.
17 Q.       And how do you know that?
18 A.       That's what they told me.  That's what
19 I was told by the accommodation team.
20 Q.       Let me direct your attention to
21 Exhibit 4.
22         (Exhibit 4 was marked.)
23 BY MS. CONRAD:
24 Q.       Are you familiar with this document?
25 A.       Yes.

1 Q.       What is it?
2 A.       It's the resident agreement form.
3 Q.       Directing your attention to paragraph
4 1, does paragraph 1 provide for any obligations
5 that you are required to perform?
6 A.       The portion that says, resident has
7 agreed to accept the position on the terms and
8 conditions set forth in this agreement.
9 Q.       Looking at paragraph 1, do you agree
10 to perform such duties at Penn State Health and
11 it's affiliated institutions which are part of the
12 residency program, consciously to the best of
13 your ability and under the highest standards of
14 professional ethics?
15 A.       Yes.
16 Q.       Directing your attention to paragraph
17 3.3.  Were you expected to provide competent and
18 compassionate patient care and to work effectively
19 as a member of the healthcare team?
20 A.       Yes.
21 Q.       And were you expected to perform at
22 the highest level of professionalism at all times.
23 A.       Yes.
24 Q.       Directing your attention to the next
25 page, paragraph 6.  Does paragraph 6 provide that

1 renewals agreement will be based on the ACGME core
2 competencies.
3 A.       Your question is, is that correct?
4 Q.       Yes.  Was renewal of the resident
5 agreement to be based upon the ACGME core
6 competencies?
7 A.       Yes.
8 Q.       And were you -- are you familiar with
9 those core competencies?
10 A.       Yes.
11 Q.       Were you evaluated on those core
12 competencies?
13 A.       Yes.
14 Q.       And was reaching certain milestones
15 required to advance to the next level of training?
16 A.       No, there were not certain milestones
17 that needed.  The way the ACGME's milestones work,
18 they're used to track a resident over time to
19 demonstrate their improvement and their growth.  So
20 each resident's milestone goals will be different
21 depending on that individual.
22 Q.       Doesn't the agreement provide that
23 ACGME milestones and -- and/or any other factors
24 deemed necessary to advance to the next level in
25 training?

1 A.       Correct.  I believe you asked me if
2 there was a minimum score or minimum level required
3 to be obtained.
4 Q.       On the next page, paragraph 11, does
5 the agreement provide for leaves of absence?
6 A.       Yes.
7 Q.       Did you ever request a leave of
8 absence?
9 A.       Yes.
10 Q.       When?
11 A.       On February 26th, 2018.
12 Q.       And was that request granted?
13 A.       Yes.
14 Q.       Did you request any other leaves?
15 A.       No.
16 Q.       Paragraph -- does paragraph 12 address
17 duty hours?
18 A.       Yes.
19 Q.       And does it provide that all
20 requirements of the residency review committee must
21 be met for work hours and work environment?
22 A.       Yes.
23 Q.       And did you understand that the hours
24 of duty will vary with the clinical service to
25 which you were assigned?

Page 134

1  A.      Yes.  And also that ultimately those
2  assigned duties were up to the program director's
3  discretion.
4  Q.      That discretion would be limited by
5  the requirement in paragraph twelve that the
6  requirements of the resident review committee must
7  be met.
8          MS. LOPEZ:  Is that a question?
9          MS. CONRAD:  Yes.
10 BY MS. CONRAD:
11 Q.      Do you agree with that?
12 A.      I'm not sure when it is saying the
13 requirements of the residency review committee,
14 it's not referring to me.
15 Q.      Who would it be referring to?
16 A.      The residency review committee.  This
17 paragraph is detailing not only my obligation but
18 the hospital's obligation to provide appropriate
19 scheduling and to follow guidelines.
20 Q.      And to meet program requirements,
21 right?
22 A.      I don't see that wording.
23 Q.      Let me direct your attention to
24 Exhibit 5.
25          (Exhibit 5 was marked.)

Page 135

1  Q.      Are you familiar with this document?
2  A.      Yes.
3  Q.      What is it?
4  A.      It's a similar form, but it's the
5  resident agreement for the subsequent training
6  years of PGY2 to 4.
7  Q.      And directing your attention to --
8  well, there's no page numbers.  If you look at the
9  Bates numbers, 856.  There's a signature on
10 this; isn't there?
11 A.      Yes.
12 Q.      All right.  Did you obtain a copy of
13 this document?
14 A.      Yes.
15 Q.      When?
16 A.      Around March of 2018.
17 Q.      And what was your understanding -- and
18 how did you receive this document?
19 A.      I don't recall if I was emailed this
20 document or if it was provided by GME.
21 Q.      What was your understanding of having
22 received this document?
23 A.      My understanding was that I would be
24 moving on to my second year of training at the end
25 of the year, to PGY2 for PM --  physical medicine

Page 136

1  and rehabilitation.
2          (Exhibit 6 was marked.)
3  Q.      And I'll direct your attention now to
4  Exhibit 6.  And we're going to go into the last
5  page of it in order to follow the time sequence.
6  If you look at the lower right-hand corner it will
7  be page 588.
8          It appears that the first email is
9  from you to Dr. Kogut on June 27, 2017; do you see
10 that?
11 A.      Yes.
12 Q.      And you state, thanks for taking the
13 time to talk to me today.  I appreciate it.  It was
14 a little weird reaching out.  Do you recall what
15 discussion -- what took place during that talk on
16 June 27th?
17 A.      I conveyed -- conveyed to Dr. James
18 Kogut that I had anxiety and depression and that
19 was a little worried about starting a brand new
20 work environment and being a fresh, new intern.
21 And that I was a little apprehensive.
22 Q.      And you appreciated that Dr. Kogut met
23 and spoke to you about those items?
24 A.      Yes.
25 Q.      Weren't you?  I'm sorry.  Did you say

Page 137

1  yes?
2  A.      Yes.
3  Q.      And then on July 6th, Dr. Kogut
4  follows up with you, doesn't he?
5  A.      Yes.
6  Q.      And he asks -- and he said he just
7  wanted to check in and say hi, how is everything
8  going?
9  A.      Yep, yes.
10 Q.      And you reply to him, don't you, later
11 in the day on July 6th?
12 A.      Yes.
13 Q.      And you tell him that you're doing
14 okay.
15 A.      Yes.
16 Q.      You mentioned the anxiety, don't you?
17 A.      Yes.
18 Q.      And you mention the apprehension,
19 don't you?
20 A.      Yes.
21 Q.      And you -- and everything being new?
22 A.      Yes.
23 Q.      And you say, let me know if you have
24 any suggestions, don't you?
25 A.      Yes.

35 (Pages 134 - 137)

Page 138

1  Q.      Do you make any reference to
2  accommodations in the July 6th email?
3  A.      No.
4  Q.      The next email, as I follow it, is on
5  July 7th.  It starts on the previous page, page
6  586.  And it's an email from Dr. Kogut to you.  Is
7  that the next email exchange you had with
8  Dr. Kogut?
9  A.      Yes.
10  Q.      And he acknowledges the adjustment
11  period, doesn't he?
12  A.      Yes.
13  Q.      And he provides you a resource,
14  doesn't he?
15  A.      Yes.
16  Q.      And with a counseling service, isn't
17  it?
18  A.      Yes.
19  Q.      And he states, any resident can use
20  their services, so I encourage you to reach out and
21  schedule an appointment with them, doesn't he?
22  A.      Yes.
23  Q.      And did you reach out to the
24  counseling service?
25  A.      Yes.

Page 139

1  Q.      And he concludes by saying, if you
2  have any questions or concerns, don't hesitate to
3  reach out to us chiefs.  We are here for you,
4  doesn't he?
5  A.      Yes.
6  Q.      And you reply to Dr. Kogut on July
7  10th, don't you?  It's on page 586.
8  A.      Yep, yes.
9  Q.      And you let him know that you made an
10  appointment, don't you?
11  A.      Yes.
12  Q.      And the next communication, I believe
13  is on the next page, 585.  It is dated August 2nd
14  from you to Dr. Kogut.
15  A.      Yes.
16  Q.      Could you explain that -- that request
17  that you're making in that email, please?
18  A.      So for my schedule that was laid out
19  in advance for the year, there were repeat
20  rotations or rotations that were listed more than
21  once.  So they were duplicative.  So I wanted to
22  bring to his attention if that could be correct and
23  perhaps swapped for something more relevant to my
24  career, yes.
25  Q.      And did you get a response from

Page 140

1  Dr. Kogut about this issue?
2  A.      Yes.
3  Q.      And what was the response?
4  A.      They removed the duplicated rotations
5  and substituted two different rotations.
6  Q.      So your request was granted, wasn't
7  it?
8  A.      Yes.  But --but it was not so much a
9  request, more of a correction to an error on my
10  schedule having multiple rotations of the same
11  sort.  It might have been an oversight and I was
12  just asking for that to be corrected.
13  Q.      And at your request, the correction
14  was corrected, wasn't it?
15  A.      Yes, the error was corrected.
16  Q.      And the next email is on August 16
17  where you asked to meet with Dr. Kogut, don't you?
18  A.      Yes.
19  Q.      And Dr. Kogut replies and suggests
20  meeting the following week, doesn't he?
21  A.      Yes.
22  Q.      Either Wednesday, Thursday or Friday,
23  right?
24  A.      Yes.
25  Q.      And he informs you, if you need to

Page 141

1  meet earlier, to let him know, right?
2  A.      Yes.
3  Q.      Did you let him know you needed to
4  meet earlier?
5  A.      I did not let him know I needed to
6  meet earlier, because I did not need to meet
7  earlier.
8  Q.      And he also let's you know, if ever he
9  is unavailable, Sim and Britt are also here to
10  support you; is what he says?
11  A.      Yes.
12  Q.      Who are Sim and Britt?
13  A.      The other chief residents.
14  Q.      And on August 16, there's an email
15  from you that says, thanks for the quick reply.  I
16  just had some questions and was feeling overwhelmed
17  a bit.  Next week is fine, right?
18  A.      Correct.
19  Q.      And did you meet next week with
20  Dr. Kogut?
21  A.      It may have been a few days over seven
22  days, but I met with him on the 25th of August, so
23  shortly after.
24  Q.      And on August 23rd, you sent him an
25  email again asking about a good time to talk this

1  week?
2  A.      Correct.
3  Q.      And if you turn to page 583, Dr. Kogut
4  replies, how does tomorrow morning sound, say
5  around 7:30, doesn't he?
6  A.      Yes.
7  Q.      And you planned to meet in the chiefs'
8  room, don't you?
9  A.      Yes.
10  Q.      And then starting on the first page,
11  there's an email dated August 26th at the bottom of
12  that page. We're on 581. Right. And this is an
13  email you sent to Dr. Kogut, isn't it?
14  A.      Yes.
15  Q.      And you thank him for meeting earlier
16  in the week, don't you?
17  A.      Yes.
18  Q.      And when you go on to say in the next
19  paragraph --
20      MS. LOPEZ: Counsel, to be clear, are
21  you talking about the next paragraph of the same
22  email thread?
23      MS. CONRAD: 582 at the top it starts,
24  I really appreciate it.
25  A.      I let him know that I'm thankful for

1  the interaction.
2  Q.      Well, could you read into the record,
3  please, the next two paragraphs that start with, I
4  really appreciate it?
5  A.      I really appreciate it. It's great to
6  know that I have support and someone to reach out
7  to as I work on my social anxiety and becoming a
8  good intern. It's been hard, but all I can do is
9  do my best.
10  Q.      And then the next paragraph?
11  A.      I think the suggestions you made were
12  really good and would help, like sit-down rounds.
13  I also talked to Britt a little on Friday, as well,
14  because I had a clinic appointment.
15  Q.      So we agree, don't we, that it was
16  Dr. Kogut who made the suggestions, including the
17  suggestion for the sit-down rounds.
18      MS. LOPEZ: Objection.
19  Mischaracterizes testimony.
20  Q.      Do we agree that based on your email
21  you state that Dr. Kogut made the suggestions,
22  including the sit-down rounds?
23  A.      I can't definitively say that, because
24  it also could have been Britt Marshall. I was
25  giving an example one of the items we discussed

1  with accommodations. It wasn't and end-all, be-all
2  email. It was a polite follow up.
3  Q.      When you say, I think the suggestions
4  you made were really good, what suggestions are you
5  referring to there?
6  A.      I'm talking about the items we
7  discussed during the meeting, such as having a
8  quiet space to work, the sit-down rounds, meeting
9  your attendings beforehand, and establishing those
10  relationships before new rotations. Those were
11  discussed and there was a feedback in that I agreed
12  that those would be useful, you know.
13  Q.      And then following that meeting later
14  on, Dr. Kogut -- or you check in with Dr. Kogut on
15  October 4, 2017, don't you?
16  A.      Yes.
17  Q.      And I'm on the first page of 581.
18  A.      Yes.
19  Q.      You make reference to the VA wards; do
20  you see that?
21  A.      Yes.
22  Q.      Where did you -- what VA wards were
23  you on in the fall of 2017?
24  A.      Veteran's Administration in Lebanon,
25  Pennsylvania.

1  Q.      And you state, I didn't have any
2  additional panic attacks. Do you see that time
3  that that referenced?
4  A.      Yes.
5  Q.      Did you have a panic attack while on
6  the VA ward?
7  A.      Prior -- prior to me starting work,
8  yes.
9  Q.      Tell me about that incident, please.
10  A.      So I was experiencing a sudden flush
11  of anxiety and physical symptoms, like increased
12  heart rate, sweating and redness.
13  Q.      And when did this occur?
14  A.      In the very, very beginning of my
15  rotation at the VA.
16  Q.      And did you have to walk away from the
17  ward at the time of this panic attack?
18  A.      No. I did reach out to Britt Marshall
19  and she came and she just sort of reassured me to
20  give it my best shot and take a deep breath and go
21  with the new environment and everything would be
22  okay. And I just went --
23  Q.      Was there a period of time you were
24  not present on the VA ward?
25  A.      Could you be a little more specific?

37 (Pages 142 - 145)

Page 146

1    I did go home to sleep and shower and eat, so when
2    I was off shift.
3        Q.      During your shift, was there a time
4    that you removed yourself from the ward from
5    patient care from services?
6        A.      No.
7        Q.      Was there a time that you could not be
8    located on the VA ward?
9        A.      No.
10              (Exhibit 7 was marked.)
11       Q.      Let me direct your attention to
12   Exhibit 7.  Are you familiar with this document?
13       A.      Yes.
14       Q.      What is it?
15       A.      It's the form that I needed to fill
16   out to get cleared to work and to get that national
17   provider identification number.
18       Q.      And is this -- was your start date at
19   Lebanon on July 1, 2017?
20       A.      No.  No, it wasn't.  This is much
21   sooner.
22       Q.      What does it mean on the form when it
23   says start date?
24       A.      That -- that is the start date of
25   having the access and the number.  But that's not

Page 147

1    saying that it's the start of my rotation.
2        Q.      When did you start that rotation?
3        A.      At the very end of -- I believe very
4    last day or so of August 2017, right after I had
5    all those meetings per accommodation request and
6    they happened right before I was starting at the
7    VA.
8                (Exhibit 8 was marked for
9    identification.)
10       Q.      I'll direct your attention to Exhibit
11   8.  Are you familiar with this document?
12       A.      Yes, they're my treatment notes with
13   Michelle Batz from our sessions.
14       Q.      And let me represent to you that your
15   counsel's office produced these documents in
16   conjunction with this matter.  Under the presenting
17   problem, description, it provides client with
18   heightened symptoms with transition to residency.
19   Do you see that description?
20       A.      No, can you please repeat what page
21   you're on?
22       Q.      I'm on the first page --
23       A.      Okay.
24       Q.      -- under description, presenting
25   problem description.

Page 148

1        A.      Yep, I see it.
2        Q.      Is that an accurate description?
3        A.      Yes.
4        Q.      Okay.  Under the mental health
5    treatment history, there's a question about
6    currently in treatment; do you see that question?
7        A.      Yes.
8        Q.      And it says no; is that correct?
9        A.      Yes.
10       Q.      So is it true that at the time you
11   started at Hershey Medical Center, you were not in
12   treatment?
13       A.      I was -- I have primary care provider
14   in New Jersey that bridges my medications and
15   treatment when I have big transitions, such as
16   going from one job to another.  So I was still
17   getting cared -- cared for.  I was not sure if this
18   question was referring to currently being treated
19   at Timothy Sullivan, because this was intake form
20   initial visit.
21       Q.      Were you receiving therapy at the time
22   you started your residency program?
23       A.      Yes.
24       Q.      From who?
25       A.      Sherry Colston.

Page 149

1        Q.      How often did you see Sherry Colston
2    during your residency program?
3        A.      I didn't see her too often during my
4    residency program.  She filled in those gaps in
5    care from before I started when my insurance
6    expired and after I was terminated.  But while I
7    was at Hershey, the main point person that provided
8    me therapy was Michelle Batz.
9        Q.      Prior to seeing Miss Batz, did you see
10   anyone for therapy while you were in the residency
11   program?
12       A.      Again Sherry Colston.
13       Q.      When did you see her during the
14   residency program.
15       A.      In the beginning months and then after
16   I was terminated.
17       Q.      What months did you see her at the
18   start of the residency program?
19       A.      I would have to refer back to my
20   patient notes to get you exact dates.
21       Q.      And did you see her in person?
22       A.      It was a mix of in person and remote.
23       Q.      I'm sorry, and -- and what?
24       A.      Remote.
25       Q.      So did you see Miss Colston prior to

38 (Pages 146 - 149)

Page 150

1  seeing Miss Batz?
2  A.      Prior, yes.
3  Q.      But you don't remember when?
4  A.      No, I just know I saw her either
5  monthly or bimonthly basis, but I can't give you
6  the date after the top -- off the top of my head
7  right now.
8  Q.      Directing your attention to the next
9  question, what was helpful with your past
10  treatment?  And there's an answer there,
11  medication; do you see that?
12  A.      Yes.
13  Q.      Were you on medication at the time you
14  started the residency program?
15  A.      Yes.
16  Q.      What medication were you on?
17  A.      Cymbalta.
18  Q.      Anything else.
19  A.      No.
20  Q.      On the next page, 947, there's a
21  question about history of suicidal ideation; do you
22  see that question, in the lower portion the last
23  section.
24  A.      Yes.
25  Q.      What is that history?

Page 151

1  A.      It's marked no, because there's no
2  history.
3  Q.      I'm looking at it.  And if you look at
4  the screen, it appears to say yes.
5  A.      Oh, the top.  Sorry.  I was looking at
6  the wrong -- history of suicidal ideation.  Yes.
7  So that's marked yes.
8  Q.      And what is that history?
9  A.      When I was younger, I struggled a lot
10  with my disability.
11  Q.      So it was when you were younger?
12  A.      Yep.
13  Q.      What do you mean by younger?
14  A.      Teenager.
15  Q.      And under the question current
16  suicidal ideation, the answer is no, correct?
17  A.      Yeah.
18  Q.      Are the rest of your answers on this
19  form true and correct?
20  A.      To the best of my knowledge, yes.
21       (Exhibit 9 was marked.)
22  Q.      And directing your attention to the
23  next exhibit, number 9, which is a treatment plan.
24  A.      Okay.
25  Q.      Under the first number one, objective,

Page 152

1  individual needs of client.  It lists attend
2  therapy, doesn't it?
3  A.      Yes.
4  Q.      Were there any other treatment plans
5  as a result of your July meeting with Dr. Batz?
6  A.      Yes, there was also a plan to see a
7  psychiatrist to get medication management.
8  Q.      Any other plans?
9  A.      To continue to perform self-care as
10  best as I could.
11  Q.      And what do you mean by self-care?
12  A.      Getting sufficient sleep, having a
13  good nutritious diet.  Being able to exercise
14  regularly, all of these things help me to be high
15  functioning.
16       (Exhibit 10 was marked.)
17  Q.      I'd like to direct your attention to
18  Exhibit 10.  Dr. Salcedo, there are a number of
19  these faculty evaluation forms that have been
20  produced during the discovery in this case.  Are
21  you familiar with these forms?
22  A.      Yes.
23  Q.      Would you receive a copy of these
24  forms at or near time they were issued?
25  A.      Yes, I believe they would be uploaded

Page 153

1  and then I could download them to review them.
2  Q.      And did you review them once you
3  uploaded them.
4       MS. LOPEZ:  Objection,
5  mischaracterizes testimony.
6  Q.      Once you had access to the documents,
7  did you review them, the evaluations, did you
8  regularly review them?
9  A.      Yes.
10  Q.      Did you ever submit rebuttals or any
11  responses to the information contained in these
12  evaluations?
13  A.      I believe I did ask for a follow-up
14  and more feedback on the evaluation I got later in
15  the year from Eddison Consult.  But for this
16  particular evaluation, I did not.  I had a
17  discussion at the end of the rotation with the
18  attending to talk about my performance overall, and
19  that was my feedback.
20  Q.      And who was that?
21  A.      Dr. Gishu Gofree.
22  Q.      Are there any documents that you
23  submitted in response to these faculty evaluations.
24  A.      No.
25       (Exhibit 11 was marked.)

39 (Pages 150 - 153)

Page 154

1  Q.       Directing your attention to Exhibit
2  11.  Are you familiar with this email exchange?
3  A.       Yes.
4  Q.       What is it?
5  A.       It's the email exchange between myself
6  and Mark -- Hunder -- Hundertmark, who provided me
7  the accommodation request form to give to
8  Dr. Swallow.
9  Q.       Now, it said -- did you have an email
10 address in conjunction with your position at
11 Hershey Medical Center.
12 A.       You mean did I have an employee email,
13 an employee design -- yes.
14 Q.       Excuse me?
15 A.       Yes.
16 Q.       What was that email address?
17 A.       psalcedo@pennstatehealth.psu.edu.
18 Q.       You didn't use that email address in
19 this exchange, did you?
20 A.       I can't -- I can't tell from this
21 document if I forwarded this to my personal email.
22 It looks as though it was forwarded.  And that I
23 forwarded it to myself, to my personal email.  But
24 I also do see my Penn State email on this exhibit,
25 as well.

Page 155

1  Q.       Where?
2  A.       Near the top it says,
3  psalcedo@pennstatehealth.psu.edu.
4  Q.       Right.  And then I see the from,
5  buddy4732@gmail.com.  So doesn't it appear as if
6  you forwarded from your gmail account to your Penn
7  State Health account?
8  A.       That would seem reasonable, yes.
9  Q.       So why were you initially
10 communicating with HR Solutions at Penn State
11 Health from your gmail account?
12 A.       Just coincidence.  It's my personal
13 email.  And that's what I reached out using.
14 Q.       In Miss Hundertmark's message to you,
15 she expressly says, please let us know if you have
16 any difficulties bringing up the form or have
17 questions about it.  Do you see that?
18 A.       Yes.
19 Q.       And now there was an attachment with
20 the form, wasn't there?
21 A.       There's the form itself.  And I see
22 something that says .GIF.  So that could be a logo
23 or someone's signature or something there, but it
24 doesn't look like it's a document.  It's an image
25 of some sort.

Page 156

1  Q.       Well, if you turn to the next page,
2  there's an ADA Accommodation rm.pdf, isn't there?
3  A.       Yes.
4  Q.       Did you access that form?
5  A.       Yes.
6  Q.       How many pages was that form?
7  A.       I think it was three to four pages.
8  Q.       Did you produce a copy of that form in
9  conjunction with this litigation?
10 A.       Yes.
11 Q.       The three to four pages of the form?
12 A.       I know the part of the form that I had
13 at the time, which I believe would have only been
14 the first page definitely.
15         MS. CONRAD:  Well, I would make a
16 formal request that the attachment to this email
17 exchange, the complete attachment, be produced in
18 discovery.  I don't believe it's been produced.
19         MS. LOPEZ:  Counsel, I think this form
20 is what I sent you last night.
21         MS. CONRAD:  Well, see, I have not had
22 the opportunity to review what was sent last night.
23         MS. LOPEZ:  And I tried to describe it
24 in the email for your convenience.  But there was a
25 three- or four-page form that was in Dr. Munoz's

Page 157

1  file that was the complete form.  The only document
2  that we have in discovery or in our possession is
3  the one page of the ADA form, which you already
4  have.
5          MS. CONRAD:  Well, I would request
6  that Dr. Salcedo return to his personal email
7  and/or -- well, probably he cannot access his Penn
8  State health email, but it should be contained in
9  his gmail account and I would request the copy that
10 he received.
11         MS. LOPEZ:  I will.  I will definitely
12 do that.
13         MS. CONRAD:  Thank you.
14 BY MS. CONRAD:
15 Q.       Oh, and I apologize if I asked this
16 question, I got sidetracked.  Did you follow up
17 with Miss Hundertmark and ask any questions in
18 response to her message to please let her know if
19 you have any questions?
20 A.       No, I didn't have any questions at the
21 time after meeting with Dr. Swallow.
22 Q.       So what was your understanding when
23 you received this form from HR as to what the next
24 steps were in the accommodation process?
25 A.       That I would review it with my mental

1   health provider, as well as Dr. Swallow.  And that
2   that package would get sent to HR.
3   Q.        And did you have any follow-up with HR
4   about the accommodation process?
5   A.        No.
6   Q.        Why not?
7   A.        When I presented this document to
8   Dr. Swallow, she gave me the instruction that she
9   would be handing in my accommodations, and that I
10  would be going directly through her and that there
11  was no need for this form or this process anymore.
12  Q.        Did you talk to the chiefs about this
13  form or this process?
14  A.        No, I already brought this form to
15  Dr. Swallow.
16  Q.        But you are alleging that you had
17  spoken to the chiefs about accommodation requests,
18  correct?
19  A.        Yes.
20  Q.        Why didn't you talk to the chiefs
21  about the accommodation process?
22  A.        The form seemed more appropriately
23  designated for Dr. Swallow as my direct supervisor
24  and the program director.  The chiefs have to
25  notify residents that they could reach out with any

1   concerns or scheduling issues.  But that's a little
2   different than actually completing accommodation
3   request forms.
4            (Exhibit 13 was marked.)
5   Q.        I want to direct your attention to
6   Exhibit 13.  And I will be skipping several of the
7   exhibits now that Dr. Salcedo has testified to the
8   faculty evaluation process.  So I believe we --
9   this already discussed this email message or
10  exchange with Dr. Kogut, didn't we?
11  A.        Yes.
12  Q.        How did you have possession of this
13  email message?
14  A.        I believe that when I was terminated,
15  one of the actions I took would actions I took was
16  to take screen shots of any email that I thought
17  would be relevant or important before I lost
18  access.
19  Q.        And have you produced all of those
20  screen shots?
21  A.        Yes.
22  Q.        You'll agree with me, won't you,
23  though, that you did not -- you do not have screen
24  shots of all of the email exchanges in this case,
25  do you?

1   A.        No, I was only able to get some.  But
2   the ones I was able to screenshot have been
3   provided.
4            (Exhibit 14 was marked.)
5   Q.        Let me direct your attention to
6   Exhibit 14.  What is Exhibit 14?
7   A.        That is a treatment provider note from
8   Dr. Britt Marshall in the clinic.
9   Q.        How did you obtain a copy of this
10  patient note?
11  A.        I believe from the patient side on the
12  patient portal, you have access to your notes.  So
13  it would have been something I probably printed
14  out.
15  Q.        And this is an outpatient note from a
16  meeting with Dr. Marshall on August 2017, correct?
17  A.        Yes.
18  Q.        And in the first paragraph -- I'm
19  sorry, what?
20  A.        Sorry, 25th.
21  Q.        August 25th, thank you.  The first
22  section is a chief complaint, isn't it?
23  A.        Yes.
24  Q.        And next section is a history of
25  present illness, isn't it?

1   A.        Yes.
2   Q.        And in that section, she notes a past
3   medical history of generalize anxiety, social
4   anxiety, ADHD and major depressive disorder,
5   doesn't she?
6   A.        Yes.
7   Q.        On the next page there's a review of
8   systems section.  And it notes that the patient
9   does have some social anxiety since beginning his
10  intern year residency, doesn't it?
11  A.        Yes, yes.
12  Q.        And then it again lists that past
13  medical history, doesn't it?
14  A.        Yes.
15  Q.        And then towards the end of the
16  document, is a section titled assessment and plan;
17  do you see that?
18  A.        Yes.
19  Q.        And number three refers to a plan
20  related to the generalized anxiety major depressive
21  disorder and ADHD, doesn't it?
22  A.        Yes.
23  Q.        And what is that plan?
24  A.        To continue my therapy with my
25  therapist and my medication management with my

41 (Pages 158 - 161)

1 psychiatrist.
2 Q.        Well, it says well we follow up with
3 both his psychiatrist and psychologist for further
4 management, doesn't it?
5 A.        Yes.
6 Q.        And does the plan make any reference
7 to accommodations?
8 A.        No. This visit was -- although Britt
9 Marshall was part of the program, and on the
10 competency committee, this was purely a personal
11 clinic visit. It was not part of my sequence of
12 meetings to request accommodations.
13 Q.        So Dr. Marshall was not involved in
14 your accommodation request?
15          MS. LOPEZ: Objection.
16 Mischaracterization of testimony.
17 Q.        Was Dr. Marshall involved in your
18 accommodation request?
19 A.        In her capacity as a chief resident,
20 yes. In her capacity as my primary care provider,
21 no.
22          (Exhibit 16 was marked.)
23 Q.        Directing your attention to Exhibit
24 16.
25          MS. LOPEZ: Is this for the record,

1 counsel, we're skipping Exhibit 15, right?
2          MS. CONRAD: Correct. As I previously
3 said, having received testimony from Dr. Salcedo
4 about the faculty evaluations, there's no reason,
5 nor will I review, those subsequent evaluations
6 during this deposition.
7          MS. LOPEZ: I understand. I just want
8 to make sure, so that when we look back on this in
9 a couple months or longer, we have a clear clarity
10 about what happened to the exhibits. And I just
11 wanted to make sure and put it on the record.
12 BY MS. CONRAD:
13 Q.        Directing your attention to Exhibit
14 16, are you familiar with this document?
15 A.        Yes.
16 Q.        What is it?
17 A.        It's letter of accommodation request
18 that I received from Dr. Frank Munoz to give to
19 Dr. Swallow at the end of August of 2017.
20 Q.        And it's dated August 28, 2017, isn't
21 it?
22 A.        Yes.
23 Q.        And when did you obtain this document?
24 A.        August 28, 2017.
25 Q.        And how did you obtain this document?

1 A.        During my treatment visit with
2 Dr. Frank Munoz after our discussion on what
3 accommodations would suit me best. He wrote this
4 letter in front of me to give to Dr. Swallow.
5 Q.        So did I hear you right, after you
6 informed Dr. Munoz as to the accommodations that
7 would suit you best, he then drafted this letter?
8 A.        No. After we had a discussion --
9 Q.        Then I didn't hear you correctly. Say
10 it again, please.
11 A.        After we had a discussion on
12 appropriate accommodations that would be helpful,
13 this is what he decided on and wrote down.
14 Q.        At the time, did you have any sort of
15 program description, job description, resident
16 description with you during the August 28th meeting
17 with Dr. Munoz?
18 A.        No.
19 Q.        Did you provide any information to him
20 about the program requirements, the residency
21 requirements, that needed to be met in your
22 conversation with Dr. Munoz on August 28th?
23 A.        I believe -- I believe we had a brief
24 discussion on the general expectations. But I
25 didn't provide additional documentation.

1 Q.        At any time, did you provide
2 documentation to Dr. Munoz about the program
3 requirements?
4 A.        No.
5 Q.        The letter is addressed to whom it may
6 concern. Do you see that?
7 A.        Yes.
8 Q.        Do you know why it's not addressed to
9 a specific individual?
10 A.        That is just how Dr. Frank Munoz wrote
11 the letter.
12 Q.        Did you ask him to address it to
13 anyone?
14 A.        I told him it was for Dr. Swallow.
15 But again, that's just how he wrote the letter. I
16 cannot say why he chose that wording.
17 Q.        It's also handwritten as opposed to
18 typed. Do you know why it was hand written?
19 A.        I would lean towards the side of
20 Dr. Frank Munoz is a little more traditional and
21 still uses fax and keeps a lot of paper files and
22 that's just how he does things.
23 Q.        This appears to be a photo of the
24 letter, is it?
25 A.        Yes.

Page 166

1    Q.        Why did you take a photo of the
2    letter?
3    A.        For my record.
4    Q.        Do you have the original?
5    A.        I believe so.  I believe that's
6    already been shared.
7    Q.        The original has been sent?
8    A.        I believe so.
9              MS. CONRAD:  We'll review our records.
10   If it has not, then I'll request production or an
11   opportunity to review the original.
12             MS. LOPEZ:  No problem.
13   BY MS. CONRAD:
14   Q.        And I'm sorry.  I may have asked this.
15   Why did you take a photo of it?
16   A.        For my records.
17   Q.        When did you take a photo of it?
18   A.        Shortly after receiving it.  I'm not
19   sure.  Probably when I got back home.
20   Q.        Was that before you allegedly had a
21   meeting with Dr. Swallow?
22   A.        Yeah.  I took a picture of this before
23   I had the meeting with Dr. Swallow on the 30th.
24   Q.        Did you ever share this letter to the
25   chiefs?

Page 167

1    A.        No.  This letter was intended for
2    Dr. Swallow.  She was the only person I gave it to.
3    Q.        It says, to whom it may concern,
4    doesn't it?
5    A.        I understand that.  But the letter was
6    intended for Dr. Swallow.  So it was given to
7    Dr. Swallow.
8    Q.        But you were talking -- according to
9    your testimony, you were talking about
10   accommodations with the chiefs, weren't you?
11   A.        Yes.  That was me being very proactive
12   and reaching out to multiple channels to get help
13   on different fronts.
14   Q.        Why then, if you're talking to the
15   chiefs about accommodations, you didn't show them
16   this letter that addressed accommodations.
17   A.        Well, if you recall, I met with them
18   on the 25th of August.  So this letter did not yet
19   exist.  It was written August 28th.
20   Q.        Well, you continued to meet with them
21   after August 28th, didn't you?
22   A.        Yes.  After I gave the letter to
23   Dr. Swallow, and she said she understood there
24   would have been no need to show the letter to
25   anyone else.  Dr. Swallow is my direct reporting

Page 168

1    supervisor.
2    Q.        Then why did you even raise the issue
3    of accommodations with the chiefs?
4    A.        Again, to be proactive to see what was
5    available, and how to be working more closely with
6    the chiefs and the chiefs had prior to sending an
7    email to all the residents, saying that if we had
8    any concerns, anything we wanted to talk about or
9    any requests, to meet with them, to reach out.  So
10   that's exactly what I did.
11   Q.        Well, why would not be proactive with the
12   chiefs and show them this letter that addressed
13   accommodations?
14             MS. LOPEZ:  Objection.  Argumentative
15   and asked and answered.
16   Q.        You can answer.
17   A.        I was proactive with the chiefs.  I
18   organized the meeting to meet with them and reached
19   out initially.
20             This letter was not intended for the
21   chiefs, because the chiefs only have so much power
22   over my schedule.  There's things that they can
23   help with and accommodations they can try to put
24   into place.  Ultimately, as the resident agreement
25   noted, the person responsible for my scheduling,

Page 169

1    duty hours and modifications is the program
2    director, Dr. Swallow.
3    Q.        When you sent an email to Dr. Kogut on
4    October 4, 2017, sometime after August 28th, and
5    that's when what you expressed concern about
6    starting wards; do you recall that email?
7    A.        Yes.
8    Q.        Why didn't you raise in October of
9    2017 when you were -- had concerns about starting
10   wards, some of these suggestions from Dr. Munoz?
11   A.        I believe I did raise them.  There's
12   an email communications in which I can prompt and
13   request accommodations.  There's one in October and
14   one in November.
15   Q.        To who?
16   A.        One is addressed to Dr. James Kogut.
17   And one is addressed to Dr. Nicole Swallow.
18   Q.        And did you send Dr. Kogut the Dr.
19   Munoz August 28th, 2017 letter in conjunction with
20   that communication.
21             MS. LOPEZ:  Objection.  Asked and
22   answered.
23   Q.        You can answer the question.
24   A.        Again, no, because he was not the
25   appropriate person to give that letter to.

43 (Pages 166 - 169)

1    Q.        In November when you had this
2    communications with Dr. Swallow, did you attach and
3    remind her about Dr. Munoz's recommendations?
4    A.        I reminded her about the need for
5    accommodations, but having -- having given her the
6    form already, I did not attach it again.
7    Q.        Why not?
8    A.        Because I didn't see the need to
9    attach a form again that I had already presented to
10   Dr. Swallow.
11           (Exhibit 17 was marked.)
12   Q.        Directing your attention to an email
13   at Exhibit 17.  Now the meeting you had with
14   Dr. Swallow in which you allegedly presented to
15   Dr. Munoz handwritten note was when?
16   A.        August 30th.
17   Q.        And as you look at Exhibit 17, what is
18   it?
19   A.        It's an email, again, of me as
20   customary of me to respond, being polite and
21   following up after a meeting, thanking her for her
22   time for, listening to me and for providing the
23   support?
24   Q.        Well, let's break it done a little
25   bit.  So after the meeting that you had with

1    Dr. Swallow on August 30th in which you allegedly
2    presented an accommodation form, and then the Munoz
3    letter, you sent her an email and thanked her for
4    meeting with you, right?
5    A.        Yes.
6    Q.        And you say, I'm really happy and
7    relieved at the support that has been extended to
8    me here; do you see that?
9    A.        Yes.
10   Q.        You say, I did not expect that, don't
11   you?
12   A.        Yes.
13   Q.        You go on to say, I will do my very
14   best -- oh, it made the world of difference to know
15   you're not alone, don't you?
16   A.        Yes.
17   Q.        And you go on to say, I'll give my
18   very best to stay strong and get over this anxiety,
19   don't you?
20   A.        Yes.
21   Q.        And then you add a P.S., sorry for the
22   anxious tears, don't you?
23   A.        Yes.
24   Q.        Do you make my reference to the Munoz
25   letter in this email?

1    A.        No.
2    Q.        Do you make any reference to the
3    accommodation form in this email?
4    A.        No.  This was simply a follow-up email
5    out respect and being polite.
6           (Exhibit 18 was marked.)
7    Q.        Let me direct your attention to
8    Exhibit 18.  What is Exhibit 18?
9    A.        It starts with the email -- I mean,
10   text message thread between myself and Dr. Kogut.
11   Q.        And what is the communications about?
12   A.        First it seems I'm reaching out to
13   talk to Dr. James Kogut again.  He notes he has an
14   interview tomorrow, but that we'll be in touch once
15   it's finished.  And I say, no rush, good luck
16   tomorrow.  And there seems to be 10/23, good
17   morning, James.  And there's February 24th, 2018,
18   hey James, it's Pablo.  Can I talk to you when you
19   have a time?  And that would be the time where I
20   subsequently removed myself from service.
21   Q.        So these text messages range from
22   September 2017 to February 2018, correct?
23   A.        Yes.
24   Q.        Are these the only text message
25   exchanges you had with Dr. Kogut?

1    A.        To the best of my knowledge, yes.
2    Q.        Have you made a complete search of
3    your cell phone and your cell phone records?
4    A.        Yes.
5           (Exhibit 20 was marked.)
6    Q.        I'll direct your attention to Exhibit
7    20.  Are you familiar with this document?
8    A.        Yes.
9    Q.        What is it?
10   A.        It's another reminder for myself to
11   Dr. Swallow on October 30th, 2017 to implement some
12   of the accommodations that were previously
13   discussed.
14   Q.        You don't use the word accommodations,
15   do you?
16   A.        I say if we can implement anything
17   that we've talked about to make the transition
18   easier, which would be the accommodations.
19   Q.        You don't use the word accommodation
20   in the email, do you?
21   A.        No.
22   Q.        And this email, it takes place on
23   October 30th, 2017, doesn't it?
24   A.        Yes.
25   Q.        So what -- and it's before you start

Page 174

1  wards, correct?
2  A.     Yes.
3  Q.     So what had you discussed with
4  Dr. Swallow prior to starting wards in late October
5  of 2017?
6        MS. LOPEZ:  Counsel, do you mean at
7  any time?
8        MS. CONRAD:  No.
9  BY MS. CONRAD:
10  Q.     You say -- Dr. Salcedo, you say, it
11  would be great to meet sometime prior to when I
12  start wards to see if we can implement anything
13  that we talked about to make the transition easier;
14  do you see that statement?
15  A.     Yes.
16  Q.     Is the transition you're referring to
17  the transition to starting wards?
18  A.     Yes.
19  Q.     So what had you discussed with
20  Dr. Swallow about implementing to make the
21  transition easier to wards, to wards?
22  A.     We had discussed modifying my schedule
23  to make it less erratic and more consistent and so
24  that it would provide more time for self-care and
25  sleep.

Page 175

1  Q.     And when did you have that discussion
2  with Dr. Swallow?
3  A.     On August 30th, as well as December
4  14.
5  Q.     August 30th and when else?
6  A.     December 14th.
7  Q.     December?
8  A.     Yes.
9  Q.     Okay.  I'm focusing on pre-September
10  -- pre-November.  You're about to start wards,
11  right?
12  A.     Yes.
13  Q.     And in this email, you ask to meet
14  prior to starting wards to implement anything we've
15  talked about to make the transition to wards
16  easier, right?
17  A.     Yes.
18  Q.     So when did you meet with Dr. Swallow
19  to discuss the transition to wards, to wards?
20        MS. LOPEZ:  I'm going to have to
21  object, because I think there's no foundation for
22  that particular fact.  If you're asking, did you
23  meet with Dr. Swallow to discuss the transition to
24  wards, then I think I understand your question.
25  But as it's stated, I'm not sure I understood it to

Page 176

1  be that specific.
2        MS. CONRAD:  Let me rephrase.
3  BY MS. CONRAD:
4  Q.     Dr. Salcedo, as you reference in
5  Exhibit 20, did you meet with Dr. Swallow prior to
6  starting wards?
7  A.     Yes.
8  Q.     Did you meet with Dr. Swallow prior to
9  starting wards to see if we can implement anything
10  that we talked about to make the transition easier?
11  A.     Yes, on August 30th.
12  Q.     But this email is October 30th.
13  A.     Yes.  And I still had not gotten --
14  Q.     What did you discuss in October --
15  what did you discuss on August 30th about wards?
16  A.     We discussed the need to have a
17  modified schedule and reduced work hours to offer
18  for better sleep.
19  Q.     In order to transition into wards?
20  A.     In order for me to be able to have my
21  disability addressed and to be high functioning and
22  to excel in the new wards.
23  Q.     And did you specifically discuss wards
24  in your August 30th meeting?
25  A.     Yes.  If you recall the dates, the

Page 177

1  August 30th meeting was also prompted by starting
2  wards, the VA wards.  So shortly after that
3  meeting, I started my rotation of the VA wards.
4  Q.     Then why were you asking on October
5  30th, to meet prior to starting wards?
6  A.     So the way the schedule works, it's
7  not consistently one rotation throughout the whole
8  year.  So I could be doing a bulk of wards for two
9  weeks, and then going to an elective.
10        So, I was about to start again a bulk
11  of ward rotations.  And that prompted that email
12  before I started that bulk of rotation.
13  Q.     So the two meetings you had with
14  Dr. Swallow to -- in which you discussed
15  implementing things to make the transition easier,
16  took place on August 30th and December 14th; is
17  that right?
18  A.     If you were including all meetings,
19  you would have to include February 26th, also.
20        Is it possible to take a small
21  restroom break.  I don't know how short we can do
22  it.
23        MS. CONRAD:  It's currently 2:49.  Do
24  we want to take a break and return at 3:00?
25        MS. LOPEZ:  That's fine with me.

45 (Pages 174 - 177)

Page 178

1    THE VIDEOGRAPHER: Okay. Let me just
2  go off the record. It's 2:49 p.m. and we're going
3  off the record.
4    (Discussion held off the record.)
5    (A break was taken.)
6    THE VIDEOGRAPHER: The time is now
7  3:03 p.m. We're going back on the record.
8    MS. LOPEZ: Before we start, we did
9  have an exchange with -- counsel had an exchange.
10  And I just want to state that we are -- plaintiff
11  is reserving all objections except as to form of
12  the question until trial. And also, the Plaintiff
13  would like to read and sign this deposition.
14    In addition, we conferred further
15  about the need for additional time. And just to be
16  clear, plaintiff is willing to continue until day's
17  end to complete the exhibits and review the
18  deposition that were planned for today and discuss
19  additional time as needed. But we were -- we
20  object to having the day end earlier than 5:00,
21  especially given that we were prepared to go
22  forward for seven hours of depositions today. I
23  just want to put that on the record.
24    MS. CONRAD: And I just briefly want
25  to add to the record that we -- I have no issue

Page 179

1  with continuing the deposition until 5:00 tonight.
2  I do, as I noted in the start of the deposition, we
3  received a supplemental production late last night,
4  as well as early this morning. And I have not had
5  the opportunity to review those documents.
6    So in light of the fact that we will
7  need to recall the witness for a second day to
8  review that late production, I will continue with
9  whatever remaining time there is to conclude the
10  deposition as well as make a determination whether
11  we will seek additional time for the plaintiff's
12  continued deposition. Are we ready to proceed?
13    MS. LOPEZ: Yes.
14    MS. CONRAD: Thank you.
15  BY MS. CONRAD:
16  Q.    Dr. Salcedo, were you aware that in
17  November of 2017, mid-year resident reviews were
18  about to commence?
19  A.    No.
20  Q.    Did you receive any information about
21  a mid-year review by the clinical competency
22  committee?
23  A.    Not that I can recall.
24    (Exhibit 23 was marked.)
25  Q.    Can I direct your attention to Exhibit

Page 180

1  23? Are you familiar with this document?
2  A.    Yes.
3  Q.    What is it?
4  A.    It's my duty hours or my log hours.
5  I'm required as part of my job to record the hours
6  that I work.
7  Q.    So I want to make sure I understand
8  your testimony. You make a record of the hours
9  that you work; is that correct?
10  A.    Yes.
11  Q.    And how do you record them?
12  A.    So I believe there was a portal or
13  some type of web interface application for you
14  would log in and you would be able to report your
15  time for the day. And you could mark it, the
16  training location, what type of duty and then you
17  would just save it. And every so often you would
18  have to submit almost like how you do with time
19  stubs.
20  Q.    So was there a time clock which
21  actually recorded the time you started on the
22  service until the time you clocked out?
23  A.    No. There was only the designated
24  time that you were considered on duty. So these
25  hours largely reflect that. And sometimes they

Page 181

1  would be more, even though if I was scheduled a
2  certain amount of hours, I may exceed those hours
3  depending on the patient load that day.
4    (Exhibit 24 was marked.)
5  Q.    And my question then goes to Exhibit
6  23. This is your recording of the hours, correct?
7  A.    Yes.
8  Q.    I want to direct your attention to
9  Exhibit 24. Are you familiar with this document?
10  A.    I have seen it, yes.
11  Q.    Did you see it prior to discovery?
12  A.    No.
13  Q.    Do you know what -- can you explain
14  this document?
15  A.    Yeah, so these -- this document is
16  taking those core competencies and trending them
17  through time. However, the different categories,
18  there's only one time. There's only a recording
19  for December 2017. So it's actually incomplete,
20  because you can't trend with just one date. So
21  these markings are only showing scores for December
22  2017.
23  Q.    And it's titled on the left-hand side
24  CCC Milestone Review. Do you know what that means?
25  A.    That's related to the clinical

Page 182

1   competency committee meeting in which they evaluate
2   residents' progress through the year.
3   Q.      And there are numbers following the
4   round chart under December 2017.  There are numbers
5   that start with 3.0.  Do you know what those
6   numbers signify.
7   A.      I believe they're the score that you
8   would have received from the evaluator on a scale
9   of zero to five.
10  Q.      Did you receive any fives?
11  A.      I believe I may have received a five
12  or a couple fours.
13  Q.      I'm directing your attention to
14  Exhibit 24.  Did you receive any -- a score of five
15  in any of these listings?
16  A.      I'm a little unclear if this is a
17  compilation of all scores, or if this is one score
18  in time, as in an evaluation from one person; or if
19  it is the sum of all the evaluations from all my
20  evaluators.  And these are --
21  Q.      Mr. Salcedo, regardless of how it is
22  compiled, on the CCC Milestone Review at Exhibit
23  24, did you receive a score of five in any
24  category?
25  A.      I'm not seeing a five there.

Page 183

1   Q.      We can agree, can't we, that you
2   received one score of four, correct?
3   A.      Yes.
4   Q.      And I believe there are three scores
5   of three -- oh, no, five scores of 3.5; is that
6   correct?
7   A.      Yes.
8   Q.      And the remaining scores were 3.0?
9   A.      Correct.
10          (Exhibit 25 was marked.)
11  Q.      And I want to direct your attention to
12  Exhibit 25.  This is exhibit dated December 6th,
13  2017.  And it's from Dr. Marshall to Dr. Swallow;
14  do you see that designation?
15  A.      Yes.
16  Q.      Have you seen this document prior to
17  the exchange of discovery documents?
18  A.      No.
19  Q.      I just want to walk you through it and
20  see if you agree with the information that
21  Dr. Marshall recorded.  She relates that at 7:32
22  this morning, meaning December 6th, she was
23  initially called by Pablo; is that correct?
24  A.      Again, I will preface my subsequent
25  responses with the fact that I'm experiencing

Page 184

1   amnestic episode.  And so by that very nature, I
2   don't remember that much from this day or this
3   event.
4   Q.      Do you remember calling Dr. Marshall?
5   A.      No.
6   Q.      Do you recall informing Dr. Marshall
7   that you had your step three exam that morning and
8   couldn't see very well?
9   A.      No, I don't remember that
10  conversation.
11  Q.      Do you remember the phone being passed
12  to your roommate Antonio?
13  A.      No.  But I do remember my roommate
14  being there driving.
15  Q.      Do you remember going to the grocery
16  store either that morning or the prior evening?
17  A.      I do remember going to the grocery
18  store.  I went to Giant and bought fruit.
19  Q.      Do you remember to admitting to
20  driving on the wrong side of the road?
21  A.      No.
22  Q.      Do you remember the dent on your car?
23  A.      I saw it after, afterwards, the
24  scratch at the bottom of the car trim that I
25  visually inspected after the fact, after the

Page 185

1   amnestic side effects wore off.
2   Q.      And could you remember how that
3   scraping or that dent happened?
4   A.      At the time, no.
5   Q.      Do you have any recollections up until
6   today?
7          MS. LOPEZ:  Recollection of?
8   Q.      What happened to your car.
9   A.      No, I can just give you the best
10  assumption of auto mechanics and people that work
11  on cars, that it looks like I scraped the bottom of
12  a curb, like sort of the parking dividers.
13  Q.      Do you recall that you couldn't locate
14  your cell phone?
15  A.      I believe, yes.
16  Q.      Do you recall Dr. Marshall
17  recommending that you go to the emergency room?
18  A.      No.
19  Q.      Do you recall stating that you wanted
20  to go take the test?
21  A.      No.
22  Q.      At the time were you using Xanax or
23  alcohol or any other substance?
24  A.      I'm not a drinker, so I can
25  definitively say I was not using alcohol.  And at

47 (Pages 182 - 185)

Page 186

1    the time I was taking the prescribed medications
2    that were given to me. But it wasn't Xanax. It
3    was Cymbalta and another, diazepam.
4    Q.        How did you get to the exam?
5    A.        My roommate drove me.
6    Q.        Did you contact your psychiatrist and
7    psychologist after the exam?
8    A.        Yes.
9    Q.        And what was the result of that
10   content?
11   A.        My psychiatrist discontinued the
12   medication that caused the adverse side effect.
13   Q.        Dr. Marshall in the second paragraph
14   says that she spoke to Dr. Swallow, that she will
15   email and text you to meet with Dr. Swallow
16   tomorrow, and the likely conclusion is that he will
17   need to meet with his psychiatrist to formally
18   evaluate him for fitness for duty and possibly an
19   evaluation for other potential causes for this
20   erratic behavior. Do you see that statement by
21   Dr. Marshall?
22   A.        Yes.
23   Q.        Do you agree with that assessment?
24   A.        Are you --
25           MS. LOPEZ:  Are you asking whether he

Page 187

1    agrees that that is what is written?
2    BY MS. CONRAD:
3    Q.        Do you agree that you would -- would
4    need to meet with your psychiatrist to be evaluated
5    for fitness for duty and possibly an evaluation for
6    other causes?
7           MS. LOPEZ:  Calls for speculation.
8           THE WITNESS:  I would --
9           MS. CONRAD:  I'm sorry. Both of you
10   were talking at the same time.
11           MS. LOPEZ:  My objection is calls for
12   speculation. He's already testified he doesn't
13   remember what occurred during that day. And he
14   went through with you the facts of what he does
15   remember and what he doesn't remember.
16           MS. CONRAD:  He said that there was an
17   agreement that he would contact his psychiatrist
18   and psychologist.
19           MS. LOPEZ:  So are you asking --
20           MS. CONRAD:  My question then is --
21           MS. LOPEZ:  Okay.
22           MS. CONRAD:  Do you agree that your
23   psychiatrist would have to evaluate you for fitness
24   for duty, as well as potentially evaluate for other
25   potential causes for this erratic behavior?

Page 188

1           MS. LOPEZ:  So then my objection is
2    compound question.
3    BY MS. CONRAD:
4    Q.        Do you agree with Dr. Snyder's -- not
5    Snyder -- Dr. Marshall's assessment that begins
6    with, the likely conclusion?
7    A.        No, I don't agree fully with that
8    statement. I would agree with the component that I
9    need to follow up with my mental healthcare
10   providers to get cleared to discontinue the
11   medication.
12           But my -- all my mental health
13   providers were in agreement that it was, in fact,
14   the medication that caused the adverse medical side
15   effect and that there are not other potential
16   causes for erratic behavior.
17   Q.        So you agreed that you would have to
18   be evaluated for fitness for duty; is that correct?
19   A.        No. I would agree that I needed to
20   follow up with my psychiatrist. That fitness for
21   duty language is something from Dr. Swallow.
22   That's not terminology that I would use.
23   Q.        How do you know it's not from
24   Dr. Marshall?
25   A.        Because Dr. Swallow requested fitness

Page 189

1    for duty forms subsequently in her meeting. And
2    this fitness for duty forms are addressed here.
3    Q.        Dr. Marshall references fitness for
4    duty, December 6, 2017, at 10:18 a.m., doesn't she?
5    A.        Yes. Again, that's why I -- I can't
6    speculate on what she was thinking or her logic
7    when she wrote that.
8    Q.        All right. So we'll defer to
9    Dr. Marshall to explain.
10           And, Dr. Marshall also writes, I'm
11   also aware that he's become dependent on my
12   support. Do you see that reference?
13   A.        Yes.
14   Q.        Had you become dependent on
15   Dr. Marshall for support?
16   A.        I reached out to her for support,
17   because she said to reach out to her for support.
18   So I think that comment of dependency might be
19   subjective. I didn't view it as dependency. I
20   viewed it as reaching out for help to my
21   leadership.
22           (Exhibit 26 was marked.)
23   Q.        Let me show you the document that's
24   marked Exhibit 26.
25           By the way, did you ever discuss the

1  events with Dr. Marshall after December 6th, 2017?
2  A.      No.
3  Q.      Why not?
4  A.      Not that I recall.  Because I had --
5  our meeting had already been arranged to discuss it
6  with Dr. Swallow.  So it was discussed with
7  Dr. Swallow.
8          (Exhibit 26 was marked.)
9  Q.      Turning to Exhibit 26.  Are you
10 familiar with this document?
11 A.      Yes.
12 Q.      When was the first time you saw it?
13 A.      During discovery exchange.
14 Q.      Did you meet with Dr. Swallow on
15 December 7?
16 A.      I believe so.
17 Q.      And have you had the opportunity to
18 review -- well, let's go through it paragraph by
19 paragraph.
20         Is there anything in the first
21 paragraph that you disagree with?
22 A.      This is an odd document in the sense
23 that I still had residual amnestic side effects.
24 So the event was from December 6th into December
25 7th.  So I was still experiencing symptoms of

1  amnesia.  So I can't recollect this meeting to its
2  fullest.  But I can state that I don't recall her
3  stating that.
4  Q.      Well, let's start with the first
5  paragraph then.  We'll have to go through this line
6  by line.  Did you meet with Dr. Swallow the morning
7  of December 7th?
8  A.      Yes.
9  Q.      Did you contact Dr. Marshall around 7
10 a.m. on December 6th?
11 A.      Again, on December 6th, I was in the
12 full height of amnestic episode.  I can't recall
13 that.
14 Q.      There's a reference in the last
15 paragraph to attach documentation, including the
16 text message exchange.
17         Did you have a text message exchange
18 -- the end of the first paragraph.  On the morning
19 of December 6th, were there text messages
20 exchanged?
21 A.      Yes, between my roommate, myself and
22 Dr. Marshall.  But it says they should be attached
23 to this document.
24 Q.      Well, do you have copies of those text
25 messages?

1  A.      I can -- I can look.  If I do, I'll
2  find them.  But I'm not 100 percent certain.
3          MS. CONRAD:  I would make a formal
4  request for those text messages.
5          (Request.)
6  Q.      Directing your attention to the second
7  paragraph.  Do you recall Dr. Swallow asking you
8  how you were feeling?
9  A.      No, I don't really recall that.  I
10 believe she did ask how I was doing, along the
11 lines of today, and I mentioned that I was feeling
12 better than the day before.  But that's as much
13 detail as I can give.
14 Q.      She goes on to summarize information
15 that you stated to her in the meeting.  Do you
16 recall stating any of that information to her in
17 your meeting on December 7th?
18 A.      I don't recall stating these items,
19 but I do know that some of them did occur.  So I
20 have to have said of some of them, such as going to
21 the grocery store.
22 Q.      Is there any statements in paragraph
23 -- in the second paragraph that did not occur?
24 A.      Again, I can't definitively tell you
25 that if I don't remember.

1  Q.      Let's skip down to the end of the
2  second paragraph.  Dr. Swallow asked you if the
3  symptoms resolved during the test.  And you noted
4  while taking the test the words appeared in 3-D.
5  Do you recall telling Dr. Swallow that information?
6  A.      No, I don't recall that.  I don't
7  recall even taking the -- the exam.
8  Q.      The last sentence, Dr. Swallow reports
9  that you told her that even as of the morning of
10 December 7th, you were continuing to have double
11 vision and that you were seeing two of her.  Do you
12 recall that?
13 A.      No.  It's possible though.
14 Q.      Do you recall, staring in the third
15 paragraph, Dr. Swallow asking if you felt safe to
16 continue patient care in light of these symptoms?
17 A.      No.
18 Q.      Do you recall your response to that
19 question?
20 A.      No.
21 Q.      Do you recall acknowledging that there
22 were concerns?
23         MS. LOPEZ:  Objection.  Vague.
24 BY MS. CONRAD:
25 Q.      I will direct your attention to the

49 (Pages 190 - 193)

Page 194

1  last two sentences of paragraph three.  Do you
2  recall providing that information?
3  A.      No.
4  Q.      Directing your attention to the next
5  page, do you recall Dr. Swallow informing you that
6  she had a concern that there could be a risk to
7  patient safety to continue -- for you to continue
8  to care for patients with the current ongoing
9  symptoms?
10 A.      No, I don't remember this
11 conversation.
12 Q.      Do you remember her also saying she
13 was equally concerned about erratic events, about
14 your erratic events and unclear recollection of
15 them?
16 A.      No.
17 Q.      Would you agree with me that if you
18 were unable to recall the events that had occurred
19 the prior day, that was a matter of concern?
20 A.      I would agree.
21 Q.      Do you recall Dr. Swallow informing
22 you that she was going to place you on a medical
23 leave of absence pending a fitness for duty
24 evaluation?
25 A.      I do vaguely remember some of that.

Page 195

1  But I think what prompts the memories, the symptoms
2  basically dissipated by the following day.  And
3  there was follow-up email exchange of remembering
4  to get these documents.  So that's how I knew that
5  I was on medical leave and that I needed to get
6  these fitness to return to work documents.
7  Q.      And do you recall Dr. Swallow -- or
8  telling Dr. Swallow you had additional physical
9  complaints that had arisen and were new for him --
10 or you?
11 A.      Uh-huh, no.
12 Q.      Do you recall Dr. Swallow informing
13 you that it was a conflict of interest to pursue
14 care with one of your resident colleagues, and it
15 was in your best interest to have a medical
16 evaluation by someone else?
17 A.      No, I don't recall that.  And that's
18 also an odd statement, because the chief resident,
19 part of the competency committee volunteered to be
20 my primary care provider.  And she did not disclose
21 that information.  So I had no way of knowing.
22 Q.      Do you know if there were any policies
23 that addressed conflict of interest in treating
24 with colleagues?
25 A.      No.

Page 196

1  Q.      Do you recall Dr. Swallow reviewing
2  with you that you needed to meet with your medical
3  providers and discuss the events of the previous
4  day and your fitness to return to duty?
5  A.      Vaguely, but I might be attributing
6  that to the follow-up communications after this
7  meeting, in which I was back to baseline and then
8  my memory was back.
9  Q.      Do you recall Dr. Swallow asking you
10 to contract her by Friday, December 8th, which
11 would be the following day, to discuss the details
12 of his upcoming appointments?
13 A.      I don't remember her saying that.  But
14 I know that she wrote those instructions down.
15 Q       And were you removed from clinical
16 duties during your leave of absence?
17 A.      Yes.  During my leave of absence, I'm
18 not on clinical duty.
19 Q.      I'm sorry, what?
20 A.      When I -- I was not at -- on clinical
21 duty prior to the event, during or after, and then
22 subsequently when I was on the medical leave of
23 absence, there are no clinical duties.
24 Q.      I'm directing your attention to
25 exhibit 27.

Page 197

1          (Exhibit 27 was marked.)
2  Q       Are you familiar with this document?
3  A.      Yes, I think this is exactly what I
4  was referring to about the clearer directions that
5  I knew to follow after the meeting.
6  Q.      When did you receive this document?
7  A.      I believe it was the same day as this
8  meeting with Dr. Swallow so --
9  Q.      Did you understand what was required
10 from you as summarized in this document?
11 A.      Within a day or so, yes.
12 Q.      Did you object to any of these
13 conditions?
14 A.      No.  Some of them seem odd.  But as
15 the student training employee I was just following
16 directions.  And I didn't object to anything.
17 Q.      Which item seemed odd?
18 A.      The specification that I did it to be
19 -- that I couldn't be cleared by a doctor of my
20 choosing.  But that I was required to use a doctor
21 associated with the hospital system.
22 Q.      And where is that addressed --
23 A.      Number two.
24 Q.      -- in Exhibit 27?
25 A.      Number two.  Hope Drive is the

1   hospital's clinic.
2   Q.      Did you ask to obtain a medical
3   evaluation from some medical provider other than at
4   Hope Drive?
5   A.      I got a clear medical evaluation from
6   my provider in addition to the provider at Hope
7   Drive.  So I gave multiple.
8   Q.      And doesn't number two say you need to
9   schedule a medical evaluation with a non-resident
10  provider at Hope Drive?
11  A.      Yes.
12  Q.      So, again, what is your objection?
13          MS. LOPE:  Objection.
14  Mischaracterization of testimony.  He said it was
15  odd, not that he objected.
16          MS. CONRAD:  Oh, I'm sorry.
17  BY MS. CONRAD:
18  Q.      What was odd about the requirement
19  that you needed to schedule a medical evaluation
20  with a non-resident provider at Hope Drive?
21  A.      I've never been told that I could only
22  see a certain group of doctors.  Usually it's the
23  patient's choice of what doctor they will see and
24  get care with.  I thought it was odd that I was
25  told I could only see certain providers that were

1   affiliated with the hospital.
2   Q.      Well, wouldn't you agree that
3   Dr. Marshall was one of your chief residents that
4   oversaw your performance as a resident, wasn't she?
5   A.      Yes.
6   Q.      And you sought out Dr. Marshall for
7   medical treatment, didn't you?
8   A.      Yes.
9   Q.      And you thought it odd that
10  Dr. Swallow was concerned there might be a conflict
11  of interest in having a chief resident who was
12  supervising you treat you medically?
13  A.      No, I thought it was odd that she
14  would say that my medical care provider, who
15  specializes in mental health, was not sufficient.
16  But that a provider at a clinic that was associated
17  with the hospital, who was not a psychiatrist, was
18  sufficient.  It's a little odd.
19  Q.      Where does it say that?
20  A.      The provider at Hope Drive.  Hope
21  Drive is the clinic center at the hospital.
22  Q.      It says you need to schedule a medical
23  provider -- you need to schedule an evaluation with
24  a non-resident provider at Hope Drive?
25  A.      Yes.  Why -- why shouldn't I go to my

1   psychiatrist?
2   Q.      Was your psychiatrist at Hope Drive?
3   A.      I think that's exactly my point.
4   She's telling me where I need to get cleared at
5   rather than tell me --
6   Q.      Where was your psychiatrist located?
7   She's only saying you can't go to a resident
8   provider who is at Hope Drive, isn't she?
9   A.      She's saying I need to schedule a
10  medical -- medical evaluation with a provider at
11  Hope Drive.  She's telling me to go to Hope Drive.
12  Q.      Did you ask her what was meant by that
13  statement?
14  A.      No.  But she did clarify in a
15  subsequent email that it was okay to see my
16  provider.  So someone else must have caught that
17  something wasn't exactly right there, because she
18  had to clarify that it was okay for me to be
19  cleared by a doctor Of my choosing.
20  Q.      Isn't medical separate from
21  psychological?
22  A.      No.  Psychological would be a
23  specialty or a subcategory of medical, I would say.
24  Q.      If you had a question about whether or
25  not you could be evaluated by a non-resident

1   provider at Hope Drive, why didn't you ask did
2   Dr. Swallow what that meant?
3           MS. LOPEZ:  Objection.  Asked and
4   answered.
5   Q.      I asked if he did ask her.  My
6   question now is, why didn't you ask her?
7   A.      I was just following the instructions
8   given to me.  I noted that it was -- seemed quite
9   odd.  I didn't object to it though.  I followed the
10  directions that were given to me by my supervisor.
11  Q.      Can a psychologist do a medical
12  evaluation?
13  A.      He's doing a psychiatric evaluation.
14  I would -- I would say that he's more fit to do
15  that evaluation than a general medical doctor who
16  doesn't specialize in, psychiatry and that's who
17  I'm being asked to see.
18          (Exhibit 28 was marked.)
19  Q.      Let's look at Exhibit 28.  Are you
20  familiar with this document?
21  A.      Yes.
22  Q.      What is it?
23  A.      It's a return to work clearance to
24  return to work after the amnestic episode.
25  Q.      And who is this document from?

Page 202

1   A.      Dr. Frank Munoz.
2   Q.      And is the document handwritten or is
3   it typed?
4   A.      This one is typed.
5   Q.      And does it list any type of
6   accommodation requirements in conjunction with your
7   return to work on December 12th?
8   A.      No.  This form had clear instructions
9   from Dr. Swallow that I just needed a form that
10  says you are fit for duty and may return to full
11  duty work.  So that's exactly what I asked -- what
12  I got.  It was just a form to satisfy that
13  requirement.
14  Q.      And it says he's fit for duty and he
15  may return to full duty work; doesn't it?
16  A.      Yes.
17  Q.      It doesn't say -- make any reference
18  to work that has less stressful rotations, does it?
19  A.      No, because it's not discussing
20  accommodations at this point.  It's just discussing
21  if I can return to work.
22  Q.      It doesn't say full duty work which
23  allow for adequate sleep and time off on weekends
24  when possible, does it?
25          MS. LOPEZ:  Objection.  Argumentative.

Page 203

1   And this has been asked and answered.  The document
2   speaks for itself.
3           MS. CONRAD:  Then he can answer the
4   question.
5           MS. LOPEZ:  It's argumentative,
6   counsel.
7           MS. CONRAD:  Excuse me?
8           MS. LOPEZ:  It's argumentative.
9           MS. CONRAD:  It is not.  He can answer
10  the question.
11  A.      You can repeat the question?
12  Q.      Certainly.  Does Dr. Munoz say he is
13  fit for duty and may return to full duty that
14  allows for adequate sleep and time off on weekends
15  when possible as of December 12, 2017?
16  A.      No.  You added quite a few words that
17  aren't on this document.
18  Q.      Right.  Well, I'm looking back at the
19  August 28th, 2017 handwritten letter that Dr. Munoz
20  wrote.
21          And I'm asking if Dr. Munoz
22  incorporated any of those considerations into the
23  December 11, 2017 note?
24          MS. LOPEZ:  Objection.  Asked and
25  answered.

Page 204

1   BY MS. CONRAD:
2   Q.      And you agree with me he did not, did
3   he?
4           MS. LOPEZ:  Asked and answered.
5   Q.      Did he?
6           MS. LOPEZ:  Asked and answered.
7   Q.      Did he?  You may answer the question.
8   A.      Can You repeat the question?
9           MS. CONRAD:  This will be the third
10  time.  And this will be part of the basis for my
11  request for additional time to depose.
12          Because counsel continues to make
13  objections.  Dr. Salcedo refuses to answer the
14  question.  And then we need to repeat the question.
15          MS. LOPEZ:  And you're asking the same
16  question over and over.
17          MS. CONRAD:  Read it from the record,
18  please.
19          (The court reporter read the
20  referred-to question.)
21  A.      No, he does not say that.
22  Q.      I'm going to direct your attention to
23  Exhibit 29.
24          (Exhibit 29 was marked.)
25  Q.      Are you familiar with Exhibit 29?

Page 205

1   A.      Yes.
2   Q.      What is it?
3   A.      It's another release -- secure to work
4   from my therapist Michelle Batz saying that I can
5   return to work.
6   Q.      And with respect -- I apologize.
7   Going back to the December 11 note from Dr. Munoz,
8   was this note submitted to Dr. Swallow?
9   A.      Yes.
10  Q.      How was it submitted to Dr. Swallow?
11  A.      In person.
12  Q.      So did you pick up the note from
13  Dr. Munoz?
14  A.      Yes.  All three of these providers I
15  saw individually and got the notes individually to
16  give.
17  Q.      And at the time you obtained the note
18  from Dr. Munoz, did you say to him, you could
19  please include those considerations that were
20  contained on the August 2017 note that you wrote?
21  A.      No, I did not, because that was not
22  the point of the letter.  The request from
23  Dr. Swallow was a statement that I'm clear and fit
24  to work.  So that's what I requested.
25  Q.      You are clear and fit to --

52 (Pages 202 - 205)

Page 206

1    A.       Return to work.
2    Q.       -- return to work, right?
3    A.       Return to work.
4    Q.       Dr. Munoz says full duty work, doesn't
5    he?
6    A.       We would have to ask him what he means
7    by exactly full duty to work. But the intent of
8    the letter was fit to return to work.
9    Q.       No, the letter that he wrote, signed
10   and you submitted, says he is fit for duty and may
11   return to full duty work as of December 12, 2017,
12   doesn't it?
13   A.       Yes. But what does he mean by full
14   duty? We need to ask him. I'm telling you
15   that Dr. Swallow gave me specific instructions on
16   what this letter had to say. So that's what I
17   obtained. And that's what I returned to her.
18   Q.       Let me direct your attention now to
19   Exhibit 29. What is exhibit 29?
20   A.       It's another clear -- clear of fitness
21   to return to work.
22   Q.       And this clearance confirms that
23   Mr. Salcedo is fit for work as of December 11,
24   2017, doesn't it?
25   A.       Yes.

Page 207

1            (Exhibit 30 was marked.)
2    Q.       Let me direct your attention to
3    Exhibit 30. Are you familiar with Exhibit 30?
4            Dr. Salcedo, are you familiar with
5    Exhibit 30?
6    A.       Yes. I'm looking, because Exhibit 30
7    I have opened here is a different document than the
8    one you have on your screen, or to whom it may
9    concern I'm reading. Okay. Yes, I'm familiar with
10   this document.
11   Q        What is it?
12   A.       I thought we already did this one.
13   It's a return to work letter saying I'm fit for
14   duty.
15   Q.       From what?
16   A.       Timothy Sullivan, he's the Hope Drive
17   clinic provider that I was forced to see.
18   Q.       What do you mean, you were forced to
19   see?
20   A.       Had it been my choice, I would have
21   gotten cleared by my treating providers, Dr. Munoz.
22   Q.       Which providers?
23   A.       Dr. Frank Munoz, my psychiatrist.
24   Q.       But you had Dr. Munoz submit a fitness
25   for duty letter, didn't you?

Page 208

1    A.       Yes, but Dr. Swallow specified I
2    needed a fitness for duty from someone from clinic
3    drive -- Hope Drive.
4    Q.       And where did she say that?
5    A.       Few exhibits ago in her outline of the
6    next steps. She said I needed to see a
7    non-resident provider at clinic drive -- Hope Drive
8    at the clinic.
9    Q.       We've already covered that. We're not
10   going back to it. Dr. Swallow will be deposed
11   tomorrow.
12           Timothy Sullivan doesn't just release
13   you to return to work. He goes on to say, you may
14   return to work on December 12, 2017 without any
15   restrictions, doesn't he?
16   A.       Yes.
17   Q.       Did Timothy Sullivan have any further
18   assessment and plans following -- strike that.
19           You met with Timothy Sullivan on or
20   about December 12, 2017, didn't you?
21   A.       Yes.
22   Q.       And did you have -- have you had the
23   opportunity to review his text note?
24   A.       Yes.
25   Q.       And you'll agree that if you pull up

Page 209

1    -- no, it's not an exhibit -- never mind. In his
2    assessment and plan, he, in fact, indicated that no
3    additional interventions are required at this time,
4    didn't he?
5            MS. LOPEZ: Sorry, counsel. I'm not
6    sure why you're at here.
7            MS. CONRAD: I'm not looking at an
8    exhibit. I'm looking at a note from Timothy
9    Sullivan. It's not an exhibit. I'm just asking if
10   Dr. Salcedo remembers.
11           MS. LOPEZ: Oh.
12           THE WITNESS: Yes. Well, I think it's
13   important to differentiate the fact that these
14   fitness for duty letters are strictly secondary to
15   the amnestic event, and not any way related to
16   accommodations or my underlying health condition.
17   They were -- there was a precipitating event, the
18   amnestic episode, and that's what the letters are
19   addressing so --
20   Q.       Well, do you recall Timothy Sullivan
21   noting that the patient had transient amnesia due
22   to adverse side effect from -- I'm not sure how to
23   say this -- tempa --
24           MS. PANTALIONE: Temazepam.
25   Q.       Temazepam, thank you, which has since

Page 210

1  been discontinued.  And he has returned to baseline
2  and no additional interventions are required at
3  this time.  Do you recall that assessment by
4  Timothy Sullivan?
5  A.      Yes, we are discussing the amnestic
6  episode, yes.
7  Q.      And he goes on to say, he was provided
8  a note that he is stable from a medical perspective
9  to return to work without any specific
10 restrictions.  Do you recall that plan?
11 A.      Yes.
12 Q.      And do you recall speaking to him
13 about minimizing your caffeine intake?
14 A.      Yes, and addressing good sleep
15 hygiene.
16 Q.      And did he advised you to talk to your
17 psychiatrist about medications?
18 A.      Oh, I believe -- at this point, I
19 might need the document in front of me, because
20 you're going through it.  I would like to see it.
21 Q.      I'm just asking what you remember.
22 And do you agree with the -- with the treatment
23 plan by Timothy Sullivan?
24 A.      Again, what is the treatment plan?
25 Q.      What I just went over.

Page 211

1  A.      Hm.
2  Q.      No, you did not agree with it?
3  A.      No.  I don't think you just went over
4  the treatment plan.  You went from -- from the top
5  of the note -- is there any way we can get the note
6  up?  That might be easier.
7  Q.      Well, what do you recall from Timothy
8  Sullivan's treatment plan?
9  A.      To continue care with my providers.
10 We talked about lifestyle changes like the caffeine
11 and to try my best to get good sleep hygiene.  And
12 that I would also be following up with Britt
13 Marshall, but that's about all I remember.
14        (Exhibit 31 was marked.)
15 Q.      Let me direct your attention to
16 Exhibit 31.  Are you familiar with this document?
17 A.      Yes.
18 Q.      What is it?
19 A.      It's the letter that I received
20 December 14, 2017 after amnestic episode, and
21 Dr. Swallow places me on remediation.
22 Q.      Let's take it one step at a time here.
23 It says clinical competency committee follow-up,
24 Dr. Pablo Salcedo at the top, doesn't it?
25 A.      Yes.

Page 212

1  Q.      And it goes -- it's dated December 14,
2  2017, correct?
3  A.      Yes.
4  Q.      And Dr. Swallow signed this document,
5  didn't she?
6  A.      Yes.
7  Q.      And did you sign the document?
8  A.      Yes.
9  Q.      And in it, it begins by saying she'll
10 review the concerns raised to the competency
11 committee by the evaluations to date on
12 Dr. Salcedo; do you see that?
13 A.      Yes.
14 Q.      Is there any reference in this
15 document to the episode -- the amnestic episode
16 that you experienced and your medical leave?
17 A.      No.  But this document was given to me
18 with a second document that does address my mental
19 health.
20 Q.      Well, we'll get to that document.
21 A.      Okay.
22 Q.      We're looking at two different issues,
23 aren't we?  This document deals with concerns
24 raised by the competency committee by the
25 evaluations to date, doesn't it?

Page 213

1  A.      Yes.
2  Q.      And the concerns are summarized in
3  one, two and three, aren't they?
4  A.      Yes.
5  Q.      And based on those concerns, a
6  remediation plan was presented to you, wasn't it?
7        MS. LOPEZ:  Objection.  Calls for
8  speculation.  He doesn't know whether the mediation
9  plan was based on these concerns.  This is just a
10 document.  He doesn't know what the committee said.
11 Q.      Did you ask what the committee said?
12 A.      No, I did not ask what the committee
13 said.  I'll be honest, I did not have much
14 knowledge of the competency committee until near
15 the end of my time at the medical center.
16 Q.      Was a remediation plan proposed to you
17 in your meeting with Dr. Swallow on December 14th?
18 A.      Yes.
19 Q.      And the document provides, I propose a
20 remediation plan to improve these skills and help
21 him obtain a level of comfort in these areas.  Do
22 you see that reference?
23 A.      Yes.
24 Q.      And it goes on to list three areas
25 that must be addressed as part of the remediation

54 (Pages 210 - 213)

Page 214

1    plan, doesn't it?
2    A.      Yes.
3    Q.      It then goes on to note, that
4    observation activities will take place between
5    blocks 13 through 18, correct?
6    A.      Yes.
7    Q.      And then you're provided information
8    that at the conclusion of block 18, that's February
9    23rd, the data will be reviewed and the next course
10   of action will be determined, right?
11   A.      Yes.
12   Q.      It goes on to say, I hope -- the hope
13   is that he will have made sufficient progress in
14   his decision-making, presentation skills and
15   interpretation of the data that will allow him to
16   be removed from the remediation plan and continue
17   on his training.  Do you see that statement?
18   A.      Yes.
19   Q.      Did you understand then that the
20   purpose of the remediation plan was to allow you to
21   make progress to be removed from remediation and
22   continue your training?
23   A.      Yes.
24   Q.      And you signed that document, correct?
25   A.      Yes.

Page 215

1    Q.      Did you voice any objection to the
2    information that was covered in that meeting and
3    contained in this document?
4    A.      I did voice some objection to
5    Dr. Swallow.
6    Q.      What were those objections?
7    A.      I told her that I felt I was being
8    punished for having this amnestic episode.  And
9    that this entire mediation is imputative.  Because
10   I was being provided this remediation and at the
11   same time being given this mental health follow-up
12   emergency mental health plan.  And most of the
13   meeting was to discuss my disability and also by
14   the way replacing me on remediation.  This should
15   have been separate.  But in fact, my disability was
16   intertwined with the remediation and in the
17   clinical judgment of the people in charge of me.
18   Q.      Did you understand that in
19   mid-December, most residents were going through a
20   mid-year evaluation?
21          MS. LOPEZ:  Objection.  Asked and
22   answered.
23   Q.      You may answer.
24   A.      I believe so.  But I had no knowledge
25   besides someone -- seeing that the evaluation

Page 216

1    occurred.  But honestly I was keeping my head down
2    working those long hours, just waiting for the
3    accommodations.  And those types of things,
4    administrative things, didn't have knowledge of
5    or experience to know.  I was looking to
6    leadership, aka, Dr. Swallow to be able to guide me
7    and to tell me what needed to be done.
8    Q.      So you didn't engage in any
9    conversations with your colleagues that mid-year
10   evaluations were going on?
11   A.      No.
12          (Exhibit 32 was marked.)
13   Q.      Take a look at Exhibit 32.  Are you
14   familiar with this document?
15   A.      Yes, it was the second document that
16   was handed to me on December 14th, 2017 by
17   Dr. Swallow along with the remediation document.
18   Q.      And now they are two separate
19   documents, aren't they?
20   A.      Yes, two documents.
21   Q.      And they address two separate issues,
22   don't they?
23   A.      The straightforward answer is they
24   are two separate documents.  But they are related.
25   That's why they were given to me at the same time.

Page 217

1    Perhaps that I was not being accommodated is to
2    prompt the reason why they're putting me on
3    remediation in the first place.  So, yes, they're
4    labeled two different documents.  But that doesn't
5    mean they're completely separate.
6    Q.      Well, point out to me how document 32
7    is related to document 31?
8    A.      They're related -- so if I put myself
9    back into the room, I'm sitting in Dr. Swallow's
10   office.  And she hands me at the same time this
11   form for a mental health, and this form for my
12   remediation and tells me to sign both forms at the
13   same time.  She's connecting them.  A proper way to
14   do it would be to separate those two items as
15   distinct events.  But, in fact, this was all given
16   to me in one meeting at the same time and I signed
17   both documents at the same time, immediately after
18   a medical event.  And that is why they're
19   connected.
20   Q.      So you're on a medical leave.  You're
21   clear to return to work without restrictions.  And
22   these two separate items have to be addressed with
23   you, both of which occurred in or about the same
24   time.  And it's your position that because they
25   were both addressed at the same day, at the same

55 (Pages 214 - 217)

Page 218

1    meeting, they're related?
2    A.        I'm saying that it's my opinion I was
3    placed on the remediation plan because of my
4    disability and the amnestic event.
5    Q.        I respect you have an opinion. I'm
6    not asking for opinion testimony today. I'm asking
7    about facts.
8              What facts can you point to in these
9    two documents to establish that they are related?
10             MS. LOPEZ: Asked and answered.
11   A.        They were given to me together. A
12   reasonable person would conclude they're related,
13   if I'm asking to sign two things at one time and
14   they're both handed at the same time.
15   Q.        So going back to 31 for a moment, do
16   you have any documents or evidence to support a
17   position that the evaluations to date on
18   Dr. Salcedo do not raise the three concerns that
19   are listed in 31?
20   A.        I -- I -- I would say that my grading
21   and scoring up to that point did not justify the
22   remediation. So again as we went over those
23   objective performance scores, those zero to five, I
24   did not have any critical deficiencies. But what
25   you see numbered one, two, three, are cherry-picked

Page 219

1    comments that come from the constructive feedback
2    section. It's supposed to be an honest section for
3    my evaluator to give me feedback on how to grow and
4    learn, not to be used to penalize or place someone
5    on remediation. That defeats the purpose and kind
6    of taints the open critical channel of
7    communication on behalf of our attendings.
8    Q.        Is it your position that one, two and
9    three are not true and accurate information?
10   A.        It's my position that one, two and
11   three are misused and taken out of context.
12   Q.        Well how can you -- can you please
13   explain to me how they're taken out of context?
14             MS. LOPEZ: Asked and answered.
15   A.        I didn't hear an answer to that
16   question.
17             MS. LOPEZ: Okay.
18             THE WITNESS: They're taken out of
19   context, because those don't reflect the entire
20   evaluation. So if you refer to, let's say the
21   first one that says he entered at reporter stage,
22   then that's a feedback comment. But the rest of
23   the evaluation says that I was very compassionate.
24   That I excelled in this and this. Then you're not
25   seeing that whole picture, you're only seeing that

Page 220

1    cherry-picked comment that fits this narrative from
2    confirmation bias. You are trying to fit a
3    narrative and only including certain words and buzz
4    words, but you're not accurately describing me or
5    my performance.
6    Q.        Well, point to evaluations that rebut
7    item number one?
8              MS. LOPEZ: Counsel, you wants him to
9    go back to the evaluations?
10             MS. CONRAD: If I heard him correct,
11   he said that he takes out of context. I want
12   him to point to me evaluations that establish that
13   he was not observed at the data gathering or
14   reporter stage.
15             Let's do it this way, let's not waste
16   time. Between now and the next deposition, be
17   prepared to respond to those three areas of
18   concern.
19             THE WITNESS: Okay. If you want, if
20   you go to your Exhibit 21, I have a quick example.
21   BY MS. CONRAD:
22   Q.        Okay. Go ahead.
23   A.        So that data collection phase portion,
24   so if you see on top of Exhibit 21, quality of
25   history and physical exam. So had it been a big

Page 221

1    concern, you would expect to be marked critically
2    deficient. Does not collect accurate historical
3    data. Or if you were stretching it you may put
4    direct supervision, sometimes inaccurate. But I,
5    in fact, received indirect supervision.
6              This states I acquire accurate
7    history, perform appropriate physical exams and
8    obtain data from secondary sources when needed and,
9    in fact, the majority of my evaluators marked that
10   same section. So that contradicts number one in
11   the remediation.
12   Q.        So you pointed to one evaluation.
13   Between now and our next deposition, we can
14   collectively look at the evaluations with respect
15   to one, two and three.
16             And by the way, Dr. Salcedo, I know I
17   asked this before, but if it's your position that
18   one, two and three were taken out of context and
19   misused, why didn't you submit a rebuttal when you
20   got out?
21   A.        I did raise my concern that I thought
22   that this was punitive and it was not fair. And
23   the response I got from Dr. Swallow was, don't
24   worry, this happens all the time to other
25   residents. It's just part of the process. She's

56 (Pages 218 - 221)

Page 222

1   my direct supervisor.  And in the clinical culture,
2   you do what you're told.  Otherwise, you face more
3   consequences.
4       Q.      I'm not asking about your opinion that
5   this was punitive in nature.  I'm asking about, why
6   didn't you sit down with Dr. Swallow and address
7   one, two and three, and how they were taken out of
8   context?
9       A.      So my response to you is that, I did
10  in the sense as much as I could.  So take it from
11  my position, I'm sitting there and my direct
12  supervisor has complete control over my career is
13  putting me on remediation plan, right after coming
14  back from a medical event, and instead of
15  discussing accommodations, right?  So now in my
16  mind, I feel like I'm being punished that, oh,
17  they're actually not going to help me, but they're
18  holding things against me.  I need to keep my head
19  down.  And that's what I did.  You're asking why I
20  didn't keep fighting back.  So I could be hurt more
21  and put on more avenues of ensured failure.  It
22  wouldn't be logical at that time.
23      Q.      But this -- these concerns are not
24  just Dr. Swallow's concerns, are they?  They're the
25  concerns raised to the competency committee?

Page 223

1       A.      The problem is those concerns --
2               MS. LOPEZ:  Objection.
3               MS. CONRAD:  Excuse me?  I didn't hear
4   your answer.
5               MS. LOPEZ:  Objection.  Calls for
6   speculation.  He only received this from
7   Dr. Swallow.  He didn't receive direct
8   communications from the clinical competency
9   committee.
10  BY MS. CONRAD:
11      Q.      Doesn't the first sentence say, at our
12  meeting today, I told you the concerns raised to
13  the clinical competency committee by evaluations to
14  date on Dr. Salcedo; do you see that statement?
15              MS. LOPEZ:  That's what it says.  But
16  you were asking him whether or not -- how the
17  clinical competency committee assessed the
18  information.  That is a different question
19  altogether.  It says what it says.  It doesn't mean
20  that he understood what they were basing their
21  opinion on.
22      Q.      And Dr. Salcedo, you didn't ask for
23  any further explanation, did you?
24      A.      No, just aside from I felt I was being
25  punished.

Page 224

1       Q.      And returning to document 32 -- strike
2   that.
3               Going back to 31, there's no reference
4   to this being a punishment in the document, is
5   there?
6       A.      There is no reference to it being a
7   punishment.  I'm telling you what I felt during
8   that meeting.  I felt it was --
9       Q.      Did you read -- and did you read the
10  last sentence?
11      A.      Yes.
12      Q.      And the hope is to be -- that you will
13  be removed from remediation and continue your
14  training, isn't it?
15      A.      Yes.  That is what it says on the
16  paper.
17      Q.      Did you agree with that?
18      A.      It's not the statement for me to agree
19  or disagree.  That's a statement that they're
20  telling me.
21      Q.      Did you hope that you would make
22  sufficient progress to be removed from remediation
23  and continue your training?
24      A.      Yes.  I was also under the assumption
25  I would have an actual remediation, and not a plan

Page 225

1   to terminate me, disguised as a remediation, two
2   different things.
3       Q.      Okay.  Were you scheduled to be on
4   internal medicine wards following December 14,
5   2017?
6       A.      Yes.
7       Q.      Were you asked to submit a progress
8   note twice per week while you were on general
9   medicine wards?
10      A.      Yes.
11      Q.      I'm on 31, number two.  Did you
12  provide progress notes as provided in number two?
13      A.      Yes, I reviewed two progress notes
14  with Dr. Amy Dewater.
15      Q.      And also provided that you could
16  review these notes with a member of your team, a
17  senior resident or attending to receive feedback.
18  Did you review the notes with any of those
19  individuals?
20      A.      Yes, I sometimes would review my notes
21  with my attendings prior to submission.
22      Q.      And weren't you provided clinical case
23  scenarios to work through?
24      A.      I was provided medical school level
25  test prep book of clinical vignettes that I did

57 (Pages 222 - 225)

1  complete. And I did not get any further
2  instruction on someone was going to review it with
3  me, or what would be done with it. So I ultimately
4  returned the book to Dr. Swallow on her mailbox,
5  hanging on her door.
6  Q.     Did you ask to meet with Dr. Swallow
7  about that work that you had completed?
8  A.     I did ask Dr. Swallow via email more
9  the logistics on how this would work. And I don't
10  remember getting a response back. But I wanted to
11  know sort of how are these check-ins supposed to
12  occur? Was she going to age them and things of
13  that nature. Because those actual details of the
14  mediation plan were not flushed out in this letter.
15  Q.     Well, it clearly says that you can
16  review notes with a member of the team's senior
17  resident or attending, doesn't it?
18  A.     Yes. And that portion I fulfilled.
19  But above it it says, with a program administrator.
20  Q.     And did you reach out to a member of
21  the program administration?
22  A.     No, I will be asked to submit. So
23  they reached out to me. So it was customary for
24  that person to reach out to me, whether it was for
25  scheduling or to arrange it. Dr. Amy Dewaters

1  scheduled the meeting. And I met with her to
2  review the two notes.
3  Q.     Let's move on to 32 now. Did
4  Dr. Swallow review with you the conditions of your
5  return to clinical practice?
6  A.     Yes.
7  Q.     Did that include number one, an
8  ongoing care management plan?
9  A.     Yes.
10  Q.     Did that include number two,
11  developing a social support network outside of the
12  residency program?
13  A.     Yes.
14  Q.     Did that include number three, have a
15  documented emergency plan?
16  A.     Yes.
17  Q.     And did that condition provide that
18  the emergency plan needs to include details about
19  who to contact should he have an acute exacerbation
20  of his anxiety that prohibits him from being able
21  to safely care for patients?
22  A.     Yes.
23  Q.     And did that include number four, if
24  there's another issue where there's a concern for
25  your safety or the safety of the patients under

1  your care, that he would -- that you will be
2  removed from rotation?
3  A.     Yes.
4  Q.     And that it may mandate a longer leave
5  of absence to be sure that you have time to take
6  care of and stabilize your issues?
7  A.     Yes.
8  Q.     And did you sign off in agreement to
9  those four conditions?
10  A.     Yes.
11  Q.     And did you begin internal medicine
12  ward service on December 18th?
13  A.     Approximately, yes.
14  Q.     And were you expected to meet with a
15  member of program administration on a weekly basis.
16  A.     That was my impression from the plan.
17  And that's why I emailed Dr. Swallow to find out
18  the details of how that would be arranged.
19  Q.     And did you range those details?
20  A.     Dr. Swallow did not arrange those
21  details. That was not in my power to arrange.
22  Q.     Why wasn't it in your power to set up
23  a weekly meeting?
24  A.     That would be rather uncustomary for
25  me to tell Dr. Swallow when she should meet me.

1  Usually the attending or leader or director tells
2  you their availability and they send out a request.
3  It's not the other way around.
4  Q.     Did you ever take any action to say,
5  Dr. Swallow, I would like -- I'm available to meet
6  with you the following dates and times to have our
7  weekly meeting?
8  A.     Outside of that email prompting her to
9  let me know how it would be arranged, no.
10  Q.     Exhibit 33.
11       (Exhibit 33 was marked.)
12  Q.     Are You familiar with a document
13  marked 33?
14  A.     Yes.
15  Q.     What is it?
16  A.     It's a warning letter that was
17  allegedly given to me.
18  Q.     What do you mean allegedly?
19  A.     I believe the hospital claims they
20  gave me this warning letter. But I, in fact, never
21  received it.
22  Q.     Well, isn't that your signature at the
23  bottom of that document?
24  A.     No, it is not. I've never seen this
25  document until discovery and never signed it. And

1  there's also an extra gentleman on that note.  If
2  you notice the other two documents, it was just me
3  and Dr. Swallow.  For some reason there's another
4  gentleman on here who signed it.  But there was
5  only two people in the meeting.
6  Q.      Who is the other gentleman?
7  A.      I had not met him until the date of my
8  termination, but he's Dr. Aramani, chair of the
9  clinical competency committee.
10  Q.      Have you had any other bouts of
11  amnesia since the prior one?
12  A.      No.  I no longer take that medication.
13  Q.      That's not my question.  Have you had
14  any recurring bouts of amnesia?
15  A.      No.  I just testified because you
16  could have current bouts of amnesia separate from
17  medication.  So I wanted it to note that it was
18  because of medication that I had amnestic episode.
19  Important to know.
20  Q.      Do you dispute any of the information
21  that is contained in the document marked 33?
22  A.      Well, aside from it being a document I
23  never signed, or that I never received, it was
24  never presented to me as this paragraph states,
25  that Dr. Swallow met with me and I was given this

1  official warning.  However, that never occurred.  I
2  only received two documents on December 14th, my
3  confidential remediation there.
4  Q.      Were there issues related to patient
5  care based on the evaluation that had been
6  completed to date?
7          MS. LOPEZ:  Objection.  Asked and
8  answered.
9  Q.      You can answer the question.
10  A.      To date, as in December 14th, 2017,
11  no.
12  Q.      There were no areas of concern about
13  patient care?
14  A.      No.
15  Q.      How about medical knowledge?
16  A.      I know that I received comments that
17  said, as all, is customary for beginning learners,
18  and I needed to expand my foundation and medical
19  knowledge.  But that was more a constructive
20  feedback comment, and not an area of concern.  It
21  was not marked as a deficiencies or a low score on
22  that zero to five scale.
23  Q.      You'll agree with me, won't you, that
24  as of December 14, a plan of remediation had been
25  outlined for you, wasn't it?

1  A.      Yes.
2  Q.      And you understood that upon
3  completion of the remediation plan, your progress
4  would be reviewed, didn't you?
5  A.      Yes.
6  Q.      And did you have an understanding that
7  the purpose of the clinical competency committee
8  was to review the progress of all current residents
9  in the milestones of training?
10  A.      No.
11  Q.      Did you have any understanding of the
12  role of the clinical competency committee?
13  A.      I had --
14          MS. LOPEZ:  Are you asking if he
15  understood at the time December 14 only or today?
16  BY MS. CONRAD:
17  Q.      As of December 14th, 2017, there's a
18  reference to the clinical competency committee in
19  Exhibit 31, as well as 33.  Did you have any
20  understanding of the role of the clinical
21  competency committee with respect to reviewing the
22  progress of residents?
23  A.      No.
24  Q.      How did you understand you would be
25  evaluated?

1  A.      I understood that I would be evaluated
2  by trending my growth and how I improved through
3  subsequent rotations.  But unfortunately, I had not
4  had much rotation time from December 14th to
5  February.  But it was my understanding that on the
6  program would be looking for improvement in growth,
7  that was what I understood.
8  Q.      Were you familiar at all with the
9  ACGME milestones reporting process?
10  A.      Yes.
11  Q.      And what did you understand about that
12  process?
13  A.      I understood that those milestones are
14  meant to be used to track residents through time.
15  And they're not recommended to be used as snapshots
16  -- snapshot scores or to make heavy stakes
17  decisions based off just one or two data points.
18  They're meant to trend residents over their
19  training careers and to show that development,
20  improvement through time.
21  Q.      What if the resident was not meeting
22  the milestones?
23  A.      As in the resident was failing to
24  progress or to grow?
25  Q.      Was not meeting the milestones as

Page 234

1  required in the reporting process.
2  A.       Okay.  So the way the milestones work,
3  it's not as if there's a clear-cut mark where
4  you're not meeting it or you are.  It's different
5  for each resident.  And depends on how much you're
6  growing.  Everyone starts out in a different place
7  when you start training.  So if you mark everybody
8  by the same level, you have people failing, right?
9           The idea with the milestones is to
10 trend the resident to take the scores and how
11 they're doing in the beginning, and to look at them
12 later on and to ensure that they're growing and
13 getting better.  And if they're not, then to remify
14 that by intervening and providing that extra
15 support.
16 Q.       Where are these standards provided?
17 A.       ACGME guidelines?
18 Q.       The standards that you just described,
19 where is that information contained?  Where is your
20 source for information?
21 A.       ACGME guidelines.
22 Q.       Where does it say that the ACGME
23 milestones are only to be used to track residents
24 over time to show their development?
25 A.       ACGME create these milestones and

Page 235

1  they're using the milestones, so I would assume
2  they're using the milestones as intended.
3  Q.       I'm not asking about your assumptions.
4  I'm asking where in the ACGME guidelines does it
5  say that the milestones are only to be used to
6  track residents over their training to show
7  development?
8  A.       I would have to get you that
9  documentation later so you can review it.
10         MS. CONRAD:  Well, I'm making a formal
11 request for the ACGME guidelines that specifically
12 provide that the milestones are only to be used to
13 track residents over time to show their
14 development.
15         (Request.)
16         (Exhibit 34 was marked.)
17 BY MS. CONRAD:
18 Q.       I want to direct your attention to
19 Exhibit 34.  Are you familiar with this document?
20 A.       Yes.
21 Q.       What is it?
22 A.       It's an email from myself to
23 Dr. Swallow on December 17th submitting her the
24 emergency mental health plan she required me to
25 create.

Page 236

1  Q.       What do you say in the first sentence
2  of this email?
3  A.       Hello, Dr. Swallow.  Thank you again
4  for your support and understanding and for meeting
5  with me.
6  Q.       So that as of December 17th, which is
7  several days after receipt of the remediation plan,
8  as well as the plan with respect to the conditions
9  for your return, you're thanking Dr. Swallow for
10 her support and understanding, aren't you?
11 A.       Yes.  But this is me -- this is a
12 personal trait of mine of being respectful and
13 courteous and me walking this fine line of keeping
14 the engagement going and still being professional.
15 And that's how I reply in all my emails.  You'll
16 see in all email communications I sent I'm always
17 very appreciative and I always start -- start like
18 that.
19 Q.       And you don't address the alleged
20 issues you have with the remediation plan or the
21 conditions, do you?
22 A.       No, because the subject of this email
23 is the emergency mental health plan.  So that's
24 what is discussed.
25 Q.       Well, you didn't address that in the

Page 237

1  two documents that were issued to you, did you?
2          MS. LOPEZ:  Objection
3  mischaracterization -- mischaracterization of
4  testimony.
5  BY MS. CONRAD:
6  Q.       You didn't submit a rebuttal letter or
7  you didn't sign anything underneath your signature
8  saying I disagree with this remediation plan or I
9  disagree with these conditions to return, did you?
10 A.       No, I didn't believe that was an
11 option.  And that would most certainly have created
12 more problems and resistance had I gone against the
13 grain when I already realized that I was being
14 penalized for having a disability.
15         So you're suggesting things that I
16 could have done.  Anything is possible.  I could
17 have done a lot of things.  But at that time, those
18 things did not seem to be rational or advantageous
19 for me.
20 Q.       Where does it say any Exhibit 32 or 31
21 that you're being penalized for having a
22 disability?
23         MS. LOPEZ:  Objection.  Asked and
24 answered.
25         MS. CONRAD:  That is the first time I

60 (Pages 234 - 237)

Page 238

1 heard him make that claim.
2        MS. LOPEZ:  He said it was punitive
3 and he explained that it was related to his
4 disabilities.
5        He's already answered this question,
6 counsel.
7        MS. CONRAD:  And I really request that
8 you refrain from testifying for your client.
9 BY MS. CONRAD:
10 Q.        Where does it say in Exhibit 32 or 31
11 that you're being penalized for a disability?
12 A.        As we already went over, it's not
13 explicitly stated in the wording, but I described
14 the situation of how it was delivered, the
15 conversations with Dr. Swallow, and the entire
16 atmosphere.  And that is what drew the conclusion
17 that I was being penalized, as well as the timing
18 of events.
19 Q.        And then you thank her for her support
20 and understanding, right?
21 A.        Again, that's me being polite and
22 letting her know I'm still here wanting to work and
23 as the phrase goes, you get more flies with honey
24 than vinegar.  It's being polite.  I know you keep
25 bringing that up, but that's just a characteristic

Page 239

1 of me.  I'm always polite.
2 Q.        Let's look at your emergency plan.
3 Now this is an emergency plan for anxiety attacks
4 and mental health.  Do you see that?
5 A.        Yes.
6 Q.        And you list four items, don't you?
7 A.        Yes.
8 Q.        Do you list in that plan for anxiety
9 attacks and mental health, assignments to less
10 stressful rotations?
11 A.        No.  This is an emergency plan for
12 acute exacerbation.  So, assignment to less
13 stressful rotation, modified schedule, that would
14 handle the chronic underlying disease.
15        My disease doesn't turn on and off.
16 It worsens and gets better.  So those
17 accommodations you just mentioned would address the
18 underlying problem.  But this plan is to add
19 address an acute exacerbations of my disability.
20 Q.        Doesn't it say this is a plan for your
21 mental health?
22 A.        It also says it's an emergency plan.
23 So by emergency, we're talking about acute
24 exacerbations.
25 Q.        And didn't the panic attacks result as

Page 240

1 a result of -- or occur as a result of those
2 underlying conditions?
3 A.        That's a reasonable statement.
4 Q.        And then wouldn't you want to have or
5 seek less stressful rotations in conjunction with
6 your mental health?
7 A.        Yes, definitely.  But that was a
8 discussion outside of this emergency plan.  Almost
9 as if you're asked to provide A, B and C, you
10 provide A, B and C, not other items not related.
11 So I was given instruction on what to do in case I
12 have another exacerbation of anxiety, and what I
13 would do in the moment.  So in the moment, I could
14 not go readjust my schedule.  But in the moment, I
15 can take medication --
16 Q.        Of course you can --
17 A.        I can reach out.  So these are more
18 acute in the moment things I can do to address my
19 disability.
20 Q.        Well, weren't you concerned about
21 having a plan to try to prevent the moment?
22 A.        Yes.  And that was the basis of the
23 discussions in August, the follow-up in October,
24 the follow-up in November, as well as in February.
25 Q.        Why didn't you incorporate that into

Page 241

1 your overall plan here?
2        MS. LOPEZ:  Objection.  Asked and
3 answered.
4 A.        Again, what you're asking is not
5 related to an emergency plan for anxiety attacks.
6 An emergency plan for anxiety attacks is what I,
7 Dr. Pablo Salcedo, can do in this moment to
8 alleviate my symptoms.  And what you --
9 Q.        So you didn't need less stressful
10 rotations for your mental health, did you?
11 A.        Say again.
12 Q.        You didn't need less stressful
13 rotations for your mental health, did you?
14        MS. LOPEZ:  Objection.
15 A.        Of course I did.
16 Q.        Well, then why didn't you include it
17 under the emergency plan for mental health?
18        MS. LOPEZ:  Objection.  Asked and
19 answered.
20 A.        Because those aren't emergency plan
21 items.  Those aren't emergency plans.  I am trying
22 to make clear the distinction between a chronic
23 underlying disease and an acute exacerbation are
24 two different things and require different
25 treatment and different ways to address them.

61 (Pages 238 - 241)

Page 242

1      What you're referring to is not for
2  acute exacerbation, that's to address the chronic
3  underlying disease, which is something that is
4  implemented over time.  It's not just something you
5  do in the moment.
6          If you look at number one through
7  four, they're all de-actionable items that I can do
8  in the moment.  That's -- that's why it's not on
9  there.
10  Q.      Did you consult with Dr. Munoz in
11  creating this plan?
12  A.      No, I don't believe I consulted with
13  Dr. Munoz.  I just kind of went on the feedback
14  that I've gotten with my care providers as I've
15  been working with them.
16  Q.      Why didn't you consult with Dr. Munoz?
17  A.      Again, because I had already had
18  discussions with him.  So my discussions with him
19  are consulting with him.  But me incorporating what
20  I learned from my providers, that's what's in here.
21  Q.      You list him as an emergency contact,
22  don't you?
23  A.      Yes.
24  Q.      And you list his telephone number,
25  don't you?

Page 243

1  A.      Yes.
2  Q.      Why did you list his telephone number?
3  A.      It looks like I listed everyone's
4  telephone number, so that just is something I did.
5  My mom is on here.  Her telephone number is on
6  there.  My friend, his number.  My therapist, her
7  number.  His number is on there, as well.
8  Q.      And it says emergency contacts, right?
9  A.      Yes.
10  Q.      So these are individuals that can be
11  contacted in conjunction with an emergency, aren't
12  they?
13  A.      Yes.
14  Q.      And the purpose of the emergency
15  contact was so that your colleagues who were
16  working with you, had a resource if there was
17  another emergency situation, right?
18  A.      No.  No, I don't believe so.  That
19  wasn't really the goal there.  It was not shared --
20  it was just that I was instructed to do that by
21  Dr. Swallow.  So I completed the task.  But it was
22  not like she was going to share with members of my
23  team.
24  Q.      So why do you think there was a
25  request for emergency contacts?

Page 244

1          MS. LOPEZ:  Objection.  Calls for
2  speculation.
3  A.      I guess that would be a better
4  question for Dr. Swallow.
5  Q.      Well, did you ask Dr. Swallow why you
6  were required to provide emergency contacts?
7  A.      No, I just did as I was told and
8  completed the task.
9  Q.      Were you required to submit their
10  telephone numbers?
11  A.      I don't believe so.  I don't think so.
12  But I guess perhaps if you're providing an
13  emergency contact, it's a little incomplete if you
14  don't have the number.  So I couldn't answer your
15  question as to why the numbers are there.
16  Q.      Let's go back to document 32.  And
17  looking at number three, number three addresses the
18  emergency plan, doesn't it?
19  A.      Yes.
20  Q.      And it states, have a documented
21  emergency plan that he will share with us for acute
22  mental health issues that may arise.  This needs to
23  include details about who to contact should he have
24  an acute exacerbation of his anxiety that prohibits
25  him from being able to safely care for patients.

Page 245

1  Do you see that statement in number three?
2  A.      Yes.
3  Q.      And did you sign off on this document,
4  having received it?
5  A.      Yes.
6  Q.      And so did you understand the purpose
7  of the emergency contacts was to be able to allow
8  your colleagues to contact someone if there was an
9  exacerbation of your anxiety that prohibited you
10  from being able to safely care for patients.
11  A.      No, I took us to mean Dr. Swallow and
12  the program leadership.  Colleagues would be
13  everyone I'm working with on a day-to-day basis.  I
14  would in no way want them to have that information.
15  Q.      But what if you had the acute
16  exacerbation of your anxiety outside of
17  Dr. Swallow's presence and someone had to call an
18  emergency contract?
19          MS. LOPEZ:  Objection.  Calls for
20  speculation.
21  A.      That's a what-if question.  I don't
22  really know how to answer that.
23          (Exhibit 37 was marked.)
24          MS. CONRAD:  I'm going to direct your
25  attention to Exhibit 37.  We're not spending time

62 (Pages 242 - 245)

Page 246

1  on 35 or 36.
2          MS. LOPEZ:  You did -- just to be
3  clear, is 35 the same as 34?  It looks like it.
4  That's a duplication; is that right?
5          MS. CONRAD:  I don't recall.
6          MS. LOPEZ:  I see.  I see what it is.
7  Okay.
8  BY MS. CONRAD:
9  Q.      Exhibit 37, are you familiar with this
10 document?
11 A.      Yes.
12 Q.      It's a two-page document?
13 A.      Yes.
14 Q.      What is it?
15 A.      It's -- again, it's my duty log hour
16 of where I submit my hours worked for the day,
17 where I worked and what type of work.
18 Q.      And it's the hours you recorded,
19 right?
20 A.      Yes.
21 Q.      Do you recall in and about January of
22 2018, having the opportunity to work with Stephanie
23 Harris?
24 A.      Yes, that was on medicine consults.
25 Q.      And what, if anything, do you recall

Page 247

1  from that time with her?
2  A.      There wasn't much remarkable about
3  that time.  She was not the most interactive
4  attending.  She was more remote.  And there was
5  minimal feedback.  I do know that she had left a
6  comment -- a negative comment in my evaluation.  So
7  I did call her to ask her to meet to go over that.
8  But I never heard back to get more feedback as to
9  what was her concern.  But nothing --
10 Q.      What was the negative comment?
11 A.      I believe she mentioned that I needed
12 more ward time, which given that I had not had much
13 ward time, that does make sense, ward time, as in
14 floor teaching team time.
15 Q.      Did she make reference to your medical
16 knowledge and management plans are on the level of
17 a medical student?
18 A.      I don't believe so.
19 Q.      Did she let -- reference that you
20 struggle with basic medical knowledge and clinical
21 reasoning?
22 A.      I don't believe so.  I would need to
23 pull up her individual evaluation to see what she
24 marked.  I can't --
25 Q.      Do you recall -- do you recall her

Page 248

1  senior resident needing to intervene and they
2  changed to the plans that you initiated?
3  A.      No.  And I'm not sure there was a
4  senior resident involved at all times.  This was a
5  consult service.  So it was not a teaching service.
6  Q.      Do you recall meeting with
7  Dr. Dewaters to review notes and provide feedback
8  with you?
9  A.      Yeah, yes.
10 Q.      And do you recall meeting with Dr. --
11 is it Munion?
12 A.      Yes.
13 Q.      To review clinical cases?
14 A.      Dr. Munion?  I don't believe I met
15 with Dr. Munion to review clinical cases.  I did
16 rotate under him during medicine consults.  I
17 believe the clinical cases were with Brian McLenon
18 and Kinyard Shane.
19 Q.      And did you -- I believe you already
20 testified that you worked through the clinical
21 cases from the book that Dr. Swallow provided?
22 A.      Yes.
23 Q.      And did she specifically select
24 certain case scenarios for you to review?
25 A.      No.  She just gave me that book.

Page 249

1          (Exhibit 39 was marked.)
2  Q.      Let me direct your attention to
3  Exhibit 39.
4  A.      I seem to jump from 38 to 40.
5          MS. LOPEZ:  I don't have a 39.
6  Q.      It's HMC 453.  It seems I'm only one
7  that has 39.  So I'll put that aside and we'll
8  follow-up another time with that.
9          Did you also meet with Dr. Gonzalo?
10 A.      Yes.
11 Q.      And what, if anything, do you recall
12 about your time with Dr. Gonzalo?
13 A.      I recall it being kind of a weird
14 remediation session, because Dr. Gonzalo did not
15 have instructions on what he was supposed to be
16 doing during the session.  So it was rather
17 impromptu.  So we ended up just taking the session
18 to discuss my disability, how it was impacting me
19 and how I was adjusting through residency.
20 Q.      Isn't it true that you reported the
21 issue you had with anxiety and other psychological
22 issues you had for years?
23 A.      Yes.
24 Q.      Excuse me?
25 A.      Yes.

63 (Pages 246 - 249)

Page 250

1  Q.      You also reported there was a question
2  of bipolar disease in your past, didn't you?
3  A.      Oh, when I was younger in medical
4  school.  I believe it was a misdiagnosis.  I was
5  being trialed on a couple medications.
6  Q.      And didn't you inform him that newness
7  is your issue, that you struggle to acclimate to
8  new?
9  A.      Yes.
10  Q.      I'm sorry, did you answer that
11  question?
12  A.      Yes.  Yes.
13  Q.      And did you relate to him that you
14  were worried about a new environment, new
15  attending, new resident, new process, new acuity?
16  A.      Yes.
17  Q.      Did you also discuss that ICU rotation
18  is not a requirement for you?
19  A.      I don't recall that discussion, that
20  part of the discussion.
21  Q.      Do you recall going through a clinical
22  case with him?
23  A.      No.
24  Q.      Did you meet with Dr. Shane Kinyard?
25  A.      Yes.

Page 251

1  Q.      And did you go over a case with him?
2  A.      Yes.
3  Q.      And did he provide you feedback about
4  that review?
5  A.      Yes.  I believe it was along the lines
6  of that I had a good differential diagnosis and
7  that I ordered appropriate tests.  There were a
8  couple things that I forgot.  But that with time, I
9  would get better with my medical knowledge.
10  MS. CONRAD:  I'm about to enter a new
11  area.  And in light of the time at 4:48, we can
12  continue or I can start fresh with this new area
13  when we reconvene.
14  MS. LOPEZ:  Do you know how long the
15  new area will -- like if it's another half hour, I
16  think we should keep going.
17  MS. CONRAD:  No probably over an hour.
18  MS. LOPEZ:  But how much time is left,
19  If I can the videographer.
20  THE VIDEOGRAPHER:  So at the moment,
21  it's been an hour and 45 minutes for just this one.
22  MS. LOPEZ:  Okay.  So the cumulative
23  -- we've been going since our last break at 10 of.
24  THE VIDEOGRAPHER:  So we started at
25  10:22 a.m.  Let me quickly do the math here.

Page 252

1  MS. LOPEZ:  First break you said was
2  two hours.
3  THE VIDEOGRAPHER:  yeah.  And then the
4  last one was 106 minutes, what is that?  Just about
5  an hour.
6  MS. LOPEZ:  Hour 20.
7  THE VIDEOGRAPHER:  Yeah.
8  MS. LOPEZ:  Hour 40.
9  THE VIDEOGRAPHER:  Hour 40, yes.
10  Sorry, not doing the best with the math.  I
11  apologize.
12  MS. LOPEZ:  We're almost at four
13  hours, four hours 90 minutes, if I am doing my math
14  right.
15  THE VIDEOGRAPHER:  Yes.  That would be
16  about correct, yes.
17  MS. CONRAD:  Can you go over that
18  again for me, please?
19  THE VIDEOGRAPHER:  Oh, the minutes?
20  MS. CONRAD:  So we started with two
21  hours, right?
22  THE VIDEOGRAPHER:  Started at two
23  hours.  And then went to 106 minutes, would be an
24  hour and 40 minutes, and now we're at an hour and
25  45 minutes.

Page 253

1  MS. CONRAD:  Okay.  Thank you.
2  THE VIDEOGRAPHER:  You're welcome.
3  MS. LOPEZ:  So hour 45, so that is
4  1.75.  Okay.
5  MS. CONRAD:  So we're about at five
6  hours.
7  MS. LOPEZ:  We're about at five hours.
8  MS. CONRAD:  Okay.  We can request an
9  adjournment.  You're not going to move forward with
10  more?  You don't want to continue for another hour?
11  We prefer to continue, if you're up for it.
12  MS. CONRAD:  I would prefer, knowing
13  that we have at least two more hours, and I may
14  seek additional time from the court, that we
15  adjourn and continue on another day.
16  MS. LOPEZ:  Well, I can't agree to
17  that.  But I understand your position.  Can we go
18  off the record, please?
19  THE VIDEOGRAPHER:  Yeah, of course.
20  The time is 4:50 p.m.  We're going off the record.
21  (Discussion held of the record.)
22  THE VIDEOGRAPHER:  The time is 4:58
23  p.m., we're going back on the record.
24  MS. LOPEZ:  Counsel and I, plaintiff
25  and defense counsel, have conferred and recognized

64 (Pages 250 - 253)

Page 254

1  the lateness of the hour and the amount of time
2  still needed to conclude the deposition.  And we've
3  decided to adjourn the deposition and reconvene
4  at -- we suggested dates such as December 16 or
5  22nd.
6         And in addition, defense counsel will
7  follow up with assessment of -- if she needs
8  additional time and how much time that would be to
9  address the 11 pages that were submitted to her
10 yesterday and -- Monday and yesterday.  Is there
11 anything else, counsel?
12        MS. CONRAD:  Only that I'll forward a
13 list of the additional documents that were
14 identified during the deposition, and I would
15 request that they be produced, to the extent they
16 exist, prior to the deposition resuming.
17        MS. LOPEZ:  That is fine.  That is
18 fine.  Okay.
19        THE VIDEOGRAPHER:  Okay.  So the time
20 is 4:59 p.m.  This ends the deposition for today.
21 Going off the record.
22        (Deposition adjourned at 5:00 p.m.)
23
24
25

Page 255

1              CERTIFICATE
2
3       I do hereby certify that the aforesaid
4  testimony was taken before me, pursuant to notice,
5  at the time and place indicated; that said deponent
6  was by me duly sworn to tell the truth, the whole
7  truth, and nothing but the truth; that the
8  testimony of said deponent was correctly recorded
9  in machine shorthand by me and thereafter
10 transcribed under my supervision with
11 computer-aided transcription; that the deposition
12 is a true and correct record of the testimony given
13 by the witness; and that I am neither of counsel
14 nor kin to any party in said action, nor interested
15 in the outcome thereof.
16
17
18
19
20
21    _Leandra M. Stoudt_
22
23    _____
       Leandra Stoudt, RPR, CRR
       CBC, CCP, Notary Public
24
25

Page 256

1  Sharon R. Lopez, Esquire
2  lopez@triquetralaw.com
3            December 6, 2021
4  RE: Salcedo, Pablo A. v. The Milton S. Hershey Medical Center
5   12/1/2021, Pablo A. Salcedo (#4971897)
6   The above-referenced transcript is available for
7  review.
8    Within the applicable timeframe, the witness should
9  read the testimony to verify its accuracy. If there are
10 any changes, the witness should note those with the
11 reason, on the attached Errata Sheet.
12   The witness should sign the Acknowledgment of
13 Deponent and Errata and return to the deposing attorney.
14 Copies should be sent to all counsel, and to Veritext at
15 erratas-cs@veritext.com
16
17  Return completed errata within 30 days from
18 receipt of transcript.
19   If the witness fails to do so within the time
20 allotted, the transcript may be used as if signed.
21
22       Yours,
23       Veritext Legal Solutions
24
25

Page 257

1  Salcedo, Pablo A. v. The Milton S. Hershey Medical Center
2  Pablo A. Salcedo (#4971897)
3      E R R A T A  S H E E T
4  PAGE_____ LINE_____ CHANGE_____
5  _____
6  REASON_____
7  PAGE_____ LINE_____ CHANGE_____
8  _____
9  REASON_____
10 PAGE_____ LINE_____ CHANGE_____
11 _____
12 REASON_____
13 PAGE_____ LINE_____ CHANGE_____
14 _____
15 REASON_____
16 PAGE_____ LINE_____ CHANGE_____
17 _____
18 REASON_____
19 PAGE_____ LINE_____ CHANGE_____
20 _____
21 REASON_____
22
23 _____  _____
24 Pablo A. Salcedo            Date
25

65 (Pages 254 - 257)

Page 258

1  Salcedo, Pablo A. v. The Milton S. Hershey Medical Center

2  Pablo A. Salcedo (#4971897)

3          ACKNOWLEDGEMENT OF DEPONENT

4    I, Pablo A. Salcedo, do hereby declare that I

5  have read the foregoing transcript, I have made any

6  corrections, additions, or changes I deemed necessary as

7  noted above to be appended hereto, and that the same is

8  a true, correct and complete transcript of the testimony

9  given by me.

10

11  _____   _____

12  Pablo A. Salcedo          Date

13  *If notary is required

14          SUBSCRIBED AND SWORN TO BEFORE ME THIS

15          _____ DAY OF _____, 20___.

16

17

18          _____

19          NOTARY PUBLIC

20

21

22

23

24

25

Veritext Legal Solutions
215-241-1000 ~ 610-434-8588 ~ 302-571-0510 ~ 202-803-8830

**[02201 - 26th]** Page 1

| **0** |
| --- |

**02201** 1:2

| **1** |
| --- |

**1** 1:10 3:10 5:10
  17:25 18:17,18
  47:23 76:6,22,23
  107:15 131:4,4,9
  146:19
**1.75.** 253:4
**10** 3:20 124:25
  152:16,18 251:23
**10/23** 172:16
**10/30/17** 4:7
**100** 27:6 29:13
  44:7 97:24 98:8
  108:14 192:2
**101** 3:12 99:10
**102** 100:13
**106** 252:4,23
**10:18** 189:4
**10:22** 5:14 251:25
**10th** 139:7
**11** 3:21 119:15,15
  125:12 128:6
  133:4 153:25
  154:2 203:23
  205:7 206:23
  254:9
**115,000** 13:7
**118** 4:24
**12** 47:25 123:14
  133:16 203:15
  206:11 208:14,20
**12/1/2021** 256:5
**12/6/17183** 4:10
**129** 3:14
**12:28** 102:6
**12:30** 102:1
**12th** 202:7

**13** 3:22 159:4,6
  214:5
**134** 3:15
**135** 3:16
**14** 3:23 85:13
  129:6 160:4,6,6
  175:4 211:20
  212:1 225:4
  231:24 232:15
**145** 3:17
**146** 3:18
**14th** 38:21 39:2
  48:9 53:10 85:17
  99:4 175:6 177:16
  213:17 216:16
  231:2,10 232:17
  233:4
**15** 56:17,18 124:24
  163:1
**151** 3:19,20
**159** 3:23
**16** 4:4 140:16
  141:14 162:22,24
  163:14 254:4
**162** 4:4
**17** 3:10 4:5,25
  112:21 170:11,13
  170:17
**172** 4:6
**173** 4:7
**17602** 1:16
**17th** 235:23 236:6
**18** 4:6 51:4 130:3
  172:6,8,8 214:5,8
**180** 4:8
**18034** 2:4
**189** 4:11
**18th** 228:12
**192** 4:24
**197** 4:12

**19th** 51:6,10 71:9
**1:00** 102:2 127:17
**1:03** 102:10
**1:19** 1:2
**1st** 5:14 122:6

| **2** |
| --- |

**2** 3:11 54:13,14
  77:8 103:7 107:15
**2-4** 3:15
**20** 4:7 129:5 173:5
  173:7 176:5 252:6
  258:15
**2008** 108:22 109:2
**201** 4:13
**2017** 20:7,9 22:3
  34:6 35:3,9,14
  36:2,9 39:2,22
  41:1 48:9 53:10
  84:3 85:13 111:10
  111:13 112:21
  122:6 136:9
  144:15,23 146:19
  147:4 160:16
  163:19,20,24
  169:4,9,19 172:22
  173:11,23 174:5
  179:17 181:19,22
  182:4 183:13
  189:4 190:1
  203:15,19,23
  205:20 206:11,24
  208:14,20 211:20
  212:2 216:16
  225:5 231:10
  232:17
**2018** 19:6 25:4
  43:12,18 49:19
  50:4 51:2 87:23
  90:20 91:9 92:3
  94:3 95:1 96:10
  98:15 99:6 106:15

**115:25 117:17
  118:5 119:5
  133:11 135:16
  172:17,22 246:22
**2019** 13:5
**2021** 1:10 256:3
**205** 4:14
**207** 4:15
**21** 220:20,24
**211** 4:16
**216** 4:17
**22** 4:24
**229** 4:18
**22nd** 254:5
**23** 4:8 179:24
  180:1 181:6
**235** 4:25
**23rd** 90:19 91:9
  127:13,25 141:24
  214:9
**24** 4:9 43:12,18
  49:19 92:3 94:3
  95:1 96:10 130:3
  181:4,9 182:14,23
**245** 4:20
**249** 4:21
**24th** 22:3 44:24
  45:21 50:4,9 91:7
  91:20 93:20
  127:18,22 128:3
  172:17
**25** 4:10 183:10,12
**25th** 22:3,4 25:4
  70:4 141:22
  160:20,21 167:18
**26** 4:11 189:22,24
  190:8,9
**26th** 56:10,12
  115:1,2,24 117:6
  117:13,17,22
  118:5,21 133:11

**[26th - able]**                                                    Page 2

142:11 177:19
**27**   4:12 136:9
   196:25 197:1,24
**27th**   56:10 136:16
**28**   4:13 35:3,9,14
   36:9 163:20,24
   201:18,19
**28th**   34:5 35:5
   36:2 164:16,22
   167:19,21 169:4
   169:19 203:19
**29**   4:14 204:23,24
   204:25 206:19,19
**2:49**   177:23 178:2
**2nd**   139:13

| 3 |
| --- |

**3**   3:12 19:19 37:21
   102:13,16,19
   193:4
**3.0**   183:8
**3.0.**   182:5
**3.3.**   131:17
**3.5**   183:5
**30**   4:15 47:20
   207:1,3,3,5,6
   256:17
**300**   2:4
**301**   1:16
**30th**   20:7,9 35:7
   35:22 166:23
   170:16 171:1
   173:11,23 175:3,5
   176:11,12,15,24
   177:1,5,16
**31**   4:16 211:14,16
   217:7 218:15,19
   224:3 225:11
   232:19 237:20
   238:10
**32**   4:17 216:12,13
   217:6 224:1 227:3

237:20 238:10
   244:16
**33**   4:18 229:10,11
   229:13 230:21
   232:19
**34**   4:19 235:16,19
   246:3
**35**   1:16 246:1,3
**36**   246:1
**37**   4:20 245:23,25
   246:9
**3701**   2:4
**38**   249:4
**39**   4:21 249:1,3,5,7
**3:00**   177:24
**3:03**   178:7

| 4 |
| --- |

**4**   3:14 22:9 98:15
   107:15 108:6,6
   130:21,22 135:6
   144:15 169:4
**40**   14:3 249:4
   252:8,9,24
**45**   57:8,9 90:10
   251:21 252:25
   253:3
**453**   249:6
**47**   58:4,5
**48**   60:16 63:3
**488**   255:21
**48b**   69:18 70:6
**4971897**   256:5
   257:2 258:2
**4:48**   251:11
**4:50**   253:20
**4:59**   254:20
**4th**   98:16,18,25
   99:6 101:9

| 5 |
| --- |

**5**   3:15 25:13
   108:20 134:24,25
**50**   71:8 128:10,13
   128:15
**53**   3:11 71:17,24
**54**   72:13 79:15
**55**   81:15
**581**   142:12 144:17
**582**   142:23
**583**   142:3
**585**   139:13
**586**   138:6 139:7
**588**   136:7
**59**   82:9
**5:00**   178:20 179:1
   254:22
**5th**   19:6

| 6 |
| --- |

**6**   3:5,16 47:24
   109:22 131:25,25
   136:2,4 189:4
   256:3
**6/27/17**   3:16
**60**   83:8,25
**610-782-4909**   2:5
**63**   84:2
**67**   84:23
**69**   85:7
**6:30**   45:23 46:10
   127:18,19 128:1,1
**6th**   51:2 137:3,11
   138:2 183:12,22
   190:1,24 191:10
   191:11,19

| 7 |
| --- |

**7**   3:17 46:19
   123:15 146:10,12
   190:15 191:9

**70**   83:25 85:7
**717-299-6300**   1:17
**77**   85:12
**78**   83:9,9 86:12
**7:30**   142:5
**7th**   138:5 190:25
   191:7 192:17
   193:10

| 8 |
| --- |

**8**   3:18 4:24 147:8
   147:11
**8/28/17**   4:4
**80**   74:9 83:9,24
**84**   90:17,18,24
**85**   91:10 92:5,8
   93:25 95:18
**856**   135:9
**8th**   196:10

| 9 |
| --- |

**9**   3:19 151:21,23
**90**   56:9 252:13
**91**   96:20
**947**   150:20
**98**   97:12,13
**9:57**   1:10
**9th**   87:22

| a |
| --- |

**a.m.**   1:10 5:14
   45:23 46:10,19
   47:24 127:19,20
   128:1 189:4
   191:10 251:25
**ability**   9:24 10:1
   23:22 40:14 66:15
   67:16 69:19 77:4
   84:19 91:15
   119:21 131:13
**able**   40:17 41:8
   45:9 58:23 67:21
   68:1 69:4 70:20

70:24 85:8 113:8
114:14 152:13
160:1,2 176:20
180:14 216:6
227:20 244:25
245:7,10
**absence** 38:20
49:25 50:2 133:5
133:8 194:23
196:16,17,23
228:5
**accept** 125:2,16
131:7
**accepting** 113:9
**access** 17:21
101:11 146:25
153:6 156:4 157:7
159:18 160:12
**acclimate** 250:7
**accommodate**
8:12 76:11 77:4
**accommodated**
82:20 91:22 217:1
**accommodation**
4:4 14:21 15:4,7
15:11 19:20 20:5
20:10,13 21:6
22:10,11,25 24:7
25:15,20,24 26:4
26:15,19,20 27:2,3
27:13,22 28:12,17
29:2,10,12 30:7
32:6 41:17,21
49:22 59:6 62:22
65:14,18,19 66:5
66:14 67:8 70:21
71:19 73:3 81:11
81:16,20,22,22
82:6 83:1,5 91:18
91:21 92:2,10,11
92:12,16,22 93:1,2

93:3,9,22 94:5,16
95:3,5,11 109:24
110:8,18 111:5,10
128:17 130:19
147:5 154:7 156:2
157:24 158:4,17
158:21 159:2
162:14,18 163:17
171:2 172:3
173:19 202:6
**accommodations**
13:18,21,24 14:6,7
14:14,15,18,25
15:13 20:16 21:9
23:11 24:21 32:10
34:7,15 35:12
39:5 41:5,9,10,12
42:6,10,22 43:6,7
45:16 46:6 49:10
53:11 58:6,10,15
58:17 59:4,4,9,16
59:17 61:14 64:16
65:2 66:10 67:9
74:1 79:5 82:1,11
82:17,22 93:17
104:7 108:25
109:4,8,10,12,18
111:1,14,19 114:2
119:1,3,11,17
121:15,17,20
122:9 128:9 130:6
130:11,15 138:2
144:1 158:9 162:7
162:12 164:3,6,12
167:10,15,16
168:3,13,23
169:13 170:5
173:12,14,18
202:20 209:16
216:3 222:15
239:17

**account** 155:6,7
155:11 157:9
**accounting** 110:19
**accuracy** 103:3
256:9
**accurate** 55:4
58:14 63:8 92:6,7
94:6,8 95:18,24
111:4 148:2 219:9
221:2,6
**accurately** 220:4
**accusation** 51:22
**acgme** 76:5 78:25
132:1,5,23 233:9
234:17,21,22,25
235:4,11
**acgme's** 132:17
**acknowledge** 6:6,9
**acknowledged**
120:2,14
**acknowledgement**
258:3
**acknowledges**
138:10
**acknowledging**
193:21
**acknowledgment**
256:12
**acquire** 221:6
**act** 120:6 121:23
122:3,19 123:2,5
**acted** 120:2,15
**action** 8:1 120:24
121:6,12,14
126:24 214:10
229:4 255:14
**actionable** 242:7
**actions** 61:20
159:15,15
**activities** 17:9
214:4

**activity** 16:4 57:24
**actor** 89:14
**actual** 7:7 224:25
226:13
**acuity** 250:15
**acute** 43:11,18
45:25 227:19
239:12,19,23
240:18 241:23
242:2 244:21,24
245:15
**ad** 121:18
**ada** 156:2 157:3
**adapting** 88:7
**add** 171:21 178:25
239:18
**added** 94:14 96:2
203:16
**addendum** 114:6
114:11
**addition** 20:21
94:12 106:7
178:14 198:6
254:6
**additional** 9:19
14:6 20:23 70:22
80:23 81:4 130:15
145:2 164:25
178:15,19 179:11
195:8 204:11
209:3 210:2
253:14 254:8,13
**additions** 55:11
258:6
**address** 39:18
41:9,17 42:6,9,21
74:11 110:4 114:1
133:16 154:10,16
154:18 165:12
212:18 216:21
222:6 236:19,25

239:17,19 240:18
241:25 242:2
254:9
**addressed** 15:12
35:10 87:20 100:7
121:7 165:5,8
167:16 168:12
169:16,17 176:21
189:2 195:23
197:22 213:25
217:22,25
**addresses** 244:17
**addressing** 209:19
210:14
**adequate** 77:9,14
77:14 202:23
203:14
**adequately** 15:12
**adhd** 161:4,21
**adjourn** 253:15
254:3
**adjourned** 254:22
**adjournment**
253:9
**adjusting** 249:19
**adjustment**
138:10
**administer** 6:11
**administered** 6:10
**administration**
144:24 226:21
228:15
**administrative**
17:6 57:22 216:4
**administrator**
226:19
**admitting** 184:19
**advance** 23:5 61:4
69:18 70:2,9,11,14
70:19 132:15,24
139:19

**advanced** 12:22
16:9,11
**advantageous**
237:18
**adverse** 186:12
188:14 209:22
**advice** 29:9
**advised** 210:16
**affect** 9:24
**affiliated** 131:11
199:1
**aforesaid** 255:3
**afternoon** 9:3
127:5
**age** 226:12
**ago** 66:22,22 87:25
208:5
**agree** 131:9
134:11 143:15,20
159:22 183:1,20
186:23 187:3,22
188:4,7,8,19
194:17,20 199:2
204:2 208:25
210:22 211:2
224:17,18 231:23
253:16
**agreed** 60:9,25
73:16 131:7
144:11 188:17
**agreement** 3:14,15
16:20,22 17:14
57:11,13,18 131:2
131:8 132:1,5,22
133:5 135:5
168:24 187:17
188:13 228:8
**agrees** 187:1
**ahead** 220:22
**aid** 84:9

**aided** 255:11
**aka** 216:6
**alcohol** 185:23,25
**aliya** 107:14
**allegation** 22:13
34:8 36:12,14
37:5 56:21 57:3
58:7 70:5 71:20
72:15 81:17 82:12
85:15 96:9,23
100:15 115:7
**allegations** 54:23
55:7 103:3
**allege** 56:18 72:13
81:15 82:9 85:12
91:10 96:20
110:23 128:7
**alleged** 84:23
105:24 126:3
236:19
**allegedly** 166:20
170:14 171:1
229:17,18
**alleging** 158:16
**allen** 12:20 13:23
14:1,13 130:6
**alleviate** 241:8
**allotted** 256:20
**allow** 74:19 77:9
77:19 202:23
214:15,20 245:7
**allowed** 77:14
**allows** 203:14
**altered** 128:19
**alternative** 22:24
**altogether** 223:19
**ambiguous** 52:9
55:13 59:22 64:19
65:12,25 67:23
75:15 80:5

**amenable** 64:5
**ami** 48:16 88:17
89:20
**amnesia** 37:13,18
38:1 42:2 54:10
84:12,16 191:1
209:21 230:11,14
230:16
**amnestic** 38:19
53:10 184:1 185:1
190:23 191:12
201:24 209:15,18
210:5 211:20
212:15 215:8
218:4 230:18
**amount** 76:21
83:13 91:23 124:3
181:2 254:1
**ample** 14:4,4
**amy** 225:14
226:25
**annual** 13:6
**answer** 8:7,18
11:25 29:1,6 30:3
30:21 31:14 32:20
34:1 35:25 42:14
43:1 50:15,24
54:19 56:7 58:21
61:21 64:4 65:13
66:3,24 68:5,17,19
69:2 73:13 78:8
78:20 79:9 83:19
94:20,25 95:10,16
95:21 99:5 103:17
108:6 110:13
117:16 150:10
151:16 168:16
169:23 203:3,9
204:7,13 215:23
216:23 219:15
223:4 231:9

244:14 245:22
250:10
**answered** 27:16
27:19 28:24 30:2
30:19 31:7,12
32:19 33:25 35:16
35:17 36:5 42:8
42:13,25 56:6
58:20 62:5,15
63:16,17 64:3,20
65:1 66:18 67:14
68:9 69:1 73:11
74:23 78:7,19
79:8 80:5 92:24
94:18,22 95:8,13
95:19 112:7 116:6
121:25 122:1,21
168:15 169:22
201:4 203:1,25
204:4,6 215:22
218:10 219:14
231:8 237:24
238:5 241:3,19
**answers** 112:17
151:18
**antonio** 108:1
184:12
**anxiety** 15:2 20:25
21:9 43:24 46:2
90:22 91:15 96:15
136:18 137:16
143:7 145:11
161:3,4,9,20
171:18 227:20
239:3,8 240:12
241:5,6 244:24
245:9,16 249:21
**anxious** 45:8
171:22
**anymore** 96:14
158:11

**apart** 53:12
**apologize** 102:5
157:15 205:6
252:11
**apparent** 53:21
**appeal** 99:9,12,14
99:14,17 100:2,8
**appear** 20:22
155:5
**appearances** 1:14
2:1 5:21
**appeared** 193:4
**appears** 136:8
151:4 165:23
**appended** 258:7
**applicable** 256:8
**application** 180:13
**applied** 17:18 18:5
18:10 100:2
**apply** 8:18
**appointment**
112:14 138:21
139:10 143:14
**appointments**
196:12
**appreciate** 101:22
136:13 142:24
143:4,5
**appreciated**
136:22
**appreciative**
236:17
**apprehension**
137:18
**apprehensive**
136:21
**approached** 121:5
**appropriate** 30:24
79:23 80:19 81:1
134:18 164:12
169:25 221:7

251:7
**appropriately**
158:22
**approval** 61:24
62:7 63:23 68:20
68:24 69:4,6
**approve** 62:3
**approximately**
25:2 102:1 127:18
127:20 128:1
228:13
**april** 98:15,16,18
98:25 99:6 101:8
**aramani** 230:8
**area** 231:20
251:11,12,15
**areas** 69:15,16
85:24 86:1 213:21
213:24 220:17
231:12
**argumentative**
29:4,5 60:5
168:14 202:25
203:5,8
**arisen** 195:9
**arrange** 119:18
226:25 228:20,21
**arranged** 190:5
228:18 229:9
**arrangement** 6:12
**ascii** 5:7
**ashley** 100:19
101:13
**aside** 39:24 90:12
223:24 230:22
249:7
**asked** 14:10 22:9
27:15,18 28:23
30:1,19 31:6,11
32:18 33:24 35:15
36:4 40:4,22 42:7

42:12,24 47:1,17
54:3 56:5 58:19
62:2,4,17 63:15,23
64:2,20,25 66:17
66:21 67:14,17
69:1 73:10 74:22
77:16,17 78:6,18
79:7 80:5 89:8
92:23 94:17 95:8
95:12 114:13
116:5 117:2
121:25 122:1,13
122:21 123:15
133:1 140:17
157:15 166:14
168:15 169:21
193:2 201:3,5,17
202:11 203:1,24
204:4,6 215:21
218:10 219:14
221:17 225:7
226:22 231:7
237:23 240:9
241:2,18
**asking** 8:4 10:13
24:1 33:8,12
35:13 46:9,19
52:17,18 55:16,20
60:12 65:7,19,22
66:9,12 67:9,10,15
67:16 68:23 77:18
77:22 79:2,3 80:7
92:7 94:24 95:14
95:15,17 114:13
116:12 122:10,11
140:12 141:25
175:22 177:4
186:25 187:19
192:7 193:15
196:9 203:21
204:15 209:9

210:21 218:6,6,13
222:4,5,19 223:16
232:14 235:3,4
241:4
**asks** 137:6
**aspirational**
100:21
**assert** 115:2
**assessed** 223:17
**assessment** 161:16
186:23 188:5
208:18 209:2
210:3 254:7
**assigned** 75:11
133:25 134:2
**assignment** 239:12
**assignments** 77:8
239:9
**assistant** 40:2
**associate** 105:21
**associated** 197:21
199:16
**assume** 52:15
78:23 235:1
**assumed** 125:15
**assuming** 78:23
122:25
**assumption** 43:4
97:6 185:10
224:24
**assumptions** 52:17
235:3
**atmosphere**
238:16
**attach** 170:2,6,9
191:15
**attached** 191:22
256:11
**attachment**
155:19 156:16,17

**attack** 145:5,17
**attacks** 145:2
239:3,9,25 241:5,6
**attend** 16:2,25
152:1
**attending** 49:6
58:24 71:3 98:21
105:6 153:18
225:17 226:17
229:1 247:4
250:15
**attending's** 71:1
**attendings** 21:13
23:8 48:13 69:21
72:11 99:2 120:20
121:16 144:9
219:7 225:21
**attention** 18:16
19:17 54:12 56:8
56:16 57:7 58:3
90:18 102:15
103:7 108:5
109:21 124:24
125:22,24 126:1
129:5 130:2,20
131:3,16,24
134:23 135:7
136:3 139:22
146:11 147:10
150:8 151:22
152:17 154:1
159:5 160:5
162:23 163:13
170:12 172:7
173:6 179:25
181:8 182:13
183:11 192:6
193:25 194:4
196:24 204:22
206:18 207:2
211:15 235:18

245:25 249:2
**attorney** 8:1 10:11
10:21 11:16,24
80:9 256:13
**attorneys** 6:5
**attributed** 93:5
**attributing** 196:5
**august** 20:6,7,9
22:3,3 25:4 34:5
35:3,5,7,8,22 36:2
36:8 70:3 71:9
111:10,13 139:13
140:16 141:14,22
141:24 142:11
147:4 160:16,21
163:19,20,24
164:16,22 167:18
167:19,21 169:4
169:19 170:16
171:1 175:3,5
176:11,15,24
177:1,16 203:19
205:20 240:23
**auto** 185:10
**availability** 229:2
**available** 78:2,10
130:5 168:5 229:5
256:6
**avenues** 222:21
**average** 86:8,9
98:13,13,20,20
100:20,21
**avoid** 12:12 61:19
**awards** 13:16
**aware** 6:23 50:16
50:17 78:9 104:25
106:23 107:6,10
117:23 127:2
179:16 189:11

**b**

**b** 240:9,10
**back** 33:20 55:21
55:25 82:4,7
102:10 116:24
122:16 128:6
149:19 163:8
166:19 178:7
196:7,8 203:18
205:7 208:10
217:9 218:15
220:9 222:14,20
224:3 226:10
244:16 247:8
253:23
**bad** 46:20
**badged** 17:15
**barbara** 31:17
**base** 57:3
**based** 9:6 16:8
103:13 132:1,5
143:20 213:5,9
231:5 233:17
**baseline** 196:7
210:1
**basic** 110:6 247:20
**basically** 10:17
17:25 50:8 87:9
90:10 92:18 195:2
**basing** 223:20
**basis** 56:21 101:2
115:6 116:20
121:19 150:5
204:10 228:15
240:22 245:13
**bates** 135:9
**bats** 41:2
**batz** 3:18 4:14
26:11 40:9,20
84:24 107:3
147:13 149:8,9

150:1 152:5 205:4
**becoming** 143:7
**bedi** 22:8
**beginning** 124:15
 124:17 145:14
 149:15 161:9
 231:17 234:11
**begins** 5:10 188:5
 212:9
**behalf** 118:8 219:7
**behavior** 186:20
 187:25 188:16
**belief** 22:20 53:5
**believe** 7:6 17:5,8
 17:13,23 23:6
 28:18,18 31:15
 33:14,17 36:23
 38:21 40:15 43:6
 48:14 50:5,20,20
 51:18 53:1 54:1
 56:9,23 57:19
 61:20 76:17 80:25
 83:5 97:6,19,19,21
 101:8 110:7
 112:20 116:1
 122:1 124:16
 126:19 129:18
 133:1 139:12
 147:3 152:25
 153:13 156:13,18
 159:8,14 160:11
 164:23,23 166:5,5
 166:8 169:11
 180:12 182:7,11
 183:4 185:15
 190:16 192:10
 197:7 210:18
 215:24 229:19
 237:10 242:12
 243:18 244:11
 247:11,18,22

248:14,17,19
 250:4 251:5
**benefit** 99:17
**best** 8:2 9:2 37:16
 54:25 69:19 73:3
 81:14 121:1
 131:12 143:9
 145:20 151:20
 152:10 164:3,7
 171:14,18 173:1
 185:9 195:15
 211:11 252:10
**beti** 62:18
**better** 77:20
 176:18 192:12
 234:13 239:16
 244:3 251:9
**bias** 53:1,6,16
 220:2
**biased** 99:15
**big** 148:15 220:25
**bimonthly** 150:5
**bipolar** 250:2
**birth** 110:5
**bit** 141:17 170:25
**block** 19:2 214:8
**blocks** 214:5
**blurriness** 37:25
 84:14
**book** 89:5,9 90:1
 225:25 226:4
 248:21,25
**booz** 12:20 13:22
 14:1,13 130:6
**bottom** 19:2 38:7
 98:22 142:11
 184:24 185:11
 229:23
**bought** 184:18
**bouts** 230:10,14
 230:16

**brand** 136:19
**break** 8:11,14
 89:19 93:25
 101:19,21,23,24
 102:8 170:24
 177:21,24 178:5
 251:23 252:1
**breath** 145:20
**brian** 248:17
**bridges** 148:14
**brief** 17:24 40:16
 101:20 164:23
**briefly** 103:10
 178:24
**bring** 7:10,17,22
 139:22
**bringing** 77:5
 155:16 238:25
**brings** 12:8
**britt** 3:23 22:8,17
 23:3,19 40:1
 111:17 112:14
 141:9,12 143:13
 143:24 145:18
 160:8 162:8
 211:12
**broader** 21:17,20
**broadly** 65:6
**brought** 55:2
 125:22,23 126:1
 158:14
**browser** 30:11
**buddy4732** 155:5
**building** 17:9
**buildup** 46:5
**bulk** 113:24 114:3
 177:8,10,12
**buzz** 220:3

**c**

**c** 240:9,10
**caffeine** 210:13
 211:10
**call** 44:1,5,24
 45:25 46:11,23,25
 47:4,6,14 96:21
 117:22 119:14
 128:22 245:17
 247:7
**called** 47:25 56:11
 115:4,17 117:18
 126:20 183:23
**calling** 184:4
**calls** 34:20 50:13
 68:3 73:22 75:14
 79:16 80:6 83:15
 114:15 187:7,11
 213:7 223:5 244:1
 245:19
**capacity** 16:1
 44:15 103:24
 162:19,20
**car** 38:4,7 184:22
 184:24 185:8
**care** 14:4 25:25
 39:25 74:20
 106:16 118:16,24
 119:10 123:12
 125:3,16 131:18
 146:5 148:13
 149:5 152:9,11
 162:20 174:24
 193:16 194:8
 195:14,20 198:24
 199:14 211:9
 227:8,21 228:1,6
 231:5,13 242:14
 244:25 245:10
**cared** 125:7
 148:17,17

**career**  139:24
   222:12
**careers**  233:19
**carefully**  121:21
**carry**  84:19
**cars**  185:11
**case**  7:25 89:4,20
   104:9 152:20
   159:24 225:22
   240:11 248:24
   250:22 251:1
**cases**  248:13,15,17
   248:21
**categories**  100:24
   100:25 181:17
**category**  182:24
**caught**  200:16
**caused**  42:2
   186:12 188:14
**causes**  186:19
   187:6,25 188:16
**cbc**  1:11 255:23
**ccc**  4:9 181:24
   182:22
**ccp**  1:11 255:23
**cell**  173:3,3 185:14
**cemented**  53:9
**center**  1:5 2:4 5:13
   5:25 6:2,24 10:9
   11:15 15:24 16:19
   16:21 17:17 19:24
   21:11 26:2,13
   27:22 28:8,11,16
   29:3 40:10 44:20
   45:9 71:9 104:6
   105:8,11,18
   106:15 107:5
   108:3 115:11
   120:10 148:11
   154:11 199:21
   213:15 256:4

257:1 258:1
**certain**  9:5 51:13
   57:15 75:12,18
   76:10,12,18 78:12
   79:5 132:14,16
   181:2 192:2
   198:22,25 220:3
   248:24
**certainly**  8:11
   203:12 237:11
**certificate**  255:1
**certification**  40:14
   41:18,20
**certifications**
   40:21,25 41:5
   42:23
**certify**  255:3
**chair**  230:8
**change**  35:12
   56:15 121:4
   128:17 257:4,7,10
   257:13,16,19
**changed**  55:1,23
   56:23 57:5 248:2
**changes**  55:11,15
   55:16,18,19 56:3
   56:13 211:10
   256:10 258:6
**channel**  219:6
**channels**  167:12
**characteristic**
   238:25
**characterizing**
   116:13
**charge**  3:10 18:23
   25:13 34:5 65:2
   215:17
**chart**  182:4
**charts**  69:9
**check**  48:11 82:18
   101:17 137:7

144:14 226:11
**checking**  88:25
**chen**  107:24
**cherry**  218:25
   220:1
**chief**  20:2 22:12
   24:10,16,20 58:7
   58:16 59:3 60:21
   60:23 62:1 63:7
   64:12 71:14 89:13
   112:1 119:17
   120:8,21 141:13
   160:22 162:19
   195:18 199:3,11
**chiefs**  21:5 22:2,5
   24:14,22 58:11,18
   58:22 59:10,15,20
   60:3,7,14 61:12,17
   61:22 62:2,9,12
   65:3,20 111:16
   112:2,9 139:3
   142:7 158:12,17
   158:20,24 166:25
   167:10,15 168:3,6
   168:6,12,17,21,21
**choice**  198:23
   207:20
**choosing**  40:6
   197:20 200:19
**chose**  165:16
**chronic**  15:1 21:8
   43:24 45:10
   239:14 241:22
   242:2
**chronically**  46:5
**chronological**
   111:24
**civil**  79:21 80:2,4
**claim**  32:6 104:17
   238:1

**claims**  229:19
**clarification**  21:3
**clarify**  36:7 91:5
   200:14,18
**clarity**  163:9
**clear**  11:17 142:20
   163:9 178:16
   198:5 202:8
   205:23,25 206:20
   206:20 217:21
   234:3 241:22
   246:3
**clearance**  4:13
   201:23 206:22
**cleared**  3:17
   146:16 188:10
   197:19 200:4,19
   207:21
**clearer**  96:7,9
   197:4
**clearly**  9:8,12 53:1
   53:6 226:15
**client**  9:9 10:21
   12:3 147:17 152:1
   238:8
**clinic**  111:17
   112:14 143:14
   160:8 162:11
   198:1 199:16,21
   207:17 208:2,7,8
**clinical**  13:2 48:13
   49:13,16,18,22
   53:22 57:20 89:5
   89:14 97:14
   133:24 179:21
   181:25 196:15,18
   196:20,23 211:23
   215:17 222:1
   223:8,13,17
   225:22,25 227:5
   230:9 232:7,12,18

232:20 247:20
248:13,15,17,20
250:21
**clock**  180:20
**clocked**  180:22
**close**  107:12 109:6
109:7 110:16
**closely**  168:5
**closer**  83:23
**coaching**  8:20
**coincidence**
155:12
**collaborative**  60:9
**colleague**  103:15
103:18,19,21,25
104:14,24 107:9
123:21 127:2
128:3
**colleagues**  17:8
23:4 61:4 69:18
70:2,9,14,23 72:11
99:2 119:21
195:14,24 216:9
243:15 245:8,12
**collect**  221:2
**collection**  220:23
**collectively**  221:14
**colson**  106:19
**colston**  106:9,10
106:22 148:25
149:1,12,25
**combination**
13:25
**come**  18:7 48:20
121:3 219:1
**comes**  47:16
130:14
**comfort**  101:23
213:21
**comfortable**  45:12
69:23 96:13

**coming**  222:13
**commence**  179:18
**commencing**  1:10
**comment**  23:23
24:10 30:13 33:20
58:1 75:25 86:3
86:11 101:2
124:22 125:25
189:18 219:22
220:1 231:20
247:6,6,10
**commenting**  19:16
**comments**  98:21
219:1 231:16
**commission**  18:24
**committee**  97:15
133:20 134:6,13
134:16 162:10
179:22 182:1
195:19 211:23
212:11,24 213:10
213:11,12,14
222:25 223:9,13
223:17 230:9
232:7,12,18,21
**communicate**
14:20
**communicated**
50:22
**communicating**
12:3 155:10
**communication**
52:16 100:4
139:12 169:20
219:7
**communications**
10:21 11:5 31:19
51:25 169:12
170:2 172:11
196:6 223:8
236:16

**company**  13:15
14:13 15:3
**compartmentalize**
45:9
**compassionate**
131:18 219:23
**competencies**
132:2,6,9,12
181:16
**competency**  97:14
162:10 179:21
182:1 195:19
211:23 212:10,24
213:14 222:25
223:8,13,17 230:9
232:7,12,18,21
**competent**  131:17
**compilation**
182:17
**compiled**  182:22
**complaint**  3:11
36:24 54:13,22,24
55:6,12 57:8 92:5
103:9 160:22
**complaints**  195:9
**complete**  8:13
9:18 12:13 28:5
33:1,18 49:9,17
79:13 127:2
156:17 157:1
173:2 178:17
222:12 226:1
258:8
**completed**  32:24
33:22 49:1,8,18,21
89:6,9 90:23
127:6 226:7 231:6
243:21 244:8
256:17
**completely**  81:1
217:5

**completing**  50:12
159:2
**completion**  232:3
**component**  48:18
87:14 88:9,24
89:23 188:8
**components**  48:9
88:22
**composed**  50:24
**compound**  47:7
52:8 80:7 114:7
188:2
**computer**  21:19
69:14,15 255:11
**concern**  85:24
86:1,6 125:23
165:6 167:3 169:5
194:6,19 207:9
220:18 221:1,21
227:24 231:12,20
247:9
**concerned**  65:4
194:13 199:10
240:20
**concerns**  98:14
120:11 139:2
159:1 168:8 169:9
193:22 212:10,23
213:2,5,9 218:18
222:23,24,25
223:1,12
**conclude**  9:5
76:13 93:6,10
179:9 218:12
254:2
**concludes**  139:1
**conclusion**  186:16
188:6 214:8
238:16
**condensed**  5:8

**condition**  9:23
  38:23 70:22
  118:23 119:10
  209:16 227:17
**conditions**  9:25
  131:8 197:13
  227:4 228:9 236:8
  236:21 237:9
  240:2
**conduct**  119:22
  122:4 123:3,5,6
**confer**  9:5
**conference**  47:18
**conferred**  178:14
  253:25
**confident**  44:6,7
**confidential**  54:1
  118:7 231:3
**confirmation**
  220:2
**confirmed**  61:5
**confirming**  25:1
**confirms**  206:22
**conflict**  195:13,23
  199:10
**confused**  68:10
  94:21
**confusion**  84:13
**conjunction**  39:4
  42:10 78:4 79:14
  85:19 147:16
  154:10 156:9
  169:19 202:6
  240:5 243:11
**connect**  53:15
**connected**  14:15
  49:15 217:19
**connecting**  217:13
**conrad**  2:3 3:5
  5:24,25 6:21,23
  9:14,21 10:22

11:10,24 12:6,7
  18:19 27:20 28:25
  29:5,23 30:20
  31:8,13 35:17
  36:6 54:15 55:14
  55:21 56:2 62:6
  62:16 63:22 64:21
  65:7,9 66:2,19,23
  67:15,18,20 68:4
  75:16 76:16 79:9
  79:18 80:9,15
  81:2,6 94:19
  101:16,25 102:12
  102:14,17 103:23
  108:15 112:7
  116:12,18 117:5
  121:11 122:15,18
  127:14 130:23
  134:9,10 142:23
  156:15,21 157:5
  157:13,14 163:2
  163:12 166:9,13
  174:8,9 176:2,3
  177:23 178:24
  179:14,15 187:2,9
  187:16,20,22
  188:3 192:3
  193:24 198:16,17
  203:3,7,9 204:1,9
  204:17 209:7
  220:10,21 223:3
  223:10 232:16
  235:10,17 237:5
  237:25 238:7,9
  245:24 246:5,8
  251:10,17 252:17
  252:20 253:1,5,8
  253:12 254:12
**conradn**  2:5
**conscientiously**
  131:12

**consensus**  101:24
**consent**  6:12
**consequence**
  123:1 124:11
**consequences**  69:3
  222:3
**consider**  79:22
**considerations**
  203:22 205:19
**considered**  74:18
  180:24
**consist**  96:9
**consistency**  74:12
**consistent**  79:20
  97:24 174:23
**consistently**  177:7
**consists**  102:19
**constructive**  98:22
  219:1 231:19
**consult**  153:15
  242:10,16 248:5
**consulted**  242:12
**consulting**  8:20
  242:19
**consults**  246:24
  248:16
**contact**  26:23
  28:19,22 30:9,18
  31:1 33:16 97:1,6
  186:6 187:17
  191:9 227:19
  242:21 243:15
  244:13,23 245:8
**contacted**  30:24
  45:2 71:9 243:11
**contacting**  29:12
**contacts**  243:8,25
  244:6 245:7
**contained**  14:24
  19:11 33:3 54:24
  57:10 72:3 103:4

103:9 153:11
  157:8 205:20
  215:3 230:21
  234:19
**content**  186:10
**context**  219:11,13
  219:19 220:11
  221:18 222:8
**contingent**  113:8
**continue**  82:2
  99:17 113:14
  126:21 152:9
  161:24 178:16
  179:8 193:16
  194:7,7 211:9
  214:16,22 224:13
  224:23 251:12
  253:10,11,15
**continued**  2:1
  22:23 46:15
  113:13 167:20
  179:12
**continues**  204:12
**continuing**  179:1
  193:10
**continuum**  46:14
**contract**  196:10
  245:18
**contradicts**  221:10
**control**  61:14
  222:12
**convenience**
  156:24
**conversation**  15:9
  22:24 31:23 59:18
  61:1 62:11,13
  92:9 164:22
  184:10 194:11
**conversations**
  14:22 32:2 39:8
  216:9 238:15

convey  74:5
conveyed  136:17
  136:17
cope  91:15
copies  18:13
  191:24 256:14
coping  88:7
copy  7:5 135:12
  152:23 156:8
  157:9 160:9
core  132:1,5,9,11
  181:16
corner  136:6
corporate  2:4
correct  11:19
  15:20 19:8,13
  35:9,20 44:16
  49:25 51:7 54:24
  62:20 76:19 85:10
  91:11 110:10
  112:3,17 116:4
  119:6 126:21
  130:13 132:3
  133:1 139:22
  141:18 142:2
  148:8 151:16,19
  158:18 160:16
  163:2 172:22
  174:1 180:9 181:6
  183:2,6,9,23
  188:18 212:2
  214:5,24 220:10
  252:16 255:12
  258:8
corrected  140:12
  140:14,15
correction  140:9
  140:13
corrections  258:6
correctly  164:9
  255:8

counsel  5:2,20
  6:12 8:24 9:7
  10:13,19,19 11:5,6
  65:1 79:18 95:20
  99:23 101:18
  108:16 122:13
  127:12 142:20
  156:19 163:1
  174:6 178:9 203:6
  204:12 209:5
  220:8 238:6
  253:24,25 254:6
  254:11 255:13
  256:14
counsel's  147:15
counseling  109:15
  138:16,24
counting  99:3
country  13:3
couple  48:9,13,22
  94:22 163:9
  182:12 250:5
  251:8
course  8:3 214:9
  240:16 241:15
  253:19
court  1:1 5:17 6:3
  12:9 55:25 101:18
  204:19 253:14
courteous  236:13
cover  9:10
covered  17:4
  208:9 215:2
create  234:25
  235:25
created  10:7 11:4
  11:20 237:11
creating  242:11
criminal  57:23,24
cristina  103:12
  104:19

critical  98:24 99:1
  101:3,5 218:24
  219:6
critically  221:1
critiqued  87:2
crr  1:11 255:23
cs  256:15
culture  222:1
cumulative  251:22
curb  38:8 185:12
cure  80:21
current  14:2
  130:12 151:15
  194:8 230:16
  232:8
currently  12:16
  13:13 14:3 15:10
  47:23 148:6,18
  177:23
custody  3:8 4:2
customary  68:14
  170:20 226:23
  231:17
cut  234:3
cv  1:2
cymbalta  150:17
  186:3

**d**

d  44:9 193:4
d.c.  16:8
data  16:9 214:9,15
  220:13,23 221:3,8
  233:17
date  7:12 19:4
  25:5 56:9 71:25
  101:6,12 110:5
  127:21 146:18,23
  146:24 150:6
  181:20 212:11,25
  218:17 223:14
  230:7 231:6,10

257:24 258:12
dated  51:2 139:13
  142:11 163:20
  183:12 212:1
dates  55:3 111:15
  124:22 149:20
  176:25 229:6
  254:4
day  9:1,4,6 37:21
  38:9 45:20,22
  49:14 56:12 58:2
  74:8,10 98:18
  110:19,20 111:16
  125:24 127:15,23
  137:11 147:4
  178:20 179:7
  180:15 181:3
  184:2 187:13
  192:12 194:19
  195:2 196:4,11
  197:7,11 217:25
  245:13,13 246:16
  253:15 258:15
day's  178:16
days  91:6 110:16
  111:15 119:7
  141:21,22 236:7
  256:17
de  242:7
deadline  129:9,13
  129:23
deals  212:23
dean  105:14,21
  109:20
december  1:9 5:14
  39:2,22 41:1 48:8
  53:10 84:3,24
  85:13,17 90:15
  99:4 112:21 175:3
  175:6,7 177:16
  181:19,21 182:4

183:12,22 189:4
190:1,15,24,24
191:7,10,11,19
192:17 193:10
196:10 202:7
203:15,23 205:7
206:11,23 208:14
208:20 211:20
212:1 213:17
215:19 216:16
225:4 228:12
231:2,10,24
232:15,17 233:4
235:23 236:6
254:4 256:3
**decide** 9:5
**decided** 73:4,8,24
73:25 164:13
254:3
**decision** 126:10
214:14
**decisions** 65:3
233:17
**declare** 19:7 258:4
**deemed** 22:11,16
22:21 132:24
258:6
**deep** 145:20
**defeats** 219:5
**defendant** 1:6 2:6
**defendant's** 3:12
102:21
**defense** 253:25
254:6
**defer** 189:8
**deficiencies** 86:6
98:24 99:1 101:3
218:24 231:21
**deficiency** 101:5
**deficient** 221:2

**definitely** 156:14
157:11 240:7
**definitively** 26:13
52:14 125:9
143:23 185:25
192:24
**degree** 16:9,12,14
**delivered** 35:6,22
238:14
**demonstrate** 76:8
132:19
**demonstrated**
98:24
**denied** 113:12
**dent** 38:4 184:22
185:3
**department** 13:14
14:15,16 15:11
27:5,12
**depended** 71:1
83:25
**dependency**
189:18,19
**dependent** 189:11
189:14
**depending** 132:21
181:3
**depends** 234:5
**deponent** 255:5,8
256:13 258:3
**depose** 204:11
**deposed** 7:14 10:2
208:10
**deposing** 256:13
**deposition** 1:8
5:11,15 6:6,8,9
7:2,2,4 8:3,10,17
9:1,6,19 10:4,23
11:2,8 18:14
52:23 79:24 80:10
80:10,16 97:23

163:6 178:13,18
179:1,2,10,12
220:16 221:13
254:2,3,14,16,20
254:22 255:11
**depositions** 65:21
178:22
**depressed** 45:7
**depression** 15:2
21:8 43:24 46:2
90:21 91:15 96:16
136:18
**depressive** 161:4
161:20
**deprived** 45:11
**deregulated** 92:17
**describe** 43:21
44:18 48:4 62:12
156:23
**described** 15:23
69:18 84:7 91:2
128:9 234:18
238:13
**describing** 48:5
92:8 93:4 220:4
**description** 3:9
4:3 147:17,19,24
147:25 148:2
164:15,15,16
**design** 154:13
**designated** 65:18
69:15 158:23
180:23
**designation**
183:14
**despite** 128:19
**detail** 38:10 52:21
126:17 192:13
**detailing** 134:17
**details** 29:13,14
50:22 124:5 126:3

196:11 226:13
227:18 228:18,19
228:21 244:23
**deteriorating**
39:10
**determination**
179:10
**determine** 9:2
**determined**
214:10
**developing** 227:11
**development**
233:19 234:24
235:7,14
**dewater** 225:14
**dewaters** 48:16
88:17 89:21
226:25 248:7
**diagnosis** 251:6
**dialogue** 22:25
**diazepam** 186:3
**diet** 152:13
**difference** 171:14
**different** 33:1 47:2
62:14 65:7 66:19
76:22 94:23 95:9
95:15,16 132:20
140:5 159:2
167:13 181:17
207:7 212:22
217:4 223:18
225:2 234:4,6
241:24,24,25
**differential** 251:6
**differentiate**
209:13
**differently** 66:11
**difficult** 83:19
**difficulties** 52:3,7
52:11 155:16

**direct** 14:9 18:16
19:17 30:5 33:2
35:11 54:12 56:16
57:7 58:3 90:17
102:15 130:2,20
134:23 136:3
146:11 147:10
152:17 158:23
159:5 160:5
167:25 172:7
173:6 179:25
181:8 183:11
193:25 204:22
206:18 207:2
211:15 221:4
222:1,11 223:7
235:18 245:24
249:2
**directed** 17:25
**directing** 108:5
109:21 124:24
129:5 131:3,16,24
135:7 150:8
151:22 154:1
162:23 163:13
170:12 182:13
192:6 194:4
196:24
**direction** 54:7
**directions** 32:21
197:4,16 201:10
**directly** 27:11
106:8 158:10
**director** 56:19,25
57:4,6 75:5 77:20
78:24 79:3 118:7
158:24 169:2
229:1
**director's** 134:2
**directors** 109:8

**disabilities** 15:4
108:21 109:2,13
238:4
**disability** 25:7
32:9 39:17,18
46:21 53:2,7,16,21
73:4 87:12,15,18
88:6 90:7 97:18
97:20 104:6
105:10,17,24
113:20 114:1,4
115:10 118:9,13
121:16 130:5,11
151:10 176:21
215:13,15 218:4
237:14,22 238:11
239:19 240:19
249:18
**disabled** 123:16
**disagree** 10:25
11:1 190:21
224:19 237:8,9
**disappear** 68:21
**disappearing**
51:19 68:23
**disclose** 71:3
115:12 118:20
195:20
**disclosed** 9:11
11:6 21:7 25:7
107:2,7 115:25
116:8 117:10
119:9 121:16
**disclosing** 57:23
69:23 70:22
118:12
**disclosure** 104:6
**disclosures** 115:23
116:3
**discontinue**
188:10

**discontinued**
186:11 210:1
**discovered** 55:19
**discovery** 7:12
9:20 11:8,22 55:2
55:16,19 91:6
97:16 108:13
152:20 156:18
157:2 181:11
183:17 190:13
229:25
**discretion** 134:3,4
**discrimination**
18:23
**discuss** 53:10 75:7
82:10 92:11,16,22
93:21 94:4,15
95:2,24 115:4,9
117:19 118:24
119:1 175:19,23
176:14,15,23
178:18 189:25
190:5 196:3,11
215:13 249:18
250:17
**discussed** 11:15
28:12 38:23 39:14
41:13 53:20 60:2
60:8,11 62:21
72:8 73:2 83:6,7
89:8 90:1 94:10
107:11 108:3
120:19 143:25
144:7,11 159:9
173:13 174:3,19
174:22 176:16
177:14 190:6
236:24
**discusses** 118:25
**discussing** 41:21
87:14,17 92:13,13

114:3 202:19,20
210:5 222:15
**discussion** 21:11
23:10 24:13 47:10
60:10,25 63:6
71:18 73:1,15
75:6,8 88:6 92:20
93:20 113:24
119:4 120:17
136:15 153:17
164:2,8,11,24
175:1 178:4 240:8
250:19,20 253:21
**discussions** 39:5
41:24 240:23
242:18,18
**disease** 239:14,15
241:23 242:3
250:2
**disguised** 225:1
**dismissed** 47:21
**disorder** 161:4,21
**dispute** 230:20
**disregulated** 45:12
**disregulation**
43:25 45:10
**disruptive** 79:22
116:14,15
**dissipated** 195:2
**distinct** 217:15
**distinction** 67:5
241:22
**distracting** 24:5
**district** 1:1,1
**dividers** 185:12
**doctor** 34:6,11,13
36:11 37:4,7
88:13 197:19,20
198:23 200:19
201:15

**doctors** 198:22
**document** 4:11,12
4:17 11:18 17:22
18:20 19:5,12,12
19:16 20:12,23
43:22 46:24 54:2
54:16,20 57:23,25
75:23 102:20,23
103:4 105:10
130:24 135:1,13
135:18,20,22
146:12 147:11
154:21 155:24
157:1 158:7
161:16 163:14,23
163:25 173:7
180:1 181:9,14,15
183:16 189:23
190:10,22 191:23
197:2,6,10 201:20
201:25 202:2
203:1,17 207:7,10
210:19 211:16
212:4,7,15,17,18
212:20,23 213:10
213:19 214:24
215:3 216:14,15
216:17 217:6,7
224:1,4 229:12,23
229:25 230:21,22
235:19 244:16
245:3 246:10,12
**documentation**
14:17 77:6 78:25
164:25 165:2
191:15 235:9
**documented**
105:10,17,24
227:15 244:20
**documents** 7:10
7:17,18,20,21,23

7:25 8:24 9:11,16
10:8,15 17:11
20:11,12,16,18
24:12 59:14,19,23
147:15 153:6,22
179:5 183:17
195:4,6 216:19,20
216:24 217:4,17
218:9,16 230:2
231:2 237:1
254:13
**doing** 13:16
137:13 177:8
192:10 201:13
234:11 249:16
252:10,13
**door** 226:5
**double** 37:24
84:13 193:10
**download** 5:7
153:1
**dr** 3:16 4:14 5:23
6:1,22 7:15 9:22
10:3,10 11:11
12:9,16 18:13
20:2,4,6,9,15,17
21:16 22:7,7,8,17
22:17 23:3,19,20
23:25 24:24 25:23
33:2,18 34:12,17
34:18,19,22,23,25
35:1,7,8,9,13,19
35:20,21,22 36:1,8
36:18,20,25 37:9
38:16,20 39:3,9,15
39:24 40:1,3,20
41:13,22,23 42:16
43:5,14 44:6 45:2
45:18 47:11,12,25
48:8,10,16 51:6,10
51:10 53:1,6,23

54:4 56:3,11,19,20
56:22 57:2 59:25
62:18,18,18 63:2
66:9,15,24 68:5
70:13 71:18,23
72:24,25 73:24,25
76:7,19 77:4,18,25
81:7,10,16,17,19
82:10,16 85:3,13
86:13 87:23 88:10
88:17,24 89:6,20
89:25 90:3 91:9
91:11,17 92:2,22
93:6,22 94:3,4,24
95:2,6,22 96:10,11
96:12,12,12,21,21
96:25 97:2,4,5,18
99:21 100:3,11,19
101:1,7,13,18
102:19 103:11,12
103:14 104:13,23
105:5,6,9,13,16,20
105:23 106:2,8
107:8,13,14,19,20
107:21,24 109:19
109:23 110:8,9,17
110:18,24 111:18
111:20 112:11,13
112:14,15 113:25
115:3,7,9,12,14,17
115:25 116:1,2,8
116:22 117:1,4,17
117:19,21,24
118:2,4,20,21,22
118:22 119:9,12
119:13 122:10,19
123:20,20 124:7
125:4,13,22
126:11,14,20
128:8,9 129:8
136:9,17,22 137:3

138:6,8 139:6,14
140:1,17,19
141:20 142:3,13
143:16,21 144:14
144:14 152:5,18
153:21 154:8
156:25 157:6,21
158:1,8,15,23
159:7,10 160:8,16
162:13,17 163:3
163:18,19 164:2,4
164:6,17,22 165:2
165:10,14,20
166:21,23 167:2,6
167:7,23,25 169:2
169:3,10,16,17,18
169:18 170:2,3,10
170:14,15 171:1
172:10,13,25
173:11 174:4,10
174:20 175:2,18
175:23 176:4,5,8
177:14 179:16
183:13,13,21
184:4,6 185:16
186:13,14,15,21
188:4,5,21,24,25
189:3,9,10,15
190:1,6,7,14 191:6
191:9,22 192:7
193:2,5,8,15 194:5
194:21 195:7,8,12
196:1,9 197:8
199:3,6,10 201:2
202:1,9 203:12,19
203:21 204:13
205:7,8,10,13,18
205:23 206:4,15
207:4,21,23,24
208:1,10 209:10
211:21,24 212:4

212:12 213:17
215:5 216:6,17
217:9 218:18
221:16,23 222:6
222:24 223:7,14
223:22 225:14
226:4,6,8,25 227:4
228:17,20,25
229:5 230:3,8,25
235:23 236:3,9
238:15 241:7
242:10,13,16
243:21 244:4,5
245:11,17 248:7
248:10,14,15,21
249:9,12,14
250:24
**drafted** 164:7
**drew** 238:16
**drinker** 185:24
**drive** 197:25 198:4
198:7,10,20
199:20,21,24
200:2,8,11,11
201:1 207:16
208:3,3,7,7
**driving** 38:3
184:14,20
**dropped** 101:13
**drove** 37:22 186:5
**drug** 57:24
**duca** 105:5,6,9
**due** 96:18 209:21
**duly** 6:16 255:6
**duplicated** 140:4
**duplication** 246:4
**duplicative** 139:21
**duties** 12:23 13:19
49:5,7,14,18,22
57:20 84:19 85:19
131:10 134:2

196:16,23
**duty** 40:17 42:17
43:9 74:7 84:20
84:25 85:4,4
118:6 133:17,24
169:1 180:4,16,24
186:18 187:5,24
188:18,21 189:1,2
189:4 194:23
196:4,18,21
202:10,11,14,15
202:22 203:13,13
206:4,7,10,11,14
207:14,25 208:2
209:14 246:15

**e**

**e** 44:9 257:3,3,3
**earlier** 141:1,4,6,7
142:15 178:20
**early** 37:19 127:5
179:4
**easier** 81:25
173:18 174:13,21
175:16 176:10
177:15 211:6
**east** 1:16
**easy** 119:18
**eat** 146:1
**eddison** 153:15
**education** 25:10
109:1
**eeoc** 3:10 25:13
34:4 108:8
**effect** 37:12,15,17
38:1 42:1 186:12
188:15 209:22
**effectively** 131:18
**effects** 84:4 185:1
190:23
**either** 23:19 98:13
100:20 140:22

150:4 184:16
**elective** 177:9
**email** 3:16,21
14:23,25 15:19
24:19 29:18,25
31:19,22 32:4
59:24 72:1,2,4
82:14,15,18,24
136:8 138:2,4,6,7
139:17 140:16
141:14,25 142:11
142:13,22 143:20
144:2 154:2,5,9,12
154:16,18,21,23
154:24 155:13
156:16,24 157:6,8
159:9,13,16,24
168:7 169:3,6,12
170:12,19 171:3
171:25 172:3,4,9
173:20,22 175:13
176:12 177:11
186:15 195:3
200:15 226:8
229:8 235:22
236:2,16,22
**email158** 3:22
**email170** 4:5
**email235** 4:19
**emailed** 26:1,24
82:10 135:19
228:17
**emails** 24:12,22
59:19 236:15
**emergency** 39:15
47:17 54:3,6,9
97:1,3 112:22,22
185:17 215:12
227:15,18 235:24
236:23 239:2,3,11
239:22,23 240:8

241:5,6,17,20,21
242:21 243:8,11
243:14,17,25
244:6,13,18,21
245:7,18
**emotional** 25:12
**employed** 12:17
**employee** 15:25
154:12,13 197:15
**employment** 13:4
15:22 18:24 105:7
106:14 107:5
122:5 124:16,17
**empty** 67:7
**encourage** 138:20
**ended** 15:9 249:17
**ends** 129:17
254:20
**engage** 16:5 22:24
70:24 75:6 130:16
216:8
**engagement**
236:14
**engaging** 41:24
79:19
**ensure** 69:3
234:12
**ensured** 222:21
**enter** 251:10
**entered** 219:21
**entire** 88:4 99:24
215:9 219:19
238:15
**entitled** 17:23
**entity** 36:25 37:1
**environment**
133:21 136:20
145:21 250:14
**episode** 38:19
184:1 191:12
201:24 209:18

210:6 211:20
212:15,15 215:8
230:18
**episodes** 115:11
**equal** 18:24
**equally** 194:13
**erik** 123:20
**errata** 256:11,13
256:17
**erratas** 256:15
**erratic** 74:6
174:23 186:20
187:25 188:16
194:13,14
**error** 125:14
140:9,15
**especially** 25:9
69:21 178:21
**esq** 1:15 2:3
**esquire** 256:1
**essentially** 50:3
77:17 82:19 88:6
**establish** 58:23
218:9 220:12
**established** 69:22
**establishing**
120:21 144:9
**ethics** 131:14
**eval** 101:7
**evaluate** 87:1
182:1 186:18
187:23,24
**evaluated** 13:8
85:18 132:11
187:4 188:18
200:25 232:25
233:1
**evaluating** 87:9
**evaluation** 3:20
13:12 89:13 98:18
100:14,18,22

101:7 129:8,16
152:19 153:14,16
159:8 182:18
186:19 187:5
194:24 195:16
198:3,5,9,19
199:23 200:10
201:12,13,15
215:20,25 219:20
219:23 221:12
231:5 247:6,23
**evaluations** 85:22
85:25 86:2 87:10
101:10 153:7,12
153:23 163:4,5
182:19 212:11,25
216:10 218:17
220:6,9,12 221:14
223:13
**evaluator** 182:8
219:3
**evaluators** 182:20
221:9
**evening** 9:18
115:2 117:17
118:21 184:16
**event** 25:12 39:1
53:8,10 54:10,10
84:21 110:21
125:25 126:4,18
184:3 190:24
196:21 209:15,17
217:18 218:4
222:14
**events** 10:18 11:14
104:5 107:10
115:24 124:10,20
190:1 194:13,14
194:18 196:3
217:15 238:18

**everybody** 234:7
**everyone's** 243:3
**evidence** 218:16
**exacerbation**
118:13 227:19
239:12 240:12
241:23 242:2
244:24 245:9,16
**exacerbations**
239:19,24
**exact** 30:11,22
62:23 64:21 82:25
83:4 124:5,22
149:20
**exactly** 42:19
84:15 104:18
129:2 168:10
197:3 200:3,17
202:11 206:7
**exam** 37:21,22,23
38:11 184:7 186:4
186:7 193:7
220:25
**examination** 6:20
**examinations**
109:6
**examined** 6:17
**example** 21:21
143:25 220:20
**examples** 119:17
**exams** 221:7
**exceed** 181:2
**exceeds** 13:13
**excel** 176:22
**excelled** 219:24
**exchange** 3:21
10:12 15:15 138:7
154:2,5,19 156:17
159:10 178:9,9
183:17 190:13
191:16,17 195:3

**exchanged** 191:20
**exchanges** 10:14
159:24 172:25
**excuse** 5:12 59:12
102:25 154:14
203:7 223:3
249:24
**excused** 74:14,17
124:9,19
**exercise** 152:13
**exhibit** 3:9,10,11
3:12,14,15,16,17
3:18,19,20,21,22
3:23 4:4,5,6,7,8,9
4:10,10,11,12,13
4:14,15,16,17,18
4:19,20,21 7:9
18:17,18 19:18
20:22 44:11 54:13
54:14 101:17
102:13,16,19
130:21,22 134:24
134:25 136:2,4
146:10,12 147:8
147:10 151:21,23
152:16,18 153:25
154:1,24 159:4,6
160:4,6,6 162:22
162:23 163:1,13
170:11,13,17
172:6,8,8 173:5,6
176:5 179:24,25
181:4,5,9 182:14
182:22 183:10,12
183:12 189:22,24
190:8,9 196:25
197:1,24 201:18
201:19 204:23,24
204:25 206:19,19
207:1,3,3,5,6
209:1,8,9 211:14

211:16 216:12,13
220:20,24 229:10
229:11 232:19
235:16,19 237:20
238:10 245:23,25
246:9 249:1,3
**exhibits** 3:7,8 4:1
4:2,3 5:6 18:14
20:19 159:7
163:10 178:17
208:5
**exist** 167:19
254:16
**existed** 25:10
**existing** 24:13
**expand** 231:18
**expect** 120:6
171:10 221:1
**expectations**
13:13 17:6,24
21:14 23:9 72:12
164:24
**expected** 131:17
131:21 228:14
**experience** 216:5
**experienced** 84:4
212:16
**experiencing**
43:23 96:15
145:10 183:25
190:25
**expert** 13:1
**expired** 149:6
**explain** 38:5
139:16 181:13
189:9 219:13
**explained** 47:12
63:16,20 238:3
**explanation** 62:11
223:23

**explicitly** 59:5
238:13
**expressed** 169:5
**expressing** 72:6
**expression** 93:7
**expressly** 155:15
**extended** 50:7,7
171:7
**extent** 108:17
254:15
**external** 20:20
44:12
**extra** 9:9,10 86:21
109:5 230:1
234:14

**f**

**face** 222:2
**fact** 45:19 53:17
75:25 86:7 175:22
179:6 183:25
184:25 188:13
209:2,13 215:15
217:15 221:5,9
229:20
**factors** 132:23
**facts** 103:9 104:2
104:17 187:14
218:7,8
**factual** 54:23 55:7
103:3
**faculty** 3:20
152:19 153:23
159:8 163:4
**failed** 38:13
**failing** 233:23
234:8
**fails** 256:19
**failure** 222:21
**fair** 221:22
**faith** 120:2,14

**fall** 144:23
**false** 98:17 128:9
**familiar** 18:20
54:16,20 102:22
130:24 132:8
135:1 146:12
147:11 152:21
154:2 163:14
173:7 180:1 181:9
190:10 197:2
201:20 204:25
207:3,4,9 211:16
216:14 229:12
233:8 235:19
246:9
**family** 97:7 124:2
**fax** 33:20 165:21
**february** 43:11,18
44:24 45:21 49:19
50:4,9 56:10,10
87:22 90:16,19
91:20 92:3 93:20
94:3 95:1 96:10
115:1,2,24 117:6
117:13,17,22
118:5,21 119:5
125:1 127:13,18
127:21,25 133:11
172:17,22 177:19
214:8 233:5
240:24
**federal** 3:11 54:13
54:22
**feedback** 43:14
85:14 89:16,19,24
89:25 90:4,9,13
98:23 129:15
144:11 153:14,19
219:1,3,22 225:17
231:20 242:13
247:5,8 248:7

251:3
**feedbacks** 86:10
**feel** 45:17 68:8
94:22 96:13
122:24 222:16
**feeling** 45:7
141:16 192:8,11
**fellowship** 16:2,3
16:6
**felt** 14:1 15:11
45:12 69:22 87:7
88:5 193:15 215:7
223:24 224:7,8
**fidget** 21:1
**fifth** 93:17
**fighting** 222:20
**figure** 62:7
**file** 5:7,7 157:1
**filed** 6:25 11:4
18:25 55:8
**files** 165:21
**filing** 55:11
**fill** 20:14 146:15
**filled** 30:8 82:6
109:24 110:2,3
149:4
**filling** 25:15
**final** 33:19
**finalized** 103:5
**financial** 123:25
**find** 28:22 30:8
32:15 59:4 63:2
64:17,23 65:10,16
65:23 66:16 67:1
67:12,22 68:1,13
68:18 75:8 121:12
122:20 192:2
228:17
**finding** 26:23
**fine** 47:14 101:23
102:3 141:17

177:25 236:13
254:17,18
**finished** 172:15
**first** 3:12 17:23
18:1 19:2 20:12
25:6 34:6,14
50:19 51:5 53:8
53:13 67:25 75:13
75:19 96:5 101:4
102:21 111:25
123:17 136:8
142:10 144:17
147:22 151:25
156:14 160:18,21
172:12 190:12,20
191:4,18 217:3
219:21 223:11
236:1 237:25
252:1
**fit** 40:17 42:16
85:4 201:14
202:10,14 203:13
205:23,25 206:8
206:10,23 207:13
220:2
**fitness** 43:9 186:18
187:5,23 188:18
188:20,25 189:2,3
194:23 195:6
196:4 206:20
207:24 208:2
209:14
**fits** 220:1
**five** 33:14 86:5
98:12 182:9,11,14
182:23,25 183:5
218:23 231:22
253:5,7
**fives** 182:10
**flag** 53:14,14

**flatiron** 16:7
**flexibility** 76:8
77:3 78:16 123:17
123:23
**flies** 238:23
**floor** 247:14
**floors** 44:21 76:23
**florida** 104:25
**fluctuated** 46:15
**flush** 145:10
**flushed** 226:14
**focus** 16:18 93:14
**focused** 87:12
**focusing** 175:9
**follow** 6:17 10:15
24:18 38:21,25
54:2 70:17 72:1,2
72:4 80:1 88:14
115:15 134:19
136:5 138:4 144:2
153:13 157:16
158:3 162:2 172:4
188:9,20 195:3
196:6 197:5
211:23 215:11
240:23,24 249:8
254:7
**followed** 29:24
42:17 54:7,10
64:13 89:1,24
201:9
**following** 40:25
41:16 56:20 57:1
59:20,24 80:3
84:24 90:15
140:20 144:13
170:21 182:3
195:2 196:11
197:15 201:7
208:18 211:12
225:4 229:6

**follows** 137:4
**forced** 112:25
113:6 207:17,18
**foregoing** 258:5
**forgot** 251:8
**form** 3:14,15,17
3:20 5:3 20:13
25:24 26:1,7,14,17
26:20,21 27:2,4,13
27:23 28:1,5,19
29:2,10,13,19 30:7
30:8,10,23,25 31:1
31:2,3,4 32:6,9,11
32:13,13,16,22,23
33:1,4,6,11,12,13
33:21 34:3,24,25
53:5,17,18,24 54:2
70:21,21 76:5
79:25 80:11,19
81:3,23 82:3,6
109:24 110:9,18
111:5 113:13,17
114:5,21 115:6,16
116:16 117:3,9
131:2 135:4
146:15,22 148:19
151:19 154:7
155:16,20,21
156:4,6,8,11,12,19
156:25 157:1,3,23
158:11,13,14,22
170:6,9 171:2
172:3 178:11
202:8,9,12 217:11
217:11
**formal** 156:16
192:3 235:10
**formally** 186:17
**format** 28:8
**former** 108:2

**forms** 17:14 30:24
31:23 152:19,21
152:24 159:3
189:1,2 217:12
**forth** 46:24 131:8
**fortunately** 84:21
**forward** 60:1,6,14
64:11 72:7 178:22
253:9 254:12
**forwarded** 154:21
154:22,23 155:6
**found** 27:25 28:19
30:9,23,25 31:2,2
31:3 85:8 122:11
**foundation** 175:21
231:18
**four** 33:14 48:14
60:17 63:13 64:12
156:7,11,25 183:2
227:23 228:9
239:6 242:7
252:12,13
**fours** 182:12
**fourth** 36:11 43:13
93:16
**frank** 34:12 35:1
37:9 39:24 41:2
112:11 117:19
118:22 119:13
163:18 164:2
165:10,20 202:1
207:23
**free** 86:3 98:6,20
**frequently** 48:11
**fresh** 136:20
251:12
**friday** 140:22
143:13 196:10
**friend** 107:12
243:6

**front** 7:7 21:18,23
   52:13,20 126:9
   164:4 210:19
**fronts** 167:13
**fruit** 184:18
**fulfill** 49:7
**fulfilled** 49:5 89:3
   226:18
**fulfilling** 57:20
**full** 23:8 84:25
   85:4 115:1 191:12
   202:10,15,22
   203:13 206:4,7,11
   206:13
**fullest** 191:2
**fully** 188:7
**functioning**
   152:15 176:21
**further** 6:9 91:3
   119:3 162:3
   178:14 208:17
   223:23 226:1
**future** 66:7

**g**

**gaps** 149:4
**garcia** 104:23
**gathering** 220:13
**geared** 113:19
**general** 70:4 104:4
   104:8 164:24
   201:15 225:8
**generalize** 161:3
**generalized** 15:2
   21:8 84:12 161:20
**gentleman** 230:1,4
   230:6
**gestures** 12:12
**getting** 18:1 27:8
   29:9 39:11 50:6,7
   91:23 92:18 96:16
   120:22 126:3

148:17 152:12
   226:10 234:13
**ghahramani** 51:11
**giant** 184:18
**gif** 155:22
**gishu** 153:21
**give** 21:20 26:11
   36:3,8 45:15 47:9
   47:11 81:21 86:21
   122:22 145:20
   150:5 154:7
   163:18 164:4
   169:25 171:17
   185:9 192:13
   205:16 219:3
**given** 17:7 25:9
   32:25 37:17 42:15
   53:18 97:16 99:16
   99:19 126:17
   167:6 170:5
   178:21 186:2
   201:8,10 212:17
   215:11 216:25
   217:15 218:11
   229:17 230:25
   240:11 247:12
   255:12 258:9
**giving** 77:6 78:25
   80:22 100:11
   143:25
**gmail** 155:6,11
   157:9
**gmail.com.** 155:5
**gme** 135:20
**go** 26:3,9,13,16
   27:4,10,12 55:21
   64:11 68:24 69:5
   80:15 88:19 102:4
   119:25 128:6
   136:4 142:18
   145:20 146:1

171:13,17 178:2
   178:21 185:17,20
   190:18 191:5
   199:25 200:7,11
   220:9,20,22
   240:14 244:16
   247:7 251:1
   252:17 253:17
**goal** 243:19
**goals** 21:15 23:9
   132:20
**goes** 119:1 181:5
   192:14 208:13
   210:7 212:1
   213:24 214:3,12
   238:23
**gofree** 153:21
**goggled** 26:20
**going** 61:15 79:18
   99:15,15 102:6,10
   122:15 136:4
   137:8 148:16
   158:10 175:20
   177:9 178:2,7
   184:15,17 192:20
   194:22 204:22
   205:7 208:10
   210:20 215:19
   216:10 218:15
   222:17 224:3
   226:2,12 236:14
   243:22 245:24
   250:21 251:16,23
   253:9,20,23
   254:21
**gonzalo** 87:23
   88:10 90:3 249:9
   249:12,14
**good** 5:24 6:22
   12:8 88:20 89:21
   90:5 101:19 120:2

120:14 129:15
   141:25 143:8,12
   144:4 152:13
   172:15,16 210:14
   211:11 251:6
**google** 26:18 27:1
   27:7 28:1,7,10
   29:1,8,9,14 30:17
   56:24
**googled** 30:8
**gotten** 94:19
   176:13 207:21
   242:14
**grab** 67:6
**grading** 218:20
**grain** 237:13
**granted** 123:17
   124:6 133:12
   140:6
**gratitude** 72:6
**great** 61:3,5 143:5
   174:11
**greene** 105:13,16
**grievance** 100:9
**grocery** 37:20
   184:15,17 192:21
**group** 68:15,22
   101:24 198:22
**grow** 87:1 219:3
   233:24
**growing** 234:6,12
**growth** 132:19
   233:2,6
**guarantee** 67:3
**guess** 23:23 57:5
   94:21 244:3,12
**guide** 216:6
**guidelines** 115:15
   134:19 234:17,21
   235:4,11

| h |
|---|

**h** 14:11 257:3
**half** 251:15
**halfway** 113:1
**hamilton** 12:20
13:23 14:1,13
130:7
**hand** 6:15 12:12
35:13 125:14
126:14 136:6
165:18 181:23
**handed** 53:19
109:23 110:8
111:4 216:16
218:14
**handing** 158:9
**handle** 239:14
**handles** 14:14
**hands** 217:10
**handwritten** 35:6
165:17 170:15
202:2 203:19
**hanging** 226:5
**happened** 38:2,9
44:23 71:22 147:6
163:10 185:3,8
**happens** 221:24
**happy** 171:6
**hard** 25:8 30:14
90:4 143:8
**harris** 246:23
**head** 12:2,12
15:18 150:6 216:1
222:18
**healed** 124:18
**health** 12:22 25:25
26:6,8 27:5 39:10
39:16 53:18,24
54:3 91:25 93:4,7
94:11 96:1,17
112:23 113:25

115:10 118:9
123:12 131:10
148:4 155:7,11
157:8 158:1
188:12 199:15
209:16 212:19
215:11,12 217:11
235:24 236:23
239:4,9,21 240:6
241:10,13,17
244:22
**healthcare** 23:22
24:8 33:17 71:5
119:23 131:19
188:9
**hear** 54:18 164:5,9
219:15 223:3
**heard** 89:24
220:10 238:1
247:8
**hearing** 99:11
**heart** 145:12
**heavily** 113:19
**heavy** 233:16
**height** 191:12
**heightened** 147:18
**held** 15:23 25:3
178:4 253:21
**hello** 236:3
**help** 21:1 39:13
57:22 73:3 77:7
77:25 86:22,25
92:13 100:5,8
123:18,23 130:16
143:12 152:14
167:12 168:23
189:20 213:20
222:17
**helpful** 33:5 52:19
57:25 64:9 150:9
164:12

**henderhook** 31:15
31:17,18
**hereto** 258:7
**hershey** 1:5 5:13
5:25 6:24 15:24
16:16,19,20 17:17
19:24 26:2,12
27:21 28:8,11,15
29:3 44:20 104:5
105:7,11,17 106:4
106:15 107:5
108:3 148:11
149:7 154:11
256:4 257:1 258:1
**hesitate** 139:2
**hey** 82:19,19
172:18
**hi** 137:7
**hiccup** 31:24
**high** 152:14
176:21
**higher** 86:8
**highest** 131:13,22
**highly** 13:15
**hill** 105:20,23
109:19
**hints** 80:23
**hipaa** 115:3,7
116:7 117:2,18
118:3,5,11,15
128:8
**historical** 221:2
**history** 30:11
115:5,20,23 116:3
116:9 117:19,22
148:5 150:21,25
151:2,6,8 160:24
161:3,13 220:25
221:7
**hm** 211:1

**hmc** 249:6
**hmc453** 4:21
**hmm** 126:15
**hoc** 121:18
**holding** 222:18
**home** 146:1
166:19
**honest** 213:13
219:2
**honestly** 87:24
216:1
**honey** 238:23
**hope** 197:25 198:4
198:6,10,20
199:20,20,24
200:2,8,11,11
201:1 207:16
208:3,7 214:12,12
224:12,21
**hospital** 19:20,23
36:24 38:15 40:5
84:22 90:21
197:21 199:1,17
199:21 229:19
**hospital's** 134:18
198:1
**hospitals** 13:2
**hot** 87:7
**hour** 74:7 128:10
128:13,15 246:15
251:15,17,21
252:5,6,8,9,24,24
253:3,10 254:1
**hours** 4:8,20 9:18
14:3 74:10 83:9
83:13,22 84:20
87:24 91:14 92:17
94:11 95:25
127:25 128:15
133:17,21,23
169:1 176:17

178:22 180:4,4,5,8
180:25 181:2,2,6
216:2 246:16,18
252:2,13,13,21,23
253:6,7,13
**hr** 14:11 20:14
26:2,3,9,14,17
27:10,12,12,21
29:12,18,25 30:9
30:10,18,24 31:1,5
31:10 32:15 33:20
155:10 157:23
158:2,3
**huh** 195:11
**human** 18:10
25:22 26:22 27:4
27:8 28:19 29:3
71:9
**hunder** 154:6
**hundertmark**
154:6 157:17
**hundertmark's**
155:14
**hundertmark153**
3:21
**hurt** 222:20
**hygiene** 210:15
211:11
**hypotheticals**
76:24

**i**

**icu** 250:17
**idea** 234:9
**ideation** 150:21
151:6,16
**identification**
146:17 147:9
**identified** 254:14
**identifying** 110:5
110:6

**illness** 160:25
**image** 155:24
**immediately**
217:17
**impact** 10:1 84:18
91:14 94:10 95:25
**impacted** 96:18
**impacting** 87:15
88:2 91:24 249:18
**impaired** 84:4,8
**impairments**
84:18
**implement** 60:3
60:10 82:1 173:11
173:16 174:12
175:14 176:9
**implementation**
104:8
**implemented**
21:12 45:17 61:15
64:14 83:7 114:2
119:2 121:15,20
242:4
**implementing**
60:1,7,14 72:7
174:20 177:15
**important** 12:11
67:5 159:17
209:13 230:19
**impression** 120:1
120:18 228:16
**impromptu**
249:17
**improve** 98:23
213:20
**improved** 233:2
**improvement** 86:3
86:10,24 132:19
233:6,20
**imputative** 215:9

**inaccurate** 221:4
**inappropriate**
115:18
**inaudible** 59:8
**incident** 38:15
84:3,24 90:15,16
90:20 91:2 115:1
118:25 119:5,11
125:1 145:9
**include** 43:8 80:5
97:10 177:19
205:19 227:7,10
227:14,18,23
241:16 244:23
**included** 21:12
22:23 33:13 41:25
48:10,12,15,19
51:14,20 57:19,23
96:25 98:22
**including** 10:9
59:19 97:7 98:16
104:6 118:8
143:16,22 177:18
191:15 220:3
**incomplete** 181:19
244:13
**incorporate**
240:25
**incorporated**
203:22
**incorporating**
242:19
**increased** 145:11
**independently**
39:18
**index** 3:1,7 4:1,23
**indicate** 86:12
108:20
**indicated** 85:3
91:22 209:2 255:5

**indirect** 221:5
**individual** 132:21
152:1 165:9
247:23
**individually**
205:15,15
**individuals** 103:8
103:10 225:19
243:10
**infer** 63:1 67:6
**inform** 20:4 34:22
77:21 91:13 250:6
**information** 8:9
14:24 15:17 17:3
17:16 18:4,9 19:8
19:11 20:8 21:4
30:9,18 33:3,10,12
33:15,16,21 34:23
55:1 62:8 72:3
75:17 77:24 79:4
81:4 91:3 97:1
104:11,16,21
105:1,3 106:6,22
106:24 107:6,16
110:5,6 115:13
116:8 117:10,21
118:7 119:9
153:11 164:19
179:20 183:20
192:14,16 193:5
194:2 195:21
214:7 215:2 219:9
223:18 230:20
234:19,20 245:14
**informed** 19:19
86:13 99:1 110:24
126:10 164:6
**informing** 184:6
194:5,21 195:12
**informs** 140:25

initial 28:1 148:20
initially 13:22 155:9 168:19 183:23
initiate 75:7
initiated 15:8 24:17 27:9 89:2 99:13 248:2
injury 124:8,16
ins 226:11
inspected 184:25
institution 109:14
institutions 131:11
instructed 7:22 243:20
instruction 12:14 33:1 42:15 158:8 226:2 240:11
instructions 32:21 42:18 99:16,20 196:14 201:7 202:8 206:15 249:15
insurance 149:5
intake 148:19 210:13
intended 86:21 167:1,6 168:20 235:2
intent 9:17 59:2 74:4 78:22 206:7
interaction 143:1
interactive 73:1 73:14 247:3
interest 195:13,15 195:23 199:11
interested 255:14
interface 180:13
intern 76:1,7 77:23 107:14,23 123:22 136:20

143:8 161:10
internal 44:21 76:3 225:4 228:11
interns 123:17
internship 22:10
interpretation 214:15
interrogatories 3:13 102:22
interrogatory 108:6 109:22 112:17 123:14 124:25 130:3
intertwined 215:16
intervene 248:1
intervening 234:14
interventions 209:3 210:2
interview 172:14
interwoven 53:22
investigation 108:9
involved 90:13 162:13,17 248:4
issue 52:6 97:20 125:20 126:12,14 140:1 168:2 178:25 227:24 249:21 250:7
issued 7:3 152:24 237:1
issues 98:14 159:1 212:22 216:21 228:6 231:4 236:20 244:22 249:22
item 71:24 112:19 197:17 220:7

items 51:13 60:17 60:22 63:14 73:6 73:6,16 81:23 83:7 120:18 121:7 136:23 143:25 144:6 192:18 217:14,22 239:6 240:10 241:21 242:7

**j**

jafri 107:13,14,20
james 22:7,18 23:20 24:24 45:18 47:11 109:19 136:17 169:16 172:13,17,18
january 246:21
jed 87:23 90:3
jenny 102:17
jersey 104:15 105:15 106:11 148:14
job 12:23 13:19 84:19 85:19 90:5 130:4 148:16 164:15 180:5
judgment 215:17
july 122:6 137:3 137:11 138:2,5 139:6 146:19 152:5
jump 249:4
june 106:15 136:9 136:16
justify 218:21

**k**

k 44:9
keep 90:4 118:7 222:18,20 238:24 251:16

keeping 216:1 236:13
keeps 165:21
kept 50:6,6
kin 255:14
kind 23:7 80:23 84:13 87:7 88:12 88:14 90:11 219:5 242:13 249:13
kinyard 248:18 250:24
knew 25:10 93:4 115:15 195:4 197:5
know 8:6,22 10:20 11:23,25 15:17 24:10 26:3,16 27:8,14,21 29:17 29:24 30:23 32:7 33:6 34:18,22 45:3,3 59:3,16 62:13 75:3 77:7 77:21,24 78:1,15 79:12 80:17,18,22 81:10,20 82:16 83:12,17 87:8,25 92:12 93:13,18 95:23 101:10 105:9,16,23 114:20,23 120:10 122:15 123:25 124:5 125:10 126:7 130:17 137:23 139:9 141:1,3,5,8 142:25 143:6 144:12 150:4 155:15 156:12 157:18 165:8,18 171:14 177:21 181:13,24 182:5 188:23

192:19 195:22
196:14 213:8,10
216:5 221:16
226:11 229:9
230:19 231:16
238:22,24 245:22
247:5 251:14
**knowing** 9:4 84:15
195:21 253:12
**knowledge** 8:2
50:20 54:25 55:4
78:24 79:4 81:14
96:22 101:1 103:8
104:2 112:18
151:20 173:1
213:14 215:24
216:4 231:15,19
247:16,20 251:9
**kobut** 59:25
**kogt** 22:18
**kogut** 3:16 22:7
23:20 24:25 45:2
45:19 47:11,12,25
62:18 71:18,23
91:9,11,17 92:2,22
93:6,22 94:4 95:2
95:6,22 96:11,12
126:20 136:9,18
136:22 137:3
138:6,8 139:6,14
140:1,17,19
141:20 142:3,13
143:16,21 144:14
144:14 159:10
169:3,16,18
172:10,13,25
**kuzmin** 124:7

**l**

**labeled** 217:4
**lack** 104:7

**laid** 139:18
**lancaster** 1:16
**landed** 26:22
**language** 52:3,7
52:11,16 188:21
**largely** 17:5
180:25
**late** 8:23,25 9:3,18
20:6 111:9 124:10
174:4 179:3,8
**lateness** 254:1
**law** 1:15
**lawsuit** 6:24 11:5
**lawyer** 108:8
**lead** 28:10 29:2
**leader** 229:1
**leaders** 70:23
**leadership** 61:16
64:14 68:20 75:5
121:4 122:7
189:21 216:6
245:12
**leading** 13:14
80:21 99:24
122:25
**lean** 165:19
**leandra** 1:10 5:18
255:23
**learn** 87:2,5
104:20 105:2
219:4
**learned** 118:8
242:20
**learner** 92:14
**learners** 231:17
**learning** 90:13
**leave** 38:20 39:4
39:23 40:11,25
41:16 42:4,11
49:25 50:2 90:20
90:22 98:22 133:7

194:23 195:5
196:16,17,22
212:16 217:20
228:4
**leaves** 94:8 133:5
133:14
**leaving** 15:24 91:7
106:14 125:3
126:23 128:3
**lebanon** 144:24
146:19
**led** 22:20 27:7
29:11,18 30:12,17
44:24 45:25 46:11
53:5,15
**left** 16:16 64:10
89:6 119:25
120:18 127:4,15
181:23 247:5
251:18
**legal** 5:17,18 21:22
99:23 256:23
**letter** 4:4,16,18
35:6,9,14 36:2,9
42:16 43:8 48:23
51:2,9,14,17,21,23
51:25 52:5,10,13
52:18,20,20 72:15
72:18 73:17 81:16
81:20,22 110:9,24
111:5,10 113:1,19
163:17 164:4,7
165:5,11,15,24
166:2,24 167:1,5
167:16,18,22,24
168:12,20 169:19
169:25 171:3,25
203:19 205:22
206:8,9,16 207:13
207:25 211:19
226:14 229:16,20

237:6
**letters** 34:7,14,16
40:16 41:7,14
42:18 43:2 209:14
209:18
**letting** 238:22
**level** 13:11 131:22
132:15,24 133:2
213:21 225:24
234:8 247:16
**lieu** 6:10
**life** 88:3
**lifestyle** 211:10
**light** 8:24 55:2
179:6 193:16
251:11
**lighter** 128:18
**limited** 134:4
**line** 4:24,24,25
51:5 96:5 191:5,6
236:13 257:4,7,10
257:13,16,19
**lines** 83:6 110:4
192:11 251:5
**list** 23:11,12,13,15
97:7 103:8 119:20
123:19 202:5
213:24 239:6,8
242:21,24 243:2
254:13
**listed** 52:12 66:5
79:15 88:8 139:20
218:19 243:3
**listen** 35:24
121:21
**listening** 24:20
170:22
**listings** 182:15
**lists** 152:1 161:12
**literally** 126:2

**litigation** 156:9
**little** 24:4 86:6,23
  94:21 136:14,19
  136:21 143:13
  145:25 159:1
  165:20 170:24
  182:16 199:18
  244:13
**llp** 2:3
**load** 181:3
**locate** 185:13
**located** 17:7 31:4
  146:8 200:6
**location** 180:16
**log** 4:8,20 180:4
  180:14 246:15
**logic** 189:6
**logical** 222:22
**logistics** 226:9
**logo** 155:22
**long** 47:20 66:21
  124:12,13,19
  216:2 251:14
**longer** 45:12,17
  56:24 57:6 163:9
  228:4 230:12
**look** 20:21 93:25
  135:8 136:6 151:3
  155:24 163:8
  170:17 192:1
  201:19 216:13
  221:14 234:11
  239:2 242:6
**looking** 20:17,22
  20:24 23:25 32:9
  44:10 60:1,6,13
  72:7 131:9 151:3
  151:5 203:18
  207:6 209:7,8
  212:22 216:5
  233:6 244:17

**looks** 154:22
  185:11 243:3
  246:3
**lope** 198:13
**lopez** 1:15,17 5:5
  5:22,22 9:7 10:19
  10:25 11:24 12:5
  27:15,18 28:23
  29:4,20 30:1,19
  31:6,11 32:18
  33:24 34:20 35:15
  36:4 42:7,12,24
  47:7 50:13 52:8
  55:13,18 56:5
  58:12,19 59:22
  60:5 61:9 62:4,10
  63:12,15,17,19
  64:2,19,25 65:12
  65:25 66:17,21
  67:14,17,23 68:3
  69:1,11 70:12
  73:10,22 74:22
  75:14 76:14 78:3
  78:6,18 79:7,16
  80:3,9,14,17 81:5
  81:8 83:15 92:23
  93:23 94:17 95:7
  95:12,19 101:22
  102:3 112:5 114:7
  114:15 116:5,10
  116:15 121:9,25
  122:13,21 127:12
  134:8 142:20
  143:18 153:4
  156:19,23 157:11
  162:15,25 163:7
  166:12 168:14
  169:21 174:6
  175:20 177:25
  178:8 179:13
  185:7 186:25

  187:7,11,19,21
  188:1 193:23
  201:3 202:25
  203:5,8,24 204:4,6
  204:15 209:5,11
  213:7 215:21
  218:10 219:14,17
  220:8 223:2,5,15
  231:7 232:14
  237:2,23 238:2
  241:2,14,18 244:1
  245:19 246:2,6
  249:5 251:14,18
  251:22 252:1,6,8
  252:12 253:3,7,16
  253:24 254:17
  256:1,2
**lost** 159:17
**lot** 25:11 37:18
  38:2,8 57:21
  92:17 151:9
  165:21 237:17
**low** 231:21
**lower** 21:23 136:6
  150:22
**luck** 172:15
**lunch** 101:20,23

## m

**m** 1:10
**m.d.** 2:11 16:15
**ma'am** 18:15
  122:2
**machine** 255:9
**mailbox** 89:6
  226:4
**main** 38:1 48:23
  56:15 84:17 149:7
**major** 15:1 21:8
  161:4,20
**majority** 86:8
  221:9

**making** 25:8 65:3
  139:17 214:14
  235:10
**management**
  152:7 161:25
  162:4 227:8
  247:16
**manager** 14:9
**managers** 109:7
**mandate** 228:4
**manner** 6:13
  120:3,7,15 121:23
  122:3,20 123:2,5
  126:5,13 129:16
**march** 51:2,6,10
  135:16
**mark** 154:6
  180:15 234:3,7
**marked** 18:18
  54:14 101:3
  102:13 130:22
  134:25 136:2
  146:10 147:8
  151:1,7,21 152:16
  153:25 159:4
  160:4 162:22
  170:11 172:6
  173:5 179:24
  181:4 183:10
  189:22,24 190:8
  197:1 201:18
  204:24 207:1
  211:14 216:12
  221:1,9 229:11,13
  230:21 231:21
  235:16 245:23
  247:24 249:1
**marking** 7:8
**markings** 181:21
**marrero** 108:1

**marshall** 3:23
22:8,17 23:3,20
40:1,20 62:18
111:17 112:15
143:24 145:18
160:8,16 162:9,13
162:17 183:13,21
184:4,6 185:16
186:13,21 188:24
189:3,9,10,15
190:1 191:9,22
199:3,6 211:13
**marshall's** 188:5
**material** 10:10
80:13
**math** 251:25
252:10,13
**matter** 5:11 11:22
13:1 147:16
194:19
**mclenon** 248:17
**mean** 19:23 21:19
21:20 24:19 49:4
60:13 64:7 66:1
72:17 74:2 78:23
99:19 100:17
111:19 113:5,23
120:13,16 129:12
129:14 146:22
151:13 152:11
154:12 172:9
174:6 206:13
207:18 217:5
223:19 229:18
245:11
**meaning** 183:22
**means** 63:19,20
181:24 206:6
**meant** 60:12 73:20
200:12 201:2
233:14,18

**measures** 98:19
**mechanics** 185:10
**med** 37:4
**mediation** 213:8
215:9 226:14
**medical** 1:5 5:13
5:25 6:1,24 9:22
10:9 11:15 15:24
16:19,21 17:17
19:24 21:11 25:10
26:2,8,12 27:22
28:8,11,15 29:3
38:20 39:4,22
40:7,10,11,25
41:16,16 42:3,11
44:20 45:9 71:9
93:11 104:1,5
105:8,11,14,17
106:15 107:5
108:3 109:9,17,18
112:22 115:4,13
115:20,23 116:3,9
117:10,19,22,24
118:14,17 120:10
148:11 154:11
161:3,13 188:14
194:22 195:5,15
196:2,22 198:2,3,5
198:9,19 199:7,14
199:22 200:10,10
200:20,23 201:11
201:15 210:8
212:16 213:15
217:18,20 222:14
225:24 231:15,18
247:15,17,20
250:3 251:9 256:4
257:1 258:1
**medically** 199:12
**medication** 37:5
37:10 39:12 42:2

150:11,13,16
152:7 161:25
186:12 188:11,14
230:12,17,18
240:15
**medications** 9:23
10:1 148:14 186:1
210:17 250:5
**medicine** 44:21
76:3 135:25 225:4
225:9 228:11
246:24 248:16
**meet** 22:1 45:3
69:17,20 70:1,8,11
70:14,18 71:5
95:1,22 96:11
119:21,22 123:11
134:20 140:17
141:1,4,6,6,19
142:7 167:20
168:9,18 174:11
175:13,18,23
176:5,8 177:5
186:15,17 187:4
190:14 191:6
196:2 226:6
228:14,25 229:5
247:7 249:9
250:24
**meeting** 21:13
23:4,8 24:17,23,25
25:1,3,23 28:2
35:7,23 38:22,23
38:25 39:2,3,16
48:15 53:11,20
59:2,6,10,20,24
60:2 61:4 64:10
65:21 70:4 71:18
71:23 72:2,10
79:6 81:12 82:7
82:10 87:22,24

88:4,8,10,17 90:3
90:6,7 91:19 92:2
97:12,15 99:11
111:8,25 112:1,9
112:10,11,13,15
114:3 120:1,20
125:21 140:20
142:15 144:7,8,13
152:5 157:21
160:16 164:16
166:21,23 168:18
170:13,21,25
171:4 176:24
177:1,3 182:1
189:1 190:5 191:1
192:15,17 196:7
197:5,8 213:17
215:2,13 217:16
218:1 223:12
224:8 227:1
228:23 229:7
230:5 233:21,25
234:4 236:4 248:6
248:10
**meetings** 38:14,18
49:7 72:8 88:12
89:1,3,17 90:2
111:13,21 124:10
124:20 147:5
162:12 177:13,18
**member** 131:19
225:16 226:16,20
228:15
**members** 243:22
**memories** 195:1
**memory** 33:7
196:8
**men** 100:10
**mental** 25:25 26:6
39:15 53:18,24
54:3 112:22

113:25 115:10
118:9 148:4
157:25 188:9,12
199:15 212:18
215:11,12 217:11
235:24 236:23
239:4,9,21 240:6
241:10,13,17
244:22
**mention**  100:10
137:18
**mentioned**  18:7
137:16 192:11
239:17 247:11
**message**  4:6
155:14 157:18
159:9,13 172:10
172:24 191:16,17
**messages**  172:21
191:19,25 192:4
**met**  17:8 20:6 22:6
26:24 51:6,10
56:12 71:14 72:25
79:5 91:11 92:21
94:3,9 96:12
111:16,16,18,20
133:21 134:7
136:22 141:22
164:21 167:17
208:19 227:1
230:7,25 248:14
**methods**  22:25
**michelle**  3:18
26:11 40:9 41:2
84:24 147:13
149:8 205:4
**mid**  50:11,17,21
179:17,21 215:19
215:20 216:9
**middle**  1:1

**milestone**  4:9
132:20 181:24
182:22
**milestones**  132:14
132:16,17,23
232:9 233:9,13,22
233:25 234:2,9,23
234:25 235:1,2,5
235:12
**milton**  1:5 5:12,25
256:4 257:1 258:1
**mind**  9:2 18:8
76:24 101:9 209:1
222:16
**mine**  73:7 104:14
104:24 105:7
107:10 123:21
236:12
**minimal**  247:5
**minimizing**
210:13
**minimum**  76:5
133:2,2
**minute**  90:10
**minutes**  47:20
53:12 66:22
251:21 252:4,13
252:19,23,24,25
**mischaracterizat...**
162:16 198:14
237:3,3
**mischaracterized**
58:13
**mischaracterizes**
93:24 112:6
116:11 121:10
143:19 153:5
**miscommunicati...**
126:16
**misdiagnosis**
250:4

**mispronouncing**
31:18
**missed**  83:2 87:16
**missing**  30:5
**misspoke**  31:4
**misstates**  29:20
61:9 76:15 80:6
**misused**  219:11
221:19
**mix**  149:22
**mixed**  111:15
**modifiable**  76:2
**modifications**
169:1
**modified**  176:17
239:13
**modify**  76:11
**modifying**  174:22
**mom**  243:5
**moment**  11:23
16:18 56:14
218:15 240:13,13
240:14,18,21
241:7 242:5,8
251:20
**monday**  254:10
**monitor**  20:20,24
44:13
**montclair**  109:14
**month**  129:9
**monthly**  23:22
24:8 71:6 119:23
123:12 150:5
**months**  76:23
149:15,17 163:9
**morning**  5:24 6:22
8:23 37:19 127:5
142:4 172:17
179:4 183:22
184:7,16 191:6,18
193:9

**move**  227:3 253:9
**moving**  135:24
**multiple**  19:15
63:21 68:9,9
111:21 140:10
167:12 198:7
**munion**  248:11,14
248:15
**munoz**  20:15
34:12,15,18,23
35:1,8,13 36:1,8
37:9 39:24 40:20
41:2 72:24,25
73:25 81:17 85:3
96:21,25 106:2
110:9,18 111:5,11
111:18 112:11
115:12,14,25
116:2,7 117:1,19
117:21 118:21,23
119:12,13 163:18
164:2,6,17,22
165:2,10,20
169:10,19 170:15
171:2,24 202:1
203:12,19,21
205:7,13,18 206:4
207:21,23,24
242:10,13,16
**munoz's**  156:25
170:3

**n**

**n**  44:9
**name**  6:22 15:17
16:7 31:9,18,20
32:1 33:15 44:8
74:17 75:1
**names**  26:10,11
**nancy**  2:3 5:24
6:23

**narrative** 220:1,3
**national** 146:16
**nature** 13:25 17:6
  37:17 39:7 55:3
  128:16 184:1
  222:5 226:13
**ne** 30:5
**near** 124:17
  152:24 155:2
  213:14
**necessary** 132:24
  258:6
**need** 5:6,6 14:5,6
  15:12 19:20 20:5
  20:9 21:5 41:10
  42:10,22 55:2
  59:16 61:17 68:24
  69:4 70:23 71:25
  74:5 76:9,18,22
  80:18 81:3,8 82:2
  82:8 92:11,22
  93:2,3,22 94:4,14
  94:16 95:2 96:2
  112:19 130:11,15
  140:25 141:6
  158:11 167:24
  170:4,8 176:16
  178:15 179:7
  186:17 187:4
  188:9 198:8
  199:22,23 200:4,9
  204:14 206:14
  210:19 222:18
  241:9,12 247:22
**needed** 25:11 28:5
  41:12 61:22,24
  64:14 65:14 74:20
  76:13 91:18,24
  92:19 93:8,8
  96:17 121:3 130:6
  130:14 132:17

141:3,5 146:15
  164:21 178:19
  188:19 195:5
  196:2 198:19
  202:9 208:2,6
  216:7 221:8
  231:18 247:11
  254:2
**needing** 248:1
**needs** 96:7 110:14
  152:1 227:18
  244:22 254:7
**negative** 69:3
  91:14 94:10 95:25
  98:14 101:3 247:6
  247:10
**negatively** 96:17
**neither** 255:13
**network** 227:11
**never** 26:21,24
  50:22 76:24 89:2
  89:23,25 115:8
  125:15 128:19
  198:21 209:1
  229:20,24,25
  230:23,23,24
  231:1 247:8
**nevertheless** 101:2
**new** 13:23 23:8
  64:22 67:18
  101:16 104:15
  105:15 106:11
  136:19,20 137:21
  144:10 145:21
  148:14 176:22
  195:9 250:8,14,14
  250:15,15,15
  251:10,12,15
**newark** 105:15
**newness** 250:6

**nicholas** 105:5,6
**nicole** 2:11 34:17
  36:18,20 169:17
**night** 8:23 127:8
  156:20,22 179:3
**nod** 12:2
**nodding** 22:23
**nods** 12:12
**non** 198:9,20
  199:24 200:25
  208:7
**noon** 47:11,23,25
  127:17
**notary** 1:11
  255:23 258:13,19
**note** 3:23 20:15
  49:12 67:10 79:19
  89:20 119:16
  160:7,10,15
  170:15 203:23
  205:7,8,12,17,20
  208:23 209:3
  210:8 211:5,5
  214:3 225:8 230:1
  230:17 256:10
**noted** 86:2 96:13
  124:9 168:25
  179:2 193:3 201:8
  258:7
**notes** 3:18 4:14
  23:2 43:4 48:16
  48:17 61:18,23
  62:3,20,23,25
  64:18,24 65:11,17
  65:24 66:6,13,16
  67:2,7,13,22 68:2
  68:13,18,25 69:9
  69:13,14 88:18,20
  89:21 97:12,15,17
  97:22 119:13
  121:13,24 122:12

122:20 127:6
  147:12 149:20
  160:12 161:2,8
  172:13 205:15
  225:12,13,16,18
  225:20 226:16
  227:2 248:7
**notice** 7:3,5,7,11
  100:2 111:19
  230:2 255:4
**notification** 41:22
**notified** 99:21
**notify** 158:25
**noting** 209:21
**november** 169:14
  170:1 175:10
  179:17 240:24
**number** 5:10
  19:19 22:9 33:16
  71:24 77:8 97:10
  103:7,8 108:6,6,20
  109:22 123:15
  124:25 125:12
  129:6 130:3
  146:17,25 151:23
  151:25 152:18
  161:19 197:23,25
  198:8 220:7
  221:10 225:11,12
  227:7,10,14,23
  242:6,24 243:2,4,5
  243:6,7,7 244:14
  244:17,17 245:1
**numbered** 218:25
**numbers** 98:19
  135:8,9 182:3,4,6
  244:10,15
**numerical** 86:5
**numerous** 111:13
**nutritious** 152:13

**o**

**oath** 6:10,11 8:19
**obi** 107:8
**object** 9:8 54:5
  79:25 81:2 175:21
  178:20 197:12,16
  201:9
**objected** 198:15
**objection** 27:15,18
  28:23 29:4,20
  30:1 31:6,11
  32:18 33:24 34:20
  35:15 36:4 42:7
  42:12,24 47:7
  50:13 52:8 55:13
  56:5 58:12,19
  59:22 60:5 61:9
  62:4 63:12,15
  64:2,19,25 65:12
  65:25 66:17 67:23
  69:11 70:12 73:10
  73:22 74:22 75:14
  76:14 78:3,6,18
  79:7,16 80:11,12
  80:20,24 83:15
  92:23 93:23 94:17
  95:7,7,12 112:5
  114:7,15 116:5,10
  116:16,20 121:9
  143:18 153:4
  162:15 168:14
  169:21 187:11
  188:1 193:23
  198:12,13 201:3
  202:25 203:24
  213:7 215:1,4,21
  223:2,5 231:7
  237:2,23 241:2,14
  241:18 244:1
  245:19

**objections** 5:3
  6:13 79:20,22
  80:4,16 178:11
  204:13 215:6
**objective** 89:12
  98:5,11 100:20
  151:25 218:23
**obligated** 57:15
**obligation** 89:3
  134:17,18
**obligations** 57:10
  57:14,17 131:4
**observation** 214:4
**observed** 124:20
  220:13
**obtain** 17:21 25:25
  26:7 28:8 29:10
  104:11 121:24
  135:12 160:9
  163:23,25 198:2
  213:21 221:8
**obtained** 32:16
  42:18 62:9 72:19
  133:3 205:17
  206:17
**occur** 47:5 145:13
  192:19,23 226:12
  240:1
**occurred** 37:14
  44:14 49:14 50:21
  84:20,21 91:7
  92:9 110:16,16
  111:14,21,25
  125:24 126:1,4
  187:13 194:18
  216:1 217:23
  231:1
**october** 13:5 35:14
  144:15 169:4,8,13
  173:11,23 174:4
  176:12,14 177:4

240:23
**odd** 86:23 87:3,13
  190:22 195:18
  197:14,17 198:15
  198:18,24 199:9
  199:13,18 201:9
**offer** 176:17
**offered** 15:3 59:5
  59:17 130:4
**office** 53:9 71:10
  109:13 147:15
  217:10
**official** 231:1
**oh** 12:25 24:9
  46:19 76:23
  112:13 151:5
  157:15 171:14
  183:5 198:16
  209:11 210:18
  222:16 250:3
  252:19
**okay** 14:1 21:25
  24:4 33:13 35:5
  37:16 41:15 43:16
  44:14 47:1 51:8
  52:19 55:21 68:11
  81:24 91:1 93:21
  94:15 96:8 97:22
  111:23 115:9
  121:21 137:14
  145:22 147:23
  148:4 151:24
  175:9 178:1
  187:21 200:15,18
  207:9 212:21
  219:17 220:19,22
  225:3 234:2 246:7
  251:22 253:1,4,8
  254:18,19
**once** 28:18 32:12
  32:16,24 47:20

139:21 153:2,6
  172:14
**ones** 18:7 26:6
  61:13 65:3 160:2
**ongoing** 194:8
  227:8
**online** 27:25 31:3
  129:8
**open** 219:6
**opened** 207:7
**opinion** 118:15
  218:2,5,6 222:4
  223:21
**opportunities** 87:4
**opportunity** 7:19
  9:15 18:24 80:21
  86:25 156:22
  166:11 179:5
  190:17 208:23
  246:22
**opposed** 165:17
**option** 114:20,22
  114:24 119:21
  237:11
**options** 77:18 79:1
**orange** 1:16
**order** 12:12 13:19
  41:10 111:24
  136:5 176:19,20
**ordered** 251:7
**orders** 127:1,6
**organized** 168:18
**orientation** 16:25
  17:4,12 18:2
**original** 5:8 166:4
  166:7,11
**originally** 14:8
  110:19
**osce** 89:11,23
**ospe** 89:10

outcome 38:11,17
  255:15
outlier 100:14
  101:7
outline 208:5
outlined 231:25
outpatient 160:15
outside 32:4
  227:11 229:8
  240:8 245:16
overall 13:11
  153:18 241:1
overlapping 59:8
overnight 74:10
  128:21,24
oversaw 199:4
oversee 13:1
oversight 140:11
overwhelmed
  141:16

**p**

p.m. 47:23 102:6
  102:10 127:19
  128:1 178:2,7
  253:20,23 254:20
  254:22
p.s. 171:21
pa 1:16 2:4 40:1
pablo 1:2,8 3:4
  5:11,12,23,23 6:16
  172:18 183:23
  211:24 241:7
  256:4,5 257:1,2,24
  258:1,2,4,12
package 158:2
pad 21:22
page 3:9 4:3,24,24
  4:25 19:2,18
  30:11 34:4 43:13
  43:14 52:24
  110:22 112:21

114:25 119:15,15
122:17 123:14
124:24 125:12
129:5 130:3
131:25 133:4
135:8 136:5,7
138:5,5 139:7,13
142:3,10,12
144:17 147:20,22
150:20 156:1,14
156:25 157:3
161:7 194:5
246:12 257:4,7,10
257:13,16,19
pages 19:15 156:6
  156:7,11 254:9
panic 145:2,5,17
  239:25
pantalione 209:24
paper 165:21
  224:16
paperwork 25:15
  25:20 71:10,13
par 88:21 89:22
paragraph 25:13
  37:3 43:10,15
  48:3,6 51:24
  52:25 56:9,17,18
  57:8,9 58:4,5
  60:16 63:3 71:8
  71:17 72:13 79:15
  81:15 82:9 83:8
  84:2,23 85:12
  86:12 90:17,18,23
  91:10 92:5 93:25
  94:14 95:18 96:2
  96:6,20 97:12,13
  97:24 98:8 99:10
  100:13 110:15,22
  110:23 112:23
  113:1 115:1 121:8

128:6,7 131:3,4,9
131:16,25,25
133:4,16,16 134:5
134:17 142:19,21
143:10 160:18
186:13 190:18,19
190:21 191:5,15
191:18 192:7,22
192:23 193:2,15
194:1 230:24
paragraphs 143:3
parking 38:8
  185:12
parkway 2:4
part 49:8 51:5
  55:4 75:13 87:5,6
  87:11,19 123:6
  131:11 156:12
  162:9,11 180:5
  195:19 204:10
  213:25 221:25
  250:20
partially 82:5
  109:24 110:2
participating 6:6
particular 71:2
  153:16 175:22
parties 5:2,20 6:11
partner 97:8
parts 48:24
party 255:14
passed 184:11
path 29:11,17,24
pathway 27:7
  30:12
patient 48:16
  51:16 88:12,13
  89:15,23 118:25
  119:11 125:2,4,7
  125:10,14,15,20
  125:23,25 126:4,4

126:7,7,8,12,14
131:18 146:5
149:20 160:10,11
160:12 161:8
181:3 193:16
194:7 209:21
231:4,13
patient's 198:23
patients 48:1
  88:19 90:12
  126:25 127:3,7,9
  194:8 227:21,25
  244:25 245:10
pediatrician
  103:12
peers 88:21 89:22
penalization 67:3
penalize 219:4
penalized 67:4
  69:24 237:14,21
  238:11,17
penalty 19:7
pending 8:13
  194:23
penn 19:24 26:1
  26:12,22 27:5
  32:8 104:5 105:7
  106:15 107:5
  108:3 131:10
  154:24 155:6,10
  157:7
pennstatehealth....
  154:17 155:3
pennsylvania 1:1
  103:13 106:4
  144:25
people 15:3
  120:12 121:3
  185:10 215:17
  230:5 234:8

**percent** 27:6 29:13
44:7 108:14 192:2
**perform** 131:5,10
131:21 152:9
221:7
**performance**
53:22 85:14,19
86:24 89:12 98:5
98:11,19 100:20
129:8 153:18
199:4 218:23
220:5
**period** 47:24
67:24 124:21
138:11 145:23
**perjury** 19:8
**permissible** 80:1
**permission** 60:17
61:8,11,17,22 62:7
62:19 63:7,11,13
63:19,20 96:22
118:14
**permitted** 8:20
**person** 6:10 19:25
26:25 31:9 35:11
36:25 149:7,21,22
167:2 168:25
169:25 182:18
205:11 218:12
226:24
**personal** 97:20
154:21,23 155:12
157:6 162:10
236:12
**perspective** 210:8
**pgy** 17:25 76:6,22
76:23 107:15,15
**pgy2** 135:6,25
**phase** 220:23
**philadelphia**
103:13

**phone** 14:22 97:10
173:3,3 184:11
185:14
**photo** 165:23
166:1,15,17
**photographed**
17:15
**phrase** 94:2
238:23
**physical** 135:25
145:11 195:8
220:25 221:7
**physically** 6:7
36:2
**physician** 40:2,6
104:25
**physicians** 21:13
39:21 40:13 42:5
42:9,21 58:24
**pick** 205:12
**picked** 218:25
220:1
**picture** 166:22
219:25
**place** 8:17 49:11
50:18 62:22 64:16
65:21 95:11
112:10 119:4
120:23,25 124:12
124:13 136:15
168:24 173:22
177:16 194:22
214:4 217:3 219:4
234:6 255:5
**placed** 39:12 42:3
43:14 48:8 99:4,7
218:3
**places** 211:21
**placing** 113:2
**plaintiff** 1:3,18
5:23 178:10,12,16

253:24
**plaintiff's** 3:12
102:20 179:11
**plan** 3:19 39:16
54:3,6,9 86:13,17
86:20,22,24 87:5
87:11,14,17,21
88:10,23 90:14
97:1,3 112:23
114:6,10,18
151:23 152:6
161:16,19,23
162:6 209:2
210:10,23,24
211:4,8 213:6,9,16
213:20 214:1,16
214:20 215:12
218:3 222:13
224:25 226:14
227:8,15,18
228:16 231:24
232:3 235:24
236:7,8,20,23
237:8 239:2,3,8,11
239:18,20,22
240:8,21 241:1,5,6
241:17,20 242:11
244:18,21
**planned** 142:7
178:18
**plans** 152:4,8
208:18 241:21
247:16 248:2
**please** 6:4,14 8:5
24:6 35:24,25
44:8 55:22 68:5
77:20 80:1 83:3
111:24 116:13,22
121:22 129:22
139:17 143:3
145:9 147:20

155:15 157:18
164:10 204:18
205:19 219:12
252:18 253:18
**pm** 135:25
**pmnr** 107:15
**podiatrist** 104:15
**point** 9:5 12:8
28:19,22 41:14
45:11,14,24 46:7
46:10,14,16,22
55:10 67:25 75:10
77:5 83:23,24
84:1 85:15 93:12
93:14 101:9
106:13 109:1
111:1 125:8
126:25 130:14
149:7 200:3
202:20 205:22
210:18 217:6
218:8,21 220:6,12
**pointed** 221:12
**points** 128:23
233:17
**policies** 17:17,20
17:24 18:4,6,10
28:11,16 100:6
195:22
**policy** 32:15
100:10
**polite** 72:5 144:2
170:20 172:5
238:21,24 239:1
**poor** 93:5
**portal** 160:12
180:12
**portion** 129:24
131:6 150:22
220:23 226:18

**position**  9:15,16
12:21 13:9,24,25
15:22 67:12 79:13
83:14 118:10
130:12 131:7
154:10 217:24
218:17 219:8,10
221:17 222:11
253:17
**positions**  15:24
56:23
**positive**  85:14
97:25 98:3,9,10,12
98:20
**possess**  11:12
**possessed**  115:19
**possesses**  106:6,22
107:17
**possession**  10:8
79:3 157:2 159:12
**possibilities**  27:24
**possible**  18:6 29:7
73:21 74:3,5
77:10 81:12 96:12
100:23 119:3
177:20 193:13
202:24 203:15
237:16
**possibly**  126:6
186:18 187:5
**potential**  61:19
62:21 186:19
187:25 188:15
**potentially**  187:24
**power**  64:15,17,23
65:10,15,16,23
66:1,5,8 67:1,16
121:3 168:21
228:21,22
**practice**  89:10,11
227:5

**pre**  175:9,10
**precipitating**
209:17
**predictability**
74:7,11
**predictable**  74:19
**preface**  183:24
**prefer**  253:11,12
**preference**  71:2
**preliminary**  33:15
76:1,6
**prep**  225:25
**preparation**  10:23
11:2
**prepare**  10:3,6
**prepared**  9:9
23:11,12 178:21
220:17
**preparing**  54:5
**prescribed**  186:1
**presence**  245:17
**present**  2:9 5:20
6:7 12:10 99:23
145:24 160:25
**presentation**
214:14
**presented**  8:21
158:7 170:9,14
171:2 213:6
230:24
**presenting**  147:16
147:24
**presume**  8:8 44:10
**prevent**  240:21
**previous**  71:18
108:7 127:23
138:5 196:3
**previously**  110:7
163:2 173:12
**primary**  12:23
39:25 93:19 94:8

96:1 148:13
162:20 195:20
**printed**  76:4
160:13
**prior**  8:13 16:23
16:24 21:14 23:8
24:25 25:23 29:25
55:7 56:4 58:24
98:18 100:2,4
103:4 125:24
126:19,23 128:3
145:7,7 149:9,25
150:2 168:6 174:4
174:11 175:14
176:5,8 177:5
181:11 183:16
184:16 194:19
196:21 225:21
230:11 254:16
**priority**  24:11
**privileged**  10:13
80:13
**proactive**  90:5
167:11 168:4,11
168:17
**probably**  157:7
160:13 166:19
251:17
**problem**  80:25
126:14 147:17,25
166:12 223:1
239:18
**problematic**  64:9
**problems**  52:1
237:12
**procedure**  79:21
80:2,4
**procedures**  100:1
**proceed**  9:3 99:10
179:12

**proceeding**  100:8
**process**  11:8,9
14:10 15:4,8 27:9
28:12 32:5 73:14
97:16 99:13,18,25
100:10 157:24
158:4,11,13,21
159:8 221:25
233:9,12 234:1
250:15
**produce**  7:19
156:8
**produced**  7:11,25
11:21 108:12,16
147:15 152:20
156:17,18 159:19
254:15
**production**  8:25
166:10 179:3,8
**professional**  93:12
118:14 131:14
236:14
**professionalism**
131:22
**professionals**
16:10
**profile**  84:17
**program**  16:9
17:1 25:7 43:15
48:4,5,7,8,20,24
49:10,13 50:7
56:19,25 57:4,6
61:16 75:5,13,19
77:20 78:5,12,16
78:24 79:2,6,13
81:12 118:6
121:20 124:1
131:12 134:2,20
148:22 149:2,4,11
149:14,18 150:14
158:24 162:9

164:15,20 165:2
169:1 226:19,21
227:12 228:15
233:6 245:12
**progress** 48:17
88:18 182:2
214:13,21 224:22
225:7,12,13 232:3
232:8,22 233:24
**prohibited** 245:9
**prohibits** 227:20
244:24
**project** 15:10
**prompt** 169:12
217:2
**prompted** 26:7
177:1,11
**prompting** 229:8
**prompts** 195:1
**proper** 116:20
217:13
**propose** 102:1
213:19
**proposed** 213:16
**propounded** 97:15
**protected** 11:7
**provide** 11:3 20:8
34:23 40:13 57:13
71:13 88:13
109:15 131:4,17
131:25 132:22
133:5,19 134:18
164:19,25 165:1
174:24 225:12
227:17 235:12
240:9,10 244:6
248:7 251:3
**provided** 11:1
20:11,12,13 21:10
22:22 61:12 62:10
79:21 80:5 117:21

119:17 135:20
149:7 154:6 160:3
210:7 214:7
215:10 225:12,15
225:22,24 234:16
248:21
**provider** 23:22
24:8 25:25 33:17
39:25 71:6 73:15
82:5 115:21
146:17 148:13
158:1 160:7
162:20 195:20
198:3,6,6,10,20
199:14,16,20,23
199:24 200:8,10
200:16 201:1
207:17 208:7
**providers** 14:5
26:6,8 40:8 41:17
43:3 117:25
119:23 123:12
188:10,13 196:3
198:25 205:14
207:21,22 211:9
242:14,20
**provides** 108:7
138:13 147:17
213:19
**providing** 22:24
80:23 170:22
194:2 234:14
244:12
**psalcedo** 154:17
155:3
**psychiatric** 201:13
**psychiatrist** 20:15
39:25 41:23 56:11
72:14 77:23 106:4
110:25 115:4
117:18 128:10

152:7 162:1,3
186:6,11,17 187:4
187:17,23 188:20
199:17 200:1,2,6
207:23 210:17
**psychiatry** 201:16
**psychological**
200:21,22 249:21
**psychologist** 162:3
186:7 187:18
201:11
**public** 1:11 255:23
258:19
**pull** 52:19 208:25
247:23
**pulled** 45:19
**punished** 66:7
215:8 222:16
223:25
**punishment** 224:4
224:7
**punitive** 53:13
61:19 86:14
221:22 222:5
238:2
**purely** 41:8
162:10
**purpose** 86:16,19
86:21 93:19 94:8
214:20 219:5
232:7 243:14
245:6
**pursuant** 7:3,25
255:4
**pursue** 195:13
**put** 9:8 27:3 38:20
53:12 64:15 81:8
86:6 111:23
120:22,24 129:25
163:11 168:23
178:23 217:8

221:3 222:21
249:7
**putting** 37:4
116:16 217:2
222:13

## q

**quality** 220:24
**quantity** 76:21
**question** 5:3 8:5,7
8:13 12:1 24:6
27:17 28:21 29:6
35:24,25 42:20
46:24 47:2,8
50:15 52:9 56:7
61:21 62:14,15
63:18 64:22 65:8
65:13,22 66:3,20
66:25 67:19 68:6
68:8,11,17 70:17
74:2 77:17 79:11
80:1,8,12,20,21,24
81:1,3 83:17,19
88:12 94:22 95:9
95:20 112:8 114:8
116:12,17,19,21
116:24 121:22
122:2,25 123:4,15
132:3 134:8 148:5
148:6,18 150:9,21
150:22 151:15
157:16 169:23
175:24 178:12
181:5 187:20
188:2 193:19
200:24 201:6
203:4,10,11 204:7
204:8,14,14,16,20
219:16 223:18
230:13 231:9
238:5 244:4,15
245:21 250:1,11

**questions** 8:4,21
  10:15 24:1 80:7
  95:15,16 139:2
  141:16 155:17
  157:17,19,20
**quick** 141:15
  220:19
**quicker** 82:1
**quickly** 251:25
**quiet** 21:15 23:1
  58:23 61:18,22
  62:3,19,22,24
  64:17,23 65:10,17
  65:23 66:5,13,16
  67:2,12,22 68:1,13
  68:18,25 69:5
  72:10 109:6
  119:20 120:19
  121:13,24 122:11
  122:14,20 144:8
**quite** 57:21 201:8
  203:16
**quizzed** 87:8
**quote** 36:13 76:25
**quotes** 51:19
  52:12

**r**

**r** 44:9,9,9 256:1
  257:3,3
**raise** 6:14 168:2
  169:8,11 218:18
  221:21
**raised** 85:25
  212:10,24 222:25
  223:12
**ramification** 65:5
**ramifications** 69:7
**random** 67:7 74:8
  74:9
**range** 172:21
  228:19

**rate** 145:12
**rational** 237:18
**reach** 31:5 120:12
  138:20,23 139:3
  143:6 145:18
  158:25 168:9
  189:17 226:20,24
  240:17
**reached** 24:16
  25:22 31:10 35:1
  45:18 91:8 120:9
  122:7,8 155:13
  168:18 189:16
  226:23
**reaching** 48:11
  93:13 94:9 132:14
  136:14 167:12
  172:12 189:20
**reaction** 90:21
**reactions** 42:3
**read** 32:21 55:22
  55:25 81:24
  116:24 143:2
  178:13 204:17,19
  224:9,9 256:9
  258:5
**reading** 51:4
  207:9
**readjust** 240:14
**reads** 130:13
**ready** 179:12
**real** 90:9
**realized** 91:5
  237:13
**realizing** 99:14
**really** 46:20 50:24
  68:8 69:14 84:14
  84:15 86:23 87:25
  90:4,12 142:24
  143:4,5,12 144:4
  171:6 192:9 238:7

243:19 245:22
**reason** 37:20 96:1
  163:4 217:2 230:3
  256:11 257:6,9,12
  257:15,18,21
**reasonable** 22:12
  22:16,21 58:6
  155:8 218:12
  240:3
**reasonably** 41:24
  93:11
**reasoning** 247:21
**reasons** 39:12
**reassurance** 22:22
**reassured** 145:19
**rebut** 220:6
**rebuttal** 221:19
  237:6
**rebuttals** 153:10
**recall** 9:1 17:4
  18:12 27:6 28:13
  37:18,22 38:2,3,6
  71:2 76:4 82:14
  82:15 101:6
  111:16 135:19
  136:14 167:17
  169:6 176:25
  179:7,23 184:6
  185:13,16,19
  190:4 191:2,12
  192:7,9,16,18
  193:5,6,7,12,14,18
  193:21 194:2,5,8
  194:21 195:7,12
  195:17 196:1,9
  209:20 210:3,10
  210:12 211:7
  246:5,21,25
  247:25,25 248:6
  248:10 249:11,13
  250:19,21

**recalled** 34:2
**recalling** 26:18
  84:12,14
**receipt** 236:7
  256:18
**receive** 7:5 16:11
  17:11,16,20 18:3,4
  18:9 51:9 89:16
  108:25 109:4
  123:24 135:18
  152:23 179:20
  182:10,14,23
  197:6 223:7
  225:17
**received** 8:23 10:9
  13:16 17:13,22
  18:13 32:12 86:7
  98:2 99:7 100:19
  100:23 101:4
  109:5 123:25
  124:4 125:4
  135:22 157:10,23
  163:3,18 179:3
  182:8,11 183:2
  211:19 221:5
  223:6 229:21
  230:23 231:2,16
  245:4
**receives** 75:16
**receiving** 33:19
  85:18 148:21
  166:18
**recognized** 13:15
  46:17 253:25
**recollect** 191:1
**recollection** 10:17
  11:14 37:16
  125:19 185:7
  194:14
**recollections**
  185:5

**recommendations**
170:3
**recommended**
129:25 130:1
233:15
**recommending**
185:17
**reconcile** 129:22
**reconvene** 102:2
251:13 254:3
**record** 5:10 9:8,13
12:13 55:25 79:19
81:9 101:15 102:5
102:7,11 116:17
143:2 162:25
163:11 166:3
178:2,3,4,7,23,25
180:5,8,11 204:17
253:18,20,21,23
254:21 255:12
**recorded** 180:21
183:21 246:18
255:8
**recording** 181:6
181:18
**records** 166:9,16
173:3
**recurring** 230:14
**red** 53:14
**redness** 145:12
**reduced** 176:17
**refer** 15:16 26:19
43:4 97:24 98:4
149:19 219:20
**reference** 35:4
37:4 41:5 43:12
48:3,6 49:24 51:1
51:24 52:5 57:9
57:11 71:17 83:8
84:2 90:19 97:18
97:25 100:13

110:12 112:21
116:18 124:25
128:11 129:7
138:1 144:19
162:6 171:24
172:2 176:4
189:12 191:14
202:17 212:14
213:22 224:3,6
232:18 247:15,19
**referenced** 51:13
51:16 90:17 99:10
128:2 145:3 256:6
**references** 189:3
**referencing** 43:22
55:17 56:4
**referred** 13:15
14:11 97:20
125:11 126:8
204:20
**referring** 10:16
19:25 22:15 25:21
34:10 36:16,24
37:7 53:25 97:13
98:7,8 114:25
127:12 134:14,15
144:5 148:18
174:16 197:4
242:1
**refers** 115:2
161:19
**reflect** 59:14
180:25 219:19
**refrain** 238:8
**refresh** 125:19
**refuses** 204:13
**regardless** 182:21
**regards** 15:14
**regular** 76:2,22
**regularly** 152:14
153:8

**rehabilitation**
136:1
**reinforce** 79:1
**reinforced** 61:5
**relate** 93:1 250:13
**related** 28:16
42:23 80:12 91:3
124:8 161:20
181:25 209:15
216:24 217:7,8
218:1,9,12 231:4
238:3 240:10
241:5
**relates** 183:21
**relationship** 58:24
69:22
**relationships**
109:7 120:21
144:10
**relayed** 93:3
**release** 111:19
115:8,16 117:3,8
205:3 208:12
**released** 84:25
**relevant** 104:17
139:23 159:17
**relieved** 171:7
**remaining** 179:9
183:8
**remarkable** 247:2
**remediation** 4:16
38:24 43:15 48:4
48:5,7,10,19,24
49:1,6,8,10,13
53:12,16,17 86:13
86:17,22 87:3,5,11
87:13,17,21 88:8
88:10,23 90:6,14
99:3,4 113:2,7,9
114:6,10,18
211:21 213:6,16

213:20,25 214:16
214:20,21 215:10
215:14,16 216:17
217:3,12 218:3,22
219:5 221:11
222:13 224:13,22
224:25 225:1
231:3,24 232:3
236:7,20 237:8
249:14
**remember** 18:1
25:5 26:23 31:20
32:1 33:9 37:18
37:23,24 38:9
89:1 98:17 150:3
184:2,4,9,11,13,15
184:17,19,22
185:2 187:13,15
187:15 192:25
194:10,12,25
196:13 210:21
211:13 226:10
**remembering**
195:3
**remembers**
209:10
**remify** 234:13
**remind** 8:17 77:6
121:2 170:3
**reminded** 170:4
**reminder** 4:7
173:10
**remote** 149:22,24
247:4
**remotely** 5:16 6:9
6:11
**remove** 45:4,5
46:18 47:13 94:12
96:3,14
**removed** 45:1
56:19,22 57:3,4

91:8 119:6 140:4
146:4 172:20
196:15 214:16,21
224:13,22 228:2
**removing**  93:14
93:18
**renewal**  132:4
**renewals**  132:1
**renuca**  44:6
**repeat**  24:6 79:11
84:10 116:21
139:19 147:20
203:11 204:8,14
**rephrase**  8:6
76:20 80:24 176:2
**replace**  47:16
**replacement**  47:18
**replacing**  215:14
**replies**  140:19
142:4
**reply**  137:10 139:6
141:15 236:15
**report**  180:14
**reported**  249:20
250:1
**reporter**  3:8 4:2
5:18 6:4,5,18 12:9
55:24 56:1 101:18
103:16,19,22
116:23,25 204:19
219:21 220:14
**reporting**  6:8,13
12:10 167:25
233:9 234:1
**reports**  193:8
**represent**  5:21
6:23 147:14
**request**  3:12 4:4
8:12 12:2 13:18
13:21 14:18,21
15:6 20:13 25:24

26:4,15 27:2,4,13
27:22 28:1,17
29:2,10,12,18 30:7
31:23 32:6 33:20
50:8 54:9 59:1,5
60:20 61:8,11
64:6,8 70:1,8,18
81:23 82:5,6,10,11
93:17 102:21
104:7 105:10,17
105:24 108:15,19
109:11,12,18,24
110:9,18 133:7,12
133:14 139:16
140:6,9,13 147:5
154:7 156:16
157:5,9 159:3
162:12,14,18
163:17 166:10
169:13 192:4,5
204:11 205:22
229:2 235:11,15
238:7 243:25
253:8 254:15
**requested**  11:7
14:8 24:18 30:10
39:14 40:3 45:1
58:6,9,15 60:17
63:6 70:14 71:10
82:11 108:17
115:16 122:11
188:25 205:24
**requesting**  20:15
59:15
**requests**  4:23
22:11,16 24:21
34:7,14 41:17
71:15,19 72:20,23
73:9 74:1 78:2,10
79:14 81:11 120:1
120:11,14 158:17

168:9
**require**  241:24
**required**  9:10
57:17 75:12,17,18
75:22 80:18
123:16 128:24
129:9,12,14,23
131:5 132:15
133:2 180:5 197:9
197:20 209:3
210:2 234:1
235:24 244:6,9
258:13
**requirement**
39:19 134:5
198:18 202:13
250:18
**requirements**  49:6
75:24 76:1,6 77:2
78:5,12,17 79:6,13
81:13 100:11
133:20 134:6,13
134:20 164:20,21
165:3 202:6
**research**  12:25
13:14
**resend**  31:25
**reserved**  5:4 8:25
**reserving**  178:11
**residency**  16:21
17:1 50:19 67:21
68:1,12,14 69:17
75:13 88:3 131:12
133:20 134:13,16
147:18 148:22
149:2,4,10,14,18
150:14 161:10
164:20 227:12
249:19
**resident**  3:14,15
16:22 17:13 22:12

24:19,20 32:8
44:1,5,15,25 46:1
46:11,22,23,25
47:4,6,15,15,16,18
57:10,13,18 58:16
76:3 83:14 84:19
86:22 131:2,6
132:4,18 134:6
135:5 138:19
162:19 164:15
168:24 179:17
195:14,18 198:9
198:20 199:4,11
199:24 200:7,25
208:7 225:17
226:17 233:21,23
234:5,10 248:1,4
250:15
**resident's**  83:20
132:20
**residents**  17:18,23
18:1,5,11 20:3
24:10,16 50:11
58:7,10 59:3
60:21 62:1 63:7
71:14 83:21 89:13
98:21 119:17
120:8,10,22
141:13 158:25
168:7 182:2 199:3
215:19 221:25
232:8,22 233:14
233:18 234:23
235:6,13
**residual**  190:23
**resistance**  237:12
**resolved**  193:3
**resource**  26:23
71:10 138:13
243:16

**resources** 18:10 25:22 27:5,8 28:20 29:3

**respect** 7:3 8:20 14:18,25 16:19,21 17:1,17 37:15 38:15 50:18 57:14 99:9,11 121:7 172:5 205:6 218:5 221:14 232:21 236:8

**respectful** 236:12

**respective** 5:2

**respond** 12:11 170:20 220:17

**responded** 126:15

**response** 24:24 27:4 46:13 64:1 108:10,21,23 109:22,25 114:6,9 114:12,14,18,19 115:3 123:19 125:1,13 129:6 130:4 139:25 140:3 153:23 157:18 193:18 221:23 222:9 226:10

**responses** 3:12,13 102:20,21 153:11 183:25

**responsibilities** 12:24 13:19 49:16 85:20

**responsibility** 125:3,15

**responsible** 168:25

**rest** 151:18 219:22

**restoril** 37:11

**restrictions** 85:9 208:15 210:10 217:21

**restroom** 177:21

**result** 84:8 128:17 128:25 129:2 152:5 186:9 239:25 240:1,1

**resuming** 254:16

**retrograde** 37:13 38:1 84:11

**return** 4:13,15 29:8 38:22 39:1,4 40:10,14,15,17,21 40:23,24 41:4,8,11 41:18,20 42:4,6,11 42:17,23 43:9 84:25 85:4,9 113:8 157:6 177:24 195:6 196:4 201:23,24 202:7,10,15,21 203:13 205:5 206:1,2,3,8,11,21 207:13 208:13,14 210:9 217:21 227:5 236:9 237:9 256:13,17

**returned** 53:9 89:9 206:17 210:1 226:4

**returning** 39:20 41:15 224:1

**review** 9:15 10:24 32:15 48:16 50:11 50:17,21,23,25 55:6 85:22 97:22 98:15 100:6 103:2 133:20 134:6,13 134:16 153:1,2,7,8 156:22 157:25

161:7 163:5 166:9 166:11 178:17 179:5,8,21 181:24 182:22 190:18 208:23 212:10 225:16,18,20 226:2,16 227:2,4 232:8 235:9 248:7 248:13,15,24 251:4 256:7

**review181** 4:9

**reviewed** 10:7,10 10:23 11:18 88:18 89:7 100:1 214:9 225:13 232:4

**reviewing** 55:16 196:1 232:21

**reviews** 97:25 98:2 98:4,9,10 179:17

**right** 6:15 7:8 8:25 10:24 18:8 21:21 27:1 29:1 38:19 47:1 70:15 102:9 111:1 113:11 134:21 135:12 136:6 140:23 141:1,17 142:12 147:4,6 150:7 155:4 163:1 164:5 171:4 175:11,16 177:17 189:8 200:17 203:18 206:2 214:10 222:13,15 234:8 238:20 243:8,17 246:4,19 252:14 252:21

**rigor** 78:16

**rigorous** 77:1,2

**risk** 47:15 69:6 70:22 194:6

**rm.pdf** 156:2

**road** 184:20

**role** 232:12,20

**room** 6:8 47:18 67:7 69:13 76:11 142:8 185:17 217:9

**roommate** 37:22 108:2 184:12,13 186:5 191:21

**rooms** 8:16

**rotate** 248:16

**rotating** 122:9

**rotation** 23:9 73:21 74:13 75:2 84:1 121:19 128:16 129:1,3,17 145:15 147:1,2 153:17 177:3,7,12 228:2 233:4 239:13 250:17

**rotations** 21:14 58:25 74:3,5,15,17 74:18,21,24 75:3,4 75:8,11,12,18,21 76:10,12,19,21 77:9,13,19 86:9 128:14,18 139:20 139:20 140:4,5,10 144:10 177:11 202:18 233:3 239:10 240:5 241:10,13

**round** 182:4

**rounds** 21:13 23:18 58:22 61:3 70:25 71:4 72:10 119:22 120:19 121:18 122:4,14 123:3,6,7,8,9 127:5 143:12,17

143:22 144:8
**route** 28:20
**rpr** 1:11 255:23
**rudra** 44:6 107:21
**rules** 8:18 79:21
  80:2,4
**run** 103:10
**rush** 172:15
**rutgers** 105:14,22

**s**

**s** 5:13,25 256:4
  257:1,3 258:1
**safe** 109:16 193:15
**safely** 227:21
  244:25 245:10
**safety** 51:16 194:7
  227:25,25
**sal** 5:23
**salary** 13:6
**salcedo** 1:2,8 3:4
  5:11,12,23 6:14,16
  6:22 7:15 9:22
  10:3 11:11 12:9
  12:16 18:13 20:17
  21:16 35:20 56:3
  57:2 63:2 66:9,15
  66:24 68:5 70:13
  73:24 76:19 81:7
  81:10 85:13 94:3
  94:24 96:10,12,13
  101:18 102:19
  116:22 122:10,19
  152:18 157:6
  159:7 163:3
  174:10 176:4
  179:16 182:21
  204:13 206:23
  207:4 209:10
  211:24 212:12
  218:18 221:16
  223:14,22 241:7

256:4,5 257:1,2,24
  258:1,2,4,12
**salcedo's** 56:20
  97:18
**samantha** 128:5
**santos** 104:13
**satisfy** 202:12
**save** 80:16 180:17
**saw** 40:1 150:4
  184:23 190:12
  205:15
**saying** 29:8 42:16
  72:6 96:6 134:12
  139:1 147:1 168:7
  194:12 196:13
  200:7,9 205:4
  207:13 212:9
  218:2 237:8
**says** 19:19 34:5
  77:8 131:6 141:10
  141:15 146:23
  148:8 155:2,15,22
  162:2 167:3
  186:14 191:22
  199:22 202:10,14
  206:4,10 211:23
  219:21,23 223:15
  223:19,19 224:15
  226:15,19 239:22
  243:8
**scale** 98:12 182:8
  231:22
**scenarios** 48:13
  225:23 248:24
**schedule** 24:17
  61:14 74:12 76:9
  76:11 77:3 83:20
  119:22 123:11
  128:17,19 138:21
  139:18 140:10
  168:22 174:22

176:17 177:6
  198:9,19 199:22
  199:23 200:9
  239:13 240:14
**scheduled** 83:9,13
  181:1 225:3 227:1
**schedules** 74:19
**scheduling** 35:12
  134:19 159:1
  168:25 226:25
**scholarly** 16:4
**school** 16:7 104:1
  105:15 109:9,17
  109:18 225:24
  250:4
**science** 16:9
**scientist** 12:22,25
**score** 86:5,6 98:11
  133:2 182:7,14,17
  182:23 183:2
  231:21
**scores** 86:8 98:5
  98:19 100:20
  101:5,12 181:21
  182:17 183:4,5,8
  218:23 233:16
  234:10
**scoring** 86:4
  100:23 218:21
**scorings** 100:25
  101:11
**scraped** 185:11
**scraping** 38:7
  185:3
**scratch** 184:24
**screen** 20:24 21:17
  44:11 151:4
  159:16,20,23
  207:8
**screenshot** 160:2

**scroll** 56:8
**scrolling** 19:14
**se** 86:25 93:11
**search** 27:7 28:1
  28:10,15 29:9,15
  30:17,23 173:2
**searched** 28:7
**seat** 87:7
**second** 9:1,4,6
  19:18 25:14 34:5
  34:25 52:25 115:1
  122:23 128:7
  135:24 179:7
  186:13 192:6,23
  193:2 212:18
  216:15
**secondary** 43:24
  84:16 209:14
  221:8
**section** 33:14,16
  33:18,19 86:3
  150:23 160:22,24
  161:2,8,16 219:2,2
  221:10
**sections** 33:14
  57:21 90:10
**secure** 111:14
  205:3
**secured** 72:14,18
**see** 7:6 14:5 15:3
  19:15,21 21:10,17
  21:21,23 22:13
  23:22 25:15 34:8
  36:14 37:5 41:19
  43:12,19 44:3
  49:1 51:3 52:1
  53:3 56:14 57:11
  58:7 60:17 64:8
  71:11,19 72:15,20
  77:11 81:17 82:12
  83:10 84:5,25

85:5,15 86:14
90:23 96:22 97:25
100:14 108:10,23
109:25 113:3,21
120:4 125:5,17
128:11 129:10
130:8 134:22
136:9 144:20
145:2 147:19
148:1,6 149:1,3,9
149:13,17,21,25
150:11,22 152:6
154:24 155:4,17
155:21 156:21
161:17 165:6
168:4 170:8 171:8
174:12,14 176:9
181:11 183:14,20
184:8 186:20
189:12 198:22,23
198:25 200:15
201:17 207:17,19
208:6 210:20
212:12 213:22
214:17 218:25
220:24 223:14
236:16 239:4
245:1 246:6,6
247:23
**seeing** 24:8 39:22
47:25 52:13,20
149:9 150:1
182:25 193:11
215:25 219:25,25
**seek** 12:4 14:7
179:11 240:5
253:14
**seeking** 8:9 41:6
42:4 62:8 74:14
74:16,21,25 77:13
77:24 78:17

**seen** 40:4 126:5,12
126:25 181:10
183:16 229:24
**select** 248:23
**self** 14:4 74:20
118:24 119:10
152:9,11 174:24
**semantic** 37:1
**send** 36:3 169:18
229:2
**sending** 29:18,25
168:6
**senior** 225:17
226:16 248:1,4
**sense** 49:15 61:2
74:7 110:15
118:16 190:22
222:10 247:13
**sent** 31:24 82:15
141:24 142:13
156:20,22 158:2
166:7 169:3 171:3
236:16 256:14
**sentence** 25:14
34:5 36:12 37:3
43:11,17,19 53:1
119:16 193:8
223:11 224:10
236:1
**sentences** 194:1
**separate** 8:16
20:12 47:9 49:13
65:22 110:20
200:20 215:15
216:18,21,24
217:5,14,22
230:16
**separately** 111:6
**september** 13:5
19:6 172:22 175:9

**sequence** 91:6
136:5 162:11
**series** 8:4 34:6,14
79:20
**serve** 12:25
**service** 38:22 39:1
39:20 45:2,4,6,20
45:22 46:18 47:13
50:4 93:15,19
94:13 96:3,14
109:13 119:6
133:24 138:16,24
172:20 180:22
228:12 248:5,5
**services** 138:20
146:5
**sesh** 89:11,11
**session** 16:25 88:5
88:5 89:11 126:2
249:14,16,17
**sessions** 106:8
107:2,7 147:13
**set** 21:14 23:9
46:24 88:25 89:2
101:10 131:8
228:22
**setback** 43:11,18
43:21 44:14 45:25
46:11 47:3,4,5
**setting** 8:16 72:11
**seven** 141:21
178:22
**shane** 248:18
250:24
**share** 166:24
243:22 244:21
**shared** 34:2 76:7
166:6 243:19
**sharing** 69:23,25
**sharon** 1:15 5:22
10:11 256:1

**she'll** 212:9
**sheet** 256:11
**shelby** 1:12 2:10
5:16
**sheri** 106:10
**sherry** 148:25
149:1,12
**shift** 44:18 74:8
90:23 91:7 127:11
127:17 146:2,3
**shifts** 51:20
**short** 17:22 82:17
177:21
**shorthand** 255:9
**shortly** 38:25 57:1
141:23 166:18
177:2
**shot** 145:20
**shots** 159:16,20,24
**show** 33:6 167:15
167:24 168:12
189:23 233:19
234:24 235:6,13
**showed** 76:5,9
**shower** 146:1
**showing** 78:22
181:21
**side** 37:12,15,17
38:1 42:1 84:4
160:11 165:19
181:23 184:20
185:1 186:12
188:14 190:23
209:22
**sidetracked**
157:16
**sign** 113:1 114:21
125:4 178:13
212:7 217:12
218:13 228:8
237:7 245:3

256:12

**signature** 19:1,2
135:9 155:23
229:22 237:7
255:21

**signed** 16:23 19:5
113:17 115:8
117:3 126:8 206:9
212:4 214:24
217:16 229:25
230:4,23 256:20

**signify** 182:6

**signing** 113:7,11
113:12

**sim** 22:7 141:9,12

**similar** 107:20,22
135:4

**simple** 68:11

**simply** 79:9 172:4

**sir** 64:11

**sit** 21:13 23:17
58:22 61:3 70:24
70:25 71:4 72:10
119:22 120:19
121:17 122:4,14
123:3,5,7,8,9,9
143:12,17,22
144:8 222:6

**site** 26:23 28:16

**sitting** 8:15 31:20
55:10 217:9
222:11

**situation** 92:9
238:14 243:17

**six** 76:23

**skills** 213:20
214:14

**skip** 193:1

**skipping** 159:6
163:1

**sleep** 39:11,13
45:11 77:9,14,19
84:9 91:24 92:17
92:18,19 93:5,8
96:16 146:1
152:12 174:25
176:18 202:23
203:14 210:14
211:11

**sleeping** 91:23

**slip** 118:24 119:10

**small** 177:20

**smooth** 127:3

**snapshot** 233:16

**snapshots** 233:15

**snowballed** 23:7

**snyder** 100:19
101:1,14 125:4
188:5

**snyder's** 101:7
129:8 188:4

**social** 143:7 161:3
161:9 227:11

**solutions** 5:17,19
155:10 256:23

**somebody** 27:10

**someone's** 155:23

**soon** 22:10 96:11
129:17

**sooner** 146:21

**sorry** 51:4 54:18
66:12 83:2 87:16
95:14 103:16,17
103:17 114:23
136:25 149:23
151:5 160:19,20
166:14 171:21
187:9 196:19
198:16 209:5
250:10 252:10

**sort** 17:6,8 65:4
123:16 140:11
145:19 155:25
164:14 185:12
226:11

**soto** 123:20,20

**sought** 13:24
109:10 111:14
199:6

**sound** 142:4

**sounds** 67:5
126:15

**source** 106:5,21
107:16 119:8
234:20

**sources** 221:8

**space** 23:2 58:23
61:18,22 62:3,19
62:24 64:18,24
65:11,17,24 66:6
66:13,16 67:2,12
67:22 68:2,13,18
68:25 69:5 72:10
109:6,16 119:20
120:19 121:13,24
122:11,14,20
144:8

**spaces** 21:15

**span** 111:21
124:23

**speak** 15:14 128:4

**speaking** 128:2
210:12

**speaks** 203:2

**specialize** 201:16

**specializes** 199:15

**specialty** 200:23

**specific** 14:12,12
15:6 26:10 42:15
55:3 59:6 71:15
72:20 73:8 74:1

74:15,17,24 79:14
81:11 85:9 92:8
99:16,20 100:11
110:4 145:25
165:9 176:1
206:15 210:9

**specifically** 40:4
52:6 62:23 97:17
176:23 235:11
248:23

**specification**
197:18

**specified** 208:1

**speculate** 68:6,7
189:6

**speculation** 34:21
50:14 68:3 73:23
75:15 79:17 80:6
83:16 114:16
187:7,12 213:8
223:6 244:2
245:20

**spell** 44:8

**spend** 9:9

**spending** 245:25

**spinner** 21:1

**spoke** 106:8
136:23 186:14

**spoken** 158:17

**sports** 124:8

**stabilize** 228:6

**stable** 85:8 210:8

**stage** 219:21
220:14

**stakes** 233:16

**standard** 86:10
129:15,19,22

**standardized**
89:12

**standards** 131:13
234:16,18

**staring** 193:14
**start** 13:4,23 45:22
 101:16 127:11
 143:3 146:18,23
 146:24 147:1,2
 149:18 173:25
 174:12 175:10
 177:10 178:8
 179:2 182:5 191:4
 234:7 236:17,17
 251:12
**started** 13:22
 20:14 22:10 23:6
 25:14 46:9 50:3
 67:7 120:9 122:5
 122:6,9 127:17
 148:11,22 149:5
 150:14 177:3,12
 180:21 251:24
 252:20,22
**starting** 16:23,24
 16:25 32:8 75:2
 111:1 136:19
 142:10 145:7
 147:6 169:6,9
 174:4,17 175:14
 176:6,9 177:1,5
**starts** 43:14 138:5
 142:23 172:9
 234:6
**state** 5:21 19:24
 22:9 25:14 26:2
 26:12,22 27:5
 32:8 48:25 52:6
 60:16 71:8 80:19
 104:5 105:7
 106:15 107:5
 108:3 109:14
 117:15 125:13
 128:8 130:4
 131:10 136:12

143:21 145:1
 154:24 155:7,10
 157:8 178:10
 191:2
**stated** 9:12 42:18
 51:25 81:25
 125:16 126:13
 175:25 192:15
 238:13
**statement** 19:21
 25:18 44:3 49:2
 52:25 53:3 63:3,5
 63:9 74:4,11
 77:22 94:6,7
 109:23 111:4
 113:21 120:4
 125:2,5,17 129:10
 130:8,13 174:14
 186:20 188:8
 195:18 200:13
 205:23 214:17
 223:14 224:18,19
 240:3 245:1
**statements** 58:15
 108:7,12,16
 192:22
**states** 1:1 119:2
 138:19 221:6
 230:24 244:20
**stating** 185:19
 191:3 192:16,18
**stay** 9:18 171:18
**step** 37:21 184:7
 211:22
**stephanie** 246:22
**steps** 157:24 208:6
**stigma** 25:9
**stigmatized** 69:24
**stipulated** 5:1
**stood** 127:3

**stop** 116:14
**store** 37:20 184:16
 184:18 192:21
**stotler** 1:12 2:10
 5:17
**stoudt** 1:11 5:18
 255:23
**straightforward**
 216:23
**street** 1:16
**stressful** 73:20
 74:3 75:4 202:18
 239:10,13 240:5
 241:9,12
**stretching** 221:3
**strictly** 209:14
**strike** 118:3 129:4
 208:18 224:1
**stringent** 76:2
**strong** 90:5 171:18
**structure** 14:2
**structured** 74:6
**struggle** 247:20
 250:7
**struggled** 151:9
**struggles** 88:2
 90:8
**struggling** 39:10
 92:14 93:18
**stubs** 180:19
**stuck** 68:21
**student** 118:16,17
 197:15 247:17
**students** 105:21
 109:20
**stuff** 38:24
**subcategory**
 200:23
**subject** 13:1
 236:22

**subjective** 189:19
**submission** 33:4
 101:13 225:21
**submit** 14:17 32:6
 32:13 34:15,18,24
 35:8 36:1 39:19
 114:5,9,14,19
 153:10 180:18
 207:24 221:19
 225:7 226:22
 237:6 244:9
 246:16
**submitted** 32:17
 32:24 33:11,23
 34:6,13 35:18
 36:23 40:21,24
 54:22 97:2 100:22
 111:10 114:12
 129:16 153:23
 205:8,10 206:10
 254:9
**submitting** 114:17
 235:23
**subscribed** 258:14
**subsequent** 135:5
 163:5 183:24
 200:15 233:3
**subsequently**
 58:16 172:20
 189:1 196:22
**substance** 185:23
**substituted** 140:5
**successfully** 48:25
 49:9,18,21
**sudden** 145:10
**suffer** 15:1 21:7
 45:25
**suffered** 43:18
**suffering** 45:10
 46:5 105:25

**sufficient** 152:12
199:15,18 214:13
224:22
**suggest** 58:18
**suggested** 23:1,4
24:7 25:25 26:5
28:4 58:16,22
60:4,23 61:7
254:4
**suggesting** 237:15
**suggestion** 23:6,17
23:21 58:11 60:24
86:2 112:3 129:15
129:19,23 143:17
**suggestions** 58:11
60:7,8,14 61:6,12
64:12 71:15 86:9
110:25 137:24
143:11,16,21
144:3,4 169:10
**suggests** 140:19
**suicidal** 150:21
151:6,16
**suit** 164:3,7
**suite** 1:16 2:4
**sullivan** 4:15 40:2
40:20 41:3 85:8
148:19 207:16
208:12,17,19
209:9,20 210:4,23
**sullivan's** 211:8
**sum** 182:19
**summarize** 192:14
**summarized**
197:10 213:2
**supervising**
199:12
**supervision** 221:4
221:5 255:10
**supervisor** 14:10
33:2 35:11 54:8

158:23 168:1
201:10 222:1,12
**supplemental** 8:24
179:3
**support** 99:22
100:5,7 123:25
141:10 143:6
170:23 171:7
189:12,15,16,17
218:16 227:11
234:15 236:4,10
238:19
**supposed** 37:21
50:5 87:25 88:25
219:2 226:11
249:15
**sure** 9:12 29:7
33:13 47:10 67:4
81:21 94:23
108:14 122:16
127:1 134:12
148:17 163:8,11
166:19 175:25
180:7 209:6,22
228:5 248:3
**surprise** 48:19
**swallow** 2:11 6:1
10:10 20:2,4,6,9
23:25 25:23 33:2
33:18 34:17,19,25
35:7,9,21,22 36:18
36:20,25 38:16,20
39:3,9,15 40:3
41:13,22,23 42:16
43:5,14 48:8,10
51:6,10 53:1,6,23
54:4 56:11,19,22
76:7 77:18 81:16
81:19 82:10,16
86:13 88:24 89:25
96:21 97:2,5

99:21 100:3,11
106:8 109:23
110:8,17,24 111:4
111:20 112:13,15
113:25 115:3,7,9
115:17 116:1,8
117:4,17,24 118:2
118:4,20,22 119:9
125:13,22 126:11
126:15 128:8,9
154:8 157:21
158:1,8,15,23
163:19 164:4
165:14 166:21,23
167:2,6,7,23,25
169:2,17 170:2,10
170:14 171:1
173:11 174:4,20
175:2,18,23 176:5
176:8 177:14
183:13 186:14,15
188:21,25 190:6,7
190:14 191:6
192:7 193:2,5,8,15
194:5,21 195:7,8
195:12 196:1,9
197:8 199:10
201:2 202:9 205:8
205:10,23 206:15
208:1,10 211:21
212:4 213:17
215:5 216:6,17
221:23 222:6
223:7 226:4,6,8
227:4 228:17,20
228:25 229:5
230:3,25 235:23
236:3,9 238:15
243:21 244:4,5
245:11 248:21

**swallow's** 77:4,25
89:6 97:4 217:9
222:24 245:17
**swapped** 139:23
**swear** 6:4
**sweating** 145:12
**switch** 46:3
**sworn** 6:17 255:6
258:14
**symptom** 84:17
**symptomatology**
46:15 84:11
115:10
**symptomologist**
84:10
**symptoms** 47:14
88:14 118:13
145:11 147:18
190:25 193:3,16
194:9 195:1 241:8
**system** 69:15
197:21
**systematic** 86:24
**systems** 161:8

**t**

**t** 257:3,3
**tainted** 99:15
**taints** 219:6
**take** 7:1 8:11,17
10:1 21:16 37:21
37:22 44:25 46:11
46:25 47:6,11
50:18 61:18,23
62:3,19,22,25
64:18,24 65:11,24
66:6,13,16 67:2,12
67:22 68:2,13,18
68:25 69:14
101:19 120:24
121:12,13,14,24
122:12,20,23

124:12,13 126:24
145:20 159:16
166:1,15,17
177:20,24 185:20
211:22 214:4
216:13 222:10
228:5 229:4
230:12 234:10
240:15
**taken** 1:9 5:15
101:11 102:8
178:5 219:11,13
219:18 220:11
221:18 222:7
255:4
**takes** 47:4 173:22
**talk** 39:17 65:20
88:1 117:3 136:13
136:15 141:25
153:18 158:12,20
168:8 172:13,18
210:16
**talked** 72:9 117:6
143:13 173:17
174:13 175:15
176:10 211:10
**talking** 35:3 51:5
67:24 70:3,5 88:1
90:7 98:5 142:21
144:6 167:8,9,14
187:10 239:23
**tardy** 124:20
**task** 243:21 244:8
**teaching** 44:22
247:14 248:5
**team** 13:25 14:13
17:9 44:22 68:21
68:22 69:6,10,12
69:13 130:19
131:19 225:16
243:23 247:14

**team's** 226:16
**tears** 171:22
**technical** 30:12
98:17
**teenager** 151:14
**telephone** 35:2
119:14 242:24
243:2,4,5 244:10
**tell** 21:4 27:10
29:14 30:22 32:23
37:14 52:21 71:22
91:17 96:8 115:14
125:9 137:13
145:9 154:20
192:24 200:5
216:7 228:25
255:6
**telling** 42:5 193:5
195:8 200:4,11
206:14 224:7,20
**tells** 217:12 229:1
**temazepam**
209:24,25
**tempa** 209:23
**temporarily** 84:5
**ten** 66:22
**terminate** 225:1
**terminated** 56:25
149:6,16 159:14
**termination** 50:9
51:2,9,14,17,21,23
51:25 52:5,10
56:20 100:22
101:5 104:8 230:8
**terminology**
188:22
**terms** 30:17,23
131:7
**test** 109:5 185:20
193:3,4 225:25

**testified** 6:17
11:17 55:14 58:5
65:1,5 110:7
126:20 129:18
130:10 159:7
187:12 230:15
248:20
**testify** 9:24 20:18
**testifying** 238:8
**testimony** 7:24
12:4 29:16,21
40:18 55:22 56:4
58:13 61:10 63:24
67:11 76:15 80:6
93:24 112:6
116:11,13,19
121:10 143:19
153:5 162:16
163:3 167:9 180:8
198:14 218:6
237:4 255:4,8,12
256:9 258:8
**tests** 251:7
**text** 4:6 86:3 98:6
98:21 172:10,21
172:24 186:15
191:16,17,19,24
192:4 208:23
**texted** 96:11
**thank** 6:18 12:6
21:3,24 96:19
102:12 103:20,22
142:15 157:13
160:21 179:14
209:25 236:3
238:19 253:1
**thanked** 171:3
**thankful** 142:25
**thanking** 24:19
170:21 236:9

**thanks** 136:12
141:15
**therapist** 25:24
26:12 27:25 28:2
28:4 29:11 30:6
40:9 106:11,12
107:4 161:25
205:4 243:6
**therapy** 88:5
148:21 149:8,10
152:2 161:24
**thereof** 255:15
**things** 17:7,15
21:12 48:22 55:1
55:23 57:15,24
61:2 63:6 72:8
83:6 84:14 124:10
152:14 165:22
168:22 177:15
216:3,4 218:13
222:18 225:2
226:12 237:15,17
237:18 240:18
241:24 251:8
**think** 45:14 46:18
59:25 60:9,24
62:10 67:4 69:24
122:13 143:11
144:3 156:7,19
175:21,24 189:18
195:1 197:3 200:3
209:12 211:3
243:24 244:11
251:16
**thinking** 90:11
189:6
**third** 36:11 119:16
193:14 204:9
**thorough** 97:11
**thought** 40:22
60:22 110:20

115:17 127:16
130:10 159:16
198:24 199:9,13
207:12 221:21
**thread** 4:6 142:22
172:10
**three** 20:2 21:5
22:1,5 48:14,14
58:7 119:16 156:7
156:11,25 161:19
183:4,5 184:7
194:1 205:14
213:3,24 218:18
218:25 219:9,11
220:17 221:15,18
222:7 227:14
244:17,17 245:1
**thursday** 140:22
**tie** 25:12
**time** 5:4,14 8:5,10
9:6,9,19 14:4,4
16:24 24:20 25:6
30:14 40:3 43:7
45:8,21,24 46:10
46:14,16,22,25
47:5,5,22,24 50:10
50:16 53:19,19,20
59:25 66:21 67:24
67:25 68:12 69:8
72:6 77:9,14,15
79:23 81:24 83:21
83:23,24 84:1,22
84:22 93:17 94:1
101:4,19 102:6,10
106:13 108:15
109:5,8 111:6,7,18
112:25 119:22
123:11 124:1,3,6
124:21,23 125:8
126:25 127:4
129:25 132:18

136:5,13 141:25
145:2,17,23 146:3
146:7 148:10,21
150:13 152:24
156:13 157:21
164:14 165:1
170:22 172:19,19
174:7,24 178:6,15
178:19 179:9,11
180:15,18,20,21
180:22,24 181:17
181:18 182:18
185:4,22 186:1
187:10 190:12
202:23 203:14
204:10,11 205:17
209:3 210:3
211:22 213:15
215:11 216:25
217:10,13,16,17
217:24 218:13,14
220:16 221:24
222:22 228:5
232:15 233:4,14
233:20 234:24
235:13 237:17,25
242:4 245:25
247:1,3,12,13,13
247:14 249:8,12
251:8,11,18
253:14,20,22
254:1,8,8,19 255:5
256:19
**timeframe** 130:1
256:8
**timeline** 11:19,21
104:9
**timelines** 10:7,16
10:20 11:3,11
**timely** 120:3,7,15
121:23 122:3,8,19

123:2,5 126:5,12
129:16
**times** 47:9 63:21
68:9 131:22 229:6
248:4
**timing** 238:17
**timothy** 40:2 41:3
85:7 148:19
207:16 208:12,17
208:19 209:8,20
210:4,23 211:7
**titled** 54:1 102:20
161:16 181:23
**today** 5:13 6:1 7:1
9:11,17,24 10:2
12:4 20:18 31:21
55:10 72:9 136:13
178:18,22 185:6
192:11 218:6
223:12 232:15
254:20
**today's** 10:4 18:14
**told** 26:8 36:13
39:9 85:13 87:24
104:12 105:12,19
106:1 107:1,11,18
107:20,23,25
114:20 115:9,12
118:22 125:13
130:18,19 165:14
193:9 198:21,25
215:7 222:2
223:12 244:7
**tomorrow** 142:4
172:14,16 186:16
208:11
**tonight** 179:1
**top** 15:17 142:23
150:6,6 151:5
155:2 211:4,24
220:24

**touch** 27:8 172:14
**tours** 17:7
**track** 132:18
233:14 234:23
235:6,13
**traditional** 165:20
**training** 16:2,6
113:13,15 128:23
132:15,25 135:5
135:24 180:16
197:15 214:17,22
224:14,23 232:9
233:19 234:7
235:6
**trait** 236:12
**transcribed**
119:14 255:10
**transcript** 256:6
256:18,20 258:5,8
**transcription**
255:11
**transient** 209:21
**transition** 127:4
147:18 173:17
174:13,16,17,21
175:15,19,23
176:10,19 177:15
**transitioned**
106:16
**transitions** 148:15
**treat** 103:14
199:12
**treated** 108:21
109:2 148:18
**treating** 43:3
56:11 72:14 106:3
106:17 107:4
115:21 195:23
207:21
**treatment** 3:18,19
3:23 43:4 73:15

106:7 107:2,7
109:16 147:12
148:5,6,12,15
150:10 151:23
152:4 160:7 164:1
199:7 210:22,24
211:4,8 241:25
**trend**   181:20
233:18 234:10
**trending**   181:16
233:2
**trial**   5:4 80:10,16
178:12
**trialed**   250:5
**trials**   13:2
**tried**   69:20 76:17
156:23
**triggers**   73:2
**trim**   184:24
**triquetra**   1:15
**triquetralaw.com**
1:17 256:2
**true**   19:8,12 54:24
55:5 58:9 63:3,5
92:6,21 94:6,9
95:18 148:10
151:19 219:9
249:20 255:12
258:8
**truth**   103:3 255:6
255:7,7
**truthfully**   8:19
**try**   24:2 30:4
39:13 168:23
211:11 240:21
**trying**   26:19 30:16
32:10 36:6 62:7
62:25 63:2 67:6
90:4 220:2 241:21
**turn**   21:19 46:4
142:3 156:1

239:15
**turning**   34:4 45:14
46:7 52:24 103:7
119:15 123:14
190:9
**twelve**   134:5
**twice**   225:8
**two**   20:11,11,16
27:24 47:9 50:5
52:14 72:20 73:5
73:5,5,6,8,16,25
79:14 81:11,23
88:11,18 90:2,10
95:15,16 101:14
119:7 140:5 143:3
177:8,13 193:11
194:1 197:23,25
198:8 212:22
213:3 216:18,20
216:21,24 217:4
217:14,22 218:9
218:13,25 219:8
219:10 221:15,18
222:7 225:1,11,12
225:13 227:2,10
230:2,5 231:2
233:17 237:1
241:24 246:12
252:2,20,22
253:13
**txt**   5:6
**type**   40:14 78:15
128:25 129:3
180:13,16 202:5
246:17
**typed**   165:18
202:3,4
**types**   76:10,12,18
76:21 216:3
**typical**   83:13

| u |
|---|

**u**   44:9,9
**uh**   195:11
**ultimately**   50:6
61:13 64:13 73:4
73:16 134:1
168:24 226:3
**unable**   194:18
**unaccommodated**
45:18
**unavailable**   141:9
**unclear**   55:20
182:16 194:14
**uncustomary**
228:24
**undergrad**   109:9
109:11,14
**underlying**   209:16
239:14,18 240:2
241:23 242:3
**underneath**   237:7
**understand**   8:5,8
9:14 11:25 12:5
12:13 27:17 30:16
62:17 68:8 78:11
80:25 86:16 96:4
123:4 133:23
163:7 167:5
175:24 180:7
197:9 214:19
215:18 232:24
233:11 245:6
253:17
**understanding**
30:15 104:4,9
135:17,21,23
157:22 232:6,11
232:20 233:5
236:4,10 238:20
**understood**   73:19
93:12 167:23

175:25 223:20
232:2,15 233:1,7
233:13
**unfolded**   11:14
104:5
**unfortunately**
90:14 122:24
233:3
**united**   1:1
**university**   109:15
**unpaid**   16:3
**upcoming**   196:12
**update**   129:24
**updated**   96:7
110:15
**updating**   112:19
**uploaded**   152:25
153:3
**use**   26:21 36:21
52:10 57:24 59:7
60:11 62:24 82:21
82:25 83:4 84:3
91:20,20 92:1,15
92:25 93:1 95:11
97:4,9 138:19
154:18 173:14,19
188:22 197:20
**useful**   144:12
**uses**   165:21
**usual**   8:16
**usually**   69:12
198:22 229:1
**utilize**   71:3

| v |
|---|

**v**   256:4 257:1
258:1
**va**   144:19,22 145:6
145:15,24 146:8
147:7 177:2,3
**vague**   63:8 69:11
70:12 193:23

**vaguely** 194:25 196:5
**valley** 2:4
**values** 98:11
**various** 13:2 70:23
**vary** 133:24
**verbal** 14:22
**verify** 55:7 95:17 103:2 256:9
**veritext** 5:17,18 256:14,23
**veritext.com** 256:15
**versions** 101:14
**versus** 5:12
**veteran's** 144:24
**vice** 105:14
**video** 12:1 23:24
**videograper** 2:10
**videographer** 1:12 5:9,16 6:3 102:4,9 178:1,6 251:19,20 251:24 252:3,7,9 252:15,19,22 253:2,19,22 254:19
**videotape** 5:10
**videotaped** 1:8
**view** 21:17,20,23 189:19
**viewed** 189:20
**vignette** 48:13 89:14
**vignettes** 89:5 225:25
**vinegar** 238:24
**violate** 116:7 117:2 118:2,5
**violated** 115:3,7 117:18 128:8

**violation** 118:11 118:15
**vision** 37:25,25 84:13 193:11
**visit** 124:1 148:20 162:8,11 164:1
**visits** 48:19
**visual** 84:14
**visually** 124:20 184:25
**vo** 103:11,12,14 104:19
**voice** 215:1,4
**volunteered** 195:19
**vs** 1:4
**vulnerable** 25:9

**w**

**wait** 47:17,20
**waited** 47:19
**waiting** 45:16 82:17 216:2
**waive** 6:12
**walk** 145:16 183:19
**walking** 236:13
**want** 8:11,17,22 9:12 10:14 16:18 19:15,17 24:2 26:10 45:5 52:14 56:16 58:3 62:12 68:7 76:24,25 79:25 93:10 95:22 101:17,20 103:10 122:16 128:6 130:2 159:5 163:7 177:24 178:10,23 178:24 180:7 181:8 183:11,19 220:11,19 235:18 240:4 245:14

253:10
**wanted** 15:2 21:9 21:10 39:16 45:4 46:17 47:12 59:3 93:6 96:14 113:14 137:7 139:21 163:11 168:8 185:19 226:10 230:17
**wanting** 238:22
**wants** 220:8
**ward** 126:21,24 127:15 145:6,17 145:24 146:4,8 177:11 228:12 247:12,13,13
**wards** 44:20,24 127:16 144:19,22 169:6,10 174:1,4 174:12,17,21,21 175:10,14,15,19 175:19,24 176:6,9 176:15,19,22,23 177:2,3,5,8 225:4,9
**warning** 4:18 99:7 99:7 229:16,20 231:1
**wash** 16:8
**washington** 16:8
**waste** 220:15
**wasting** 79:23
**watch** 48:20 87:1
**watched** 89:13
**way** 12:3 23:24 61:1 62:13,14 84:8 86:4 98:23 132:17 177:6 189:25 195:21 209:15 211:5 215:14 217:13

220:15 221:16 229:3 234:2 245:14
**ways** 68:9 92:13 94:23 98:23 241:25
**we've** 91:1 173:17 175:14 208:9 251:23 254:2
**web** 180:13
**wednesday** 1:9 5:13 140:22
**week** 14:3 74:10 83:10 111:12,22 140:20 141:17,19 142:1,16 225:8
**weekend** 74:8 77:10,15
**weekends** 202:23 203:14
**weekly** 228:15,23 229:7
**weeks** 50:6 177:9
**weird** 136:14 249:13
**welcome** 253:2
**went** 14:9 28:20 37:19 47:19 72:13 88:12 90:11 104:1 109:19 145:22 184:18 187:14 210:25 211:3,4 218:22 238:12 242:13 252:23
**when's** 73:21
**white** 2:3
**whiteandwillia...** 2:5
**willard** 128:5
**willer** 107:19

**williams** 2:3

**willing** 178:16

**wise** 73:3 74:7,7

**witness** 3:1 6:4
66:4 80:22 103:18
103:21 117:1
179:7 187:8
209:12 219:18
220:19 255:13
256:8,10,12,19

**witnesspage** 3:3

**woke** 37:19

**word** 12:10 36:21
57:2 59:9 60:11
66:2 72:17 82:21
82:25 83:4 91:21
92:2,8,10,12,15,25
93:1 94:1 95:5,11
129:20 173:14,19

**wording** 57:5 73:6
134:22 165:16
238:13

**words** 12:11 52:11
52:14 62:24 64:22
73:7,18 84:3
97:21 193:4
203:16 220:3,4

**wore** 185:1

**work** 3:17 4:13,15
14:2 21:15 40:16
40:17,21,24 41:4,8
41:11,15,18,20
42:4,6,11,23 45:17
48:21 58:23 68:15
68:15,16,22 69:8
69:16 72:10 85:4
85:9 88:15 90:11
113:8 120:20,22
128:24 131:18
132:17 133:21,21
136:20 143:7

144:8 145:7
146:16 176:17
180:6,9 185:10
195:6 201:23,24
202:7,11,15,18,21
202:22 205:3,5,24
206:1,2,3,4,7,8,11
206:21,23 207:13
208:13,14 210:9
217:21 225:23
226:7,9 234:2
238:22 246:17,22

**workbook** 89:4

**worked** 40:5 43:7
86:4 127:23
128:15 246:16,17
248:20

**working** 14:3
21:22 36:13 41:25
43:5 44:15 45:13
49:15 74:9 83:22
83:23,25 91:14
92:17 95:25 120:9
122:6 168:5 216:2
242:15 243:16
245:13

**works** 46:21 102:2
177:6

**workshops** 17:9

**workweek** 128:10

**workweeks**
128:13

**world** 171:14

**worried** 136:19
250:14

**worry** 221:24

**worsening** 43:23
46:7 47:13 93:4,7
96:15,15 118:23
119:10

**worsens** 46:16
239:16

**worst** 100:23

**write** 76:18

**writes** 189:10

**written** 35:21
72:14,18 88:19
115:8 165:18
167:19 187:1

**wrong** 51:5 151:6
184:20

**wrote** 73:17
119:13 164:3,13
165:10,15 189:7
196:14 203:20
205:20 206:9

**x**

**xanax** 185:22
186:2

**y**

**yeah** 35:19 38:6
44:12 63:5 92:15
128:23 151:17
166:22 181:15
248:9 252:3,7
253:19

**year** 18:1 50:11,17
50:19,21 57:1
68:1 75:13,19
123:17 135:24,25
139:19 153:15
161:10 177:8
179:17,21 182:2
215:20 216:9

**years** 17:24 135:6
249:22

**yellow** 21:22

**yep** 17:10 137:9
139:8 148:1
151:12

**yeses** 22:23

**yesterday** 9:11
254:10,10

**younger** 151:9,11
151:13 250:3

**yr** 3:15

**z**

**zero** 182:9 218:23
231:22

**zoom** 1:9 5:16

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted
fashion to authenticated parties who are permitted to
access the material. Our data is hosted in a Tier 4
SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and
State regulations with respect to the provision of
court reporting services, and maintains its neutrality
and independence regardless of relationship or the
financial outcome of any litigation. Veritext requires
adherence to the foregoing professional and ethical
standards from all of its subcontractors in their
independent contractor agreements.

Inquiries about Veritext Legal Solutions'
confidentiality and security policies and practices
should be directed to Veritext's Client Services
Associates indicated on the cover of this document or
at www.veritext.com.

# EXHIBIT 4

EXHIBIT 4



**Nancy Conrad**

3701 Corporate Parkway, Suite 300 | Center Valley, PA 18034-8233
Direct 610.782.4909 | Fax 610.782.4939
conradn@whiteandwilliams.com | whiteandwilliams.com

January 5, 2022

***By E-Mail***

Sharon R. López, Esq.
Andrea C. Farney, Esq.
Triquetra Law
35 East Orange Street, Ste. 301
Lancaster, PA 17602
Lopez@TriquetraLaw.com
Farney@TriquetraLaw.com

RE: <u>**Pablo A. Salcedo v. The Milton S. Hershey Medical Center**</u>
**USDC for the Middle District of Pennsylvania; No. 1:19-cv-02201**

Dear Attorney López and Attorney Farney,

As we previously agreed to and discussed, a list of additional documents that were identified during Plaintiff's deposition is provided below, and we request that they be produced prior to or at the continuation of Plaintiff's deposition currently scheduled for January 7, 2022 at 9:30 AM.

- Timeline reviewed by Plaintiff in preparation for his deposition;
- Email Plaintiff sent to Human Resources at Booz Allen Hamilton requesting accommodations;
- Statements made to the EEOC and Plaintiff's previous counsel;
- Email from Plaintiff's personal email account to HMC's Human Resources department requesting an accommodation form;
- Email from HMC's Human Resources department attaching an accommodation form (with attachment); and,
- Original copy of the August 28, 2017 letter from Dr. Munoz.

Thank you for your continued cooperation in this matter.

January 5, 2022
Page 2

Very truly yours,

WHITE AND WILLIAMS LLP

Nancy Conrad
Joseph J. Lee

NC:jl

# EXHIBIT 5



Sharon R. López
Lopez@TriquetraLaw.com

Andrea C. Farney
Farney@TriquetraLaw.com

The Offices at Marion Court
35 East Orange St., Ste. 301
Lancaster, PA 17602
P: (717) 299-6300
F: (717) 299-6338
www.TriquetraLaw.com

**SENT VIA EMAIL ONLY TO:**     ConradN@WhiteandWilliams.com;
Leejo@whiteandwilliams.com;
Salgadot@whiteandwilliams.com

January 6, 2022

Nancy Conrad, Esq.
Joseph Lee, Esq
Tanya Salgado, Esq.
**WHITE AND WILLIAMS, LLP**
3701 Corporate Parkway, Suite 300
Center Valley, PA 18034-8233

Re:   **FOLLOW UP RE DEPOSITION DISCOVERY
REQUESTS
SALCEDO V THE MILTON S. HERSHEY
MEDICAL CENTER
PA. M.D. 19-CV-2201 (HON. YVETTE
KANE)**

Dear Counsel,

We received your request for additional documents yesterday (4:48 p.m). During our previous meet and confer held on December 22, 2021, we agreed that you would send me a written request for these documents. While I am willing to respond to your requests as expediously as possible, I request you provide me with a reasonable time to respond to these types of requests in the future. A week following the written request seems reasonable. Also, the Rules of Civil Procedure allow 30 days to respond to a written request for discovery, which also allows the respondent an opportunity to object.  Pending your formal request for documents on the timeline, I provide the following responses:

- The timeline that was identified in the deposition is attorney client communication. See the privilege log for the same attached.

- The email from Plaintiff to Booz Allen Hamilton requesting accommodations. See attached.

employment ⚜ discrimination ⚜ civil rights

- Statement made to EEOC and Plaintiff's previous counsel. Plaintiff objects to this as being privileged and without waiving said privilege he asserts that he does not have any copies of such communication in his possession. See the privilege log for the same attached.

- Email to the HMC HR Department requesting accommodations. See attached.

- Original copy of Dr. Muñoz' letter from August 28, 2017.  Plaintiff reviewed his files and he does not have this letter.

Very truly yours,

**TRIQUETRA LAW ®**

Sharon R. Lopez

Attorney at Law

cc.   Pablo Salcedo

Attached:   Plaintiff's Privilege Log
            Salcedo.001486-Salcedo.001494

2

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| Pablo A. Salcedo, | : | Civil Action No. 19-cv-2201 |
| Plaintiff, | : | |
| v. | : | Before the Honorable |
| | : | Yvette Kane |
| The Milton S. Hershey Medical | : | |
| Center, | : | Jury Trial Demanded |
| Defendant. | : | |

## PLAINTIFF'S PRIVILEGE LOG

COMES NOW the Plaintiff, who responds to Defendant's First Set of Interrogatories and Request for documents with the following privilege log:

| Item # | Author | Recipient | Document Type | Subject Matter | Privilege |
|---|---|---|---|---|---|
| Plaintiff's Deposition 12/1/2021 | Plaintiff | Plaintiff's Counsel | Timeline of events | Facts describing events leading up to, during, and following Plaintiff's Employment with HMC | Attorney-Client Communication |
| Plaintiff's Deposition 12/1/2021 | Plaintiff's Previous Counsel | Plaintiff | Verbal communication | EEOC Contact | Attorney-Client Communication |

Respectfully submitted on January 6, 2022.

TRIQUETRA LAW

Sharon R. López, Esquire
PA 70605
The Office at Marion Court
35 East Orange Street
Lancaster, PA 17602
(717) 299-6300 (tel.)
(717) 299-6338 (fax.)
Lopez@TriquetraLaw.com

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| | : | |
| Pablo A. Salcedo, | : | Civil Action No. 19-cv-2201 |
| Plaintiff, | : | |
| v. | : | Before the Honorable |
| | : | Yvette Kane |
| The Milton S. Hershey Medical | : | |
| Center, | : | Jury Trial Demanded |
| Defendant. | : | |

## CERTIFICATE OF SERVICE

I, Sharon R. López, hereby certify that a true and correct copy of the foregoing privilege log has been served upon the following counsel via electronic mail to the following counsel of record:

Nancy Conrad
**WHITE AND WILLIAMS LLP**
3701 Corporate Parkway, Suite 300
Center Valley, PA 18034-8233
conradn@whitewilliams.com
(610) 782-4909 (Tel.)
(610) 782-4930 (Fax.)

Tanya A. Salgado
**WHITE AND WILLIAMS LLP**
1600 Market Street
One Liberty Place, Suite 1800
Philadelphia, PA 19103
Salgadot@whiteandwilliams.com
Phone: (215) 864-6368

This the 6th day of January, 2022.     **TRIQUETRA LAW**

Sharon R. López, Esquire PA # 70605
35 East Orange Street
Lancaster, PA 17602
(717) 299-6300 (tel.)
(717) 299-6338 (fax.)
Lopez@TriquetraLaw.com

# EXHIBIT 6

EXHIBIT 6



**Nancy Conrad**

3701 Corporate Parkway, Suite 300 | Center Valley, PA 18034-8233
Direct 610.782.4909 | Fax 610.782.4939
conradn@whiteandwilliams.com | whiteandwilliams.com

January 24, 2022

*By E-Mail*

Sharon R. López, Esq.
Andrea C. Farney, Esq.
Triquetra Law
35 East Orange Street, Ste. 301
Lancaster, PA 17602
Lopez@TriquetraLaw.com
Farney@TriquetraLaw.com

RE:  <u>Pablo A. Salcedo v. The Milton S. Hershey Medical Center</u><br><u>USDC for the Middle District of Pennsylvania; No. 1:19-cv-02201</u>

Dear Attorney López and Attorney Farney,

This acknowledges receipt of your letter dated January 6, 2022.  We remind you of your obligation under the Rules to supplement discovery when a "party learns that in some material respect the disclosure or response is incomplete."  <u>See</u> Fed. R. Civ. P. 26(e)(1).  Such obligation does not require a written request and is continuing in nature.

In Defendant's First Request for Production of Documents to Plaintiff, Request for Document No. 6 requested "[a]ny and all personal records including email communications, calendars, diaries, notes, tapes, journals, correspondence, social media posts, or other type of written or recorded document which relate to the allegations made in the Complaint."  In Plaintiff's deposition on December 1, 2021, Plaintiff testified that in preparation for his deposition, he "reviewed timelines [he] created" referring to his "recollection of the events."  <u>See</u> Pl. Dep., 12/1/2021, at 10:6-7, 16-18.

During the deposition, Counsel asserted the attorney-client privilege with respect to the timelines, and following the deposition, served a privilege log.  However, Plaintiff did not testify that the timelines were prepared in anticipation of an attorney-client communication.  Further, Plaintiff's testimony did not reflect that the timelines were prepared for Counsel for the purpose of requesting or receiving legal advice.  Nevertheless, even if the timelines were sent to Counsel for the purpose of requesting or receiving legal advice, the factual material is obtainable and can be extracted from privileged documents.  *United States ex rel. Lord v. NAPA Mgmt. Servs. Corp.*, No. 3:13-2940, 2019 U.S. Dist. LEXIS 194063, at *42 (M.D. Pa. Nov. 7, 2019) (citing *Andritz*

January 24, 2022
Page 2


*Sprout-Bauer v. Beazer E.*, 174 F.R.D. 609, 632 (M.D. Pa. 1997) ("The privilege attaches to the communication itself, not to the facts communicated")).

      The referenced timelines have yet to be produced in discovery, and Plaintiff has a duty to supplement his response to Defendant's First Request for Production.  For all of the foregoing reasons, Defendant requests Plaintiff to produce the timelines of Plaintiff's recollection of events that he created by **January 31, 2022**.  In the event there are other outstanding data or documents responsive to Defendant's request, please supplement your responses on or before **February 2, 2022**.  If we do not receive the timelines, we reserve our right to seek Court intervention.

      Thank you for your attention to this matter.


          Very truly yours,

          WHITE AND WILLIAMS LLP

          Nancy Conrad
          Joseph J. Lee

NC:jl

28307384v.1

# EXHIBIT 7



Sharon R. López
Lopez@TriquetraLaw.com

Andrea C. Farney
Farney@TriquetraLaw.com

The Offices at Marion Court
35 East Orange Street, Ste. 301
Lancaster, PA 17602
P: (717) 299-6300
F: (717) 299-6338
www.TriquetraLaw.com

**Sent Via Email Only to:**   ConradN@WhiteandWilliams.com;
Leejo@whiteandwilliams.com;
Salgadot@whiteandwilliams.com

February 18, 2022

Nancy Conrad, Esq.
Joseph Lee, Esq.
Tanya Salgado, Esq.
**White and Williams, LLP**
3701 Corporate Parkway, Suite 300
Center Valley, PA 18034-8233

Re:   **Response to Jan. 24th Letter seeking
Attorney-Client Communication and
Attorney Work Product
Salcedo v The Milton S. Hershey
Medical Center
Pa. M.D. 19-cv-2201 (Hon. Yvette
Kane)**

Dear Counsel,

In response to your January 24th letter, we understand you are requesting disclosure of the
timeline that Dr. Salcedo referenced at his deposition as a document he reviewed in preparation
for the deposition. We are not going to provide this document to you as it is attorney-client
privileged and subject to the attorney work product doctrine.

The protected document was prepared by Dr. Salcedo and Attorney Farney, during this litigation.
The protected timeline is clearly marked on the footer as "Attorney/Client PRIVILEGED
WORKPRODUCT." The timeline was initially created by Attorney Farney around December
2020 and it was last updated on 10/26/2021 - as such it was clearly created during litigation and
for purposes of trial.

The protected timeline references selected documents, by bates number, which have already been
disclosed by both parties. The referenced documents are not attached to the timeline. The
protected timeline contains both communications between Dr. Salcedo and his counsel as well as

employment   discrimination   civil rights

attorney mental impressions, assumptions, discovery strategies and questions. The protected timeline is 53 pages long as it has been a tool counsel and client have used throughout the litigation. The document has not been disclosed to third parties. There were other documents, which could be also be described as timelines and journal entries, which have been disclosed and are not subject to attorney-client privilege or attorney work product privilege.  These unprotected timelines and journal entries have already been disclosed. See Salcedo.000001-10.

Federal Rule of Civil Procedure 26 (b) permits discovery of nonprivileged material that is relevant to a claim or defense. FED. R. CIV. P 26 (b)(1). "Ordinarily, a party may not discover documents…that are prepared in anticipation of litigation or for trial by or for another party or its representative…." FED. R. CIV. P. 26(b)(3)(A). Privileged material may not be discovered unless the party seeking disclosure  shows  substantial need for the materials to prepare its case and cannot, without undue hardship, obtain the substantial equivalent by other means. FED. R. CIV. P. 26(b)(3)(A)(ii). Even if a party meets this burden, the Court "must protect against disclosure of mental impressions, conclusions, opinions, or legal theories of a party's attorney or other representative concerning the litigation." FED. R. CIV. P. 26(b)(3)(B).

Federal Rule of Evidence 612 requires a party to meet three conditions before disclosure or documents used to refresh recollection prior to the deposition can be obtained.  "1) the witness must use the writing to refresh his memory; 2) the witness must use the writing for the purpose of testifying; and 3) the court must determine that production is necessary in the interests of justice." FED. R. EVID. 612. The Third Circuit Court of Appeals analyzed the applicability of this rule to attorney work product in *Sporck v. Peil*, 759 F.2d 312, 317-318 (3d Cir.1985).  In *Sporck*, following exchange of document discovery, defense counsel compiled some of the documents and used them to prepare the deponent. At the opening of a pretrial deposition, opposing counsel asked the deponent if he examined any documents in preparation for the deposition. After the deponent said he had reviewed documents to prepare for the deposition, but would not disclose which ones, opposing counsel filed a motion to compel the disclosure. The motion was based on FED. R. EVID. 612. The  District Court granted the Motion and Sporck appealed. The issue on appeal was whether the grouping of the documents represented the mental impression of Sporck's attorney, because the "identification of the documents as a group will reveal defense counsel's selection process, and thus his mental impressions, petitioner argues that identification of the documents as a group must be prevented to protect defense counsel's work product." *Sporck v. Peil*, 759 F.2d 312, 315 (3d Cir.1985). The Third Circuit agreed that such identification of the compiled documents would be work product.

The protected timeline here used by Dr. Salcedo in preparation for his deposition is similar to the situation in *Sporck*.  Attorney Farney created the timeline with Dr. Salcedo and referenced specific documents in discovery, which she specifically identified, while writing out the inferences drawn from the documents. By selecting certain documents over others, Attorney Farney's mental impressions are clearly at the core of this document. Her views of what information is important in the documents is also a memorialization of her mental impressions of the case documents and how they can be used in the litigation. The document is pure work product with Dr. Salcedo for this litigation.

The *Sporck* court found that Rule 612 applied to depositions but distinguished its application by finding Rule 612 is a "rule of evidence, and not a rule of discovery." *Sporck v. Peil*, 759 F.2d 312, 317 (3d Cir.1985). Additionally, Rule 612 requires a party meet three conditions before it may obtain documents used by a witness prior to testifying: (1) the witness must use the writing to refresh his memory; (2) the witness must use the writing for the purpose of testifying; and (3) the court must determine that production is necessary in the interests of justice. FED. R. EVID. 612. Here, Plaintiff did not use the timeline to refresh his memory during the deposition and he did not use the timeline for purpose of testifying. We also do not see your compelling need for the document as all the documents referenced in this protected document have already been disclosed in this litigation.

You reference *United States ex rel. Lord v. NAPA Mgmt. Servs. Corp.* in your January 24, 2022 letter. We do not find *Lord* assists you in arguing for disclosure of the timeline. In *Lord,* the court protected a majority of the privilege-asserted documents. Also, the documents were created by in-house attorneys, involved in the defendant's regular course of business. Here, the context of the document creation is in the context of the attorney-client relationship and not an in-house attorney scenario.

The document was created by Plaintiff's retained counsel for purposes of putting together her mental impressions of the case and Dr. Salcedo assisted counsel with producing it. There is no question the document was created during litigation and was a compilation of mental impressions of documents and communications in the case with Attorney Farney and Dr. Salcedo.

Very truly yours,

Sharon L. López
Attorney at Law

cc.    Dr. Pablo Salcedo

3