## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| PABLO A. SALCEDO, | : | |
| **Plaintiff** | : | No. 1:19-cv-02201 |
| | : | |
| **v.** | : | (Judge Kane) |
| | : | |
| MILTON S. HERSHEY MEDICAL | : | |
| CENTER, | : | |
| **Defendant** | : | |

### MEMORANDUM

This case arises out of the termination of Plaintiff Pablo A. Salcedo ("Plaintiff")'s

employment as a medical resident with Defendant Milton S. Hershey Medical Center

("Defendant") in March 2018, which Plaintiff alleges violated the Americans with Disabilities

Act ("ADA"), Section 504 of the Rehabilitation Act of 1973 ("RA"), and the Pennsylvania

Human Relations Act ("PHRA"). Before the Court is Defendant's motion for summary

judgment. (Doc. No. 73.) For the reasons that follow, the Court will grant the motion in its

entirety.

### I.    BACKGROUND[1]

In March of 2017, Plaintiff accepted a position in Defendant's medical residency

program ("Residency Program"). (Doc. No. 73-95 ¶ 1.) At that time, Plaintiff signed a twelve-

month contract with Defendant (the "Resident Agreement") running from July 1, 2017 through

June 30, 2018. (Id. ¶ 3.) The Residency Program featured supervisory oversight from the Chief

Residents ("Chiefs"): Dr. James Kogut, Dr. Britt Marshall, and Dr. Simranjit Bedi. (Id. ¶ 5.)

---

[1] The following relevant facts of record are taken from Defendant's Statement of Uncontested Material Facts ("SUMF") (Doc. No. 73-95) and Plaintiff's Response to Defendant's Statement of Uncontested Material Facts ("PRMF") (Doc. No. 80-6). Both the SUMF and PRMF contain specific citations to the record at each numbered paragraph. The facts are undisputed unless otherwise noted.

The program was coordinated and supervised by Residency Program Director Dr. Nicole Swallow.  (Id. ¶ 6.)

The Medical Residency Program uses the Accreditation Council for Graduate Medical Education ("ACGME") Program Requirements and Milestone Evaluations to evaluate the performance of medical residents.  (Id. ¶ 7.)  Defendant's Graduate Medical Education Policies require that every training program have a comprehensive evaluation system in place for residents.  (Id. ¶ 8.)

Under Defendant's policies, members of the Clinical Competency Committee ("CCC") consult with the Residency Program Director to "make decisions regarding each resident or fellow's promotion to the next year of training."  (Id. ¶ 9.)  In the Resident Agreement itself, Defendant describes the criterion used by the CCC and Residency Program Director in making the determination on reappointment to resident positions.  (Id. ¶ 10.)  The metrics used include "patient care, medical knowledge, practice-based learning and improvement, interpersonal and communication skills, professionalism, system-based practice, evaluations, ACGME Milestones," and other factors that the CCC or Residency Program Director deem "necessary to advance to the next level of training."  (Id.)

The parties dispute the role of the ACGME Milestones in the context of resident evaluation and promotion.  Defendant claims that core competencies in the ACGME Milestones must be met to advance in the program.  (Id. ¶ 11.)  Plaintiff argues that the ACGME Milestones themselves are "progressive" and a graduation "target," not "requirement."  (Doc. No. 80-6 ¶ 11.)

At the time Plaintiff worked as a Medical Resident in Defendant's Residency Program, the CCC consisted of Dr. Swallow, Dr. DeWaters, Dr. Glod, Dr. Hempel, Dr. Peng, Dr. Krok,

Dr. Miller, Dr. Munyon, Dr. Popjes, Dr. Sivarajah, Dr. Wojnar, Dr. Williams, and Dr. Ghahramani.  (Doc. No. 73-95 ¶ 12.)  In following the ACGME Common Program Requirements, the CCC reviewed and prepared reports on all residents on a semi-annual basis.  (Id. ¶ 13.)  These evaluations would inform the ACGME whether residents were meeting the ACGME Milestones.  (Id.)  Plaintiff's hours were "limited to 80 hours per week, averaged over a four-week period, inclusive of all in-house clinical and educational activities, clinical work done from home, and moonlighting."  (Id. ¶ 14.)

Defendant asserts that its Human Resources Department ("HR") handles all accommodation requests, such as those under the ADA.  (Id. ¶ 15.)  In an effort to dispute this fact, Plaintiff argues that, while HR can handle ADA claims, it is not the sole entity equipped to manage such complaints and requests.  (Doc. No. 80-6 ¶ 15.)  It is undisputed that, upon receiving an accommodation request from an employee, HR can send the employee an ADA Accommodation Request form, which HR can subsequently review and act upon if the form is returned and HR finds the accommodation request to have merit.  (Doc. No. 73-95 ¶¶ 16–17; 80-6 ¶¶ 16–17.)  Defendant has a policy stating that residents who inform the Residency Program Director or other faculty members of an accommodations request should be directed to HR.  (Doc. No. 73-95 ¶ 18.)

Plaintiff made a request for information about accommodations through an email sent to HR on August 19, 2017.  (Id. ¶ 19)  On August 22, 2017, Barb Hundermark, a member of the HR Department, sent Plaintiff a copy of the ADA Accommodations Request form.  (Id. ¶ 20.)  It is undisputed that, after receiving the ADA Accommodations Request form, Plaintiff made no additional contact with HR.  (Id. ¶ 21; Doc. No. 80-6 ¶ 21.)  Plaintiff maintains that he did not follow up with HR because Dr. Swallow told him that she would take care of the

accommodations herself.   (Doc. No. 80-6 ¶ 21.)

On June 27, 2017, before the Residency Program began, Plaintiff spoke with Dr. Kogut. (Doc. No. 73-95 ¶ 26.)  During that conversation, Plaintiff discussed his anxiety and depression as well as his fears about "starting in a new work environment."  (<u>Id.</u>)  Early the following month, Dr. Kogut checked in with Plaintiff to see how he was adjusting to the rigors of the Residency Program.  (<u>Id.</u> ¶ 27.)  Plaintiff told Dr. Kogut that he was "doing okay" given his apprehensions about beginning work in a new setting.  (<u>Id.</u> ¶ 28.)  Dr. Kogut subsequently acknowledged the challenges of adjusting to life in the Residency Program.  (<u>Id.</u> ¶ 29.)  Dr. Kogut recommended that Plaintiff schedule an appointment with Mazzitti and Sullivan, a counseling service.  (<u>Id.</u> ¶ 30.)  Plaintiff took Dr. Kogut's advice and attended an evaluative session at Mazzitti and Sullivan on July 14, 2017.  (<u>Id.</u> ¶ 32.)  Michelle Batz of Mazzitti and Sullivan performed the evaluation.  (<u>Id.</u>)  Plaintiff was diagnosed with "generalized anxiety disorder; major depressive disorder in partial remission, recurrent episode; and social anxiety disorder."  (<u>Id.</u>)  This diagnosis was never disclosed to Defendant's HR Department.  (<u>Id.</u> ¶ 33.)

On August 16, 2017, Plaintiff emailed Dr. Kogut and requested a meeting.  (<u>Id.</u> ¶ 34.)  Dr. Kogut replied with his availability, while reminding Plaintiff that he could also "reach out to the other Chiefs" if he had any issues.  (<u>Id.</u> ¶ 35.)  On August 24, 2017, Plaintiff met with the Chiefs to discuss his anxiety.  (<u>Id.</u> ¶ 36.)  The Chiefs suggested to Plaintiff that "having a quiet place to work, requesting pre-round sit down opportunities, [and] meeting attending doctors before new rotations could assist him as a resident."  (<u>Id.</u> ¶ 37.)

On August 25, 2017, Plaintiff attended an appointment with Dr. Marshall at the Hope Drive Clinic to discuss physical health concerns and establish a care plan.  (<u>Id.</u> ¶¶ 38–39.) During Plaintiff's appointment with Dr. Marshall, Plaintiff informed Dr. Marshall about his

4

history with generalized anxiety, major depressive disorder, as well as Attention Deficit Hyperactivity Disorder ("ADHD").  (Id. ¶ 40.)  At that appointment, Plaintiff disclosed that he was taking medications to manage these diagnoses.  (Id.)  Plaintiff received a treatment plan that included follow up consultation with his psychiatrist and psychologist.  (Id. ¶ 41.)  The next day, Plaintiff emailed Dr. Kogut to thank him for taking the time to meet with him.  (Id. ¶ 42.)  Plaintiff expressed the desire to "work on his social anxiety" and improve as an intern.  (Id.)[2]

A major point of contention between the parties pertains to a meeting between Plaintiff and Dr. Swallow on August 30, 2017.  (Id. ¶ 43.)  Plaintiff alleges that, during this conversation, he presented Dr. Swallow with his ADA Accommodation Form and the note he obtained from Dr. Muñoz, his personal psychiatrist, requesting "reasonable accommodations" that would allow him to successfully progress in the Residency Program.  (Doc. No. 80-6 ¶ 43.)  Plaintiff alleges that the conversation included the prospect of "modifying his schedule to make it less erratic and more consistent and to provide more time for self-care and sleep."  (Id.)  Plaintiff further claims that the note from Dr. Muñoz was well received by Dr. Swallow, who found the requests in the note to be "reasonable."  (Id. ¶ 22.)  Plaintiff maintains that Dr. Swallow indicated that she would handle the accommodations herself.  (Id.)

Defendant claims that Dr. Swallow never received the note and thus could not have indicated her approval of the reasonableness of the requests nor assumed responsibility for the implementation of the accommodations.  (Doc. No. 73-95 ¶ 22.)  The parties agree that, during the conversation between Plaintiff and Dr. Swallow on August 30, 2017, Dr. Swallow suggested to Plaintiff that he should "keep working with the Chiefs."  (Id. ¶ 24.; Doc. No. 80-6 ¶ 24.)  Later that same day, Plaintiff emailed Dr. Swallow with a message of gratitude for the support he had

---

[2]  The terms "Resident" and "Intern" are used interchangeably to describe Plaintiff's position as a PGY-1 Preliminary Intern in Defendant's Residency Program.  (Doc. No. 80-6 ¶ 2.)

received from Defendant.  (Doc. No. 73-95 ¶ 44.)

The parties disagree on the issue of Plaintiff's attendance.  Defendant avers that, beginning in August of 2017, Plaintiff "began going missing from his assigned rotations without notice."  (Id. ¶ 45.)  Defendant claims that these absences became common, would last for several hours, and that Plaintiff would use this time to nap.  (Id. ¶¶ 45–48.)  Defendant maintains that Plaintiff's absences often forced other residents to accept responsibilities for additional patients.  (Id. ¶ 49.)  In response, Plaintiff claims that Defendant is aware of only one incident when Plaintiff could not be located by a senior resident.  (Doc. No. 80-6 ¶ 45.)  Plaintiff further claims that he did not miss rotations and that none of his evaluations suggest that he was gone for several hours at a time.  (Id. ¶ 46.)  Plaintiff also rejects the assertion that he missed his rotations to take naps.  (Id. ¶ 48.)

Further disagreement emerges regarding the events of late September/early October 2017.  Defendant alleges that around this time, Plaintiff went missing for several hours while he was supposed to be working a shift at Lebanon Veterans Administration ("VA").  (Doc. No. 73-95 ¶ 50.)  Defendant claims that several hours passed where Plaintiff was not in contact with officials at the VA or the Residency Program.  (Id. ¶ 52.)  Defendant avers that Plaintiff eventually returned to his rotational shift and disclosed that he was having an anxiety or panic attack that caused him to remove himself from the "situation."  (Id. ¶ 53.)[3]

Plaintiff disputes these events in their entirety.  Plaintiff claims that he "did not disappear from clinical care while serving" at the VA and that he was always accessible to VA staff and senior residents.  (Doc. No. 80-6 ¶¶ 50–51.)  Plaintiff claims that, contrary to Defendant's assertions, while he has had panic attacks and anxiety, there was never an incident where the

---

[3]  To support this contention, Defendant cites deposition testimony from Dr. Marshall, Dr. Swallow, and Dr. DeWaters.  (Doc. No. 73-95 ¶ 53.)

symptoms of either forced him to remove himself from a situation at work.  (Id. ¶ 53.)[4]

On October 5, 2017, Plaintiff emailed Dr. Kogut to inform him that "the rest of the VA wards 'went really well.'"  (Doc. No. 73-95 ¶ 55.)[5]  Plaintiff wrote that he "didn't have any panic attacks since the time [Dr. Marshall] help[ed] me out in the beginning."  (Id.)  Plaintiff thanked Dr. Kogut for his support and informed him that he was apprehensive to start the next round of wards the following week.  (Id. ¶ 56.)

At the end of October 2017, Plaintiff emailed Dr. Swallow to thank her for her support in dealing with his panic attacks.  (Id. ¶ 57.)  Plaintiff also requested a meeting with Dr. Swallow prior to beginning wards to "see if we can implement anything that we've talked about to make the transition easier."  (Id. ¶ 58.)  Plaintiff asserts that this was a reference to the accommodations that he had already discussed with Dr. Swallow.  (Doc. No. 80-6 ¶ 58.)  However, Defendant disputes the purpose of this email and what exactly Plaintiff meant to convey with his comments.  (Doc. No. 73-95 ¶ 58.)

On December 6, 2017, Plaintiff called Dr. Marshall to inform him that he was suffering from hallucinations.  (Id. ¶ 59.)  The source of those hallucinations was never conclusively determined; Defendant posits that that a medication caused the hallucinations, while Plaintiff claims that he experienced no hallucinations and merely had some sort of mental health episode that "may" have been caused by sleep medication.  (Id. ¶ 59; Doc. No. 80-6 ¶ 59.)  The parties disagree on the details here as well.  Defendant asserts that Plaintiff and his roommate informed

---

[4]  The basis for much of Plaintiff's denial is his citation to his own deposition.  See (Doc. No. 80-6 at 20–22).  The only other support for Plaintiff's denials is his assertion that Defendant's story about Plaintiff's VA shift is not supported by any definitive paper trail.  See (id.).

[5]  A ward is defined as "a division within a hospital for the care of numerous patients having the same condition."  See Dorland's Illustrated Medical Dictionary (33 ed. 2020).  In this context, the term "VA Wards" refers to Plaintiff's time working on the floor at the Lebanon Veterans Administration.

Dr. Marshall that Plaintiff had taken Xanax the night before in response to a panic attack.  (Doc. No. 73-95 ¶ 60.)  Plaintiff asserts that he never took Xanax and that the night before his phone call to Dr. Marshall, he experienced "retrograde amnesia, a side effect from his prescribed Restoril medication."  (Doc. No. 80-6 ¶ 60.)  Both parties agree that, at some point during the evening of December 5, 2017, Plaintiff drove to the grocery store, left his phone at the store, and brought home a grocery store basket.  (Doc. Nos. 73-95 ¶ 61; 80-6 ¶ 61.)  Plaintiff's roommate told Dr. Marshall that Plaintiff crashed and dented his vehicle driving home from the grocery store.  (Doc. No. 73-95 ¶ 62.)  Plaintiff could not remember what happened.  (Id.)

Dr. Marshall reported the hallucination episode and traffic accident to Dr. Swallow, who met with the Plaintiff on December 7, 2017.  (Id. ¶¶ 63–64.)  Dr. Swallow informed Plaintiff that his hallucinations and memory loss could be a "risk to patient safety if he were to continue to care for patients at that time."  (Id. ¶ 65.)  Plaintiff was accordingly placed on a medical leave of absence, until Plaintiff's personal medical team could evaluate "his physical health and well-being."  (Id. ¶ 66.)  Before he would be cleared to see patients again, Defendant maintains that Plaintiff needed to:

> (1) [C]ontact his outpatient psychiatrist and his outpatient psychologist and inform and discuss with them the December Incident, and to schedule appointments for evaluations of his mental fitness for duty for the responsibilities of direct patient care;
>
> (2) [R]eceive a medical evaluation by an internal medicine physician or a family medicine physician to assess his medical health and well-being, and assess his fitness for duty for the duties of a resident physician;
>
> (3) [I]f Plaintiff was unable to attain a release for duty from either an internal medicine or family medicine physician, Plaintiff was to provide Dr. Swallow with an ongoing care plan and approximate timeframe in which he will be reassessed for fitness for duty; and
>
> (4) Plaintiff was to inform Dr. Swallow by December 8, 2017 with details about the timing of his upcoming appointments with the above referenced physicians.

(Id. ¶ 67) (numbering added).  However, Plaintiff disputes portions of these requirements.  (Doc. No. 80-6 ¶ 67.)  Specifically, Plaintiff claims that it was untrue he would "provide an ongoing plan of care" if Plaintiff could not secure a fitness for duty clearance from his primary care and mental health care providers.  (Id.)[6]

On December 8, 2017, Plaintiff emailed Dr. Swallow and informed her that he had made appointments with the requisite medical personnel to secure confirmation that he was fit to return to duty.  (Doc. No. 73-95 ¶ 68.)  Plaintiff told Dr. Swallow that he would get this confirmation in writing.  (Id.)  On December 11, 2017, Plaintiff provided a letter from Dr. Muñoz that confirmed his fitness to return to work on December 12, 2017.  (Id. ¶ 69.)  On the same day, Plaintiff also provided Dr. Swallow with a letter from Michelle Batz of Mazzitti and Sullivan and Timothy Sullivan, PA-C, both of whom cleared Plaintiff to return to work.  (Id. ¶¶ 71–72.)

On December 12, 2017, the CCC met to review residents based on their performance for the first six months of the residency program.  (Id. ¶ 72.)  While the parties disagree as to which materials were used to evaluate residents, there is no dispute that Plaintiff was deemed "for the most part, not performing satisfactorily."  (Id. ¶ 73; Doc. No. 80-6 ¶ 73.)

Defendant asserts that Plaintiff's poor evaluation was based on several negative faculty evaluations that the CCC reviewed in December of 2017.  (Doc. No. 73-95 ¶¶ 75–81.)  Notably, Dr. Gisoo Ghaffari ("Dr. Ghaffari") denoted that Plaintiff was not able to completely manage "patients as a consultant[] to other physicians/health care teams."  (Id. ¶ 74.)  Dr. Edward Lankford ("Dr. Lankford") denoted that Plaintiff "inconsistently develops an appropriate care plan; incompletely manages patients as consultants to other physicians/health care team; Plaintiff

---

[6]  The basis for Plaintiff's denial is that "Dr. Swallow required Dr. Salcedo to prepare an ongoing plan of care irrespective of his ability to secure a release for duty."  (Doc. No. 80-6 ¶ 67.)

does not possess sufficient knowledge required to provide care for common medical problems." (Id. ¶ 76.)

Plaintiff posits that the evaluation by Dr. Ghaffari cited by Defendant is a "mischaracterization of the evaluation." (Doc. No. 80-6 ¶ 74.) Plaintiff further points out that the evaluation was made at the beginning of the semester and thus contains an incomplete record of Plaintiff's progress. (Id.) Plaintiff also notes that the language of Dr. Lankford's evaluation, cited by Defendant, was a "mischaracterization of the evaluation." (Id. ¶ 76.) Plaintiff further claims that these evaluations were not reviewed by the CCC during their December 2017 meetings to evaluate residents.[7]

At the December 12, 2017 CCC meeting, the CCC determined that Plaintiff would receive a warning later based on his performance to date. (Doc. No. 73-95 ¶ 83.) Plaintiff was placed on a remediation plan.[8] (Id.) The CCC also discussed Plaintiff's hallucination and traffic accident episode and placed the following conditions on Plaintiff returning to clinical practice:

> a. Plaintiff would ensure he has a care management plan with his treating physicians; b. Develop a social network outside of the residency program that did not involve the residency administration; c. Have a documented emergency plan for acute mental health issues that may arise; and d. Should another instance arise where there is a concern for his safety or patient safety under his care, he is

---

[7] The parties pointedly disagree over whether the faculty evaluations were used by the CCC in making its determination of resident progress in December of 2017. (Doc. Nos. 73-95 ¶¶ 74–80; 80-6 ¶¶ 74–80.) However, the bigger disagreement stems from how the language of the evaluations is utilized. Plaintiff claims that each evaluation cited by Defendant is taken out of context. (Doc. No. 80-6 ¶¶ 74–80.) Plaintiff also takes issue with the dates of certain evaluations, arguing that they were authored too early in the semester to inform Plaintiff's progress in the Residency Program. (Id. ¶¶ 74–76.) The Court finds that Plaintiff is effectively conceding the truth of these facts, as his denials are insufficient and would more accurately be classified as clarifications.

[8] Remediation is a process by which Defendant would provide a "deficient" learner with a plan to target those deficiencies and help them sufficiently move forward in the program. (Doc. No. 73-52.) Remediation plans also contain timelines and a proscribed appeals process if the learner does not progress even with the additional assistance. (Id.)

required to be removed from rotation.

(Id. ¶ 84.)  On December 17, 2017, Plaintiff and Dr. Swallow met to discuss Plaintiff's progress in the Residency Program.  (Id. ¶ 85.)  It is undisputed that, at this meeting, Plaintiff and Dr. Swallow reviewed the remediation and mental health plans promulgated by the CCC.  (Id. ¶ 86; Doc. No. 80-6 ¶ 86.)  However, Defendant posits that a warning letter, describing Plaintiff's performance deficiencies, was also presented to Plaintiff, and that Plaintiff reviewed and signed the letter in the presence of Dr. Swallow.  (Doc. No. 73-95 ¶ 85.)  Plaintiff maintains that he never received and thus never signed the warning letter.  (Doc. No. 80-6 ¶ 85.)[9]  The parties agree that Plaintiff emailed Dr. Swallow that night to thank her for her support and understanding.  (Doc. Nos. 73-95 ¶ 87; 80-6 ¶ 87.)

The core dispute relating to the December 17, 2017 meeting is the issue of requested accommodations.  Plaintiff alleges that he discussed with Dr. Swallow "his repeated request to modify my schedule to make it less erratic and more consistent and so that it would provide more time for self-care and sleep."  (Doc. No. 80-6 ¶ 88.)  Defendant asserts that the proposed modifications to Plaintiff's schedule were never discussed at this meeting.  (Doc. No. 73-95 ¶ 88.)

On December 18, 2017, Plaintiff returned to duty.  (Id. ¶ 89.)  His return followed the remediation plan.  (Id.)  Defendant asserts that, by the time the Christmas holidays arrived, several faculty members had raised concerns that Plaintiff was not progressing on the remediation plan.  (Id. ¶ 90.)  Plaintiff denies that he was failing to make progress in late December 2017, but does not deny that some faculty members voiced worries they had about his

---

[9]  While Plaintiff denies seeing and signing the warning letter, Defendant submitted the letter, signed by Plaintiff, as an exhibit in support of its motion for summary judgment.  See (Doc. No. 73-50).

performance.  (Doc. No. 80-6 ¶ 90.)  On January 16, 2018, a program administration meeting

was held.  (Doc. No. 73-95 ¶ 91.)  Defendant asserts that at that meeting, several faculty

members "again raised concerns regarding Plaintiff's performance."  (Id.)  Plaintiff claims that

no such concerns were raised.  (Doc. No. 80-6 ¶ 91.)[10]

On January 17, 2018, Dr. Ami DeWaters ("Dr. DeWaters") sent an email to the attending

physicians discussing Plaintiff's performance deficiencies.[11]  (Doc. No. 73-95 ¶ 92.)  Dr.

Stephanie Harris ("Dr. Harris") responded to this email, writing of Plaintiff:

> [d]uring presentations he has left out information or provided inaccurate
> information.  He struggles with organizing his information.  He requires direct
> supervision and his medical knowledge and management plans are on the level of
> a medical student.  I do think that his social anxiety has played a role but even in
> more relaxed teaching sessions he struggles with basic medical knowledge and
> clinical reasoning.

 (Doc. No. 73-95 ¶ 93.)  On January 22, 2018, Dr. Ryan Munyon ("Dr. Munyon") concurred

with Dr. Harris's conclusions about Plaintiff's performance.  (Id. ¶ 94.)

Faculty evaluations from January and February 2018 evinced a lack of confidence that

Plaintiff was ready to move onto the "next level of responsibility."  (Id. ¶ 95.)[12]  In Dr. Harris's

---

[10]  Plaintiff denies that the CCC discussed his performance deficiencies by citing Dr. Swallow's comments and alleging pretext.  (Doc. No. 80-6 ¶ 91.)  Plaintiff also argues that the notes of the January 16, 2018 meeting show that "the other two residents referenced in the Program Committee minutes appeared to be struggling much worse than Dr. Salcedo."  (Id.)  Even if true, this statement does not call into question the fact that the CCC discussed Plaintiff's performance struggles during the January 16, 2018 meeting.

[11]  Defendant asserts that Dr. DeWaters's email concerned Plaintiff's "remediation plan."  (Doc. No 73-95 ¶ 92.)  In attempting to dispute this fact, Plaintiff claims that the email did not deal with the remediation plan and merely "solicit[ed] information and further entrenched the narrative that Dr. Salcedo was a struggling resident."  (Doc. No. 80-6 ¶ 92.)

[12]  Plaintiff disputes this assertion by pointing out that Dr. Munyon and Dr. Snyder's evaluations of Plaintiff are "post hoc" and were submitted after the decision had been made to terminate him. Plaintiff also argues that the evaluations "show pretext" because Plaintiff's other evaluations "portray him as progressing and there is no reason not to move him to the next level of

evaluation of Plaintiff, she denoted that he "inconsistently acquires accurate historical information, does not perform appropriately thorough physical exams or misses important physical exam health findings," and "has difficulty in identifying a patient's central clinical problem and/or develops limited differential diagnosis." (Id. ¶ 96.)[13]  In the final week of January 2018, Dr. Munyon specifically authored a comment in his evaluation of Plaintiff stating "that for the first time in the year, Plaintiff's ability to interpret data was below that of his peers, that his ability to develop a [patient care] plan was below that of his peers," and "Plaintiff was unable to answer basic questions about his patients" when called upon by consultants on two specific occasions. (Doc. No. 73-95 ¶ 99.)  Dr. Munyon indicated that there were reasons Plaintiff should not move on to the next level of responsibility in the residency program.  (Id. ¶ 100.)

On January 23, 2018, Dr. Swallow emailed the relevant faculty members to "discuss Plaintiff's remediation plan and how they could implement it for better results."  (Id. ¶ 101.)  Dr. Swallow informed her colleagues that Plaintiff would be given clinical cases to work through and review with Dr. Swallow herself.  (Id. ¶ 102.)  Plaintiff would also attend one-on-one clinical reasoning sessions with Dr. Jed Gonzalo ("Dr. Gonzalo"), Dr. Shane Kinard ("Dr. Kinard"), and Dr. Brian McGillen ("Dr. McGillen").  (Id. ¶ 103.)

On or around February 9, 2018, Plaintiff attended a one-on-one remediation session with Dr. Gonzalo.  (Id. ¶ 103.)  Following the session, Dr. Gonzalo expressed that he would be

responsibility."  (Doc. No. 80-6 ¶ 95)  Plaintiff's denials do not actually take issue with the content of the evaluations.

[13]  Plaintiff disputes this assertion in part, calling the language of the evaluation "canned."  (Doc. No. 80-6 ¶ 96.)  Plaintiff is alluding to the fact that completing evaluations merely requires evaluators to check a box in response to pre-prepared evaluative descriptions; in other words, this language was not written by the evaluators themselves.  See (Doc. No. 73-62 at 1 (containing the evaluation metrics and instructions for evaluators in how to properly input responses)).

"worried if my family member were under [Plaintiff's] care." (Id. ¶ 104.) On February 13,

2018, Plaintiff and Dr. Kinard held a one-on-one remediation session. (Id. ¶ 107.) Following

this session, Dr. Kinard wrote that Plaintiff struggled to recognize what was going on with his

clinical case patient and would continue to need work. (Id.) On February 26, 2018, Plaintiff and

Dr. McGillen held a one-on-one remediation session. (Id. ¶ 107.)[14] Dr. McGillen wrote that

Plaintiff was "correct in how he chose to navigate the case, but I'm not certain he was right for

the right reasons." (Id. ¶ 108) (internal quotations omitted).

On February 23, 2018, Plaintiff was assigned to the "Med Team 1" rotation where Dr.

Snyder was serving as the attending physician. (Id. ¶¶ 109–10.) Dr. Snyder informed Dr. Willer

(also on duty that night) and all the residents that they should inform her of any new admissions

to the facility. (Id. ¶ 111.) At 1:00pm, Dr. Andrea Limpuangthip ("Dr. Limpuangthip"), who

was serving as the triage attending physician, contacted Med Team 1 and informed them that a

very sick patient had just been admitted to the facility. (Id. ¶ 112.)

The parties disagree as to what happened next. According to Defendant, Dr. Willer

received the information regarding the admission from Dr. Limpuangthip and then notified

Plaintiff about the admission directly. (Id. ¶ 113.) Defendant claims that, upon receiving this

information, Plaintiff "responded that he would attend to this patient." (Id. ¶ 114.) Dr. Willer

asserts that Plaintiff then went to attend to the patient. (Id.) Defendant reiterates that "Plaintiff

assumed responsibility of this patient." (Id. ¶ 115.) Plaintiff disputes that he ever volunteered to

attend to the patient or that he ever assumed responsibility for the patient's care. (Doc. No. 80-6

---

[14] The date for this session was not mentioned in Defendant's SUMF, but the Court finds it
helpful to highlight this information to create an accurate timeline of events. The date can be
found in an exhibit attached to Defendant's SUMF. See (Doc. No. 73-72 at 2).

¶¶ 113–16.)[15]

Defendant asserts that later in the day, Dr. Limpuangthip asked Dr. Willer about the patient's status.  (Doc. No. 73-95 ¶ 116.)  Defendant maintains that Dr. Willer told Dr. Limpuangthip "that she had not seen the patient and that Plaintiff assumed responsibility of the patient."  (Id. ¶ 117.)  Dr. Willer was then informed that the patient's blood pressure was dropping and Dr. Limpuangthip told Dr. Snyder about the patient's status.  (Id. ¶ 118.)  Upon learning about the patient's status, Defendant claims that Dr. Snyder "attempted to locate Plaintiff, but he could not be located."  (Id. ¶ 119.)  Defendant avers that Plaintiff's actions delayed care for this patient.  (Id. ¶ 120.)  The patient was subsequently moved to the Intensive Care Unit.  (Id.)

Plaintiff disputes several of Defendant's assertions with regard to this incident.  Plaintiff claims that he was not missing and was "on the floor seeing other patients."  (Doc. No. 80-6 ¶ 119.)  Plaintiff maintains that, because he never accepted care of the patient, he therefore was not responsible for the delay in the patient's care, the patient's transfer to the ICU, or for completing the patient's Health and Physical Report.  (Id. ¶¶ 120–21.)

Defendant maintains that when Plaintiff was found by Dr. Snyder, he acknowledged failing to tell Dr. Snyder about the patient's admission.  (Doc. No. 73-95 ¶ 122.)  The two then had a conversation; Plaintiff sensed that Dr. Snyder was upset with him.  (Doc. No. 80-6 ¶ 123.)  Defendant asserts that Plaintiff knew Dr. Snyder was mad at him because he had not seen the new patient.  (Doc. No. 73-95 ¶ 123.)  Plaintiff claims that he knew Dr. Snyder was upset with him but that Dr. Snyder was incorrect in assuming that Plaintiff was responsible for the patient. (Doc. No. 80-6 ¶ 123.)

---

[15]  The principal basis for Plaintiff's denial is that his name did not appear anywhere on the patient's medical report.  (Doc. Nos. 80-6 ¶ 113; 101-2 at 996–98.)

Dr. Snyder then informed the Chiefs and Dr. DeWaters about the February 23, 2018 incident. (Doc. No. 73-95 ¶ 124.) In a February 24, 2018 email, Dr. Snyder laid out the deficiencies in Plaintiff's performance from the previous day. (Id.)[16] Dr. Snyder also requested that a senior resident be sent to "help cover Med Team 1 because Plaintiff's deficits were so significant." (Doc. No. 73-95 ¶ 125.)

On February 24, 2018, Plaintiff called Dr. Kogut and requested to meet with him. (Id. ¶ 126.) Plaintiff was crying and upset during the meeting. (Id. ¶ 127.) Plaintiff told Dr. Kogut that he had been experiencing increasing anxiety and depression. (Id.) Defendant also asserts that Plaintiff told Dr. Kogut that he had not seen his therapist since January. (Id.) However, Plaintiff denies making this statement. (Doc. No. 80-6 ¶ 127.) Defendant asserts that Plaintiff admitted to Dr. Kogut that his crying spells were negatively affecting his work and patient care. (Doc. No. 73-95 ¶ 128.) Plaintiff denies making this admission to Dr. Kogut. (Doc. No. 80-6 ¶ 128.)

Following this conversation, Dr. Kogut concluded that it would be unsafe for Plaintiff to take care of patients. (Doc. No. 73-95 ¶ 129.) Dr. Kogut found that Plaintiff was "unfit" for the job. (Id.) Plaintiff agrees that Dr. Kogut decided to remove him from service on this date but disputes that Dr. Kogut found him to be unfit for service. (Doc. No. 80-6 ¶ 129.) Anonymous evaluations of Plaintiff feature comments that critique his ability to perform patient care or to demonstrate the judgment necessary to perform his job duties. (Doc. No. 73-95 ¶ 130.)

On February 25, 2018, Plaintiff was removed from clinical service. (Id. ¶ 131.) Dr. Swallow met with Plaintiff the next day. (Id. ¶ 132.) Defendant asserts that Plaintiff "admitted

---

[16] Plaintiff denies Defendant's version of events based on the premise that Plaintiff was not missing, never accepted care of the sick patient, and was on the floor working with other patients throughout that day. (Doc. No. 80-6 ¶ 124.) Plaintiff does not contest that Dr. Snyder communicated performance deficiencies to the Chiefs and Dr. DeWaters.

he was not keeping up his appointments with his treating therapist and psychiatrist."  (Id. ¶ 132.)  Plaintiff denies making this admission.  (Doc. No. 80-6 ¶ 132.)

Dr. Swallow subsequently contacted Beth Herman at the Graduate Medical Education Office.  (Doc. No. 73-95 ¶ 134.)  Dr. Swallow asked whether Plaintiff's treating physician should be the one to make a fitness for duty assessment going forward.  (Id.)  Ms. Herman told Dr. Swallow that Plaintiff's treating physician should perform the fitness for duty assessment.  (Id.)  On February 27, 2018, Dr. Muñoz faxed a fitness for duty return letter to Dr. Swallow.  (Id. ¶ 135.)  The letter requested that Plaintiff's working hours be limited to "as close to fifty hours/week as possible."  (Id.)  However, Plaintiff never returned to service.  (Id. ¶ 131.)

On March 6, 2018, the CCC met to discuss Plaintiff's performance and the patient care incidents.  (Id. ¶ 137.)  The CCC agreed with Dr. Kogut's decision to remove Plaintiff from clinical service.  (Id. ¶ 138.)  Dr. Swallow accepted the CCC's decision.  (Id.)  Plaintiff received notice of this decision later that same day.  (Id. ¶ 139.)  On March 9, 2018, Plaintiff's leave of absence was extended until March 26, 2018.  (Id. ¶ 140.)  Plaintiff was paid and retained his health benefits under the Resident Agreement until June 30, 2018, at which time he was officially dismissed.  (Id. ¶ 141.)  Plaintiff subsequently appealed his dismissal through Defendant's grievance policy.  (Id. ¶ 142.)  The appeal hearing was adjourned at the request of Plaintiff's counsel and Plaintiff did not request to reschedule it.  (Id. ¶ 143.)

On September 5, 2018, Plaintiff filed a "Charge of Discrimination" with the Equal Employment Opportunity Commission ("EEOC").  (Doc. No. 80-6 ¶ 143.)  On October 2, 2019, the EEOC issued Plaintiff a "Right to Sue" letter.  (Doc. No. 1 ¶ 31.)  On December 23, 2019, Plaintiff filed the above-captioned action, asserting the following claims: (1) discrimination under the ADA, 42 U.S.C. §§ 12101–12300, and Section 504 of the RA, 29 U.S.C. § 701 et seq,

as well as a discrimination claim under the PHRA, 43 Pa. C.S.A. §§ 951–963; and (2) failure to accommodate claims under the ADA and Section 504 of the RA, as well as under the PHRA. (Doc. No. 1. at 15–18.)  On October 29, 2020, the Court approved the Parties' Stipulated Confidentiality Agreement.  (Doc. No. 15.)  Citing Pansy v. Borough of Stroudsburg, the Court noted that the "parties have stated that discovery in this matter may include the production of personnel records of current and former employees of Defendant Milton S. Hershey Medical Center."  (Id.); see also Pansy v. Borough of Stroudsburg, 23 F.3d 772 (3d 1994).

On July 17, 2023, Defendant filed a Motion to File Under Seal its Motion for Summary Judgment.  (Doc. No. 72-1.)  In its accompanying brief, Defendant argued that its Motion for Summary Judgment would include "non-party patient records, personnel-related records referencing physician peer-reviewed evaluations and notes of Plaintiff's competencies, and proprietary and business information relating to a healthcare facility."  (Id.)  Also on July 17, 2023, Defendant filed a Motion for Summary Judgment (Doc. No. 73), a brief in support of that motion (Doc. No. 73-1), relevant exhibits (Doc. No. 73-5 through 73-93), and a Statement of Material Facts (Doc. No. 73-95).  Thereafter the Court issued an Order instructing Defendant to show cause as to why "[d]efendant's motion for summary judgment (Doc. No. 73) and its related filings (Doc. Nos. 73-1 through 73-95) should not be made a part of the publicly available docket" under the Third Circuit's document sealing standard as articulated in In re Avandia Mktg., Sales Pracs. & Prod. Liab. Litig., 924 F.3d 662, 677–78 (3d Cir. 2019).  (Doc. No. 74 at 3.)  The Court set a July 31, 2023, deadline to comply.  (Id.)  On July 31, 2023, the Court granted Defendant an unopposed motion for an extension of time to comply with the show cause Order, giving Defendant until August 14, 2023, to respond.  (Doc. No. 76.)

On August 8, 2023, Plaintiff filed a Motion to Seal his Brief in Opposition to Defendant's

Motion for Summary Judgment. (Doc. No. 79). That same day, Plaintiff filed a Memorandum in Support of Plaintiff's Motion to Seal Documents (Doc. No. 79-1), as well as his response to Defendant's Statement of Undisputed Facts (Doc. No. 80-6), one hundred and fifty-three (153) related exhibits (Doc. No. 80-1 through 80-5), and his Brief in Opposition to Defendant's Motion for Summary Judgment (Doc. No. 80). On August 14, 2023, the Court issued a show cause Order asking Plaintiff to explain why Docket Numbers 80 through 80-7 "should not be made a part of the publicly available docket in this matter" under the Third Circuit's document sealing standard, set forth in <u>Avandia</u>, 924 F.3d at 677–78. (Doc. No. 81 at 4.) Also on August 14, 2023, Defendant filed a Memorandum of Law in Support of Defendant's Response to the Order to Show Cause. (Doc. No. 83.)

On August 21, 2023, Defendant filed its Reply Brief in Further Support of its Motion for Summary Judgment. (Doc. No. 89-1.) On August 28, 2023, Plaintiff filed a Motion for Leave to File a Sur Reply Brief in Opposition to Summary Judgment. (Doc. No. 91.) On September 8, 2023, the Court granted Plaintiff's motion and allowed Plaintiff's Sur Reply to remain on the docket. (Doc. No. 94.)[17] On September 19, 2023, Defendant filed a Motion for Leave to File a Sur Sur Reply. (Doc. No. 95.) On October 2, 2023, the Court denied Defendant's motion. (Doc. No. 97.) On February 7, 2024, the Court issued a Memorandum and Order addressing the sealing motions in the instant action. (Doc. Nos. 99, 100.) On February 20, 2024, in accordance with the Court's Order, Plaintiff filed redacted versions of three exhibits on the docket of this matter (Doc. Nos. 101 through 101-2), while Defendant filed redacted versions of several exhibits the next day (Doc. Nos. 102 through 102-2). On February 26, 2024, the Court issued an Order striking and unsealing several documents in accordance with the parties' filings. (Doc.

---

[17] Plaintiff filed his Sur Reply prior to the Court's granting of his motion. Accordingly, the Sur Reply was already docketed as Docket Number 92.

No. 103.)  Accordingly, Defendant's motion has been fully briefed and is ripe for disposition.

## II.   LEGAL STANDARD

Rule 56(a) of the Federal Rules of Civil Procedure provides that summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  See Fed. R. Civ. P. 56(a).  A factual dispute is material if it might affect the outcome of the suit under the applicable law, and it is genuine only if there is a sufficient evidentiary basis that would allow a reasonable factfinder to return a verdict for the non-moving party.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248–49 (1986).  At summary judgment, the inquiry is whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law.  See id. at 251–52.  In making this determination, the Court must "consider all evidence in the light most favorable to the party opposing the motion."  See A.W. v. Jersey City Pub. Schs., 486 F.3d 791, 794 (3d Cir. 2007).

The moving party has the initial burden of identifying evidence that it believes shows an absence of a genuine issue of material fact.  See Conoshenti v. Pub. Serv. Elec. & Gas Co., 364 F.3d 135, 145–46 (3d Cir. 2004).  Once the moving party has shown that there is an absence of evidence to support the non-moving party's claims, "the non-moving party must rebut the motion with facts in the record and cannot rest solely on assertions made in the pleadings, legal memoranda, or oral argument."  See Berckeley Inv. Grp. Ltd. v. Colkitt, 455 F.3d 195, 201 (3d Cir. 2006); accord Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986).  If the non-moving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden at trial," summary judgment is warranted.  See Celotex, 477 U.S. at 322.  With respect to the sufficiency of the evidence that the

non-moving party must provide, a court should grant a motion for summary judgment when the non-movant's evidence is merely colorable, conclusory, or speculative.  See Anderson, 477 U.S. at 249–50.  There must be more than a scintilla of evidence supporting the non-moving party and more than some metaphysical doubt as to the material facts.  See id. at 252; see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  Further, a party may not defeat a motion for summary judgment with evidence that would not be admissible at trial.  See Pamintuan v. Nanticoke Mem'l Hosp., 192 F.3d 378, 387 (3d Cir. 1999).

## III.    DISCUSSION

The Court first reviews Plaintiff's discrimination claims under the ADA, RA, and PHRA, before addressing his failure to accommodate claims.

### A.    Discrimination Claims Under the ADA, RA, and PHRA

The Court reviews Plaintiff's discrimination claims exclusively under the ADA framework because the United States Court of Appeals for the Third Circuit has determined that the PHRA is merely the state analog of the ADA.  See Taylor v. Phoenixville Sch. Dist., 184 F.3d 296, 306 (3d Cir. 1999) (stating that "we will only discuss Taylor's ADA claim because our analysis of an ADA claim applies equally to a PHRA claim.").  Additionally, the ADA and RA are analogous causes of action.  See Chambers ex rel. Chambers v. Sch. Dist. Of Philadelphia Bd Of Educ., 587 F.3d 176, 189 (3d Cir. 2009) (noting that "[b]ecause the same standards govern both the Chambers' RA and ADA claims, we may address both claims in the same breath").

#### 1.    Legal Standard Applicable to Discrimination Claims

To establish a prima facie discrimination claim under Title I of the ADA, a plaintiff must demonstrate that "(1) he is a disabled person within the meaning of the ADA; (2) he is otherwise qualified to perform the essential functions of the job, with or without reasonable

21

accommodations by the employer; and (3) he has suffered an otherwise adverse employment decision as a result of discrimination."  See Shaner v. Synthes, 204 F.3d 494, 500 (3d Cir. 2000); see also 42 U.S.C. § 12101.  Relevant to establishing the second element of a prima facie case, the ADA defines a "qualified individual with a disability" in relevant part as "an individual with a disability who, with or without reasonable modifications to rules, policies, or practices . . . or the provision of auxiliary aids and services, meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity."  See Gaul v. Lucent Techs., Inc., 134 F.3d 576, 580 (3d Cir. 1998); see also 42 U.S.C. § 12131.  The Court must accordingly undertake a two-part inquiry:

> First, the Court must evaluate if the individual satisfies the prerequisites for the position, such as possessing the appropriate educational background, employment experience, skills, licenses, etc.  Second, the court must determine whether or not the individual can perform the essential functions of the position held or desired, with or without reasonable accommodation.

See Gaul, 134 F.3d at 580 (citation omitted); see also 29 C.F.R. § 1630.2(m).  As to the third element of a prima facie case, courts have held that "an adverse employment action is one which is serious and tangible enough to alter an employee's compensation, terms, conditions, or privileges of employment."  See Cardenas v. Massey, 269 F.3d 251, 263 (3d Cir. 2001) (citation omitted).  As a general matter, the plaintiff bears the initial burden of establishing a prima facie case of discrimination.  See Jones v. Sch. Dist. of Philadelphia, 198 F.3d 403, 410 (3d Cir. 1999) (citing McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973)).

"If the plaintiff succeeds in establishing a prima facie case, the burden shifts to the defendant 'to articulate some legitimate, nondiscriminatory reason for the employee's rejection.'"  Shaner, 204 F.3d at 500 (citation omitted).  If Defendant can carry its burden, "the plaintiff then must have an opportunity to prove by a preponderance of the evidence that the

legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." See id. In Shaner, the Third Circuit provided a detailed explanation of the plaintiff's burden at the summary judgment stage to establish whether an employer's legitimate reason for the adverse employment action was pretextual, stating that:

> a plaintiff may defeat a motion for summary judgment (or judgment as a matter of law) by pointing to some evidence, direct or circumstantial, from which a factfinder would reasonably either: (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action.

See id. at 501. Accordingly,

> to avoid summary judgment, the plaintiff's evidence rebutting the employer's proffered legitimate reasons must allow a factfinder reasonably to infer that each of the employer's proffered non-discriminatory reasons [] was either a post hoc fabrication or otherwise did not actually motivate the employment action (that is, the proffered reason is a pretext). To discredit the employer's proffered reason, however, the plaintiff cannot simply show that the employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent. Rather, the non-moving plaintiff must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for [the asserted] non-discriminatory reasons.

See Fuentes v. Perskie, 32 F.3d 759, 764–65 (3d Cir. 1994) (cleaned up). The ADA places a heavy burden upon plaintiffs seeking to prove that an employer's proffered reasons for an adverse employment action is pretextual. See Ezold v. Wolf, Block, Schorr & Solis-Cohen, 983 F.2d 509, 531 (3d Cir. 1992) (stating that "[w]e are not unmindful of the difficult task a plaintiff faces in proving discrimination in the application of subjective factors," as there exists "an inherent tension between the goal of all discrimination law and our society's commitment to free decisionmaking by the private sector in economic affairs").

### 2.        Arguments of the Parties

#### a.        Prima Facie Case

Here, neither party contests that Plaintiff is "a disabled person" within the meaning of the

ADA, or that Plaintiff "has suffered an otherwise adverse employment decision as a result of

discrimination." See (Doc. Nos. 73-1 at 25–31; Doc. No. 80 at 21).  Defendant argues that it is

entitled to summary judgment because Plaintiff cannot prove a prima facie case of discrimination

under the ADA.  Specifically, Defendant maintains that Plaintiff cannot demonstrate the second

element, that Plaintiff was "otherwise qualified to perform the essential functions of the job, with

or without accommodations." (Doc. No. 73-1 at 25–31.)  Defendant argues that, while Plaintiff

gained admission to and began work in the Residency Program, his subsequent workplace

performance rendered him "not qualified to advance due to his failure to demonstrate

competence in necessary clinical Milestones." (Doc. No. 73-1 at 26.)  Defendant maintains that

Plaintiff "presented a risk to patient safety." (Id.)  In support, Defendant cites a letter from Dr.

Swallow and Dr. Nasrollah Ghahramani, the Chair of the CCC, addressed to Plaintiff, which

detailed the reasons for his removal from the program.  (Id.)  The letter outlined the CCC's

concerns about Plaintiff's "ability to complete tasks assigned to [him] as the [resident] intern

responsible for care of the patient without direct oversight" and the "failure to promptly evaluate

a critically ill patient was that signed out to [him]." (Id., Doc. No. 73-87.)

Defendant cites Kling v. University of Pittsburgh Medical Center, No. 18-cv-01368, 2021

WL 3667918, at *5–7 (W.D. Pa. May 7, 2021), for the proposition that while "the determination

of whether an employee is qualified to perform the essential functions of the position is made at

the time of the employment decision," medical residency programs are unique "academic

enterprises[s]" where the "work is what is academically supervised and evaluated."  (Doc. No.

73-1 at 27–28.)  Defendant argues that <u>Kling</u> supports the premise that courts should give deference to medical residency evaluators since they are better equipped to gauge the readiness of medical residents than judges who lack the background training and experience in making those judgments.  (<u>Id.</u> at 28.)

Defendant also discusses <u>Christ v. University of Findlay</u>, No. 17-cv-00713, 2020 WL 638516, (S.D. Ohio Feb. 11, 2020).  (Doc. No. 73-1 at 28–29.)  In <u>Christ</u>, the plaintiff began the Master of Occupational Therapy program at the University of Findlay several years after diagnoses for both anxiety and ADHD.  <u>See</u> <u>Christ</u>, WL 638516, at *1.  Defendant notes that the district court in that case granted summary judgment to the school after it called the court's attention to several incidents that implicated patient safety.  (Doc. No. 73-1 at 28.)  Defendant also argues that this Court should defer to its judgment in this case, because courts "should only reluctantly intervene in academic decisions especially regarding degree requirements in the health care field when the conferral of a degree places the school's imprimatur upon the student as qualified to pursue his chosen profession."  (<u>Id.</u> at 29 (citing <u>Christ</u>, WL 638516, at *8).)  Defendant posits that educational institutions do not need to lower their academic standards to accommodate students.  (Doc. No. 73-1 at 29.)

Finally, Defendant argues that Plaintiff was not "otherwise qualified" under the ADA because he posed a risk to patient safety.  (<u>Id.</u> at 30.)  Defendant maintains that because "Plaintiff cannot establish that any reasonable accommodation was available that would enable him to perform essential job functions," he is not "otherwise qualified" under the ADA.  (<u>Id.</u> at 30–31; <u>see also</u> <u>Thompson v. AT&T Corp.</u>, 371 F. Supp. 2d 661, 678 (W.D. Pa. 2005) (holding that a plaintiff cannot establish a prima facie ADA claim when they could not perform essential job functions both with and without reasonable accommodations).

In response, Plaintiff argues that he can demonstrate the second element of a prima facie case under the ADA, which requires him to establish that "he is otherwise qualified to perform the essential functions of the job, with or without reasonable accommodations by the employer." See (Doc. No. 80 at 20–30); see also Shaner, 204 F.3d at 500.  Plaintiff argues that he "had the skill, experience, education, and other job-related requirements of the position with and without reasonable accommodation."  (Doc. No. 80 at 20.)  Plaintiff graduated from medical school and received his medical license from the Commonwealth of Pennsylvania.  (Doc. No. 101-1 at 47.) Plaintiff cites evaluations from his first semester of residency (Fall 2017) in which his evaluators signify that nothing in his performance indicates that he should not move on "to the next level of responsibility."  See (Doc. Nos. 80 at 21; 101-1 at 109, 113, 119, 151, 164, 168; 80-2 at 4, 8, 16, 20, 33, 37).  Plaintiff cites four positive evaluations from the Spring 2018 semester in support of his argument that he can sufficiently demonstrate that he was otherwise qualified for his residency position even without reasonable accommodations.  See (Doc. Nos. 80 at 21; 80-2 at 115–20; 80-3 at 47–49, 51–53, 60–65).

Plaintiff's argument in opposing Defendant's position as to his ability to establish the second element of a prima facie case focuses on what a "reasonable juror" could conclude based on the content of several cited exhibits.  (Doc. No. 80 at 21.)  Plaintiff points to an email sent by Dr. Swallow to the Faculty Committee on January 3, 2018, wherein Dr. Swallow discusses Plaintiff's remediation plan and argues that "a reasonable juror could find that Dr. Swallow decided to terminate Dr. Salcedo in late January and not on March 6, 2018 when the CCC held an ad hoc meeting to decide Dr. Salcedo's continued residency."  See (id.; Doc. No. 80-3 at 27). That email summarizes the remediation plan and provides directions to faculty as to how clinical cases and presentation feedback would be handled for Plaintiff going forward.  (Doc. No. 80-3 at

27.)  Plaintiff argues that a reasonable juror could conclude that the lack of discussion of (1) patient safety issues or (2) Plaintiff's lack of progress in the residency program and the prescribed Milestones indicates that neither of those topics were actually of concern to the CCC. (Doc. No. 80 at 21–22.)

Plaintiff argues that a "reasonable juror could find that the evaluations following the [December 14, 2017] meeting where Dr. Swallow placed Dr. Salcedo on a remediation plan[,] support a finding that Dr. Salcedo was qualified to be a PGY1 resident."  (Id. at 22.)  Plaintiff cites a range of performance evaluations and time stamp details of Plaintiff's shifts, in support of the idea that Plaintiff was consistently recommended to advance in the program and continued working as a functioning resident well into the spring semester.  See (Doc. No. 80 at 22 (citing Doc. No. 80-2 at 115–20; 80-3 at 60–65; 101-2 at 972–94)).

Plaintiff's argument that "he is otherwise qualified to perform the essential functions of the job, with or without reasonable accommodations by the employer," see Shaner, 204 F.3d at 500, also focuses on several Milestone Evaluations and the timeline of when he began to receive negative feedback from his evaluators.  (Doc. No. 80 at 29–30.)  Plaintiff points to instances where he requested feedback from his superiors and never received a response.  (Doc. No. 80-4 at 65–66 (containing a note from Plaintiff to Dr. Harris requesting feedback after receiving his Milestones Evaluation scores).)

Plaintiff also seeks to refute Defendant's argument that "there were multiple patient safety issues."  (Doc. No. 80 at 23.)  First, Plaintiff argues that "the record indicates the only record of patient safety issues was an email from Dr. Harris that was based on hearsay and one day of observation."  (Id.) (cleaned up).  Plaintiff next points to the February 23, 2018 incident, arguing that the event did not rise to the level of a patient safety incident because Dr. Marshall, a

member of the CCC, and Dr. Willer, a co-intern of Plaintiff's, did not discuss the incident or its repercussions for several weeks.  (Id. at 24; Doc. No. 101-2 at 509.)  Responding to the charge that he was missing while on duty, Plaintiff argues that "after extensive and thorough discovery there is no record of any email or attributable statement by any attending doctor that supports a finding that Dr. Salcedo could not be found when he was at the VA Hospital."  (Doc. No. 80 at 25.)

Plaintiff distinguishes the cases relied on by Defendant.  First, as to Kling v. University of Pittsburgh Medical Center, he argues that the plaintiff in Kling was failing according to his evaluators, unlike Plaintiff Salcedo.  (Doc. No. 80 at 25.)  In addition, Plaintiff claims that the plaintiff in Kling "never disclosed any disability to the University of Pittsburgh, but [he] did" disclose his disability to Defendant.  (Id. at 26.); see also Kling, 2021 WL 3667918, at *3.  Plaintiff similarly distinguishes Christ v. University of Findlay, stating that Christ admitted to committing safety violations while he has not.  (Doc. No. 80 at 26); see also Christ, 2020 WL 638516, at *5–6.  Plaintiff additionally argues that "unlike Christ, the reduced hours accommodation sought by Dr. Salcedo would have addressed the obstacles that may have prevented him from continuing to work with patients."  (Doc. No. 80 at 26.)  Further, Plaintiff maintains that Defendant's argument for deference in ensuring that it can maintain academic standards applies to graduation requirements and "not education accommodations that can be granted during the academic process."  (Id. at 27.)

Finally, Plaintiff argues that he "adduced evidence supporting [that] his requests for accommodation were reasonable and that he could have performed the essential functions of the job with the requested accommodations."  (Id. at 28.)  In support, Plaintiff again cites the first semester evaluations where he was found to be "progressing" in the Residency Program.  (Id. at

29.)  Additionally, Plaintiff cites Dr. Duca's second evaluation, reviewing Plaintiff's

performance from February 12, 2018 through February 18, 2018.  (Id. at 29–30; Doc. No. 80-3 at

60–65.)  Plaintiff asserts that Dr. Duca's evaluation described Plaintiff as "progressing, self-

aware, and following orders."  (Doc. No. 80 at 29–30.)  Plaintiff maintains that this positive

evaluation, made approximately one week before the alleged Patient #1 incident and just a few

weeks before his removal from the program, is further evidence that he was performing and thus

could continue to perform the essential functions of his residency position.  See (id. at 29–30).[18]

> **b.      Pretext**

Defendant further argues that, even assuming Plaintiff established a prima facie case of

discrimination, he has failed to meet his burden to demonstrate pretext.  As noted more fully

above, "[i]f the plaintiff succeeds in establishing a prima facie case, the burden shifts to the

defendant to articulate some legitimate, nondiscriminatory reason for the employee's rejection."

See Shaner, 204 F.3d at 500 (citation omitted).  Defendant avers that it has "set forth legitimate,

non-discriminatory reasons for its actions concerning Plaintiff's employment."  (Doc. No. 73-1

at 33.)  Defendant maintains that:

> [a]fter the Clinical Competency Committee met to review Plaintiff's progress in
> the residency program and the recent patient safety events on Plaintiff's recent
> Internal Medicine rotation, the Committee concluded that Plaintiff was not
> demonstrating competency in the Milestones of Patient Care, Medical
> Knowledge, and Interpersonal and Communication Skills.  Specifically, the
> Committee raised concerns about Plaintiff's recent performance on a Medicine
> rotation, where he failed to complete tasks assigned to him as the intern
> responsible for the care of the patient without direct oversight.  The Committee
> also considered Plaintiff's absences from clinical care during the day without
> appropriate communication to colleagues as to his whereabouts, the failure to
> promptly evaluate a critically ill patient that was signed out to him, and the
> subsequent morbidity of that patient. The Committee determined that Plaintiff

---

[18] The Court refers to "Patient #1" instead of the patient's name to ensure the patient's
confidentiality.  (Doc. No. 101-2 at 996.)  For purposes of this memorandum, all references to
Patient #1 pertain to the February 23, 2018 incident.

presented a risk to patient safety and recommended that he be removed from clinical service.

See (id. at 33–34).  Additionally, Defendant points to several relevant facts and supporting evidence that Plaintiff does not dispute.  For example, in December of 2017, Defendant was informed of Plaintiff's hallucination episode, and Plaintiff was subsequently placed on a medical leave of absence from the Residency Program and informed by Dr. Swallow that his caring for patients could pose a risk to patient safety.  (Doc. No. 73-95 ¶¶ 59, 66, 65.)  Also in December of 2017, the CCC evaluated Plaintiff and determined that his performance was not satisfactory.  (Id. ¶¶ 73, 74–81.)  When the spring semester began, Plaintiff continued to receive negative evaluations.  One from Dr. Harris noted that:

> [d]uring presentations [Plaintiff] has left out information or provided inaccurate information.  [Plaintiff] struggles with organizing his information.  [Plaintiff] requires direct supervision and his medical knowledge and management plans are on the level of a medical student.  I do think that [Plaintiff's] social anxiety has played a role but even in more relaxed teaching sessions he struggles with basic medical knowledge and clinical reasoning.

(Doc. No. 73-58.)  Other evaluations indicated that faculty did not believe that Plaintiff should "move on to the next level of responsibility."  See (Doc. Nos. 73-62 through 73-64 (containing negative evaluations by Doctors Harris, Munyon, and Snyder)).  In February of 2018, Plaintiff attended one-on-one remediation sessions with several faculty members.  Following his session with Dr. Gonzalo, Dr. Gonzalo concluded that he would be concerned if one of his own family members were being treated by Plaintiff.  (Doc. Nos. 80-6 ¶ 104; 73-70 at 27, Tr. 102:3-102:8.)  Following Plaintiff's February 13, 2018, remediation session with Dr. Kinard, Dr. Kinard wrote that Plaintiff "recognized that he did not really know what was going on" while working on a patient case study.  (Doc. No. 73-71.)  Dr. Kinard also wrote that "I think [Plaintiff] will continue to need work, but his heart is in the right place."  (Id.)  Following Plaintiff's remediation session

with Dr. McGillen, Dr. McGillen wrote that Plaintiff lacked the requisite knowledge to engage in discussion with him and was worried that Plaintiff's "wrong clinical rationale" could become an issue in future patient interactions.  (Doc. No. 73-72 at 2.)  Finally, an anonymous evaluation of Plaintiff wrote that Plaintiff had "[m]ultiple episodes of poor patient care and approach and some with dire consequences . . . [m]ultiple patient care issues were either half-baked or left undone . . . [Plaintiff] [h]ad critical knowledge and judgment deficiencies and was sometimes difficult to trust with patient care . . . ." (Doc. No. 73-80.)[19]

In response, Plaintiff argues that he "was learning and working within the same fair range as his co-residents and thus Defendant's performance-based reason for his dismissal must be pretextual."  (Doc. No. 80 at 31.)  Plaintiff maintains that numerous evaluations given to Plaintiff throughout his residency "provided positive and fair feedback to [him]."  (Id.)  Plaintiff then highlights several evaluations by faculty members.  One such evaluation was from Dr. Duca, who wrote that Plaintiff was "very responsive to feedback and elicits feedback."  (Id. at 32.)  Plaintiff also cites evaluations provided to residents in December 2017.  (Id. at 34.)  Plaintiff notes that he averaged a score of 3.0/5.0 across the board.  (Doc. No. 80-2 at 62–64.)  The other residents at the time were averaging similar scores.  (Id. at 66–89.)  Accordingly, Plaintiff posits that, in December of 2017, "[he] was on par with his co-residents" in terms of performance. (Doc. No. 80 at 34.)

Plaintiff further argues that he "was not a safety risk to patient care, because he was sufficiently self-aware to voluntarily remove himself from service on February 24, 2018."  (Id.)[20]

---

[19]  Plaintiff takes issue with the fact that this evaluation was anonymous and undated.  Plaintiff does not deny that this evaluation was submitted and available to members of the CCC during the evaluation process.

[20]  Plaintiff cites his deposition testimony that "I'm the one who pulled myself out of service that

31

Plaintiff further maintains that he could not have been a patient risk because the day after he left service, Dr. Swallow talked to Plaintiff's psychiatrist, Dr. Muñoz, and "that topic was never brought up." (Id. at 37; Doc. No. 80-4 at 9.) Additionally, Plaintiff notes that when Dr. Muñoz wrote the note clearing Plaintiff to return to duty, he failed to raise "any concerns relating to patient safety." (Doc. No. 80 at 37.)

Plaintiff additionally argues that, if the alleged February 23, 2018 incident truly concerned any of the faculty, they would have reported it in the patient safety reporting system. (Id. at 37–38.) Plaintiff maintains that the failure of staff to respond quickly to Dr. Snyder's email apprising them of the February 23, 2018 incident is further proof that "the alleged patient safety event was either not truly a serious event, or that it was not the real reason for termination." (Id. at 38.) Plaintiff further argues that nothing in the record reflects that he assumed care for Patient #1. (Id. at 39.) Plaintiff cites the treatment records for Patient #1 in support of his position that the patient was never transferred into the care of Internal Medicine physicians and residents, where Plaintiff was serving at the time, and thus Plaintiff could not have assumed responsibility for the patient. (Id. at 39–40; Doc. No. 101-2 at 996–98.) Plaintiff maintains that "[t]here is a true issue of fact" as to the question of whether he ever assumed responsibility for Patient #1's care. (Doc. No. 80 at 40.)

Finally, Plaintiff attempts to discredit Dr. Snyder's testimony, maintaining that she lied when she claimed that Plaintiff posed a risk to patient safety. (Id. at 41.) Plaintiff states that her email on February 23, 2018 could be "the last straw in [Defendant's] plan to terminate Dr. Salcedo from his residency because of his disability." (Id. at 41.) Plaintiff argues that there is

---

day." (Doc. No. 101-2 at 664.) Plaintiff argues that "Dr. Munyon claims that he removed [him] from service and determining the veracity of these counter positions is the job of the jury." (Doc. No. 80 at 36.)

nothing in the record explicitly demonstrating that he was ever absent from clinical care and therefore Defendant's citation of his absences is "not a legitimate non-discriminatory reason that should be credited." (Id. at 42–44.)

### 3. Whether Defendant is Entitled to Summary Judgment on Plaintiff's Discrimination Claims

As an initial matter, the Court need not resolve the parties' dispute regarding whether Plaintiff has adequately demonstrated the second element of a prima facie case of disability discrimination, because even assuming arguendo that he has, and upon review of the briefs of the parties and the evidence of record, and construing all facts in the light most favorable to Plaintiff, the non-moving party, the Court concludes that Plaintiff has failed to produce sufficient evidence demonstrating that Defendant's legitimate, nondiscriminatory reason for terminating his employment—namely, the poor Milestones Evaluations and patient safety incidents—was a pretext for discrimination.

As noted above, for Plaintiff's discrimination claim to survive summary judgment when his former employer articulates a legitimate, nondiscriminatory reason for its action, the burden shifts to Plaintiff to demonstrate pretext by either "(i) discrediting the proffered reasons, either circumstantially or directly, or (ii) adducing evidence, whether circumstantial or direct, that discrimination was more likely than not a motivating or determinative cause of the adverse employment action." See Fuentes, 32 F.3d at 764. In attempting to meet that burden, Plaintiff points to several pieces of evidence that he maintains are sufficient for a factfinder to reasonably either disbelieve Defendant's articulated reason for termination, or believe that a discriminatory reason was more likely than not a motivating or determinative cause of Defendant's action. The Court addresses each in turn.

First, Plaintiff attempts to demonstrate pretext by calling negative evaluations by faculty members "outlier evaluations." (Doc. No. 80 at 31.)  In so doing, Plaintiff argues that certain evaluators only worked with Plaintiff for one day and were thus ill-equipped to evaluate him. (Id. at 32 (noting that Dr. Harris only worked with Dr. Salcedo for one day).)  However, the Court notes that Defendant relied on multiple negative evaluations in support of its decision to terminate Plaintiff. (Doc. Nos. 73-59, 73-62, 73-63, 73-64.)  Plaintiff has cited no record evidence which would allow a reasonable factfinder to infer that the negative evaluations were outlier evaluations.

Next, Plaintiff attempts to demonstrate pretext by pointing out that he was progressing at a comparable level to his peers in December of 2017. (Doc. No. 80 at 33–34.)  The Court is unpersuaded that evaluations from the fall semester, which show Plaintiff and his peers receiving similar performance scores, negate the spring semester evaluations indicating widespread faculty dissatisfaction with Plaintiff's performance.  See (Doc. Nos. 73-59, 73-62, 73-63, 73-64).  As noted by Defendant, the CCC's decision to terminate Plaintiff was made:

> in light of [Plaintiff's] overall performance record, in which he had previously self-reported panic attacks during VA wards, been placed on a leave of absence due to his reported amnesic/hallucination incident prior to take his boards, been placed on a remediation plan for medical knowledge and clinical decision making, and self-reported to Dr. Kogut on February 24, 2018 that he needed to be removed from service because he was feeling very depressed, very anxious.

(Doc. No. 89-1 at 16.)  Viewing the record as a whole, and construing all facts in the light most favorable to Plaintiff, the Court finds no factual basis for Plaintiff's desired inference that the evolution of evaluations, from positive to negative, was not based on legitimate, non-discriminatory business reasons.  The evidence of record simply fails to support a reasonable inference that animus towards Plaintiff's disability, as opposed to poor performance, explains the gradual decline in his evaluations.  In Parish v. UPMC University Health Center of Pittsburgh,

the court found that a plaintiff claiming that she was terminated from a medical residency program based on gender discrimination could not point to certain positive performance evaluations to "create an inference that the decision to terminate her from the Residency Program because of unsatisfactory performance in the areas of medical knowledge, patient care and patient safety was a pretext for pregnancy or gender discrimination." See Parish v. UPMC Univ. Health Ctr. of Pittsburgh, 373 F. Supp. 3d 608, 633 n.128 (W.D. Pa. 2019). Here, as in Parish, without any record evidence to suggest that the basis for Plaintiff's evaluations moving from positive to negative over time was anything other than a genuine trend observed by Plaintiff's evaluators as opposed to discriminatory animus, the Court finds no basis to support such an inference. Accordingly, the Court concludes that Plaintiff's prior positive evaluations are an insufficient basis to support a reasonable factfinder's disbelief of Defendant's performance-based reasons for removing Plaintiff from the Residency Program.

Plaintiff's next attempt to demonstrate pretext features a citation to Dr. Swallow's January 23, 2018 email to fellow faculty members wherein she writes "[w]e need to show we've worked with him on the objective deficits and that he has failed to progress despite appropriate attempts at improvement." (Doc. Nos. 80 at 10; 80-3 at 22.) Plaintiff argues that this email was not an attempt to aid Plaintiff, instead claiming that this email reveals Dr. Swallow's "bias against [Plaintiff]." (Doc. No. 80 at 16.) The Court agrees with Defendant that there is no evidentiary support for the conclusion that Dr. Swallow was biased against Plaintiff and had a discriminatory motive in sending this email. To the contrary, after the email was sent, Defendant and its agents dedicated significant resources to implementing Plaintiff's remediation plan. This included one-on-one remediation sessions with Dr. Gonzalo, Dr. Kinard, and Dr. McGillen. (Doc. Nos. 73-70 at 27–28, Tr. 102:3–102:8; 73-71, 73-72 at 2.) Plaintiff has cited no record

evidence from which a reasonable factfinder could conclude that Dr. Swallow was motivated by animus nor that the remediation efforts following her email were anything other than genuine efforts to assist Plaintiff as he worked to improve as a medical resident.  Further, Plaintiff points to no record evidence indicating that faculty member efforts to remediate his performance were part of a larger scheme to build a paper trail to justify his firing.  Plaintiff offers only his own conjecture and circumstantial speculation, which the Court finds insufficient to permit a reasonable factfinder to disbelieve Defendant's stated reason for Plaintiff's removal from the Residency Program.  See Fireman's Ins. Co. of Newark, N. J. v. DuFresne, 676 F.2d 965, 969 (3d Cir. 1982) (holding that a party trying to defeat summary judgment cannot "rely merely upon bare assertions, conclusory allegations or suspicions").

In his next attempt to demonstrate pretext, Plaintiff cites an email sent by Dr. DeWaters, wherein she asked faculty members for diligent recordkeeping about Plaintiff's remediation plan. (Doc. No. 92 at 13.)  Plaintiff claims that Defendant and its agents had no intention of remediating Plaintiff's performance and "all they wanted to do was document deficits to justify terminating him."  (Id.)  However, Plaintiff points to no record evidence supporting his assertion that Dr. DeWaters's request for documentation was disingenuous.  Plaintiff discusses the fact that Dr. DeWaters and Dr. Swallow were in the same room together at the time Dr. DeWaters sent this email.  (Doc. No. 80 at 56.)  While Plaintiff claims that this fact renders the circumstances surrounding the email questionable, the Court disagrees.  The Third Circuit has held that "summary judgment is essentially 'put up or shut up' time for the non-moving party: the non-moving party must rebut the motion with facts in the record and cannot rest solely on assertions made in the pleadings, legal memoranda, or oral argument."  See Berckeley Inv. Grp., Ltd. v. Colkitt, 455 F.3d 195, 201 (3d Cir. 2006).  Here, Plaintiff provides no citation to record

36

evidence supporting a reasonable factfinder's conclusion that Dr. DeWaters's presence in the same room as Dr. Swallow when she sent this email creates the inference that the email was contrived or in some way a "questionable" act so as to demonstrate pretext.

As to Plaintiff's next effort to demonstrate pretext, Plaintiff argues that, at the March CCC meeting, the CCC did not focus on the proper resident evaluations in deciding to terminate Plaintiff from the program.  (Doc. No. 80 at 36.)  Plaintiff does not point to any record evidence to support this contention.  Rather, Plaintiff's argument amounts to a disagreement with the CCC's assessment.  On this issue, the Third Circuit has given the Court clear guidance.  "To discredit the employer's proffered reason . . . the plaintiff cannot simply show that the employer's decision was wrong or mistaken . . . ."  Fuentes, 32 F.3d at 765.  Accordingly, the Court finds that Plaintiff's disagreement with the CCC's assessment of his skills and decision to terminate him does not cast sufficient doubt on Defendant's legitimate non-discriminatory performance-based rationale for terminating him.  Upon consideration of the evidence of record and construing all facts in the light most favorable to Plaintiff, the Court cannot conclude that this bare assertion, with no pertinent citation to record evidence, provides a reasonable factfinder any basis to disbelieve Defendant's contention that Plaintiff was terminated for performance-related reasons or believe that a discriminatory reason was more likely than not a motivating or determinative cause of Defendant's decision to terminate Plaintiff's employment.

Plaintiff's next attempt to adduce evidence of pretext focuses on Plaintiff's assertion that there is no record evidence showing that he assumed care for Patient #1.  The Court finds that the evidence of record reflects a genuine dispute of fact as to that question.  However, whether Plaintiff actually assumed care of Patient #1 is not material to the Court's pretext inquiry. Plaintiff argues that, at the time of the Patient #1 episode, "Dr. Snyder was in her office . . . and

she checked the patient charts." (Doc. No. 80 at 39.) Plaintiff asserts, "[i]t appears that Dr. Snyder made assumptions, based on hearsay, and conflicting communication [,] that Dr. Salcedo was responsible for Patient #1." (Id. at 40.) In the Court's view, the relevant question is—in evaluating Plaintiff and his potential risk to patient safety, did the decision makers at the CCC honestly believe that Plaintiff assumed care for a patient and fail to carry out his duties to notify his superiors and treat the patient? See Oliver v. Clinical Pracs. of Univ. of Pennsylvania, 921 F. Supp. 2d 434, 449 (E.D. Pa. 2013) (stating that "[i]n evaluating the employer's reasons, our focus is upon whether the reasons honestly motivated the decision at issue, not whether the reasons are factually accurate"). Accordingly, the Court finds that Plaintiff has failed to cite record evidence from which a reasonable factfinder could conclude that Defendant and its agents did not honestly believe that Plaintiff assumed care for Patient #1. In fact, Plaintiff has effectively conceded that Dr. Snyder, correctly or not, assumed that Plaintiff had undertaken responsibility for Patient #1. See (Doc. No. 80 at 40.) Because Plaintiff fails to point to record evidence to support the inference that Defendant and its agents did not genuinely believe that Plaintiff had assumed control for Patient #1, Plaintiff's argument in this regard is unavailing.

Further, Plaintiff attempts to demonstrate pretext by claiming that Dr. Swallow did not truly believe that he posed a risk to patient safety. (Doc. No. 80 at 37.) Plaintiff supports this argument by claiming that, after the alleged February 23, 2018 incident, Dr. Swallow spoke with Plaintiff's psychiatrist, Dr. Muñoz, and never discussed patient safety. (Id.) The Court finds that Plaintiff has not pointed to evidence of record suggesting that Dr. Swallow's failure to discuss patient safety with Dr. Muñoz creates an inference of discrimination on the part of Dr. Swallow. There are innumerable reasons why Dr. Swallow may not have discussed patient safety concerns

with Dr. Muñoz.[21]  Plaintiff's argument is, at best, purely speculative.  "[S]peculation and conjecture may not defeat a motion for summary judgment."  Wharton v. Danberg, 854 F.3d 234, 244 (3d Cir. 2017) (cleaned up).  Even considering the fact that Dr. Swallow failed to discuss patient safety with Dr. Muñoz in the light most favorable to the non-movant, a reasonable factfinder could not conclude that the failure to discuss a given subject at a given time suggests a discriminatory motive on the part of Defendant.

Next, Plaintiff attempts to demonstrate pretext by arguing that the failure of Defendant's agents to report the Patient #1 episode in the patient safety reporting system suggests that Defendant did not believe the event to be significant enough to justify Plaintiff's firing.  (Doc. No. 92 at 16.)  Plaintiff cites 40 P.S. § 1303.308(a), which requires that "[a] health care worker who reasonably believes that a serious event or incident has occurred shall report the serious event or incident according to the patient safety plan of the medical facility unless the health care worker knows that a report has already been made."  (Doc. No. 92 at 16 (citing 40 P.S. §1303.308(a))).  However, Plaintiff provides no record evidence to suggest that the failure to report the Patient #1 episode creates the inference that Defendant's employees did not think that the Patient #1 event was significant enough to justify Plaintiff's firing.  On the contrary, after the Patient #1 incident, Dr. Kogut removed Plaintiff from service and prevented him from working directly with patients.  (Doc. No. 102-1 at 1.)  The night of the Patient #1 episode, Dr. Snyder requested additional support from other faculty and cited the fact that "[Plaintiff]'s deficits are so significant" to justify her request.  (Id. at 2.)  Upon consideration of the evidence of record and

---

[21]  As an example, Dr. Swallow may not have discussed patient safety concerns with Dr. Muñoz because Dr. Muñoz was not employed by Defendant.  Dr. Swallow may also have felt that discussing patient safety with Plaintiff's psychiatrist would be inappropriate.  While the Court need not list each of Dr. Swallow's possible motives, Plaintiff provides only his own speculation in support of his position that Dr. Swallow's failure to discuss patient safety with Dr. Muñoz is suggestive of pretext.

construing all facts in the light most favorable to Plaintiff, the Court cannot conclude that the failure to report the Patient #1 episode in the patient safety reporting system provides a basis to disbelieve Defendant's contention that the episode caused several faculty members to believe that Plaintiff posed a risk to patient safety.

The Court also finds unavailing Plaintiff's contention that pretext can be demonstrated by the lack of record evidence supporting the proposition that he was unreachable while working clinical rotations.  (Doc. No. 80 at 42.)  Plaintiff cites the comments of several faculty members who believed Plaintiff had gone missing from shifts, but could not recall their sources, to support his contention.  (Id.)  The Court finds that the evidence of record may reflect a genuine dispute of fact with regard to the question of Plaintiff's absences.  However, the relevant inquiry is not whether Plaintiff was unavailable or absent during his assigned shifts but rather whether faculty members genuinely believed that Plaintiff was missing from his shifts.  See Oliver, 921 F. Supp. 2d at 449.  In Plaintiff's brief, he concedes that, at minimum, Dr. Marshall, Dr. Swallow, and Dr. Willer believed that he was absent during assigned shifts.  (Doc. No. 80 at 42–44.)  Because Plaintiff "cannot simply show that the employer's decision was wrong or mistaken," see Fuentes, 32 F.3d at 765, to carry his burden, the Court finds that there is no record evidence to support the inference that Defendant or its agents did not genuinely believe that Plaintiff's absenteeism was a relevant performance issue.  Accordingly, Plaintiff fails to point to evidence from which a reasonable factfinder could either disbelieve Defendant's articulated reasoning for terminating Plaintiff or believe that invidious discrimination was more likely than not a motivating or determinative cause of Plaintiff's termination.

Additionally, when undertaking the pretext inquiry, courts in this Circuit have widely recognized the "academic deference" doctrine.  See Hankins v. Temple Univ. (Health Scis. Ctr.),

829 F.2d 437, 443 (3d Cir. 1987) (stating that "[u]niversity faculties, however, must have the widest discretion in making judgments as to the academic performance of their students"); Parish, 373 F. Supp. 3d at 630 (denoting that "our Circuit has long recognized that, in the pretext inquiry, decisions made by university faculties, both in the medical field and otherwise, are entitled to heightened deference"); Sidique v. Univ. of Pittsburgh Dep't of Dermatology, No. 02-cv-00365, 2003 WL 22290334, at *4 (W.D. Pa. Oct. 3, 2003) (stating that "the pretext inquiry also must be informed by the Third Circuit Court's longstanding recognition that decisions made by university faculties, both in the medical field and otherwise, are entitled to heightened deference"); see also Molthan v. Temple Univ. of Com. Sys. of Higher Educ., 778 F.2d 955, 962 (3d Cir. 1985) (holding that "[f]or a plaintiff to succeed in carrying the burden of persuasion, the evidence as a whole must show more than a denial of tenure [or promotion] in the context of disagreement about the scholarly merits of the candidate's academic work, the candidate's teaching abilities or the academic needs of the department or university") (alterations in original).

Considering the deference traditionally afforded to medical residency programs in evaluating their residents, as well as the undisputed facts that support Defendant's legitimate non-discriminatory performance-based rationale for Plaintiff's termination, the Court finds nothing in the record rendering Defendant's proffered reason for Plaintiff's termination so weak, implausible, inconsistent, or contradictory, that a reasonable factfinder would find Defendant's proffered reasons "unworthy of credence." See Fuentes, 32 F.3d at 765. To the contrary, the exhibits attached to the parties' summary judgment filings show that several faculty members worked with Plaintiff, observed his performance, and reached the conclusion that he presented a safety risk to patients and was not sufficiently meeting program Milestones.

Accordingly, upon review of the evidence of record, and construing all facts in the light most favorable to Plaintiff, the Court concludes that Plaintiff has failed to point to objective evidence in the record from which a factfinder could reasonably either disbelieve Defendant's articulated reason for terminating Plaintiff's employment or believe that some invidious discriminatory reason was more likely than not a motivating or determinative cause of Defendant's action.  Rather, Plaintiff highlights factual disputes that are immaterial or engages in pure speculation without citation to the record to support his argument that Defendant's stated performance-based reason for terminating him was a pretext for disability discrimination. Accordingly, the Court will grant Defendant's motion for summary judgment as to Plaintiff's discrimination claims.  The Court next turns to Plaintiff's failure to accommodate claim.

### B.   Plaintiff's Failure to Accommodate Claims Under the ADA, RA, and PHRA[22]

Plaintiff argues that Defendant denied him reasonable accommodations that would have permitted him to succeed in the Medical Residency program.  (Doc. No. 1 at 2, 16–18.) Defendant contests this assertion and further argues that Plaintiff's failure to accommodate claims are time-barred under the relevant statute of limitations.  (Doc. No. 73-1 at 34–42.) Accordingly, the Court sets forth the legal standard pertaining to Defendant's statute of

---

[22]  Failure to accommodate claims under the ADA and RA are viewed as analogous causes of action.  See McDonald v. Com. of Pa., Dep't of Pub. Welfare, Polk Ctr., 62 F.3d 92, 95 (3d Cir. 1995)(stating that, in the context of a failure to accommodate claim, "[w]hether suit is filed under the Rehabilitation Act or under the Disabilities Act, the substantive standards for determining liability are the same").  Additionally, failure to accommodate claims under the PHRA are treated "as coextensive" with ADA claims.  See Capps v. Mondelez Glob., LLC, 847 F.3d 144, 150 n.1 (3d Cir. 2017) (holding that PHRA claims are reviewed under the standard of its federal statutory counterpart).  To that end, Plaintiff's failure to accommodate claims will be examined under the ADA framework.  See Kelly v. Drexel Univ., 94 F.3d 102, 105 (3d Cir. 1996).

limitations argument, as well as its argument on the merits of Plaintiff's failure to accommodate claims.

### 1.    Legal Standard Applicable to Failure to Accommodate Claims

#### a.    Merits

To prevail on a claim that an employer failed to accommodate a disabled employee, an employee must demonstrate that:

> (1) the employer knew about the employee's disability; (2) the employee requested accommodations or assistance for his or her disability; (3) the employer did not make a good faith effort to assist the employee in seeking accommodations; and (4) the employee could have been reasonably accommodated but for the employer's lack of good faith.

See Taylor, 184 F.3d at 319–20 (3d Cir. 1999); see also 42 U.S.C. § 12112 (5)(A).

As to the first and second elements, plaintiff must show that the employer knew "of both the disability and the employee's desire for accommodations for that disability." See id. at 313. Further, the Third Circuit in Taylor observed that these requests do not need to be in writing and the "employer cannot expect an employee to read its mind and know that he or she must specifically say 'I want reasonable accommodation.'" See id. (citation omitted). "What matters under the ADA are not formalisms about the manner of the request, but whether the employee or a representative for the employee provides the employer with enough information that, under the circumstances, the employer can be fairly said to know of both the disability and desire for an accommodation." Id.

Regarding the third element—requiring an employer to show good faith in engaging in the interactive process of trying to find reasonable accommodations—the Third Circuit has held:

> [e]mployers can show their good faith in a number of ways, such as taking steps like the following: meet with the employee who requests an accommodation, request information about the condition and what limitations the employee has, ask the employee what he or she specifically wants, show some sign of having

considered employee's request, and offer and discuss available alternatives when the request is too burdensome.

See Taylor, 184 F.3d at 317; see also Mengine v. Runyon, 114 F.3d 415, 420 (3d Cir. 1997) (holding that the Postal Service showed good faith when it exchanged letters with an employee that discussed potential vacancies that the employee could fill).

As it pertains to the fourth element of Plaintiff's failure to accommodate claim, when evaluating if an employee could have been reasonably accommodated but for the employer's lack of good faith, the plaintiff bears the initial burden of showing that the requested accommodation was possible.  See Turner v. Hershey Chocolate U.S., 440 F.3d 604, 614 (3d Cir. 2006) (holding that a plaintiff must first make a "facial showing that [the] proposed accommodation is possible").  "With respect to reasonable accommodations under the Rehabilitation Act, we have held that an employee can succeed only if he can demonstrate that a specific, reasonable accommodation would have allowed [him] to perform the essential functions of [his] job."  Taylor, 184 F.3d at 230.  Additionally, "employers are not required to modify the essential functions of a job in order to accommodate an employee."  See Donahue v. Consol. Rail Corp., 224 F.3d 226, 232 (3d Cir. 2000). "The term essential functions means the fundamental job duties of the employment position the individual with a disability holds or desires. The term essential functions does not include the marginal functions of the position."  29 C.F.R. § 1630.2(n)(1) (internal quotations omitted).  The regulation specifies that functions:

> (i) may be essential because the reason the position exists is to perform that function; (ii) may be essential because of the limited number of employees available among whom the performance of that job function can be distributed; and/or (iii) may be highly specialized so that the incumbent in the position is hired for his or her expertise or ability to perform the particular function.

See 29 C.F.R. § 1630.2(n)(2).  When evaluating if a job function is essential, courts are empowered to consider:

(i)     The employer's judgment as to which functions are essential;

(ii)    Written job descriptions prepared before advertising or interviewing applicants for the job;

(iii)   The amount of time spent on the job performing the function;

(iv)    The consequences of not requiring the incumbent to perform the function;

(v)     The terms of a collective bargaining agreement;

(vi)    The work experience of past incumbents in the job; and/or

(vii)   The current work experience of incumbents in similar jobs.

See 29 C.F.R. § 1630.2(n)(3).  Additionally, if an employee's proposed accommodations would be "clearly ineffective," see Walton v. Mental Health Ass'n. of Se. Pennsylvania, 168 F.3d 661, 670 (3d Cir. 1999), a court may grant summary judgment for an employer.

However, if the employee satisfies their initial burden of providing evidence showing that a reasonable accommodation is possible, the employer can then, as an affirmative defense, make a showing that the proposed accommodations "are unreasonable, or would cause an undue hardship [to] the employer."   See Turner, 440 F.3d at 614; see also Freeman v. Chertoff, 604 F. Supp. 2d 726, 734 (D.N.J. 2009) (describing the affirmative defense available to employers if a plaintiff/employee makes a facial showing as to the fourth element).  When assessing whether an accommodation would impose an undue hardship on the employer, courts can consider "[t]he impact of the accommodation upon the operation of the facility, including the impact on the ability of other employees to perform their duties and the impact on the facility's ability to conduct business."  See 29 C.F.R. § 1630.2(p)(v).

### b.    Applicable Statutes of Limitations

With regard to the statute of limitations for Plaintiff's ADA claim, courts have observed that "a plaintiff who initially seeks relief from a state or local agency has 300 days from the

alleged unlawful employment practice to file a charge of employment discrimination with the

EEOC." See Mercer v. Se. Pennsylvania Transit Auth., 26 F. Supp. 3d 432, 441 (E.D. Pa. 2014)

(citing 42 U.S.C. § 12117 and specifying that "the same procedures used to enforce Title VII of

the Civil Rights Act of 1964 apply to ADA employment discrimination claims"); see also 42

U.S.C. § 2000e-5(e)(1) (establishing the 300-day limitation period).  Additionally, "[a]n

employer's denial of a request for a reasonable accommodation is a discrete act of discrimination

that is an independently actionable unlawful employment practice under the ADA."  See Mercer,

26 F. Supp. 3d at 442.  Generally, in discrimination cases in this Circuit, when "a defendant's

conduct is part of a continuing practice, an action is timely so long as the last act evidencing the

continuing practice falls within the limitations period; in such an instance, the court will grant

relief for the earlier related acts that would otherwise be time barred."  See Cowell v. Palmer

Twp., 263 F.3d 286, 292 (3d Cir. 2001).  However, "[a] reasonable accommodation request is a

one-time occurrence rather than a continuing practice, and therefore, does not fit under the

continuing violations theory."  See Mercer v. SEPTA, 608 F. App'x 60, 63 (3d Cir. 2015)

(unpublished); [23] see also O'Connor v. City of Newark, 440 F.3d 125 (3d Cir. 2006) (finding that

continuing violations doctrine does not apply to retaliation claim since such a claim involved a

"discrete" act).

  In the RA context, while the substantive elements are analogous to the ADA, the statute

of limitations differs.  "[W]e borrow the statute of limitations of the most analogous state law

---

[23]  The Third Circuit has acknowledged that its unpublished opinions may nonetheless contain
persuasive reasoning.  See New Jersey, Dep't of Treasury, Div. of Inv. v. Fuld, 604 F.3d 816,
823 (3d Cir. 2010) (noting that an unpublished opinion is "as persuasive as its reasoning"); see
also Drinker v. Colonial Sch. Dist., 78 F.3d 859, 864 n.12 (3d Cir. 1996) (following an
unpublished opinion based on "factual similarity" and "look[ing] to the [unpublished opinion] as
a paradigm of the legal analysis").  Mercer features a nearly identical request for
accommodations and non-response from the employer, which gives the Third Circuit's rationale
particular salience as the Court examines whether Plaintiff's claims are time-barred.

cause of action" which in Pennsylvania is a personal injury claim.  See Disabled in Action of Pennsylvania v. Se. Pennsylvania Transp. Auth., 539 F.3d 199, 208 (3d Cir. 2008). Pennsylvania personal injury claims have a two-year statute of limitations.  See id.

Relative to the ADA and RA, the PHRA actually has a shorter 180-day statute of limitations.  See 43 Pa. C.S.A. 300 § 959(h).  Accordingly, as it pertains specifically to the ADA and PHRA, the Supreme Court of the United States delineated that "a party, therefore, must file a charge within either 180 or 300 days of the date of the act or lose the ability to recover for it." See Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 110 (2002).[24]

### 2.    Arguments of the Parties

#### a.    Statute of Limitations

Defendant argues that Plaintiff's claims are time-barred and accordingly must fail.  (Doc. No. 73-1 at 34.)  First, as to Plaintiff's ADA and PHRA claims, Defendant maintains that both the ADA and PHRA require "a claimant to file a charge of discrimination asserting a discrete act of discrimination within 300 days (ADA) or 180 days (PHRA)."  (Id.)  Defendant maintains that two dates are pertinent to the date of accrual inquiry: August 30, 2017, the date that Plaintiff allegedly gave Dr. Swallow a note requesting accommodations; and October 30, 2017, the date Plaintiff allegedly emailed Dr. Swallow to request a meeting to discuss the accommodations. (Id. at 34–35.)  Defendant claims and Plaintiff does not dispute that Plaintiff filed his EEOC and

---

[24]  For reference, the ADA and PHRA each have administrative exhaustion requirements, while the RA does not.  See Kern v. Phoenixville Hosp., LLC, 342 F.R.D. 324, 329 (E.D. Pa. 2022) (specifying that "[b]ecause the Rehabilitation Act . . . do[es] not have exhaustion requirements, the Court only addresses the exhaustion requirement for Plaintiff's ADA and PHRA claims"). Additionally, while Morgan does not specifically discuss the PHRA, the Supreme Court of the United States highlighted the requirement that the EEOC complaint must be filed within three hundred (300) days of the discrete act of discrimination to be timely, while every state in the country has a shorter one hundred and eighty (180) day filing period to make a charge of discrimination.  See Morgan, 536 U.S. at 102.

PHRC charge of discrimination on September 5, 2018.  (Id. at 35.)  It follows, according to

Defendant, that Plaintiff failed to file his EEOC charges within three hundred (300) days of

either accrual date; three hundred (300) days after August 30, 2017, is June 26, 2018, while three

hundred (300) days following October 30, 2017, is August 27, 2018.  (Id. at 40.)  Further,

Defendant maintains that Plaintiff failed to file his PHRC charge of discrimination in a timely

manner, because his September 5, 2018 PHRC charge was clearly outside of the one hundred

and eighty (180) day limitations period.  (Id. at 40–41.)

In response to Defendant's arguments regarding his ADA and PHRA claims, Plaintiff

asserts that the date of claim accrual is March 19, 2018.  (Doc. No. 92 at 5.)  Plaintiff alleges that

he received no definitive answer as to his accommodations requests of August 30, 2017 and

October 30, 2017.  (Id.)  Plaintiff further claims that he would have no reason to know that his

request for accommodations had been denied because he "had varying workweeks" and none of

Defendant's agents ever clearly offered him a firm denial as to his request.  (Id. at 5–6.)  Plaintiff

accordingly maintains that he did not have clear notice that he would not be accommodated until

March 19, 2018, the date that he received the termination letter from Defendant.  (Id. at 5.)

Defendant also argues that Plaintiff's RA claim is time-barred.  (Doc. No. 73-1 at 41.)

Defendant maintains that the RA, unlike the ADA, "does not require a Plaintiff to exhaust

administrative remedies by filing an administrative charge with the EEOC."  (Id.)  However,

Defendant asserts that, because courts apply the statute of limitations for the "most analogous

state law cause of action," this principle establishes a two-year statute of limitations here.  (Id.

(citing Disabled in Action of Pennsylvania, 539 F.3d at 208).)  Defendant asserts and Plaintiff

cannot contest that he filed the above-captioned action on December 23, 2019.  (Id. at 42.)

Accordingly, Defendant argues that, whether the Court views the date of accrual as August 30,

2017 or October 30, 2017, Plaintiff's RA claim was filed outside of the two-year window and is thus time-barred. (Id. at 41–42.) Similar to his position as to his ADA and PHRA claims, Plaintiff maintains that the accrual date is March 19, 2018 and thus his RA claim is also timely. (Doc. No. 92 at 5–6.)

### b.    Merits

Defendant argues first that Plaintiff is not a "qualified individual with a disability" under the ADA. (Doc. No. 73-1 at 42.) Defendant further maintains that, even if the Court finds that Plaintiff is a qualified individual with a disability, Defendant made a sufficient good faith effort to accommodate Plaintiff and Plaintiff cannot meet his burden to establish a specific reasonable accommodation that was possible. (Id.) In reference to the fourth element, Defendant argues that Plaintiff has not created a genuine dispute of material as to whether he could have been reasonably accommodated. (Doc. No. 73-1 at 42.) Defendant argues that, as set forth in the Resident Agreement, Plaintiff was required to "be physically present and able to perform the duties associated with their position . . ." and to "provide competent and compassionate patient care, and to work effectively as a member of the health care team" and "demonstrate competency in the clinical Milestones in order to remain in the residency program." (Id. at 46; Doc. No. 73-5). Defendant posits that when Plaintiff requested "less stressful rotations when possible" and "assignment to rotations which allow for adequate sleep and time off on the weekend when possible," these requests were unreasonable as a matter of law. (Doc. No. 73-1 at 47.) Defendant additionally argues that it never received such requests because Plaintiff never submitted them. (Id.)

As to the nature of the requested accommodations, Defendant cites Gaul v. Lucent Technologies in support of its position that a request for a less stressful work environment is not

reasonable because it is "amorphous" and would impose "extraordinary administrative burdens" on employers to achieve compliance.  (Doc. No. 80 at 47–48); see also Gaul v. Lucent Techs., Inc., 134 F.3d 576, 581 (3d Cir. 1998) (discussing how a proposed accommodation which involved monitoring employee stress levels was not reasonable as a matter of law).  Defendant argues that Plaintiff's requests for accommodation would impose a "wholly impractical obligation" on the employer, and accordingly fail to satisfy Plaintiff's burden to create a genuine dispute of material fact regarding whether Plaintiff requested reasonable accommodations that could have been implemented.  (Doc. No. 73-1 at 47–48 (citing Gaul, F.3d at 580–81 (holding that the costs of the proposed accommodation must not be disproportionate to the benefits that would be produced by granting it)).)  Since "the very practice of medicine by its very nature, involves stress" and the ACGME Program Requirements are clear about the demands and rigors of a job as a medical resident, Defendant maintains that the Court should find that Plaintiff's proposed accommodation would impose administrative costs far exceeding what Defendant should reasonably need to bear.  (Doc. No. 73-1 at 49–50.)

Defendant further argues that Plaintiff did not specifically request a reduced workweek until February 27, 2018.  (Id. at 51.)  Defendant asserts that this request—while more specific than the alleged earlier requests for less stressful rotations and assignment to shifts permitting more sleep—is still unreasonable as a matter of law.  (Id.)  Defendant cites the deposition testimony of Dr. DeWaters, who stated that "we wouldn't even be able to put [Plaintiff] on a rotation that has as few as 50 hours per week, and that would be an impossible request to meet, because even our very light rotations are usually 60 hours a week."  (Id.; Doc. No. 73-31 at 41, Tr. 148:8–148:25.)  Defendant argues that in determining whether an accommodation is reasonable, the Court should look at "[t]he impact of the accommodation upon the operation of

the facility, including the impact on the ability of other employees to perform their duties and the impact on the facility's ability to conduct business." (Doc. No. 73-1 at 52); see also 29 C.F.R. § 1630.2(p)(v).

Defendant also cites Foremayne v. Board of Community College Trustees, 956 F. Supp. 574, 578–79 (D. Md. 1996), in support of its position that requests to work fewer hours than the job requires are unreasonable. (Doc. No. 73-1 at 53.) In Foremayne, the plaintiff's doctor capped her at 30 hours per week when her job required her to work 37.5 hours. See id. at 578–79. Eventually, the plaintiff's doctor concluded that, even with flexible hours, plaintiff would be able to work only 30 hours per week, rather than the 37.5 hours required for her position. See id. The court in that case stated that "[i]t would be unreasonable as a matter of law if the Court were to require that defendant accommodate this substantially reduced schedule," and therefore "the Court conclude[d] that plaintiff [could not] sustain her burden of establishing that a reasonable accommodation by defendant would have enabled her to perform the essential functions of her job." See id. at 579. Finally, Defendant argues that the ADA does not require employers to excuse past performance deficiencies and misconduct, even if those deficiencies resulted from the employee's disability. (Doc. No. 73-1 at 54 (citing Lassiter v. Children's Hosp. of Philadelphia, 131 F. Supp. 3d 331, 350–51 (E.D. Pa. 2015)).)

In response, Plaintiff argues that he can make a facial showing of a failure to accommodate claim under the ADA, RA, and PHRA. First, Plaintiff claims that he disclosed his anxiety to the Chiefs, who subsequently discussed his potential accommodations before the program even began. (Doc. No. 80 at 45–46.) Plaintiff maintains that he is a "qualified individual with a disability" who can work in the residency training program "with or without reasonable accommodation" because he has received the requisite education and licensing. (Id.

51

at 46; Doc. No. 101-1 at 47.)  Plaintiff additionally states that his qualifications are bolstered by

his Milestone Evaluations, which "show him on par with his other PGY-1 residents through

December 2017, although he is slightly below average."  (Doc. Nos. 80 at 46; 80-2 at 62–64; 80-

2 at 66–89.)

Plaintiff presents a different version of events from the summer and fall of 2017

regarding his request for accommodations.  Plaintiff maintains that, on August 30, 2017, he gave

Dr. Swallow the accommodations request letter from Dr. Muñoz.  (Doc. No. 80 at 47.)  Plaintiff

further maintains that, on October 30, 2017, he requested a follow-up meeting with Dr. Swallow

about implementing the requested accommodations, but the meeting never happened.  (Id.)

Plaintiff points to the fact that the meeting never occurred and argues that, under the third

element of his failure to accommodate claim, Defendant did not make a good faith effort as

required by the statute.  (Id. at 48–49.)  In attempting to meet his burden of proof to show that

Defendant failed to engage in the interactive process of finding a reasonable accommodation, see

Taylor, 184 F.3d at 317, Plaintiff asserts four arguments.

First, Plaintiff attempts to demonstrate a lack of good faith engagement in the "interactive

reasonable accommodations process," noting that "Dr. Swallow knew Dr. Salcedo's treating

psychiatrist requested consideration of 'assignment to less stressful rotations when possible'"

and "assignment to rotations which allow for adequate sleep and time off on weekends where

possible."  (Doc. No. 80 at 49.)  Plaintiff maintains that, if Dr. Swallow had questions about what

these requests meant, "she never asked for any follow up specificity."  (Id.)  Next, Plaintiff

argues that his October 2017 requests to meet with Dr. Kogut and Dr. Swallow about the

accommodations were ignored.  (Id.)  Plaintiff further asserts that bad faith on the part of

Defendant can be inferred from the fact that Defendant placed him on a remediation plan and

implemented that plan "in a manner to depict [Plaintiff] as failing, not to assist him as a learner." (Id.)  Finally, Plaintiff argues that a lack of good faith engagement in the interactive accommodations process is evidenced by the fact that Dr. Swallow spoke to him in a patronizing and dismissive way when he brought up program guidelines.  (Id.)

As to whether Defendant engaged in a good faith effort to assist Plaintiff in seeking accommodations, Plaintiff not only claims that Defendant failed to engage in the interactive process in good faith, but also maintains that Defendant acted in bad faith to obstruct the process itself.  (Id. at 52.)  Plaintiff argues that a reasonable juror could infer bad faith for four reasons. First, Plaintiff maintains that bad faith can be inferred from Defendant's inaction in response to his initial accommodations request in August 2017.  (Id.)  Next, Plaintiff asserts that Dr. Swallow's January 23, 2018 email regarding remediation was actually an attempt to build a paper trail to justify failing him.  (Id. at 52–53.)  Third, Plaintiff maintains that Dr. Swallow received Dr. Snyder's February 23, 2018 email about the Patient #1 incident and never verified the information therein.  (Id. at 53.)  Finally, Plaintiff argues that Dr. Swallow lied to other faculty members about providing Plaintiff with reduced work hours.  (Id.)

As to the fourth element of Plaintiff's failure to accommodate claim—that Plaintiff could have been reasonably accommodated but for Defendant's lack of good faith—Plaintiff maintains that a jury could find his requests for reduced hours and less erratic shifts to be reasonable requests for accommodation.  (Id. at 50.)  Plaintiff also argues that Dr. Swallow herself admitted that Plaintiff had worked weeks with only 50 hours of scheduled work and thus such an accommodation must be reasonable.  (Id.; Doc. No. 80-4 at 62–63).  Plaintiff further maintains that the ACGME Program Requirements for internal medicine do not have a weekly hour requirement, citing his own expert, Dr. Warburton, who asserts that reduced work hours are not

"in conflict with the requirements of ACGME and the specialty board," and adds that, while a "50-hour-per-week cap may present logistic[al] challenge[s] for the residency program," these challenges can be overcome.  (Doc. No. 80 at 52; Doc. No. 92-4 at 13–14.)

Finally, in response to Defendant's argument that employers are not obligated to excuse past misconduct even if the misconduct was caused by the employee's disability, Plaintiff maintains that he never committed an act of professional misconduct before his February 27, 2018 request for a 50-hour per week limit on hours worked.  (Doc. No. 80 at 58.)  Plaintiff asserts that there is no proof that he was ever missing from his rotation on February 23, 2018, and that even if he was, residents are not required to be on the floor working one hundred percent of the time.  (Id. at 59.)  Plaintiff also argues that there is no record of him being absent from work for "many afternoons" and that he never skipped shifts to take naps.  (Id. at 61.)  Plaintiff further avers that there is "sufficient evidence for a jury to determine that [he] did not pose a safety risk to patients" because there is a mixed record on who had authority and responsibility for certain patients and their care plans during the spring 2018 semester.  (Id. at 68–73.)

### 3.     Whether Defendant is Entitled to Summary Judgment on Plaintiff's Failure to Accommodate Claims

#### a.     Statute of Limitations

First, the Court must determine if Defendant has demonstrated that Plaintiff's ADA, RA, and PHRA claims are time-barred under Morgan.  See Morgan, 536 U.S. 101, 113, (2002) (describing the period for filing after the discrete discriminatory act occurs).  In undertaking this analysis, the Court must bear in mind the Third Circuit's holding that an "accommodation request is a one-time occurrence rather than a continuing practice, and therefore, does not fit under the continuing violations theory."  See Mercer, 608 F. App'x at 63.  The relevant inquiry for the purposes of tolling the statute of limitations is when Plaintiff's request for

accommodations was made and denied by Defendant.  See id.  In undertaking the pertinent

analysis, the Court must draw all inferences in favor of the non-movant in determining if

Plaintiff has presented evidence sufficient to support an inference that a genuine dispute of

material facts exists with regard to the date of claim accrual.  See Nicini v. Morra, 212 F.3d 798,

806 (3d Cir. 2000).

In determining whether there is a genuine dispute of material fact on this point, the Court

finds that, in accordance with how courts in the Third Circuit handle this inquiry, no reasonable

factfinder could infer from the evidence of record that Plaintiff's claim accrued on the day he

received his termination letter, March 19, 2018, as he maintains.  See Aubrey v. City of

Bethlehem, Fire Dep't, 466 F. App'x 88, 92 (3d Cir. 2012) (unpublished)[25] (specifying that

"[t]his Court finds no precedent to suggest that the date of termination marks the tolling of the

statute of limitations in an ADA case, absent an assertion that the termination itself was the

discriminatory act"); see also Mercer, 608 F. App'x at 63–64 (holding that the plaintiff's failure

to point to specific incidents of his employer denying his request for accommodations besides

forcing him to work without those accommodations does not restart the clock for the purposes of

claim accrual); Mikula v. Allegheny County, 583 F.3d 181, 186 (3d Cir. 2009) (holding that in

the context of Title VII pay discrimination, "the failure to answer a request for a raise qualifies as

---

[25]  The Third Circuit has acknowledged that its unpublished opinions may contain persuasive
reasoning.  See Fuld, 604 F.3d at 823 (noting that an unpublished opinion is "as persuasive as its
reasoning"); see also Drinker, 78 F.3d at 864 n.12 (following an unpublished opinion based on
"factual similarity").  The plaintiff in Aubrey maintained that his claimed accrued on the day he
was terminated, although his termination was not the predicate for his failure to accommodate
claim.  See Aubrey, F. App'x at 92.  The factual similarities to the present case, wherein Plaintiff
claims that his termination date should be the accrual date, despite the fact that his termination
does not provide the basis for his failure to accommodate claims, makes the Third Circuit's
reasoning in this case persuasive to the Court.

a compensation decision because the result is the same as if the request had been explicitly denied").[26]

Plaintiff names only March 19, 2018—the date he received his termination letter—as the accrual date for his ADA, RA, and PHRA claims.  (Doc. No. 80 at 62.)  However, in so doing, Plaintiff does not cite any authority for the proposition that the Court should disregard his accommodation requests of August 30, 2017 and October 30, 2017.  Plaintiff instead argues that, because Defendant never explicitly responded to his earlier accommodation requests, it necessarily follows that the August 2017 and October 2017 dates are not relevant to the claim accrual inquiry.  (Id. at 63.)  Plaintiff's argument is based on the premise that, without a definitive response from Defendant as to his request, he could not have known that his request had been denied.  See (id.).

The Court finds Plaintiff's argument unavailing.  In particular, while the Court is not bound by the Third Circuit's unpublished opinion in Mercer, its factual similarity to the above-captioned action guides the Court's evaluation of Plaintiff's arguments.  In Mercer, a plaintiff employed by SEPTA presented his employers with a doctor's note in June of 2010 "stating that overheated conditions could exacerbate [his] hypertensive condition."  See Mercer, 608 F. App'x at 63.  SEPTA forced the plaintiff to continue working on hot buses and never formally informed Plaintiff that he would not receive any accommodations.  See id. at 62.  The plaintiff filed his EEOC charge on July 8, 2011.  See id. at 63.  The Third Circuit affirmed the District Court's decision to look only at the independently actionable events that occurred in the 300 days prior to

---

[26]  While Mikula is a case regarding Title VII of the Civil Rights Act, not the ADA, the Third Circuit observed that "[i]n the context of employment discrimination, the ADA, ADEA and Title VII all serve the same purpose—to prohibit discrimination in employment against members of certain classes.  Therefore, it follows that the methods and manner of proof under one statute should inform the standards under the others as well."  See Newman v. GHS Osteopathic, Inc., Parkview Hosp. Div., 60 F.3d 153, 157 (3d Cir. 1995).

July 8, 2011 to determine whether the plaintiff had a timely ADA claim.  See id.  In finding that

the plaintiff's ADA claim was not timely, the Third Circuit explained that:

> Mercer argues that while his formal requests for accommodation, through his
> doctor's notes, took place before September 11, he continued to request
> accommodation throughout the summer of 2010, and SEPTA continued to deny
> this request by making him work on overheated buses through October 2010.  He
> argues that these incidents should restart the clock, under a continuing violations
> theory.  The District Court correctly rejected this argument for two reasons: (1)
> Mercer's requests for accommodation, assuming they were denied, were not
> continuing violations because the denial of a reasonable accommodation is a
> discrete event, and (2) Mercer had not demonstrated an independently recoverable
> denial of a requested accommodation after September 11, 2010.

See id.  Mercer's holding clarifies that employers do not need to issue a formal denial of an

accommodation request for an employee to assume that their request for an accommodation has

been denied.  See id.  This aligns with the principle, articulated by the Third Circuit in Mikula,

that "the failure to answer a request for a raise qualifies as a compensation decision because the

result is the same as if the request had been explicitly denied."  See Mikula, 583 F.3d at 186.  A

functional denial—when an employer fails to make an accommodation but never definitively

issues a direct rejection—is not legally distinct from a formal denial communicated directly from

employer to employee.  See id.; see also Oden v. SEPTA, 137 F. Supp. 3d 778, 786–87 (E.D. Pa.

2015), aff'd, 671 F. App'x 859 (3d Cir. 2016) (holding that an employer ignoring an

accommodations request is tantamount to denial).  The Court has not found, nor does Plaintiff

cite to any cases supporting a contrary finding on this issue.  Accordingly, the Court concludes

that Plaintiff cannot point to any record evidence establishing a genuine dispute of material fact

as to the accrual date of his ADA/RA/PHRA claims; August 30, 2017 and October 30, 2017 are

the two dates that Plaintiff made a concerted effort to request accommodations.  When Plaintiff

was forced to continue working without receiving those requested accommodations, the August

and October 2017 requests were functionally denied.  Importantly, Mercer reiterates the premise

that renewing old accommodation requests does not restart the clock for the purposes of claim accrual.  See Mercer, 608 F. App'x at 63.  Accordingly, any accommodation request renewal by Plaintiff after October 30, 2017, would not change the accrual date for his claim.

The Court's finding on this question is only further supported by the Third Circuit's unpublished opinion in Aubrey.  In that case, the plaintiff, a firefighter diagnosed with Post Traumatic Stress Disorder (PTSD), alleged discrimination under the ADA, also claiming that his employer failed to promote him and provide him reasonable accommodations that would have permitted him to continue working.  See Aubrey, F. App'x at 90.  In affirming the district court's decision that the plaintiff's claim was time-barred, the Third Circuit held that:

> [t]his Court finds no precedent to suggest that the date of termination marks the tolling of the statute of limitations in an ADA case, absent an assertion that the termination itself was the discriminatory act.  The amended complaint makes no such assertion.  Instead, it focuses on the failure to promote Aubrey to fire inspector and an alleged failure to accommodate.

See id. at 92.  In considering Aubrey for its persuasive value, the Court finds that here the basis for Plaintiff's failure to accommodate claims is not his termination from the Residency Program, but rather Defendant's alleged failure to provide him with accommodations that would have permitted him to continue working as a resident intern.

In considering Mercer and Aubrey, as well as the arguments of the parties, the Court is unpersuaded by Plaintiff's argument that the March 19, 2018 termination date is the proper claim accrual date.  There is no genuine dispute of material fact that: (1) Plaintiff twice requested accommodations in the fall of 2017; (2) Plaintiff's requested accommodations were never implemented; (3) Plaintiff's request was never formally denied; and (4) Plaintiff's failure to receive these accommodations, not his termination, form the basis of his failure to accommodate claims.  Plaintiff provides no record or case citations which would permit a reasonable factfinder

to conclude that March 19, 2018 is the accrual date for his claim.  No reasonable factfinder could conclude, with eight months passing with limited changes to his schedule and continued weekend shifts, that Plaintiff was somehow still unaware at the time of his firing that he would not receive a different schedule or weekends off.  As Mercer made clear, when a request is made of an employer and the employer's response is to simply force the employee to continue to work without the accommodation, the discrete act of discrimination is not ongoing or renewable, but rather must be determined by the factual timeline.  See Mercer, 608 F. App'x at 63.  The plaintiff in Mercer was hospitalized as a result of his employer continuously forcing him to work without accommodations.  See id. at 62.  The Third Circuit considered plaintiff's hospitalization the last actionable event, replacing the date the plaintiff made his accommodations request as the pertinent date for the claim accrual calculation.  See id. at 63.  In contrast, here Plaintiff can point to no events after October 30, 2017 to serve as the actionable date.  Accordingly, the Court considers whether Plaintiff's August 30, 2017 and October 30, 2017 requests are timely for the purposes of Plaintiff's asserted ADA, RA, and PHRA claims.

As noted above, under the ADA, a plaintiff must file a complaint with the EEOC within three hundred (300) days of the discrete act of employment discrimination for his claim to be considered timely.  See Simko v. United States Steel Corp, 992 F.3d 198, 204 (3d Cir. 2021); see also 42 U.S.C. § 2000e-5(e)(1).  Three hundred (300) days from Plaintiff's first purported accrual date—August 30, 2017—is June 26, 2018.  Three hundred (300) days from Plaintiff's second purported accrual date—October 30, 2017—is August 26, 2018.  Defendant claims and Plaintiff does not dispute that Plaintiff filed his EEOC and PHRC charges of discrimination on September 5, 2018.  (Doc. Nos. 73-1 at 35; 80-6 ¶ 143.)  Accordingly, any failure to accommodate claim under the ADA, based on the August 30, 2017 and October 30, 2017 dates,

is untimely.  Also, because "it is well accepted that certain Title VII case-law is relevant to ADA litigation," see Clarke v. Whitney, 907 F. Supp. 893, 895 n.1 (E.D. Pa. 1995), the Court is further persuaded by the Third Circuit's holding in Mikula that ignoring a request is tantamount to a denial of said request.  See Mikula, 583 F.3d at 186; Oden, 137 F.Supp. 3d at 786–87 (holding that an employee's accommodations request was functionally denied at the time of request when the employee never received a response); see also Newman, 60 F.3d at 157 (holding that Title VII caselaw can be instructive in evaluating ADA claims).  When Defendant's agents never responded to Plaintiff's August 30, 2017 and October 30, 2017 requests for accommodations, the Court finds that, as in Mikula, these are functional denials of those requests.  Accordingly, because Plaintiff did not file his EEOC complaint within three hundred (300) days of the discrete act of discrimination, even assuming that the Court finds the later October 30, 2017 date to be the appropriate accrual date, the Court will grant Defendant's motion for summary judgment as to Defendant's failure to accommodate claim under the ADA.

With regard to Plaintiff's RA claim, the Court agrees with the parties that a two-year statute of limitations is appropriate.  (Doc. Nos. 73-1 at 42–43; 80 at 48.); see also Disabled in Action of Pennsylvania, 539 F.3d at 208 (holding that "[n]either Title II of the ADA nor Section 504 of the RA includes an express statute of limitations").  The Court also agrees that the RA does not require the exhaustion of administrative remedies.  See Ott v. Maryland Dep't of Pub. Safety & Corr. Servs., 909 F.3d 655, 661 (4th Cir. 2018).  Plaintiff filed this action on December 23, 2019, more than two years after August 30, 2017 and October 30, 2017.  Because Plaintiff has cited no authority or record evidence that would permit a reasonable finder of fact to conclude that March 19, 2018 is the date of accrual, the Court finds that Plaintiff's failure to

accommodate claim under the RA is untimely.  The Court will grant Defendant's motion for summary judgment on this claim.

Finally, the Court concludes that Plaintiff's failure to accommodate claim under the PHRA is untimely as well.  The PHRA has a one hundred and eighty (180) day statute of limitations.  See 43 Pa. C.S.A. § 959(h).  As discussed above, Plaintiff has failed to cite record evidence to create a genuine dispute of material fact as to the date of claim accrual.  The Court finds that either August 30, 2017 or October 30, 2017 are the relevant dates for claim accrual purposes.  Plaintiff filed his complaint with the PHRC on September 5, 2018, the same day he filed his EEOC complaint.  Because the Court already concluded that Plaintiff's claim is untimely under its three hundred (300) day statute of limitations, see supra at 58–60, the Court similarly holds that Plaintiff's PHRA claim, filed more than 180 days after either of the two possible claim accrual dates, is also untimely.  Accordingly, the Court will grant Defendant's motion for summary judgment as to Plaintiff's PHRA claim.

However, even if the Court assumes arguendo that Plaintiff's claims are timely, the Court concludes that, as discussed more fully below, no reasonable factfinder, viewing the evidence in the light most favorable to Plaintiff, could find that the record evidence reflects a genuine dispute of material fact as to Plaintiff's required facial showing that Defendant failed to accommodate his disability.

### b.    Merits of Plaintiff's Failure to Accommodate Claims

As an initial matter, the Court need not resolve the parties' dispute regarding whether Plaintiff has adequately demonstrated the first three elements of his failure to accommodate claims.  Even assuming that he has, and upon review of the briefs of the parties and the evidence of record and construing all facts in the light most favorable to Plaintiff, the non-moving party,

the Court concludes that Plaintiff has failed to create a genuine dispute of material fact as to the fourth element, or that Plaintiff could have been reasonably accommodated but for Defendant's lack of good faith.  See Taylor, 184 F.3d at 319–20.  As to the fourth element of Plaintiff's case, Plaintiff argues that he could have been reasonably accommodated for several reasons.  The Court discusses each below.

First, Plaintiff maintains that his August 30, 2017 request, where he allegedly presented Dr. Swallow with a note from his psychiatrist Dr. Muñoz requesting "less stressful rotations when possible" and "assignment to rotations which allow for adequate sleep and time off on the weekend when possible," was a valid and reasonable request.  (Doc. Nos. 80 at 47–49; 92 at 7.)  The Court finds that a request for "less stressful rotations" is "amorphous" and would impose "extraordinary administrative burdens" on employers to achieve compliance.  See Gaul, 134 F.3d at 581.  No accommodation that would depend on an employee's "stress levels at any given moment" can be considered reasonable.  See id.  Plaintiff appears to acknowledge the abstract nature of his own request, noting in his Sur Reply Brief that "[t]his request for less stressful rotations allowing [him] to sleep and be off on the weekends would have been clarified during the interactive process had HMC responded in good faith to the requests."  (Doc. No. 92 at 8.)  This statement contradicts language from the prior page of Plaintiff's brief, wherein he states that it "is clear by reviewing the note that the reference to less stressful rotations is modified by the description phrases that follow, 'rotations that allow for adequate sleep' and 'time off on the weekends.'"  (Id. at 7.)  Regardless, the Court finds that no reasonable factfinder could conclude that Plaintiff's August 30, 2017 proposed accommodation was reasonable and, if offered, would have allowed him to perform the essential functions of his job.

Next, Plaintiff attempts to demonstrate that he could have been reasonably accommodated by asserting that a jury could view his submission to Defendant of Dr. Muñoz's note recommending a maximum 50-hour work week as a timely and "reasonable accommodation for a teaching hospital to give a preliminary intern learner with a mental health condition." (Doc. Nos. 80 at 51; 92 at 7.) The Court finds that this argument is insufficient to create a genuine dispute of material fact as to this element. First, Plaintiff did not request a fifty-hour work week until February 26, 2018. By the time of this request, Plaintiff had: experienced a hallucination episode; been placed on a remediation plan; been placed on medical leave; struggled to progress forward in the remediation plan well into January and February of 2018; and been suspended from service due to the Patient #1 episode. Defendant points out, and the Court agrees, that reasonable accommodations are "prospective" and employers "are not required to excuse past misconduct even if it is the result of the individual's disability." See Lassiter, 131 F. Supp. at 351 (holding that this premise "is well settled" in circuit courts across the country); see also Heard v. St. Luke's Hosp., No. 08-cv-05494, 2009 WL 3081513, at *5 (E.D. Pa. Sept. 28, 2009) (stating that "[m]any courts throughout the country have held that an employer is not obligated to accommodate an employee whom it has decided to discharge for misconduct, even if the employee subsequently cites some medical condition or disability as the supposed cause of the prior misconduct triggering the discharge"). Accordingly, even drawing all inferences in Plaintiff's favor, the Court finds that no reasonable factfinder could conclude that Plaintiff's February request was reasonable in light of the events that preceded the request.

Plaintiff's next attempt to show that he could have been reasonably accommodated includes a citation to Dr. Warburton's expert report, wherein Dr. Warburton stated that "the 50-hour-per-week-cap may present logistic challenge[s] for the residency program, but this can be

overcome." (Doc. No. 80 at 52.) The Court finds that Plaintiff has failed to point to record evidence suggesting that a theoretically possible accommodation is necessarily reasonable. Dr. Warburton acknowledged that a 50-hour working cap "may present logistic challenge[s]." (Doc. No. 92-4 at 13.) Further, Dr. Warburton also stated that a "program would accomplish [a 50-hour work week for a resident] by changing the rotation schedule, shortening the duty period, and/or reducing patient census." (Id. at 13–14.) In other words, such an accommodation may be theoretically possible but still unreasonable or burdensome to the employer. The Court concludes that Dr. Warburton's report fails to demonstrate a genuine dispute of material fact as to the question of whether reasonable accommodations could have been implemented to allow Plaintiff to perform his job duties.

Finally, Plaintiff's last attempt to demonstrate that he could have been reasonably accommodated features as assertion that he never committed misconduct on the job and that his request for accommodation originated on August 30, 2017, not on February 26, 2018, the day he presented Defendant with Dr. Muñoz's note. (Doc. No. 80 at 58.) Plaintiff maintains that: he was never absent from his shifts; he did not assume care of Patient #1; he never took naps in lieu of working; and his request to remove himself from service cannot be classified as misconduct. (Doc. No. 80 at 58–61.) While there are genuine factual disputes as to these points, as discussed more fully supra, their resolution does not change the analysis in determining whether Plaintiff could have been reasonably accommodated. Accordingly, the Court finds that Plaintiff's assertion fails to establish a genuine dispute of material fact from which a reasonable factfinder could conclude that Plaintiff presented Defendant with reasonable accommodations that could have been successfully implemented.

Additionally, even if the Court assumes that Plaintiff did not commit misconduct, the only accommodation requests that he made in the fall of 2017 were "amorphous" and would impose "extraordinary administrative burdens" on Defendants to achieve compliance.  See Gaul, 134 F.3d at 581.  As stated above, a request for "less stressful rotations" is unreasonable as a matter of law.  See id.  Given the nature of medical residency programs and the reality that future medical professionals are learning the skills needed to undertake their vitally important duties, the workplace is bound to be stressful.  The burden cannot be placed on an employer to prioritize mitigating the stress of one employee over mitigating the stress of another.  See id.

To summarize, Plaintiff has failed to point to record evidence that would allow a reasonable finder of fact to conclude that he proposed a "a specific, reasonable accommodation [that] would have allowed [him] to perform the essential functions of [his] job."  See Taylor, 184 F.3d at 306.  Plaintiff's August 30, 2017 request was neither specific nor reasonable. While Plaintiff's February 27, 2018 request was sufficiently specific (in asking for a 50-hour limit on shift hours per week), it was unreasonable.  Accordingly, Plaintiff has failed to demonstrate that Defendant failed to accommodate his disability under the ADA and the Court will grant Defendant's motion for summary judgment on Plaintiff's failure to accommodate claims.

## IV.   CONCLUSION

For all of the foregoing reasons, the Court will grant Defendant's motion for summary judgment in its entirety.  An appropriate Order follows.

s/ Yvette Kane
Yvette Kane, District Judge
United States District Court
Middle District of Pennsylvania